**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 0:22-cv-61029-RAR**

**LATOYA RATLIEFF**,

     Plaintiff,

vs.

**CITY OF FORT LAUDERDALE,
FLORIDA**, a Municipal Government;
**ELIEZER RAMOS**, individually; **PAUL
CRISTAFARO**, individually; **STEVE
GREENLAW**, individually; **AVERY
FIGUERAS**, individually; **DOUGLAS
MACDOUGHALL**, individually;
**ROBERT DIETRICH**, individually;
**JOHN DOE 1**, individually; **JOHN
DOE 2**, individually; and **JOHN DOE
3**, individually,

     Defendants.

_____/

**FIRST AMENDED COMPLAINT**

This federal civil rights and state law tort action arises from the unlawful and unjustified police shooting of an unarmed and defenseless Latoya Ratlieff on May 31, 2020, during her peaceful participation in a public demonstration at the "George Floyd Demonstrations" in Fort Lauderdale, Florida. The official police response left Ms. Ratlieff seriously and permanently injured from a police shooting to her face, causing life-impacting eye damage, neurological injuries, and other directly attributable physical and emotional trauma. Her unjustified assault by law enforcement and her ensuing injuries are the direct and proximate result of the decision and a series of decisions by the Fort Lauderdale Police Department and its police officers, including both named and still-unidentified officers, to unlawfully disperse peaceful demonstrators using chemical, less-than-lethal munitions, and lethal force in violation of Latoya Ratlieff's valid and lawful exercise of free speech rights protected and guaranteed by the United States Constitution, the Florida Constitution, and the laws and

regulations of the United States and the State of Florida.

## JURISDICTION

1.      The claims asserted arise pursuant to 42 U.S.C. §§ 1983 and 1988, the First Amendment, Fourth Amendment, and Fourteenth Amendment to the United States Constitution, and the Constitution and laws of the State of Florida. This Court has jurisdiction to hear all claims.

2.      This Court has original jurisdiction over claims brought pursuant to 42 U.S.C. § 1983 and concurrent subject matter jurisdiction over claims brought pursuant to the Constitution and laws of the State of Florida. Damages exceed $50,000.

3.      Venue is proper in Broward County, Florida because it is where the events complained of occurred, where defendant City of Fort Lauderdale is headquartered, and where the named and unidentified individual defendants work or undertook the actions that are the subject of this complaint.

4.      Plaintiff Latoya Ratlieff ("Ms. Ratlieff" or "Ratlieff" or "Latoya") performed all conditions precedent, in accordance with §768.28(6), Florida Statutes, before bringing this action. All conditions precedent have otherwise occurred, been performed, been met, been waived, would be futile, or are otherwise inapplicable.

## PARTIES

5.      Latoya Ratlieff was, at the time of the actions described in the complaint, a resident of Palm Beach County, Florida, and a citizen of the United States of America and the State of Florida.

6.      Ms. Ratlieff is the great niece of Fannie Lou Hamer, an American voting and women's rights activist and civil rights icon, a community organizer, and a leader of the civil rights movement in the 1960s and 1970s. From her infancy, Ms. Ratlieff was encouraged to speak out peacefully against injustice and to never be silent in the face of oppression, just as her great-aunt, Ms. Hamer, did. Through civil rights pioneer Fannie Lou Hamer, Ms. Ratlieff learned

at an early age the power of organized community gatherings, peaceful in nature, designed to speak to the powerful, governmental institutions, and the favored about the need to improve society and implement social justice reforms.

7.      At all relevant times, defendant City of Fort Lauderdale ("City") is and was a duly organized municipal government and public entity existing under the laws of the State of Florida. At all relevant times, City was the employer of defendants Eliezer Ramos, Douglas MacDoughall, Robert Dietrich, Paul Cristafaro, Steve Greenlaw, Avery Figueras, and John Does 1-3. The Fort Lauderdale Police Department ("FLPD") is a Department within the City.

8.      At all relevant times, defendant Eliezer Ramos ("Ramos") was a duly authorized employee of the City of Fort Lauderdale and the Fort Lauderdale Police Department. At the times relevant to the conduct described in this complaint, Ramos was a licensed police officer within the State of Florida. Ramos is a citizen of the State of Florida residing in Broward County and is over the age of 18.

9.      At all relevant times, defendant Sergeant Paul Cristafaro ("Cristafaro") was a duly authorized employee of the City of Fort Lauderdale and the Fort Lauderdale Police Department and a licensed police officer within the State of Florida. Cristafaro is a citizen of the State of Florida and is over the age of 18. On information and belief, he resides in Broward County, Florida.

10.     At all relevant times, defendant Assistant Chief Douglas MacDoughall ("MacDoughall") was a duly authorized employee of the City of Fort Lauderdale and the Fort Lauderdale Police Department and a licensed police officer within the State of Florida. MacDoughall is a citizen of the State of Florida and is over the age of 18. On information and belief, he resides in Broward County, Florida.

11.     At all relevant times, defendant Captain Robert Dietrich ("Dietrich") was a duly authorized employee of the City of Fort Lauderdale and the Fort Lauderdale Police Department and a licensed police officer within the State of Florida. Dietrich is a citizen of the State of Florida and is over the age of 18. On

information and belief, he resides in Broward County, Florida.

12.     At all relevant times, defendant Captain Steve Greenlaw ("Greenlaw") was a duly authorized employee of the City of Fort Lauderdale and the Fort Lauderdale Police Department and a licensed police officer within the State of Florida. Greenlaw is a citizen of the State of Florida and is over the age of 18. On information and belief, he resides in Broward County, Florida.

13.     At all relevant times, defendant Lieutenant Avery Figueras ("Figueras") was a duly authorized employee of the City of Fort Lauderdale and the Fort Lauderdale Police Department and a licensed police officer within the State of Florida. On day in question, Figueras was S.W.A.T. Commander. Figueras is a citizen of the State of Florida and is over the age of 18. On information and belief, he resides in Broward County, Florida.

14.     At all relevant times, defendants John Does 1-3 were duly authorized employees of the City. John Does 1-3 are citizens of the State of Florida residing in Broward County and are over the age of 18.

15.     The causes of actions contained in this complaint accrued in Broward County, in the Southern District of Florida.

## RELEVANT FACTS COMMON TO ALL COUNTS

16.     The murder of George Floyd, captured on video and seen by millions around the world, encouraged countless law-abiding citizens and residents from every corner and region of the United States (and even more worldwide) to commence peaceful public demonstrations to demand meaningful, impacting change, social justice, and a collective determination that Black lives matter. During the time of the global pandemic of COVID-19, groups of peaceful, law abiding, constitutionally enabled citizens gathered throughout the United States, including in Fort Lauderdale, Florida, to demonstrate against the brutality and systemic injustices perpetrated by law enforcement officers against Black people and people of color.

17.     This action arises because of the FLPD's decision to disperse peaceful demonstrators with chemical, less-then-lethal munitions, and lethal

force without warning or lawful justification.

## I.     Weapons and Rounds Used.

18.     Ms. Ratlieff and other peaceful demonstrators were tear gassed and shot at by FLPD officers, including the individual defendants, while they peacefully and legally assembled and demonstrated against police brutality occurring in the United States.

### A.     Riot Control Agent.

19.     Euphemistically labeled as "riot control agents," "tear gas" consists of chemical compounds that temporarily make people unable to function by causing substantial irritation to the eyes, mouth, throat, lungs, and skin.[1]

20.     On May 31, 2020, FLPD officers deployed riot control agents on peaceful, law-abiding demonstrators gathered in the City of Fort Lauderdale.

21.     When the City deployed these agents, it and the FLPD, including the individual defendants named in the complaint, knew or reasonably should have known the agents would temporarily incapacitate and immobilize the target of the tear gas and any person in the vicinity, whether targeted or not. The City and FLPD further knew the deployment of tear gas would restrict the free movement of gathered participants.

22.     FLPD officials knew that launching chemical munitions cannisters from 40mm devices could and would injure persons when the cannisters hit a person in the head, face, or other body parts.

23.     Vendors of chemical munitions and riot control agents market them as aerosols containing ingredients formulated to provide a reliable means to incapacitate targets and others in the vicinity.

24.     An "OC chemical munition," such as pepper spray, is one such type of riot control agent. The active ingredient in pepper spray is oleoresin capsicum

---

[1]Centers for Disease Control and Prevention, *Facts About Riot Control Agents Interim document* (Last Accessed Aug. 2, 2021), https://emergency.cdc.gov/agent/riotcontrol/factsheet.asp.

(OC), an oily resin plant extract. The spray is intended to cause a severe burning sensation in the eyes, nose, and mouth. Contact with OC particles incapacitates subjects by causing an almost immediate burning of the skin, and a burning, tearing, and swelling of the eyes. Exposure to the OC can cause severe blepharospasm (twitching or spasmodic contraction) of the eyes and even involuntary closing of the eyes.[2]

25.     When an OC agent is inhaled, the respiratory tract is inflamed, resulting in a swelling of the mucous membranes lining the breathing passages, temporarily restricting breathing to short, shallow breaths.

26.     The OC agent further causes a constriction of the airway. When inhaled, the inhalation causes coughing and shortness of breath. This, in turn, causes a gagging reflex and gasping for breath.

27.     A "CS chemical munition" is another type of chemical munition riot control agent. Exposure to a CS chemical agent causes a burning sensation and tearing of the eyes to the extent that the subject cannot keep their eyes open, and a burning irritation of the mucous membranes of the nose, mouth, and throat, resulting in profuse coughing, nasal mucus discharge, disorientation, and breathing difficulty, partially incapacitating the subject.

28.     Tear gas also causes respiratory arrest, vomiting, and allergic reactions. It can permanently damage the eyes, cause asthma symptoms, and result in traumatic brain injury ("TBI").[3] It can also have adverse effect on

---

[2]David K. DuBay, Director of Research, Defense Technology Corporation of America, Casper Wyoming. Rusty E. Rush, Associate Director of Toxicology, Springborn Laboratories, Spencerville, Ohio, *Aerodynamic Particle Size Analysis Of First Defense® Pepper Spray* (2003), https://www.defense-technology.com/wp-content/uploads/2020/06/aerodynamic-particle-size-analysis-062520.pdf.

[3]Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/health- shots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control- agents.

pregnant people and fetuses.[4]

29.     Riot control agents are banned in warfare.[5]

**B.     Impact Weapons Designed to Harm.**

30.     FLPD also deployed kinetic impact projectiles (KIPs). Kinetic impact projectiles have a larger surface area than other ammunition, and take unpredictable flight paths when deployed, thus reducing accuracy.[6] The unreliability of KIPs is so well understood that FLPD policy prescribes the minimal standard of accuracy for KIPs as only twelve inches.

31.     KIPs are widely known to cause contusions, abrasions, and hematomas.[7] Blunt impact from KIPs may cause internal injuries.[8]

32.     Fatalities occur when KIPs strike a person's head, neck, or

---

[4]Chemical Irritants, Physicians for Human Rights, https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheets_Chemical_Irritants.pdf.

[5] Art. 1, § 5, Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, opened for signature Jan. 13, 1992, S. Treaty Doc. No. 103-21, 32 I.LM. 800, available at http://www.opcw.org/chemical-weapons-convention/ (last visited Jan. 28, 2022) ("Each State Party undertakes not to use riot control agents as a method of warfare."); *Gas Smells Awful: U.N. Forces, Riot-Control Agents, and the Chemical Weapons Convention*, 31 Mich. J. Int'l L. 475, 477 (2010) ("RCAs are banned chemical agents under the CWC, except when used in law-enforcement situations."); Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/health-shots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents.

[6]Rohini Haar et al., *Death, injury and disability from kinetic impact projectiles in crowd control settings: a systematic review*, 2017 BMJ Open 2, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/pdf/bmjopen-2017-018154.pdf.; Kinetic Impact Projectiles, Physicians for Human Rights, https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheet_Kinetic_Impact_Projectiles.pdf.

[7]W. Bozeman & J. Winslow, *Medical Aspects of Less Lethal Weapons*, The Internet Journal of Rescue and Disaster Medicine, https://print.ispub.com/api/0/ispub-article/7142.

[8]*Id.*

precordium (the region of the chest immediately in front of the heart).[9]

33.     Well known and reliable independent studies have documented the likelihood of serious bodily injury and death from the use of KIPs. This is especially so when KIPs are used in crowd control situations.

34.     In *Death, injury and disability from kinetic impact projectiles in crowd control settings*, a systematic review of readily available literature uncovered that three percent of those injured by KIPs in crowd control settings died from inflicted injuries.[10] Of those who survived KIP injuries, seventy-one percent had injuries considered severe.[11] Fifteen percent of the other survivors of KIP injuries were permanently injured.[12]

35.     Another study's findings revealed that chest and abdominal KIP impact sites are associated with increased rates of hospital admissions and serious injuries, and that head, ocular, and torso impacts sites are associated with death, significant injury, and permanent disability. Cardiac arrest and death have been described following impacts to the chest or abdomen.[13] Abdominal strikes can additionally cause liver laceration.

36.     The U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, in a 2014 publicly released report, advised that users of impact munitions (including KIPs) must be aware that individuals struck in the chest and abdomen areas are "more susceptible to serious injury or death,

---

[9]*Id.*

[10]*Id.*

[11]Rohini Haar et al., *Death, injury and disability from kinetic impact projectiles in crowd control settings: a systematic review*, 2017 BMJ Open 2, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/pdf/bmjopen-2017-018154.pdf. The study defined severe injuries as those requiring professional medical management. Severe injuries ranged from lacerations that required suturing to penetrating injuries that required surgery or intensive care unit-level care.

[12]*Id.* at 7.

[13]Jennifer A. Beatty, Jason P. Stopyra, John H. Slish, William P. Bozeman, *Injury patterns of less lethal kinetic impact projectiles used by law enforcement officers*, 69 J. Forensic Leg. Med. 4 (2020).

especially at close ranges."[14]

37.   Among the weapons issued to and used by defendant Ramos were Defense Technology 40mm Direct Impact CS rounds. The 40mm Direct Impact munition is a high-speed projectile consisting of a plastic body and a blue crushable foam nose. The blue foam nose indicates that the round contains a CS powder payload. The CS powder contains the chemical orthochlorobenzal-malononitrile, the same chemical found in tear gas.

38.   Upon impact, the crushable foam nose dissipates energy while simultaneously releasing the CS powder payload. The payload is ejected laterally, dispersing a two-foot diameter cloud of CS powder. The CS payload causes a burning sensation to the skin, tearing, tightness in the chest, feelings of suffocation, and possible mental disorientation.

39.   The Direct Impact CS round is intended to be used as an accurate way to deliver an irritant payload in close proximity to a group of subjects. According to official product materials, due to the efficient payload dispersion pattern, multiple subjects will be affected by targeting only a few individuals with a direct impact round.

40.   Consistent with the research showing the increased likelihood of serious bodily injury by targeting the abdomen and chest areas, the product specifications for the direct impact munition defendant Ramos fired advised against abdominal, upper body, and head strikes. The specifications explain that the large muscle groups of the buttocks, thigh, and knees of the subject, when shot from 16 feet to 131 feet, are likely to provide sufficient pain stimulus, while greatly reducing serious or life-threatening injuries.

41.   Likewise, Defense Technology's Specialty Impact Munitions Basic Instructor Certification Program advises against abdominal, upper body, and head strikes as a first resort. According to the manual, all rounds have the

---

[14]U.S. Department of Justice Office of Justice Programs, National Institute of Justice, *Impact Munitions Use: Types, Targets, Effects* (Oct. 4, 2014), https://www.ojp.gov/pdffiles1/nij/206089.pdf.

potential for causing serious injury and/or death. Defense Technology, accordingly, defines the "green zone" for targeting a person as the thighs, buttocks, and legs.

42.     As explained by Defense Technology, the "yellow zone" includes the knees, abdomen, and arms.

43.     The "red zone" includes the entire back, chest, groin area, and head. The red zone is the unauthorized target area.

44.     The training manual instructs that a yellow strike zone is an escalated zone only for an individual unaffected by a green zone strike.

45.     Contrary to Defense Technology training materials and product specifications, FLPD's less-then-lethal policy does not advise against targeting the lower abdomen and back.

46.     Misuse of impact weapons can result in serious and permanent bodily harm and death.[15]

47.     On May 31, 2020, City final decisionmakers directed the use of KIPs to disperse crowds containing peaceful demonstrators.

48.     The official spokesperson for the City and FLPD agreed after Ms. Ratlieff's shooting that KIPs were fired with the intent to disperse crowds.

49.     City FLPD officers were directed to target anyone who picked up tear gas cannisters. FLPD officers, including defendant Ramos, did not aim for the green zone. They, including defendant Ramos, targeted the yellow zone (i.e., the abdomen area) and red zone (i.e., the lower back, chest, groin area, and head) as a first resort. Several innocent congregants were hit in the red zone, including

---

[15] *See* United Nations Public Order Management, *Less Than Lethal Weapons* (UN Peacekeeping PDT Standards for Formed Police Units, 1st Edn. 2015),                    available                    at: http://repository.un.org/bitstream/handle/11176/387390/Less%20Than%20 Lethal%20Weapons.pdf#page=7. KIPs include rubber bullets; rubber buckshot; soft polymer rounds; wax bullets; plastic bullets; beanbag rounds; sponge grenades; ring airfoil projectiles (both kinetic and tear gas projectiles); and rubber bullets with electroshock effect (e.g., Taser XREP rounds).

Ms. Ratlieff.

50.     FLPD's 40mm less-than-lethal training materials confirm FLPD officers were not instructed against aiming for the abdomen and lower back "no-go" zones. In training, FLPD employees were instructed to deploy rounds to the chest area if other rounds are ineffective. An FLPD captain, during the investigation into Ms. Ratlieff's shooting, confirmed that officers were "looking for. . . center mass, you know, areas" and that "hitting somebody in the chest [with a KIP] is - is just as viable."

51.     The defendants knew that KIPs can cause serious personal injury upon striking a person. FLPD did not train its officers on the use of KIPs in crowd control situations. Nor does the FLPD less-than-lethal munitions policy provide guidance for using KIPs during mass demonstrations. The bi-annual KIP certification course does not include or test on the use of these weapons during crowd control situations.

**II.      Absence of a Dispersal Order.**

52.     Florida law specifies the circumstances under which law enforcement officers, including the City and FLPD, may lawfully use force to disperse and/or arrest a crowd unlawfully assembled.

53.     Florida law defines an unlawful assembly as three or more persons who meet together to commit a breach of the peace, or to do any other unlawful act.

54.     Under Florida law, if any number of persons, whether or not armed, are unlawfully, riotously, or tumultuously assembled, law enforcement must go among the persons so assembled, or as near to them as may be done with safety, and in the name of the state command them to immediately and peaceably disperse.

55.     If such persons do not thereupon immediately and peaceably disperse, law enforcement shall command the assistance of all such persons in seizing, arresting, and securing such persons in custody, the failure of which to aid and assist law enforcement in seizing and securing the rioter or persons

unlawfully assembled makes the noncompliant person one of the rioters or persons unlawfully assembled, and subject to prosecution and punishment.

56.    Under Florida law, the person unlawfully assembled and the person who refused to aid and assist shall be held answerable for resulting death or injury caused by the police.

57.    FLPD created policies and procedures to implement Florida's unlawful assembly laws. FLPD drafted a warning that has the purpose to inform those assembled that their assembly has been declared unlawful and that should they fail to disperse, less-than-lethal munitions and chemical agents will be deployed.

58.    Specifically, FLPD's dispersal order Policy No. 501.10 provides:

When the Incident Commander determines that the participants are unlawfully, riotously, or tumultuously assembled in violation of F.S. 870.04, the following proclamation must be issued before an arrest for unlawful assembly is made: DISPERSAL ORDER I am (rank and name), of the Fort Lauderdale Police Department. I hereby declare this to be an unlawful assembly and, in the name of the State of Florida, command all persons so assembled at (specific address of location) to immediately and peacefully disperse, which means to separate and leave the area. If you do not do so, you will be arrested or subjected to other police action. Other police action may include the use of less-lethal munitions, or chemical agents. Chapter 870.04 of the Florida State Statutes prohibits remaining present at an unlawful assembly. If you remain in the area, which was just described, regardless of your purpose for remaining, you will be in violation of Section 870.04. The following routes of dispersal are available: (give directions for evacuation routes). **You have (X number of minutes) to leave** in a peaceful, orderly manner, or face arrest or other police action.

59.    The policy further provides that the warnings will be made from stationary vantage points that are observable by the crowd, or to a large number of participants. Additional warnings, according to the policy, must be announced via public address systems in police vehicles. The warning must be given at an amplitude to be heard by the entire assemblage.

60.    In preparation for the Fort Lauderdale demonstrations in solidarity with worldwide opposition to the unprovoked police murder of the unarmed and not resisting George Floyd, FLPD prepared a pre-recorded dispersal order to be

played from a Long-Range Acoustic Device (LRAD).

61.  LRAD "can project messages up to 600 meters away, produce a maximum continuous output of 136 dB at one meter away, and has the capacity to overcome 88 dBs of background noise at 250 meters."

62.  FLPD Detective Burdick assisted in the preparation of the dispersal announcement. The LRAD was placed on top of FLPD Lt. Jenkins' marked FLPD Suburban vehicle.

63.  Lt. Jenkins, with the LRAD and pre-recorded dispersal order, was present at the parking garage during the incident giving rise to this complaint.

64.  Lt. Jenkins did not personally deploy chemical munitions or fire less-than- lethal weapons. He was aware of other FLPD officers doing so but did nothing to stop them.

65.  Upon information and belief, Lt. Jenkins remained ready and able to play the pre-recorded dispersal message through the LRAD.

66.  During the time leading to the tear gassing and shooting of gathered participants, including Ms. Ratlieff, at no point was their assembly declared unlawful. Nor was any dispersal order given.

67.  No advance warning or announcement was made before FLPD deployed chemical and less-than-lethal munitions.

68.  In contrast, police in the area received ample warning of the FLPD's decision and intent to deploy chemical munitions via their closed-access police communications channel.

**III.  Timeline of Law Enforcement Response to Fort Lauderdale George Floyd Demonstration.**

69.  On Sunday, May 31, 2020, Black Lives Matter Alliance of Broward County organized a peaceful community gathering against police brutality in the wake of the murder of George Floyd by Minneapolis, Minnesota police on May 25, 2020.

70.  In preparation for the event, the BLM Alliance trained 80 volunteers

in de-escalation techniques.[16]

71.     The Fort Lauderdale peaceful gathering involved thousands of socially conscious citizens from every walk of life and every recognizable demographic group. Some participants were born in the United States. Others were immigrants to this country. Men, women, and children gathered in solidarity. Black, white, people of color, Latinos, Asians, Caucasians, and many other ethnicities and cultures were represented in Fort Lauderdale that day. They all joined in a visible demonstration to propel meaningful change in police behavior against the citizens and people of the United States, the State of Florida, and Broward County.

72.     The gathering was peaceful and without incident. None of the participants were accused of looting, burning, rioting, or otherwise inciting violence.

73.     Yet, despite the peaceful gathering and the organizers' announcements that the lawful display would be peaceful, FLPD readied its officers and employees for violence, and presented themselves as ready to unleash violence against the peaceful congregants.

74.     As the gathering, including speeches and displays, wound down and the peaceful demonstrators returned to their cars, some passers-by observed uniformed FLPD police officers situated at a public parking garage at S.E. 2nd Street and S.E. 1st Avenue. They began a peaceful chant and display of their signs around 6:45 p.m.

75.     One of the FLPD officers requested the arrival of more police units and officers, claiming she was completely surrounded.

76.     Photojournalists and others present in the area confirm that the police officers were never attacked, were never in danger of being attacked, and were never surrounded by anyone. Those persons walking from the organized

---

[16]Miami Herald, *Protest live updates: Ft. Lauderdale issues 9 pm curfew after clashes with 'agitators,'* https://www.miamiherald.com/site-services/profiles/article243135896.html (last accessed October 21, 2022).

demonstration were peaceful and kept a sufficient distance from the police vehicle. They were engaged in the peaceful exercise of their First Amendment rights.[17]



77.    Nonetheless, acting on the false representations of a FLPD police officer, several FLPD units responded. The responding units did not encounter any unlawful conduct from the peaceful demonstrators. Still, force was used against peaceful demonstrators

78.    Specifically, video footage shows a responding member of the FLPD (Stephen Pohorence) physically attacking a peaceful demonstrator. The officer, with a known history of using excessive force against citizens, attacked a woman kneeling with her hands in the air while offering no violence to anyone at or around 6:52 p.m.

79.    A few individuals in the crowd defended the unarmed woman by responding to this unprovoked use of force—done at a rally decrying those very

---

[17] Miami Herald, *How a peaceful march turned ugly: Cops say protesters attacked. Photos tell another story,* https://www.miamiherald.com/news/local/community/broward/article24367 1132.html#storylink=cpy (last accessed October 21, 2022).

police practices—in throwing bottles, rocks, and other non-deadly objects at Pohorence.

80.     Those gathered, however, remained peaceful. The majority peaceful congregants continued demonstrating and lawfully exercising their First Amendment rights by taking to their knees, displaying signs, chanting, and policing the minority agitators.

81.     Notwithstanding, at or around 6:52:52 p.m., in broad daylight, FLPD decided to disperse the crowd in front of the garage by means of tear gas and kinetic impact projectiles (KIPs). Body camera footage shows an officer requesting the key to get tear gas from the police vehicles.

82.     FLPD gave no announcement to those gathered of its intention to use these means of force, despite having opportunity to do so.

83.     The decision to use tear gas and KIPs was not a split-second decision. Nor was the implementation of the decision to disperse the crowd using tear gas and KIPs.

84.     At or around 6:53:09 p.m., the FLPD officers were first advised of the anticipated tear gas. FLPD made no effort to similarly inform the gathered demonstrators.

85.     However, when FLPD made the decision to deploy tear gas, the assembly had not been declared unlawful. Nor was there a curfew violation.

86.     FLPD ignored Florida law and FLPD Policy No. 501.10's dispersal order requirements, even though FLPD had ready access to a pre-recorded dispersal order for broadcasting to the persons gathered in the vicinity.

87.     The group near the parking garage included peaceful demonstrators, media observers, and other persons who were simply trying to drive out of the parking garage.

88.     At around 6:54 p.m., FLPD officers were advised a second time to clear the area because of the anticipated tear gas.

89.     The announcement made exclusively to the FLPD officers via the confidential police radios but not broadcast to those gathered citizens gave law

enforcement officers without tear gas masks the opportunity to move to a safe distance, and to further encourage those officers equipped with gas masks sufficient time to put their gas masks on. Because of the announcement, officers without gas masks were able to retreat to a safe distance.

90.     The public, media, and peaceful demonstrators received no such warning that tear gas was about to be deployed.

91.     After officers without gas masks were allowed to go to places of safety and those with masks were given the opportunity to put on gas masks, FLPD began indiscriminately directing tear gas against peaceful demonstrators minutes later.

92.     The police use of the tear gas was done by firing metal cannisters capable of inflicting serious bodily injury directly into the community of gathered citizens.

93.     FLPD officers formed an impenetrable line in front of a public parking garage at or around 6:58 p.m. The line was not formed to protect property or persons. The command given over the radio was that once the person who initially requested assistance was extracted, they were to back away from the crowd.

94.     At that time, the FLPD officer who had initially requested police reinforcements and the officer who provoked the crowd by attacking a demonstrator (Pohorence) had already left the scene.

95.     The FLPD line completely blocked egress and ingress from the public parking garage and prohibited the free movement of the gathered community members. The FLPD presence and concerted actions in attacking the peaceful demonstrators agitated those present in the area. No legitimate law enforcement interest existed to cause the police line to be initiated or maintained.

96.     Among the demonstrators struck by the deployment of tear gas were those who had parked in the public parking garage and were merely trying to leave the day's peaceful event. They were trapped in the garage and assaulted by the FLPD unannounced deployment of tear gas. As recorded by body camera

footage, many of these unarmed, law-abiding, and peaceful participants begged and pleaded to be allowed to leave, even as they were tear gassed.

97.    As these peaceful demonstrators were gassed, one demonstrator who was finally allowed to leave by the FLPD requested that internal affairs be called to the scene immediately. An FLPD bicycle officer, who had been given enough time to move to a safe location by the pre-gas warnings, casually replied, almost gleefully, that not only was internal affairs present at the scene, but internal affairs had ordered the use of tear gas.

98.    Body camera footage shows tear gas filling the garage even as peaceful demonstrators were trapped by FLPD officers at around 6:56 p.m. The police made no provision for peaceful participants to exit the garage in their cars until around 6:56:45 p.m., after being assaulted by the tear gas.

99.    Also counted among demonstrators subjected to tear gas was a group of peaceful demonstrators standing in front of the FLPD, but sufficiently far away to not be within reach.

100.    Plaintiff Ratlieff, while passing the parking garage at approximately 7:01:29 p.m., joined with peaceful participants who were taking a knee and peacefully exercising their First Amendment rights in the presence of the FLPD officers. Plaintiff held a sign proclaiming "Stop Killing Us."

101.    Ms. Ratlieff and those gathered with her were a sufficient distance away from the FLPD to not interfere with or disrupt any law enforcement activities.

102.    But FLPD continued to deploy tear gas without provocation and without warning.

103.    When the peaceful demonstrators verbally complained of the indiscriminate and assaultive FLPD police conduct, FLPD continued to deploy tear gas without legal justification. Participants, hands raised in the air, chanted the now-common mantra: "Hands up, don't shoot."

104.    Plaintiff Ratlieff and the group of peaceful participants gathered with her were purposefully tear gassed. They received no advance warning before

being tear gassed, and no warning was made during the FLPD tear gas deployment. Their assembly was not declared unlawful. No order to disperse issued. At all times, Ms. Ratlieff and other peaceful demonstrators were lawfully assembled in a place they were allowed to be.

105. By 7:04 p.m., only twenty (20) to thirty (30) peaceful participants remained in front of the FLPD officers. Notwithstanding, FLPD officers continued to deploy tear gas and fire kinetic impact weapons without warning or legal justification for the sole purpose of stopping the demonstrators from assembling.

106. At or around 7:06:06 p.m., the FLPD officers in the vicinity of Ms. Ratlieff reported that there were only ten (10) demonstrators in front of them and that most had dispersed after being attacked by the deployment of tear gas and KIPs. Notwithstanding, the FLPD SWAT team continued using chemical munitions directed at the participants, fully aware that the tear gas and KIPs were intended to and likely to cause serious personal harm and injury. Ms. Ratlieff was among the ten (10) remaining peaceful participants targeted by the FLPD. She struggled to flee from the armed police presence at approximately 7:07:01 p.m.

107. Ms. Ratlieff walked to a safe space near journalists and observers, even as she choked on and tried to recuperate from the tear gas. For no lawful reason, defendant FLPD officer John Doe 1 deployed yet another round of chemical munitions directly at and in the vicinity of Ms. Ratlieff and the group, incapacitating Ms. Ratlieff to the point she could not move or function.

108. As another peaceful demonstrator was helping her to safety, Ms. Ratlieff was shot by defendant Ramos.



109.   Ramos gave no warning before deploying the direct impact round. FLPD Policy No. 113, Section H.4.b. requires the deploying officer give a warning before deploying a KIP. Ramos admits he fired direct impact munitions in aid of dispersing the crowd of demonstrators.

110.   When he shot Ms. Ratlieff, Ramos was not defending life or property. He did not fire in response to any reasonable fear of imminent bodily harm to himself or others.

111.   Shortly after Ms. Ratlieff was shot, a supervising officer is heard saying, while pointing in her direction, "Got one down. Got one down." Another supervisor within seconds of Ms. Ratlieff being shot, even while a woman's voice is screaming, said "Put a f**ing cap in that mother***."

112.   Ms. Ratlieff was struck in the eye by Ramos' direct impact round, causing her severe, painful, and permanent physical and emotional injuries:



## IV.    The Aftermath.

113.    Ms. Ratlieff was targeted by the City, FLPD, and the individual defendants and treated as an aggressor solely for her exercise of her cherished First Amendment rights. City and FLPD officials mocked her in public.

114.    FLPD claims it launched an investigation into Ms. Ratlieff's shooting, but the "investigation" was mere window dressing designed to provide public cover for her illegal, unconstitutional, and unconscionable police shooting.

115.    When Ms. Ratlieff appeared for her interview with FLPD internal affairs officers, she was informed by the FLPD official specifically selected and assigned to conduct the investigation that defendant Ramos was a "good guy" who "did not intend" to strike her.

116.   Given the clear bias on the part of the investigating internal affairs officer, the FLPD, and the City, Ms. Ratlieff demonstrated and terminated the interview.

117.   When Ms. Ratlieff appeared for a second interview, she was again victimized by the City, the FLPD, and its authorized agents. The substitute investigator, specifically tasked by the City and FLPD to conduct the interview after Ms. Ratlieff's recognized complaint about the biased first interview, asked her in an accusatory manner if she threw projectiles at law enforcement, despite no evidence supporting the accusation and abundant contemporaneous video and personal observations that she did nothing of the sort.

118.   The City and FLPD had no factual basis for asking any such question or making the scandalously false inquisition, knowing full well from both body camera footage and cell phone video that Ms. Ratlieff was a peaceful participant. The offending comment was made solely for the purpose of embarrassing and intimidating Ms. Ratlieff for participating in an internal affairs investigation of the City's officers.

119.   During the internal affairs interview, the interviewed demanded to know how Ms. Ratlieff knew and was associated with individuals accused of throwing back the unlawfully deployed chemical munitions to law enforcement. Again, the City and FLPD had no factual basis for this line of questioning and knew from the body camera and cell phone footage that Ms. Ratlieff had no such associations.

120.   The City did not investigate the initial decision to use tear gas and KIPs against demonstrators without warning.

121.   As a direct and proximate result of the defendants' individual and collective unlawful conduct, Ms. Ratlieff suffered severe and lasting physical injury, mental and emotional distress, and humiliation, some of which is permanent, and is entitled to monetary damages for each of said losses and damages.

122.   As a further direct and proximate result of the individual and

collective acts and conduct of the defendants, and each of them, as alleged in the complaint, Ms. Ratlieff incurred and will incur for an indefinite time in the future, medical, hospital, and related expenses, all in an amount presently unascertained, but according to proof at the time of trial.

123.   As a further direct and proximate result of the individual and collective acts and conduct of defendants, and each of them, as alleged in the complaint, Ms. Ratlieff has suffered loss of income and loss of earning capacity, all in an amount presently unascertained, but according to proof at the time of trial.

## V.      Municipal Liability Allegations.

124.   The Fort Lauderdale Chief of Police is the final policymaker for policies governing policing by the FLPD. The Chief of Police reviews and approves FLPD policies before their implementation and dissemination.

125.   The Chief of Police approved Policy No. 501.10, FLPD's dispersal order. Through Policy No. 501.10, the Chief of Police delegated the authority to disperse a demonstration as well as use tear gas and KIPs to the Incident Commander.

126.   The Chief appointed Douglas MacDougall, Assistant Chief, Incident Commander for the entire City. Assistant Chief Douglas MacDoughall approved the deployment of tear gas and/or less-lethal munitions on May 31, 2020, near the corner of SE 2nd Street and SE 1st Ave, from 6:30pm to 7:30pm.

127.   Captain Steven Greenlaw, Operations Bureau - Special Events & Emergency Management S.W.A.T. Commander, approved the deployment of tear gas and/or less-lethal munitions on May 31, 2020, near the corner of SE 2nd Street and SE 1st Ave, from 6:30pm to 7:30pm.

128.   Captain Robert Dietrich, Field Force Commander approved the deployment of tear gas and/or less-lethal munitions on May 31, 2020, near the corner of SE 2nd Street and SE 1st Ave, from 6:30pm to 7:30pm.

129.   Police Chief Rick Maglione participated in the decision to use approved the deployment of tear gas and/or less-lethal munitions on May 31,

2020, near the corner of SE 2nd Street and SE 1st Ave, from 6:30pm to 7:30pm and ratified the decisions of MacDougall, Greenlaw, and Dietrich.

130.   The City and FLPD's failure to properly train its employees on the proper use of KIPs in crowd control situations, including the type of KIPs that should be used as well as where and when to aim KIPs, was a moving force behind the constitutional law violations alleged in this lawsuit.

131.   FLPD officers who deployed chemical munitions worked, the FLPD officers assigned to deploy less-than-lethal munitions, and FLPD command staff worked collectively toward a unified goal of dispersing the assembly that included Ms. Ratlieff.

132.   Shortly before or after Ratlieff's shooting, one officer with KIPs approached another officer who had also fired KIPs. The first officer asked if the second officer's video was on. The second officer mistakenly said it was on standby. Their conversation was recorded. The first officer asked, "Did you see me f**k up those motherf****rs? The second officer responded "Yeah, "I got the one f***er," and the two began laughing.

## CAUSES OF ACTIONS

### COUNT I: Federal Civil Rights Violations - First Amendment Violation.
(All Defendants)

133.   Plaintiff realleges paragraphs 1 through 132.

134.   On May 31, 2020, all Defendants named in this lawsuit stopped peaceful demonstrators from exercising their First Amendment rights. Plaintiff was among the peaceful demonstrators.

135.   Defendants violated plaintiff's rights of freedom of speech and assembly under the First Amendment to the United States Constitution by disrupting her lawful First Amendment activities, including her peaceful demonstration of excessive force by law enforcement.

136.   Defendants violated Plaintiff's First Amendment rights by deploying tear gas and KIP at crowds containing peaceful demonstrators without warning.

137.   The deployment of tear gas and KIPs forced peaceful demonstrators

to discontinue exercising their First Amendment rights.

138.   Plaintiff was peacefully demonstrating when she was tear gassed and forced to discontinue her peaceful assembly and demonstration.

139.   Plaintiff was peacefully demonstrating when she was tear gassed and, while trying to recover and then escape, she was struck with a KIP, and forced to discontinue her peaceful assembly and demonstration.

140.   The Defendants, individually and in concert with one another, used tear gas and KIPs to stop a peaceful demonstration. They did so without any warning, forcing demonstrators to discontinue their peaceful assembly.

141.   Defendants' actions violated plaintiff's clearly established rights to freedom of expression and assembly under the First Amendment to the United States Constitution by prohibiting plaintiff from and making her discontinue exercising her constitutional rights to free speech and expression in a public forum.

142.   Final policymakers within the City of Fort Lauderdale authorized and directed the deployment of tear gas and KIPs to disperse lawfully assembled demonstrators exercising their First Amendment rights.

143.   Defendants John Does 1-3 deployed tear gas to disperse the crowd of peaceful demonstrators.

144.   Defendant Ramos deployed several rounds of KIPs to ensure that crowds of peaceful demonstrators could no longer peacefully practice their First Amendment-protected rights.

145.   Defendants John Does 1-3 and Ramos deployed tear gas and KIPs in support of the FLPD decision to disperse a First Amendment protected demonstration against police brutality.

146.   Defendant Sergeant Paul Cristafaro ordered the use of KIPs and tear gas after requesting permission from SWAT command.

147.   Sergeant Cristafaro, Assistant Chief MacDougall, and Captain Dietrich violated plaintiff's First Amendment rights because their commands caused the subordinate police officers to disperse a crowd of peaceful

demonstrators, including plaintiff, who were exercising their freedom of expression protected by the First Amendment.

148. Sergeant Cristafaro, Assistant Chief MacDougall, and Captain Dietrich violated plaintiff's First Amendment rights by failing to stop the use of tear gas and KIPs against peaceful demonstrators who he knew or should have known were exercising their First Amendment rights. Their failure to stop their subordinate officers from acting unlawfully caused the First Amendment violations.

149. SWAT command consisted of defendants Captain Steve Greenlaw and Lieutenant Avery Figueras.

150. Captain Greenlaw and Lieutenant Figueras violated plaintiff's First Amendment rights because their commands caused the subordinate police officers to disperse a crowd of peaceful demonstrators, including plaintiff, who were exercising their freedom of expression protected by the First Amendment. Defendants inhibited and chilled plaintiff's First Amendment activity by incapacitating and injuring her with tear gas and KIPs when plaintiff was engaged in a peaceful demonstration at a public forum, speaking out against police violence and the continued law enforcement oppression of communities of color in the United States. Plaintiff's protected First Amendment activity was a substantial or motivating factor in defendants' use of force intended to chill plaintiff's speech.

151. FLPD and its employees were not enforcing a lawful dispersal order. The participants' assembly had not been declared unlawful. Nor was there a lawful order to disperse. At all times, plaintiff was in a place she was allowed to be. Yet, FLPD indiscriminately deployed chemical agents at the peaceful gathering and directed the use of KIPs to effectuate and support the deployment of chemical agents.

152. The defendants knew or should have known that dispersing a crowd of peaceful demonstrators, directing subordinates to dispersing a crowd of peaceful demonstrators, and failing to stop subordinates from dispersing a crowd

of peaceful demonstrators, thereby preventing plaintiff from exercising her constitutional rights to free speech and expression in a public forum, were clearly established violations of the First Amendment at the time of the incident. *Keating v. City of Miami*, 598 F.3d 753, 766 (11th Cir. 2010).

153.   As a direct and proximate result of defendants' unlawful conduct, plaintiff suffered severe and permanent physical injury, emotional distress, and humiliation, and is entitled to monetary damages.

For these reasons, Ms. Ratlieff demands judgment against all defendants for damages, punitive damages, prejudgment interest on liquidated damages as allowed by law, costs of this action, reasonable attorney's fees, injunctive relief, and any other relief this Court deems just and proper.

### COUNT II: Federal Civil Rights Violations – Fourteenth Amendment.
(City of Fort Lauderdale)

154.   Plaintiff realleges paragraphs 1 through 132.

155.   Defendants committed acts that violated plaintiff's right to substantive due process of law in violation of the Fourteenth Amendment to the United States Constitution.

156.   The City, FLPD, and the individual defendants provoked a peaceful gathering by using unwarranted and unlawful violence against a peaceful demonstrator kneeling and chanting.

157.   The City, FLPD, and the individual defendants did not deescalate. Instead, final policymakers within the City authorized and directed the deployment of tear gas and KIPs to disperse the peaceful gathering. The demonstration was never declared unlawful, as provided by Florida law and FLPD policies. No dispersal order issued. Nor were those gathered warned before the police deployment of force.

158.   The decision by the City, FLPD, and the individual defendants to deploy tear gas and KIPs to disperse peaceful demonstrators was not a split-second decision.

159.   The City, FLPD, and the individual defendants had sufficient time to

allow those peacefully assembled to leave. The City, FLPD, and the individual defendants had sufficient time to declare (if the facts warranted) an unlawful assembly, to issue a lawful dispersal order, or alternatively, to warn peaceful demonstrators of the police intent to deploy force.

160.  FLPD warned law enforcement officers present in the same area of its intended deployment of tear gas, giving only the police sufficient time to get to safety. The City, FLPD, and the individual defendants refused and failed to give the peaceful gathering the same warning, despite having the opportunity to do so. The City, FLPD, and the individual defendants failed and refused to broadcast the readily available prerecorded message on the LRAD device.

161.  After the initial use of tear gas and KIPs, City final policymakers had sufficient time to consider the continued use of tear gas and KIPs.

162.  To effectuate and support the deployment of the unlawfully deployed tear gas, City and FLPD final decisionmakers authorized, ordered, and/or ratified the use of KIPs against anyone who "picked up" a chemical munition without regard to the peaceful demonstrators in or near the line of fire.

163.  The City, FLPD, and the individual defendants knew or reasonably should have known the crowd contained mostly peaceful demonstrators and members of the media. The City, FLPD, and the individual defendants were deliberately indifferent to the substantial likelihood of injury to peaceful demonstrators and media observers lawfully present who were neither warned nor lawfully dispersed.

164.  Defendant Ramos deployed munitions in a manner that created a substantial risk of causing death or serious bodily harm. Ramos intentionally fired direct impact rounds into crowds of peaceful demonstrators knowing they had been tear gassed and were frantically trying to escape the cloud of tear gas.

165.  In addition, Ramos did not aim for the thighs, buttocks, and legs, the recommended target areas. He aimed for the abdomen. By firing, as a first resort, at areas other than those recommended by the product specifications, Ramos increased the substantial risk of death or serious bodily injury naturally

associated with the use of KIPs in crowd control situations, and knew or reasonably should have known of the increased risk.

166.   Ramos did not deploy direct impact rounds to protect himself or others from death or serious bodily harm, much less to prevent *imminent* death or serious bodily harm. Ramos did not deploy direct impact rounds to protect property or life. Nor did Ramos deploy direct impact rounds for a lawful purpose. Ramos was not responding to a clear and present danger.

167.   Defendant Ramos deployed direct impact rounds to effectuate the indiscriminate dispersal of those persons gathered in the area. Their presence was lawful, and their assembly was never declared unlawful. There was no dispersal order. There was no curfew violation. Those who gathered and assembled, including the media observers, were lawfully gathered in a place they had a right to be.

168.   Ramos' statement that he was targeting a man walking away after throwing back a chemical munition launched at the peaceful demonstrators was not true. Notwithstanding, the claim did not justify his use of force against Ms. Ratlieff or any other person.

169.   As Ramos admitted under oath, he knew at the time he fired the round that the intended target "was trying to use people as shields." Ramos accordingly knew or should have known there was a substantial likelihood that plaintiff (whom Ramos claims the intended target was hiding behind) would either be struck by the direct impact round itself or the CS powder payload ejected upon impact as well as the substantial likelihood of death or serious bodily injury.

170.   Furthermore, the people comprising the group into which FLPD fired indiscriminately were engaged in no unlawful conduct when John Does 1-3 fired chemical munitions to disperse the lawful assembly. There was no lawful ground or legitimate government interest served by using tear gas to disperse the lawfully assembled group without a warning or lawful dispersal order. There was no lawful ground or legitimate government interest served by using KIPs to

effectuate or support the unlawful dispersal by tear gas.

171.   By their conduct, the defendants individually and collectively were deliberately indifferent to the substantial risk of harm their conduct could cause. Their conduct was so egregious that it shocks the conscience.

172.  Defendants' conduct and manner in which they deployed chemical munitions and KIPs without warning or dispersal order violated Ms. Ratlieff's due process rights.

173.  Defendants' conduct in unjustifiably using chemical munitions and KIPs to unlawfully disperse peaceful demonstrators and in striking plaintiff in the head, causing severe physical injury, while plaintiff and other peaceful demonstrators were engaged in protected First Amendment activity was shocking to the conscience, beyond the bounds of acts tolerable in a civilized society, and so egregious and outrageous that it may fairly be said to shock the contemporary conscience.

174.  Alternatively, defendants' individual and collective conduct in using chemical munitions and KIPs to unlawfully disperse a peaceful assembly engaged in protected First Amendment activity was maliciously and sadistically done to harm and injure those gathered, including the plaintiff.

175. The City and FLPD's failure to properly train its employees, including Ramos and John Does 1-3, on the proper use of KIPs in crowd control situations, including the type of KIPs that should be used as well as where and when to aim KIPs, was a moving force behind the constitutional law violations alleged.

176.  As a direct and proximate result of defendants' unlawful conduct, plaintiff suffered severe and permanent physical injury, emotional distress, and humiliation, and is entitled to monetary damages.

For these reasons, Ms. Ratlieff demands judgment against the City for damages, punitive damages, prejudgment interest on liquidated damages as allowed by law, costs of this action, reasonable attorney's fees, injunctive relief, and any other relief this Court deems just and proper.

**COUNT III: Federal Civil Rights Violations – Fourth Amendment.**
(City of Fort Lauderdale)

177.   Plaintiff realleges paragraphs 1 through 132.

178.   The City of Fort Lauderdale, John Does 1-3, and Ramos' conduct violated plaintiff's rights to be free from unreasonable seizures and excessive force in violation of the Fourth Amendment to the United States Constitution.

179.   Final policymakers within the City of Fort Lauderdale authorized and directed the use of tear gas and less lethal munitions against peaceful demonstrators without warning and without first issuing a lawful dispersal order. Ms. Ratlieff and other peaceful demonstrators were seized.

180.   Demonstrators were seized when FLPD, by means of physical force, terminated and/or restrained their freedom of movement through means intentionally applied. FLPD and its officers excessively tear gassed the demonstrators.

181.   The officers, including John Does 1-3 and Ramos, restrained their freedom of movement by deploying tear gas and direct impact munitions around them and blocking their movement.

182.   Ratlieff and other peaceful demonstrators complied with the unlawful orders to leave issued by the FLPD's deployment of tear gas. Specifically, plaintiff moved from the area in front of the assembled police officers.

183.   Notwithstanding, Officer John Doe 1 issued yet another unlawful order to move by deploying more tear gas, to which plaintiff complied. While Ms. Ratlieff complied with the unlawful order and submitted to the unlawful show of authority that restricted her freedom of movement, Ramos shot Ms. Ratlieff in the face with a direct impact round.

184.   The seizure was unreasonable. Ms. Ratlieff was in a place she had a right to be. Curfew had not yet begun. FLPD had not issued a dispersal order, much less declared the assembly unlawful. FLPD did not have probable cause or reasonable suspicion to seize Ms. Ratlieff.

185. Defendants City, John Does 1-3, and Ramos could not have reasonably believed plaintiff had committed or was about to commit any crime or public offense, particularly since plaintiff was unarmed, non-violent, compliant, and engaged in lawful First Amendment activity when seized by police. She was not unlawfully assembled.

186. With no lawful basis, reasonable suspicion, probable cause, or warrant, defendants used excessive force on plaintiff by unjustifiably deploying tear gas and KIPs at the area in which plaintiff was situated as well as by striking plaintiff in the head with a direct impact weapon not marketed for targeting a single individual in a peaceful assembly, causing severe physical injury when there was no reason to so restrain a peaceful participant such as plaintiff. Given the absence of a lawful basis to seize plaintiff, all force used was unreasonable.

187. Defendant Ramos fired KIPs to effectuate the seizure of the peaceful assembly. After tear gas was deployed, Ramos fired KIPs in support of that seizure, firing indiscriminately at anyone who attempted to prevent the attempted seizure by picking up the chemical munitions and moving the munitions from the location.

188. FLPD officers who deployed chemical munitions worked collectively with the FLPD officers assigned to deploy less-than-lethal munitions to unlawfully disperse the peaceful assembly, including plaintiff.

189. The City and FLPD's failure to properly train its employees, including Ramos and John Does 1-3, on the proper use of KIPs in crowd control situations, including the type of KIPs that should be used as well as where and when to aim KIPs, was a moving force behind the constitutional law violations alleged.

190. As a direct and proximate result of defendants' unlawful conduct, plaintiff suffered severe physical injury, emotional distress, humiliation, and is entitled to monetary damages.

For these reasons, Ms. Ratlieff demands judgment against the City for damages, punitive damages, prejudgment interest on liquidated damages as

allowed by law, costs of this action, reasonable attorney's fees, injunctive relief, and any other relief this Court deems just and proper.

**COUNT IV: Federal Civil Rights Violations – Fourth Amendment.**
(Ramos and the City of Fort Lauderdale)

191.   Plaintiff realleges paragraphs 1 through 132.

192.   The City and Ramos violated plaintiff's rights to be free from unreasonable seizures and excessive force in violation of the Fourth Amendment to the United States Constitution.

193.   Final policymakers within the City authorized and directed the use KIPs to disperse crowds of peaceful demonstrators.

194.   Ramos intentionally fired a direct impact CS round into a crowd of peaceful demonstrators within a two feet diameter of each other.

195.   Ramos knew or should have known that upon contact, the direct impact round would laterally eject a two-foot diameter cloud of CS powder.

196.   Ramos knew or should have known that the powder would cause burning sensation to the skin, tearing, tightness in the chest, feelings of suffocation, and possible mental disorientation to anyone within a two-foot diameter.

197.   Ramos fired a direct impact round at a person within the two-feet diameter of plaintiff.

198.   Alternatively, Ramos intentionally aimed at and struck plaintiff in the face with a direct impact munition.

199.   The seizure was unreasonable. Ms. Ratlieff was in a place she had a right to be. Curfew had not yet begun. The City and FLPD had not issued a dispersal order or declared the assembly unlawful. The City, FLPD, and Ramos did not have probable cause or reasonable suspicion to seize, shoot at, or strike Ms. Ratlieff.

200.   The City and Ramos could not have reasonably believed plaintiff had committed or was about to commit any crime or public offense, particularly since plaintiff was unarmed, non-violent, compliant, and engaged in lawful First

Amendment activity when seized.

201.  With no lawful basis, reasonable suspicion, probable cause, or warrant, the City and Ramos used excessive force on plaintiff by striking plaintiff in the head (face) with a direct impact weapon, causing severe physical injury.

202.  The City and FLPD's failure to properly train its employees, including Ramos, on the proper use of KIPs in crowd control situations, including the type of KIPs that should be used as well as where and when to aim KIPs, was a moving force behind the constitutional law violations alleged.

203.  As a direct and proximate result of defendants' unlawful conduct, plaintiff suffered severe physical injury, emotional distress, humiliation, and is entitled to monetary damages.

For these reasons, Ms. Ratlieff demands judgment against the City and Ramos for damages, punitive damages, prejudgment interest on liquidated damages as allowed by law, costs of this action, reasonable attorney's fees, injunctive relief, and any other relief this Court deems just and proper.

### COUNT V: Battery.
(Ramos, Eugene, Cristafaro, Greenlaw, Figueras, Dietrich, MacDoughall, and John Does 1-3)

204.  Plaintiff realleges paragraphs 1 through 132.

205.  Ratlieff suffered a harmful and offensive contact when she was shot by Ramos.

206.  Ratlieff suffered a harmful and offensive contact when she was tear gassed by John Does 1-3.

207.  Eugene, Cristafaro, Greenlaw, and Figueras, Dietrich, MacDoughall directed the use of tear gas and KIPs.

208.  Ramos, Eugene, Cristafaro, Greenlaw, Figueras, Dietrich, MacDoughall, and John Does 1-3 were acting in the scope and furtherance of their employment.

209.  Ramos, Eugene, Cristafaro, Greenlaw, Figueras, Dietrich, MacDoughall, and John Does 1-3 acted intentionally, in bad faith, or with

malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

210.  As a direct and proximate result of Ramos and John Does 1-3's conduct, plaintiff suffered damages, including mental anguish, bodily injury, pain and suffering, disability, disfigurement, emotional distress, humiliation, embarrassment, loss of capacity of the enjoyment of life, expense of hospitalization, medical treatment. The losses are permanent and/or continuing and plaintiff will continue to suffer losses in the future.

For these reasons, Ms. Ratlieff demands judgment against Ramos and John Does 1-3 for compensatory damages, costs, injunctive relief, and such other and further relief as the Court deems appropriate.

## COUNT VI: Battery.
(City of Fort Lauderdale)

211.  Plaintiff realleges paragraphs 1 through 132.

212.  Ratlieff suffered a harmful and offensive contact when she was shot by Ramos.

213.  Ratlieff suffered a harmful and offensive contact when she was tear gassed by John Does 1-3 and other FLPD employees.

214.  Final decisionmakers within the City directed and authorized the use of chemical and less-than-lethal munitions against the assembly. Ms. Ratlieff was a participant in the assembly.

215.  Eugene, Cristafaro, Greenlaw, Dietrich, MacDoughall, and Figueras directed the use of tear gas and KIPs.

216.  Ramos, Eugene, Cristafaro, Greenlaw, Figueras, Dietrich, MacDoughall, and John Does 1-3 were acting in the scope of their employment.

217.  Ramos, Eugene, Cristafaro, Greenlaw, Figueras, Dietrich, MacDoughall, and John Does 1-3 acted intentionally but not in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

218.  Pursuant to Florida Statute §768.28(9), the City of Fort Lauderdale

is liable.

219. As a direct and proximate result of Ramos and John Does 1-3's conduct, plaintiff suffered damages, including mental anguish, bodily injury, pain and suffering, disability, disfigurement, emotional distress, humiliation, embarrassment, loss of capacity of the enjoyment of life, expense of hospitalization, medical treatment. The losses are permanent and/or continuing and Ratlieff will continue to suffer losses in the future.

For these reasons, Ms. Ratlieff demands judgment against the City for compensatory damages, costs, injunctive relief, and such other and further relief as the Court deems appropriate.

### COUNT VII: Negligent Use of Direct Impact Munitions.
(City of Fort Lauderdale)

220. Plaintiff realleges paragraphs 1 through 132.

221. This common law cause of action arises from Ramos negligently shooting plaintiff with a direct impact weapon in the face.

222. Final decisionmakers within the City directed and authorized the use of chemical and less-than-lethal munitions against the assembly. Ms. Ratlieff was a participant in the assembly.

223. The City and Ramos created a foreseeable zone of risk by deploying impact rounds into a crowd of peaceful demonstrators who had been tear gassed and were frantically moving around trying to escape the cloud of tear gas.

224. The City and Ramos owed a duty to all within the zone, including Ratlieff, to act with reasonable care to lessen the risk or see that sufficient precautions were taken to protect others from the harm that the risk imposed.

225. Ramos breached his duty of care owed by negligently handling his 40mm launcher, negligently firing a direct impact round that hit plaintiff, and/or firing a KIP into a crowd without giving a warning.

226. Ramos negligently deployed a direct impact at a demonstrator. Ramos knew his intended target "was trying to use people as shields." Notwithstanding, Ramos attempted to strike this demonstrator with a less-than-

lethal round, while firing into a known group of people peacefully assembled. Ramos used the wrong less-than-lethal round and fired even though his view was obscured by tear gas and the bystanders behind whom the intended target was hiding. Even worse, Ramos aimed for the abdomen, a body part different from that recommended by the direct impact product specifications (i.e., the thighs, buttocks, and legs), that substantially increased the risk of serious death or bodily harm. There was no immediate need for Ramos to fire a less-than-lethal round.

227.   Defendant Ramos's negligent operation of his KIP directly and proximately caused Ratlieff's wrongful injury and resultant damages.

228.   Ramos' actions occurred within the scope and course of his employment with the City.

229.   Pursuant to Florida Statute §768.28(9), the City of Fort Lauderdale is liable.

230.   As a direct and proximate result of Ramos's conduct, Ratlieff suffered damages, including mental anguish, bodily injury, pain and suffering, disability, disfigurement, emotional distress, humiliation, embarrassment, loss of capacity of the enjoyment of life, expense of hospitalization, medical treatment. The losses are permanent and/or continuing and Ratlieff will continue to suffer losses in the future.

For these reasons, Ms. Ratlieff demands judgment against the City for compensatory damages, costs, injunctive relief, and such other and further relief as the Court deems appropriate.

### COUNT VIII: Negligent Use of Direct Impact Munitions.
(Ramos)

231.   Plaintiff realleges paragraphs 1 through 132.

232.   This common law cause of action arises from Ramos negligently shooting plaintiff with a direct impact weapon in the face.

233.   Ramos created a foreseeable zone of risk by deploying impact rounds into a crowd of persons peacefully assembled who had been tear gassed and were

trying to escape the cloud of tear gas.

234.   Ramos owed a duty to all within the zone, including Ratlieff, to act with reasonable care to lessen the risk or see that sufficient precautions were taken to protect others from the harm that the risk imposed.

235.   Ramos breached his duty of care owed by negligently handling his 40mm launcher, negligently firing a direct impact round that hit plaintiff, and/or firing the KIP without providing a warning.

236.   Ramos negligently deployed a direct impact at a person in the assembly. Ramos knew his intended target "was trying to use people as shields." Notwithstanding, Ramos attempted to strike this person with a less-than-lethal round, while clearly in a group of people peacefully assembled. Ramos used a less-lethal round not intended to target a single person in a group and fired even though his view was clearly obscured by tear gas and the bystanders behind whom the target was hiding. Even worse, Ramos aimed for the abdomen, a body part different from that recommended by the direct impact product specifications (i.e., the thighs, buttocks, and legs), that substantially increased the risk of serious death or bodily harm. And there was no immediate need for Ramos to fire a less-than-lethal round.

237.   Ramos's negligent operation of his KIP directly and proximately caused Ms. Ratlieff's wrongful injury and resultant damages.

238.   Ramos acted in bad faith, or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

239.   As a direct and proximate result of Ramos's conduct, Ms. Ratlieff suffered damages, including mental anguish, bodily injury, pain and suffering, disability, disfigurement, emotional distress, humiliation, embarrassment, loss of capacity of the enjoyment of life, expense of hospitalization, medical treatment. The losses are permanent and/or continuing and Ratlieff will continue to suffer losses in the future.

For these reasons, Ms. Ratlieff demands judgment against the City of Fort Lauderdale for compensatory damages, costs, injunctive relief, and such other

and further relief as the Court deems appropriate.

**COUNT IX – Negligent Training and/or Supervision.**
(Against City of Fort Lauderdale)

240.    Plaintiff realleges paragraphs 1 through 132.

241.    At all times material hereto, the City owed a duty to take reasonable care in the instruction, training, and supervision of its employees.

242.    The City breached its duty by failing to implement its training regimen and by failing to implement its agency review procedures, including by, but not limited to:

    a.    Improperly training its officers on how to use KIPs;

    b.    Failing to train FLPD on the use of KIPs in crowd control situations before authorizing their use during the George Floyd demonstrations; and

    c.    Failing to train FLPD on the use of chemical munitions in crowd control situations before authorizing their use during the George Floyd demonstrations.

243.    The City breached its duty owed by negligently instructing, training, and supervising its officers in the reasonable and safe interaction with demonstrators.

244.    As a direct and proximate result of the City's negligent supervision, retention, and training, Ratlieff was subjected to injury, including deprivations of her civil rights and state law rights. Ratlieff suffered damages, including mental anguish, bodily injury, pain and suffering, humiliation, embarrassment, loss of earnings, and loss of ability to earn money. The losses are permanent.

For these reasons, Ms. Ratlieff demands judgment against the City of Fort Lauderdale for compensatory damages, costs, injunctive relief, and such other and further relief as the Court deems appropriate.

**Count X: Federal Civil Rights Violations – Fourteenth Amendment Procedural Due Process**
(All defendants)

245.   Plaintiff realleges paragraphs 1 through 132.

246.   Florida state law, federal law, and FLPD policies authorize the dispersal of person unlawfully assembled when there is a clear and present danger.

247.   Before dispersing a crowd, and using force to effectuate the dispersal, the defendants were required to provide notice that their assembly was declared unlawful as well as an opportunity to comply with the declaration of unlawful assembly.

248.   Ratlieff's  Due Process rights were violated when the defendants, individually and in concert with each other, dispersed a demonstration using chemical agents and kinetic impact projectiles without providing a warning and opportunity to disperse in a way that a person of ordinary intelligence could understand and comply with.

249.   Ramos used KIPs to disperse a crowd of demonstrators. Ramos gave no prior warning. Nor did he rely on warnings given by someone else. No one warned the demonstrators of the use of force.

250.   John Does 1-3 dispersed a crowd of demonstrators with tear gas. They gave no prior warning before dispersing the crowd with tear gas. Nor were they relying on warnings given by someone else. No one warned the demonstrators of the use of force.

251.   It was the City's policy, as well as its failure to train and supervise its officers, and issue corrective instructions after violations were brought to light, that caused the due process violations.

252.   Plaintiff's Fourteenth Amendment rights were violated when she was shot with a kinetic impact projectile by Defendant Ramos without prior warning or prior dispersal order.

253.   Plaintiff's Fourteenth Amendment rights were violated when she was tear-gassed by John Doe 1 without prior warning or prior dispersal order.

254.   Cristafaro ordered the use of KIPs and tear gas, after requesting permission from SWAT command.

255. Sergeant Cristafaro, Assistant Chief MacDougall, and Captain Dietrich violated plaintiff's rights because their commands caused the subordinate police officers to disperse a crowd of peaceful demonstrators, including plaintiff, who were lawfully assembled.

256. Sergeant Cristafaro, Assistant Chief MacDougall, and Captain Dietrich violated plaintiff's rights by failing to stop the use of tear gas and KIPs against peaceful demonstrators. Their failure to stop their subordinate officers from acting unlawfully caused the Fourteenth Amendment violations.

257. SWAT command consisted of defendants Captain Steve Greenlaw and Lieutenant Avery Figueras.

258. Captain Greenlaw and Lieutenant Figueras violated plaintiff's First Amendment rights because their commands caused the subordinate police officers to disperse a crowd of peaceful demonstrators, including plaintiff, who were exercising their freedom of expression.

259. There is no remedy at state law for the defendants' violation of Florida's unlawful assembly statutory procedure.

260. There is no adequate remedy at state law for challenging the defendants' dispersal of demonstrators, using force, without declaring their assembly unlawful and providing an opportunity to leave.

261. As a direct and proximate result of the City's conduct, Ratlieff suffered damages, including mental anguish, bodily injury, pain and suffering, disability, disfigurement, emotional distress, humiliation, embarrassment, loss of capacity of the enjoyment of life, expense of hospitalization, medical treatment. The losses are permanent and/or continuing and Ratlieff will continue to suffer losses in the future.

For these reasons, Ms. Ratlieff demands judgment against the City for compensatory damages, costs, injunctive relief, and such other and further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial as to all counts so authorized.

**RATZAN WEISSMAN & BOLDT**
2850 Tigertail Avenue,
Suite 400
Coconut Grove, FL  33133
Tele: 305.374.6366
Fax: 305.374.6755
Stuart@rwblawyers.com
StuartW@rwblawyers.com
Kimberly@rwblawyers.com

**KUEHNE DAVIS LAW, P.A.**
100 SE 2 Street, Suite 3105
Miami, FL 33131
Tel: 305.789.5989
Fax: 305.789.5987
ben.kuehne@kuehnelaw.com
mdavis@kuehnelaw.com
johand@kuehnelaw.com
efiling@kuehnelaw.com

By:   *s/Stuart N. Ratzan*
**STUART N. RATZAN**
Florida Bar No. 911445
**STUART J. WEISSMAN**
Florida Bar No. 57909
**KIMBERLY L. BOLDT**
Florida Bar No. 957399

By:   *S/ Michael T. Davis*
**BENEDICT P. KUEHNE**
Florida Bar No. 233293
**MICHAEL T. DAVIS**
Florida Bar No. 63374
**JOHAN D. DOS SANTOS**
Florida Bar No. 1025373

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify on October 27, 2022, I electronically filed this document with the Clerk using CM/ECF, and certify this document is served on all counsel via transmission of Notices of Electronic Filing generated by CM/ECF.

By:  *S/ Michael T. Davis*
**MICHAEL T. DAVIS**