## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 22-CV-61029-RAR

**LATOYA RATLIEFF**,

     Plaintiff,

v.

**CITY OF FORT LAUDERDALE, FLORIDA,** *et al.*,

     Defendants.

_____/

### ORDER GRANTING IN PART MOTIONS TO DISMISS

     The protests sparked by George Floyd's death have engulfed municipalities in litigation for the past three years. This is one of those cases, addressing the liability of the City of Fort Lauderdale and some of its police officers following a protest held shortly after Floyd's death. Currently before the Court are Defendant Officer Eliezer Ramos's Motion to Dismiss First Amended Complaint ("Ramos Motion"), [ECF No. 50], and the remaining Defendants'[1] Motion to Dismiss Plaintiff's First Amended Complaint ("Non-Ramos Motion"), [ECF No. 51] ("Motions").[2] Having considered Defendants' Motions, the record, and being otherwise fully advised, it is hereby

     **ORDERED AND ADJUDGED** that the Motions, [ECF Nos. 50–51], are **GRANTED IN PART** and **DENIED IN PART** as set forth herein.

---

[1] The Court adopts the parties' nomenclature and refers to the individual Defendants who are not Ramos or the John Doe Defendants as the "Non-Ramos Defendants."

[2] The Motions are fully briefed and ripe for adjudication. *See* Corrected Pl.'s Combined Resp. in Opp'n to Defs.' Mots. to Dismiss First Am. Compl. ("Response"), [ECF No. 65]; Defs.' Combined Reply ("Reply"), [ECF No. 70]. Defendants MacDoughall and Dietrich subsequently joined in the other Non-Ramos Defendants' Motion and Reply. *See* Notice of Joinder, [ECF No. 71]. Therefore, the Court construes any defense in the Non-Ramos Motion asserted by Greenlaw, Cristafaro, and Figueras collectively as also asserted by MacDoughall and Dietrich. The Court has also reviewed Ramos's Notice of Supplemental Authority, [ECF No. 92].

## BACKGROUND

### I. Factual Allegations

Following the death of George Floyd, many people throughout the country participated in demonstrations as a form of protest.  *See* First Am. Compl. ("Amended Complaint"), [ECF No. 49] ¶ 16.  This case arises out of one such demonstration, held in Fort Lauderdale, Florida on May 31, 2020.  *See* Am. Compl. ¶ 69.  On that day, thousands of citizens within the Fort Lauderdale area participated in a "peaceful gathering."  Am. Compl. ¶ 71.  The Fort Lauderdale Police Department ("FLPD") had officers at the scene of the demonstration and was otherwise prepared to respond if police assistance was required, but the demonstration was largely "without incident." *See* Am. Compl. ¶¶ 72–73.

As the demonstration came to an end, some participants approached FLPD officers who were observing the demonstration from a nearby parking garage.  Am. Compl. ¶ 74.  After making their way to the officers, these demonstrators began to chant and display signs.  *Id.*  One of the FLPD officers, feeling she was "completely surrounded" following the arrival of the demonstrators, requested backup.  *See* Am. Compl. ¶ 75.  Other officers arrived to provide backup, and one officer proceeded with force against a demonstrator.  Am. Compl. ¶ 78.  In response, "[a] few" members of the crowd threw "bottles, rocks, and other non-deadly objects" at the officer. Am. Compl. ¶ 79.  Despite this, the gathering "remained peaceful," and most of the crowd continued peacefully protesting by "taking to their knees, displaying signs, [and] chanting."  Am. Compl. ¶ 80.  The peaceful members of the crowd also attempted to "polic[e] the . . . agitators" who engaged the FLPD officers.  *Id.*

Then, before any FLPD officer at the scene declared the assembly unlawful or ordered the demonstrators to leave, the FLPD officers began to forcibly disperse the crowd.

Am. Compl. ¶¶ 80–90.  Ratlieff alleges this was contrary to FLPD Policy Number 501.10 ("Policy 501.10"), which provides as follows:

> When the Incident Commander determines that the participants [of an assembly] are unlawfully, riotously, or tumultuously assembled in violation of [Fla. Stat. §] 870.04, the following proclamation must be issued before an arrest for unlawful assembly is made: DISPERSAL ORDER I am (rank and name), of the Fort Lauderdale Police Department.  I hereby declare this to be an unlawful assembly and, in the name of the State of Florida, command all persons so assembled at (specific address of location) to immediately and peacefully disperse, which means to separate and leave the area. If you do not do so, you will be arrested or subjected to other police action.   Other police action may include the use of less-lethal munitions, or chemical agents.  Chapter 870.04 of the Florida State Statutes prohibits remaining present at an unlawful assembly.  If you remain in the area, which was just described, regardless of your purpose for remaining, you will be in violation of Section 870.04. The following routes of dispersal are available: (give directions for evacuation routes).  You have (X number of minutes) to leave in a peaceful, orderly manner, or face arrest or other police action.

Am. Compl. ¶ 58.  Policy 501.10 also requires officers to deliver this dispersal order loud enough for everyone assembled to hear.  Am. Compl. ¶ 59.  In accordance with Policy 501.10, members of the FLPD prepared a pre-recorded dispersal order to use on the day of the demonstration if needed, but as noted, this pre-recorded dispersal order went unused.  Am. Compl. ¶¶ 66–67. Despite the lack of warning, FLPD officers proceeded to disperse the demonstrators with tear gas and "kinetic impact projectiles" ("KIPs").  Am. Compl. ¶ 81.

KIPs are projectiles with a "larger surface area than other ammunition," which results in unpredictable flight paths and reduced accuracy.  Am. Compl. ¶ 30.  The Amended Complaint alleges that, to account for this reduced accuracy, FLPD policy identifies the "minimal standard of accuracy for KIPs as only twelve inches."  *Id.*  On the day in question, Defendant Ramos, a police officer stationed at the demonstration, utilized a KIP known as a "Defense Technology 40mm Direct Impact CS round" ("Direct Impact Round").  Am. Compl. ¶ 37.  The Direct Impact Round is comprised of two distinct parts: "a plastic body and a blue crushable foam nose."  *Id.*  When a

Direct Impact Round makes contact, the foam nose releases a "two-foot diameter cloud of CS powder" ("CS Payload") that contains a chemical used in tear gas.  Am. Compl. ¶¶ 37–38.  The CS Payload therefore allows a user to disperse "CS powder" among a group of people by shooting the Direct Impact Round at a single point near the group.  Am. Compl. ¶ 39.

Because of certain dangers associated with striking the abdomen, upper body, and head with a Direct Impact Round, Defense Technology, the manufacturer of Direct Impact Rounds, advises users to aim for thighs, buttocks, and legs, collectively known as the "green zone," as a first resort.  Am. Compl. ¶ 41.  The "yellow zone" includes knees, arms, and the abdomen, and the "red zone" is comprised of the back, chest, groin area, and head.  Am. Compl. ¶¶ 42–43.  Despite the risks associated with hitting the lower back and abdomen, and contrary to Defense Technology's instructions, FLPD did not instruct its officers to avoid aiming for these areas.  Am. Compl. ¶¶ 45, 50.  Instead, FLPD encourages its officers to aim for the chest "if other rounds are ineffective," and an unidentified "FLPD captain" confirmed that on the day of the demonstration FLPD officers were aiming for "center mass."  Am. Compl. ¶ 50.

Shortly after the FLPD began dispersing the crowd, Plaintiff Latoya Ratlieff, who was passing by the parking garage where these events were unfolding, joined the demonstrators as FLPD officers continued to deploy tear gas throughout the area.  Am. Compl. ¶¶ 100–02.  After being exposed to tear gas she then moved to an area near "journalists and observers" to recover.  Am. Compl. ¶ 107.  An FLPD officer identified as "John Doe 1" then deployed tear gas to Ratlieff's new location.  *Id.*  This was followed shortly by Ramos firing a Direct Impact Round in Ratlieff's direction without giving a warning as required by FLPD policy.  Am. Compl. ¶¶ 108–09.  Ratlieff alleges two alternative versions of events relating to Ramos's use of the Direct Impact Round.  Am. Compl. ¶¶ 108, 197–98.  In one version, Ramos intended to hit her with the Direct Impact Round.  Am. Compl. ¶ 198.  In the other, Ramos was aiming for someone near Ratlieff but

accidentally struck her instead. *See, e.g.*, Am. Compl. ¶¶ 168–69. Ramos's intent notwithstanding, he ultimately struck Ratlieff in the eye with the Direct Impact Round he deployed, thereby injuring her. Am. Compl. ¶ 112.

## II. Plaintiff's Causes of Action

Ratlieff filed the operative Amended Complaint on October 27, 2022 asserting: a § 1983 claim against all Defendants for violation of her First Amendment rights (Count I); a § 1983 claim against the City for violation of her substantive due process rights under the Fourteenth Amendment (Count II); a § 1983 claim against the City for violation of her Fourth Amendment rights (Count III); a § 1983 claim against the City and Ramos for violation of her Fourth Amendment rights (Count IV); state law battery claims against Ramos, Cristafaro, Greenlaw, Figueras, Dietrich, MacDoughall, and John Does 1–3 (Count V);[3] a state law battery claim against the City (Count VI); a state law claim for Negligent Use of Direct Impact Munitions against the City (Count VII); a state law claim for Negligent Use of Direct Impact Munitions against Ramos (Count VIII); a claim for negligent training against the City (Count IX); and a § 1983 claim against all Defendants for violation of her procedural due process rights under the Fourteenth Amendment (Count X).

With regards to her municipal liability claims, Ratlieff alleges that Rick Maglione, the Fort Lauderdale Chief of Police, is the final policymaker "for policies governing policing by the FLPD." Am. Compl. ¶¶ 124–25. Chief Maglione approved Policy 501.10, through which Ratlieff alleges he "delegated the authority to disperse a demonstration as well as use tear gas and KIPs to the Incident Commander." Am. Compl. ¶ 125. Defendant Douglas MacDoughall, the Assistant Chief of Police, serves as the Incident Commander for the entirety of Fort Lauderdale.

---

[3] Count V also references "Eugene," but references to Eugene are clearly a scrivener's error because Ratlieff abandoned her claims against him in her Amended Complaint.

Am. Compl. ¶ 126.  Also relevant to Ratlieff's municipal liability claims are Defendants Captain Steven Greenlaw, a S.W.A.T. supervisor, and Captain Robert Dietrich, the "Field Force Commander."  Am. Compl. ¶¶ 127–28.  MacDoughall, Greenlaw, and Dietrich "approved the deployment of tear gas and/or less-lethal munitions," and Chief Maglione "participated in the decision to use [and] approved the deployment of tear gas and/or less-lethal munitions."  Am. Compl. ¶¶ 126–29.  Chief Maglione also allegedly "ratified the decisions" of MacDoughall, Greenlaw, and Dietrich.  Am. Compl. ¶ 129.  Throughout the Amended Complaint Ratlieff also alleges that final policymakers within the City directed the use of tear gas and KIPs to disperse the demonstration.  *See* Am. Compl. ¶¶ 142, 157, 161, 179, 193.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a "short and plain statement of the claim," but a complaint must set forth more than "labels and conclusions" or a mere "formulaic recitation of the elements of a cause of action."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Instead, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  In addition to accepting the complaint's allegations as true, the court must draw all inferences in the plaintiff's favor when determining if a complaint states a claim to relief.  *Smith v. United States*, 873 F.3d 1348, 1351 (11th Cir. 2017).  But courts "are not bound to accept as true a legal conclusion couched as a factual allegation," *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555), and need not accept as true allegations that are "more conclusory than factual."  *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012).

A claim to relief is plausible where the plaintiff alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Iqbal*, 556 U.S. at 678.  The requirement that a claim be plausible does not require that it be probable, "but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  Allegations that are "merely consistent with" the defendant's liability are not enough.  *See Twombly*, 550 U.S. at 557.  Ultimately, "determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Holland v. Carnival Corp.*, 50 F.4th 1088, 1093 (11th Cir. 2022) (alterations accepted) (quoting *Iqbal*, 556 U.S. at 679).

<u>**ANALYSIS**</u>

Defendants have collectively moved to dismiss each count, either in whole or in part, contained within the Amended Complaint.  Accordingly, the Court will address the parties' arguments in turn.

### I. Count I – First Amendment Violation

Ramos argues Count I must be dismissed because (1) Ratlieff has not demonstrated a causal connection between Ramos's actions and her speech, and (2) Ramos is nonetheless entitled to qualified immunity.  Ramos Mot. at 4–7.  MacDoughall, Dietrich, Cristafaro, Figueras, and Greenlaw also argue they are entitled to qualified immunity.[4]  Non-Ramos Mot. at 23–24.  The Court rejects all of these arguments.

The Free Speech Clause of the First Amendment prohibits States from abridging freedom of speech.  U.S. CONST. amend. I; *see also Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) ("[T]he Fourteenth Amendment makes the First Amendment's Free Speech Clause applicable against the States.").  The Free Speech Clause not only guarantees the right to free speech, "but also the right to be free from retaliation by a public official for the exercise of

---

[4] The Court addresses the City's *Monell* arguments below because they relate to all claims asserted against the City.

that right." *Echols v. Lawton*, 913 F.3d 1313, 1320 (11th Cir. 2019) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000)).

Section 1983 provides a private right of action against "[e]very person who," acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. First Amendment retaliation "is a well-established basis for section 1983 liability." *O'Boyle v. Sweetapple*, 187 F. Supp. 3d 1365, 1370 (S.D. Fla. 2016). To state a First Amendment retaliation claim, a plaintiff must allege "(1) [s]he engaged in protected speech; (2) the defendant's conduct adversely affected the protected speech; and (3) a causal connection exists between the speech and the defendant's retaliatory actions." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016). A causal relationship only exists where "the defendant was subjectively motivated to take the adverse action because of the protected speech." *See Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011). Stated differently, a complaint must demonstrate the plaintiff's protected speech was the but-for cause of the defendant's actions. *See Noel v. Arias*, 460 F. Supp. 3d 1318, 1329 (S.D. Fla. 2020). At the motion to dismiss stage, a plaintiff may "identify a sequence of events from which 'a retaliatory motive can be inferred.'" *See Eisenberg v. City of Miami Beach*, 1 F. Supp. 3d 1327, 1344 (S.D. Fla. 2014) (quoting *Lippman v. City of Miami*, 719 F. Supp. 2d 1370, 1374 (S.D. Fla. 2010)).

Ramos argues that because he was following his superiors' directives to disperse the crowd, Ratlieff has not demonstrated Ramos was subjectively motivated to quell her speech. Ramos Mot. at 5. But Ratlieff has identified a series of events from which a retaliatory motive may be inferred. First, even assuming Ramos was not motivated by Ratlieff's speech, the fact he was following orders does not relieve him of liability. To the contrary— "since World War II, the

'just following orders' defense has not occupied a respected position in our jurisprudence, and officers in such cases may be held liable under § 1983 if there is a 'reason why any of them should question the validity of [an] order.'" *O'Rourke v. Hayes*, 378 F.3d 1201, 1210 n.5 (11th Cir. 2004) (quoting *Brent v. Ashley*, 247 F.3d 1294, 1306 (11th Cir. 2001)).

Second, Ramos completely ignores the allegations evidencing his intent to quell speech. Ratlieff alleges Ramos fired the Direct Impact Round "in aid of dispersing the crowd of demonstrators," "to stop a peaceful demonstration," and "to ensure that crowds of peaceful demonstrators could no longer peacefully practice their First Amendment-protected rights." Am. Compl. ¶¶ 109, 140, 144. Ratlieff was one of these demonstrators when Ramos shot her in the face. Am. Compl. ¶¶ 106–109. Drawing all inferences in Ratlieff's favor, the Court may infer that Ramos shot the Direct Impact Round in retaliation for Ratlieff's participation in the demonstration. *See Eisenberg*, 1 F. Supp. 3d at 1344. Therefore, the Court turns to whether Ramos, MacDoughall, Dietrich, Cristafaro, Figueras, and Greenlaw are entitled to qualified immunity.[5]

"Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action." *Bailey*, 843 F.3d at 480. While "the defense of qualified immunity is typically addressed at the summary judgment stage," a defendant may also raise it in a motion to dismiss. *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002). A public official is entitled to qualified immunity when he "establish[es] that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred." *Bailey*, 843 F.3d at 480. If a defendant has

---

[5] Ratlieff argues qualified immunity is waived as to Cristafaro, Greenlaw, and Figueras because it was not asserted in their first motion to dismiss, which was denied as moot after Ratlieff filed her Amended Complaint. Resp. at 36–37. But given that the Court finds Cristafaro, Greenlaw, and Figueras are not entitled to qualified immunity, it need not reach the issue of waiver.

made this showing, the burden then shifts to the plaintiff "to overcome the official's qualified immunity." *Echols*, 913 F.3d at 1319.  A court should dismiss a complaint "on qualified immunity grounds when the 'complaint fails to allege the violation of a clearly established constitutional right.'" *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (quoting *St. George*, 285 F.3d at 1337).  The parties do not dispute Ramos, MacDoughall, Dietrich, Cristafaro, Figueras, and Greenlaw were acting within the scope of their discretionary authority during the demonstration, so the burden is on Ratlieff to demonstrate they are not entitled to qualified immunity.

To establish a defendant is not entitled to qualified immunity, a plaintiff must show the defendant (1) "violated a statutory or constitutional right" which was (2) "'clearly established' at the time of the challenged conduct." *Echols*, 913 F.3d at 1319 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).  The facts of existing caselaw do not need to be identical to the plaintiff's case, "but the unlawfulness of the conduct must be apparent from pre-existing law." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011).  The "critical inquiry is whether the law provided [the defendant] with 'fair warning' that" the challenged conduct violated the plaintiff's constitutional rights. *McClish v. Nugent*, 483 F.3d 1231, 1248 (11th Cir. 2007) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

A plaintiff may demonstrate a defendant's conduct violated a clearly established right in three ways.  First, the plaintiff "may show that a materially similar case has already been decided." *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012) (quoting *Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012)).  Second, the plaintiff may demonstrate that "a broader, clearly established principle should control the novel facts in this situation." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005).  Or third, the plaintiff can show that "this case fits within the exception of conduct which so obviously violates the constitution that prior case law is unnecessary." *Keating v. City of Miami*, 598 F.3d 753, 766 (11th Cir. 2010) (alteration accepted)

(quoting *Mercado*, 407 F.3d at 1159).  Courts in Florida must look to the law as interpreted by the Supreme Court, the Eleventh Circuit, and the Supreme Court of Florida when determining whether a right was clearly established at the time of the challenged conduct.  *Id.*

Ramos argues he is entitled to qualified immunity because it is not clearly established "that ***following a directive*** to utilize less-than-lethal force during a protest where rioters w[ere] 'throwing bottles, rocks, and other non-deadly objects'" violates a plaintiff's First Amendment rights "in . . . bright line terms."  *See* Ramos Mot. at 6–7 (quoting Am. Compl. ¶ 79). MacDoughall, Dietrich, Cristafaro, Figueras, and Greenlaw similarly argue it is not clearly established "that ***issuing a directive*** to utilize less-than-lethal force during a protest where rioters w[ere] 'throwing bottles, rocks, and other non-deadly objects'" violates the First Amendment "in . . . bright line terms."  *See* Non-Ramos Mot. at 24 (quoting Am. Compl. ¶ 79).

The Court rejects these arguments, because directing "subordinate officers to use less-than-lethal weapons to disperse a crowd at a large public demonstration" violates a demonstrator's First Amendment rights because of the "broader, clearly established principle, that peaceful demonstrators have a First Amendment right to engage in expressive activities."  *Keating*, 598 F.3d at 767.   Because Ratlieff alleges she was retaliated against while peacefully demonstrating, the Court finds *Keating* controlling at this stage.  The only difference as to Ramos is that *Keating* addressed the issue of giving a directive rather than "following a directive."  *See id.*  But even assuming Ramos was following a directive to disperse a peaceful crowd, he had sufficient reason to "question the validity of" that order given *Keating*'s holding. *O'Rourke*, 378 F.3d at 1210 n.5 (quoting *Brent*, 247 F.3d at 1306).  And *Keating* is even more controlling as to MacDoughall, Dietrich, Cristafaro, Figueras, and Greenlaw's claim of qualified immunity, because it directly rebuts their assertion that it is not clearly established that ordering subordinates

to disperse a peaceful demonstration and then failing to stop the unlawful retaliatory conduct violates the demonstrators' First Amendment rights.  *See Keating*, 598 F.3d at 767.

The Court is unpersuaded by Ramos, MacDoughall, Dietrich, Cristafaro, Figueras, and Greenlaw's resort to the Amended Complaint's allegation that some protestors began to throw "bottles, rocks, and other non-deadly objects" to distinguish the instant case.  Ratlieff alleges that only "[a] few individuals in the crowd," not including herself, engaged in this behavior.  Am. Compl. ¶ 79.  Instead, she alleges that she was among "peaceful participants who were taking a knee and peacefully exercising their First Amendment rights" and was "a sufficient distance away from the FLPD" so as to not interfere with any "law enforcement activities."  Am. Compl. ¶¶ 100–01.  By the time Ratlieff was tear gassed by John Doe 1 and shot by Ramos, she was in "a safe space near journalists and observers."  Am. Compl. ¶¶ 106–08.  While subsequent discovery might call this version of events into question, the Court must accept these well-pleaded allegations as true.  Ratlieff has sufficiently established, at this stage of the litigation, that Ramos, MacDoughall, Dietrich, Cristafaro, Figueras, and Greenlaw violated her clearly established First Amendment rights and are accordingly not entitled to qualified immunity.

### II.  Count IV – Fourth Amendment Violation

Ramos moves to dismiss Count IV, which alleges a § 1983 claim against him and the City for violating Ratlieff's right to be free from unreasonable seizures and excessive force.  Am. Compl. ¶¶ 191–203.  He argues that because his conduct was meant to disperse the demonstrators present, Ratlieff was not subject to a "seizure" within the meaning of the Fourth Amendment.  The Court agrees with Ramos that the allegations within the Amended Complaint do not establish a seizure occurred.

The Fourth Amendment provides that the government shall not violate "[t]he right of the people to be secure . . . against unreasonable searches and seizures."  U.S. CONST. amend. IV; *see*

*also Torres v. Madrid*, 141 S. Ct. 989, 997 (2021) ("[T]he Fourteenth Amendment . . . incorporated the protections of the Fourth Amendment against the States."). This includes the right to be free from the use of excessive force during an "arrest, investigatory stop, or other 'seizure.'" *Corbitt*, 929 F.3d at 1313 (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)). A Fourth Amendment excessive force claim requires "(1) that a seizure occurred and (2) that the force used to effect the seizure was unreasonable." *Troupe v. Sarasota Cnty., Fla.*, 419 F.3d 1160, 1166 (11th Cir. 2005).

"A seizure occurs whenever the police 'restrain the freedom of a person to walk away.'" *AFL-CIO v. City of Miami, FL*, 637 F.3d 1178, 1191 (11th Cir. 2011) (alteration accepted) (quoting *Brower v. Cnty. of Inyo*, 489 U.S. 593, 595 (1989)). To determine if a seizure has occurred, a court must evaluate whether "a reasonable person would have believed that [s]he was not free to leave." *See Knight ex rel. Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 822 (11th Cir. 2017) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.)). Generally, "[a] seizure requires the use of force *with intent to restrain*." *Torres*, 141 S. Ct. at 998. This excludes both "[a]ccidental force" as well as "force intentionally applied for some other purpose." *Id.* Ultimately, courts must remain cognizant that not "every physical contact between a government employee and a member of the public" is a seizure. *See id.*

The Supreme Court illustrated this concept in *Brower*, where it hypothesized that "if a parked and unoccupied police car slips its brake and pins a passerby against a wall, it is likely that a tort has occurred, but not a violation of the Fourth Amendment." 489 U.S. at 596. This is so even "if the passerby happened, by lucky chance, to be a serial murderer for whom there was an outstanding arrest warrant" and who was actively being pursued by other officers. *Id.* As expressed by the Supreme Court, "[i]t is clear . . . that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement . . . nor even whenever there is a governmentally caused and governmentally *desired*

termination of an individual's freedom of movement." *Id.* at 596–97.  Instead, a seizure occurs "only when there is a governmental termination of freedom of movement *through means intentionally applied*." *Id.* at 597.  The Eleventh Circuit has recognized that lower courts interpret *Brower* to require "that the officer's action must have been intended to stop the plaintiff." *Corbitt*, 929 F.3d at 1318.  "[T]he appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain." *See Torres*, 141 S. Ct. at 998.

Because Ratlieff was clearly not arrested nor subjected to an investigatory stop, she alleges she was seized when Ramos shot her with the Direct Impact Round.  *See* Am. Compl. ¶¶ 194–201. After a thorough review of the Amended Complaint, the Court concludes that Ratlieff's factual allegations do not establish she was subjected to a seizure within the meaning of the Fourth Amendment.  Count IV alleges that Ramos either intentionally shot the Direct Impact Round at Ratlieff or accidentally shot her when he was aiming for someone close enough to her to ensure that she would be hit with the CS Payload.  Am. Compl. ¶¶ 197–98.  Neither constitutes a seizure. Pursuant to both versions of events, Ramos shot the Direct Impact Round to "disperse crowds of peaceful demonstrators."  Am. Compl. ¶ 193.

Ratlieff's allegations that Defendants "knew or reasonably should have known the [crowd control] agents would temporarily incapacitate and immobilize" a demonstrator and "would restrict the free movement of gathered participants," Am. Compl. ¶ 21, are inapposite, because it is clear from the allegations in the Amended Complaint that Ramos's actions did not *objectively* manifest an intent to restrict Ratlieff's freedom of movement.  *See Torres*, 141 S. Ct. at 998.  It is instead clear that Ramos fired the Direct Impact Round "for some other purpose," *id.*, namely, to "disperse crowds of peaceful demonstrators,"  Am. Compl. ¶ 193, and that any reasonable person in Ratlieff's position would feel free—perhaps even encouraged—to leave.  This was seemingly

effective, because Ratlieff does not allege factual matter establishing she could not leave the demonstration after being hit with the Direct Impact Round.

Other courts, including the Eleventh Circuit, have reached similar conclusions. *See AFL-CIO*, 637 F.3d at 1191 (holding plaintiff suffered no Fourth Amendment injury where her "freedom of movement was certainly restrained" but she nonetheless "had the ability to, and indeed did, walk away" despite the fact she was also "expos[ed] to pepper fumes"); *Dundon v. Kirchmeier*, 577 F. Supp. 3d 1007, 1040 (D.N.D. 2021) (holding there was no Fourth Amendment seizure where officers did not use less-than-lethal force "to herd Plaintiffs into a certain location" or "encircle them without a way out" and the protestors could "leave and disengage law enforcement contact"); *see also Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 49 (D.D.C. 2021) (holding defendants were entitled to qualified immunity because it was not clearly established that "the use of tear gas to move members of a crowd can constitute a seizure"). As aptly stated by another court facing a similar question, "[t]here simply was no seizure here." *Dundon*, 577 F. Supp. 3d at 1040.

Accordingly, Count IV must be dismissed. Count III, which is a Fourth Amendment excessive force claim based on the use of tear gas and KIPs at the demonstration, is therefore also dismissed.[6]

---

[6] Ramos also moves to dismiss Count IV on the ground that he is entitled to qualified immunity because it is not clearly established that accidentally shooting a plaintiff violates Fourth Amendment rights. Ramos Mot. at 10–11. But Count IV alleges that Ramos meant to at least subject Ratlieff to the CS Payload and alternatively struck Ratlieff intentionally, so this argument is largely unresponsive to Count IV. *See* Am. Compl. ¶¶ 197–98. Because Ramos's argument is unresponsive to most of the allegations in Count IV, the Court need not address this alternative argument. To the extent Count IV asserts that Ramos struck Ratlieff completely by accident, this would seemingly not constitute a seizure under *Brower*'s hypothetical relating to accidental use of force by government officials. 489 U.S. at 596–97; *see also Corbitt*, 929 F.3d at 1318–19 (holding officer was entitled to qualified immunity because there was no case "clearly establishing . . . that a temporarily seized person . . . suffers a violation of [the person's] Fourth Amendment rights when an officer" accidentally shoots the person while aiming for a different target); *Woods v Reeve*, No. 21-14001, 2023 WL 3454921, at *10 (S.D. Fla. May 15, 2023) ("Indeed . . . it is far from clear whether . . . accidental conduct can even sustain a Fourth Amendment violation.").

### III.  Counts V and VI – Battery

Ratlieff asserts a claim for battery against Ramos and the Non-Ramos Defendants in Count V, and she asserts the same against the City in Count VI.  Am. Compl. ¶¶ 204–19.  All Defendants move to dismiss these claims, but the Court is satisfied the Amended Complaint sufficiently states a battery claim against Defendants.

There are two elements to battery under Florida law: (1) "intent to cause a harmful or offensive contact" and (2) "a resulting 'offensive contact with the person of [another].'" *Baxter v. Roberts*, 54 F.4th 1241, 1272 (11th Cir. 2022) (alteration accepted) (quoting *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996)).  The second element is met where an offensive contact "directly or indirectly results" from the defendant's actions.  *Rubio v. Lopez*, 445 F. App'x 170, 175 (11th Cir. 2011).  The intent required by Florida law exists where the defendant acts either with "a deliberate intent to injure or engages in conduct which is substantially certain to result in injury."  *See id.*  Courts reviewing civil claims for battery may also look to the criminal analogue, because in Florida "[t]here is no difference between the tort of battery and the crime of battery."  *Swindell v. Hunter*, No. 3:15-cv-1532-J-25JBT, 2019 WL 1297207, at *4 (M.D. Fla. Mar. 21, 2019) (quoting *Mason v. Fla. Sheriffs' Self-Insurance Fund*, 699 So. 2d 268, 270 n.1 (Fla. 5th DCA 1997)).  The crime of battery may be committed by either "actually and intentionally touch[ing] or strik[ing] another person" or "[i]ntentionally caus[ing] bodily harm to another person."  Fla. Stat. § 784.03(1)(a)1–2.

#### i.  Ramos

Ramos argues the Amended Complaint does not evidence an intent to make contact with Ratlieff because he accidentally shot her.  Ramos Mot. at 11.  Ramos's argument, which amounts to one paragraph and a single case cite, is barely developed and borders on waived.  *Cf. Christmas*

*v. Harris Cnty., Ga.*, 51 F.4th 1348, 1354 n.4 (11th Cir. 2022) (stating that a "passing reference to an issue in a brief is not enough" to avoid waiver (citation omitted)).

Nevertheless, as discussed in the context of Ratlieff's First Amendment retaliation claims, the Amended Complaint contains sufficient factual matter for the Court to infer an intent to make contact with Ratlieff's person through either the Direct Impact Round or the CS Payload. Ramos fired the Direct Impact Round and shot Ratlieff as she was amongst other demonstrators. Am. Compl. ¶¶ 106–10. Certainly, the Court may reasonably infer an "intent to cause a harmful or offensive contact" from these allegations. *Baxter*, 54 F.4th at 1272 (alteration accepted). This is especially true with regard to the CS Payload, which "dispers[es] a two-foot diameter cloud of CS powder," Am. Compl. ¶ 38, thereby making it more likely that a person utilizing a Direct Impact Round is "substantially certain" to hit anyone in a given area with the CS Payload's powder. *Rubio*, 445 F. App'x at 175.

To the extent Ramos argues he only hit Ratlieff by mistake, this is simply a denial of Ratlieff's allegations, because she claims he shot her "intentionally," Am. Compl. ¶ 209, and mental conditions such as "intent may be alleged generally." *Jones v. City of Palm Beach Gardens*, No. 16-81247, 2022 WL 2191689, at *4 (S.D. Fla. June 17, 2022); *see also* FED. R. CIV. P. 9(b). At this stage, Ratlieff has adequately alleged Ramos acted intentionally in firing the Direct Impact Round. Accordingly, Ratlieff has sufficiently pleaded her battery claim against Ramos.[7]

### ii.  *Non-Ramos Defendants*

Ratlieff avers battery claims against the Non-Ramos Defendants because they "directed the

---

[7]  In reaching this conclusion, the Court notes Ramos and Ratlieff brief the issue of whether Ratlieff may maintain a battery claim in the event Ramos aimed the Direct Impact Round at someone else and only hit Ratlieff by accident. Resp. at 22–23; Reply at 18–19. Ratlieff argues that if this version of events is true, transferred intent would nonetheless apply. Resp. at 22–23. This argument is not properly before the Court, because while references to Ramos accidentally hitting Ratlieff appear within other Counts, *see, e.g.*, Am. Compl. ¶¶ 226, 236, neither the general allegations nor Count V contain allegations regarding this version of events. Therefore, the Court finds it premature to address this issue.

use of tear gas and KIPs."  Am. Compl. ¶ 207.  The Non-Ramos Defendants move to dismiss these claims because they are entitled to statutory immunity and the Amended Complaint does not allege they "touched or otherwise made any form of contact with" Ratlieff or demonstrate any contact with Ratlieff was intended.  Non-Ramos Mot. at 12.

The Court finds dismissal of the battery claims against the Non-Ramos Defendants unwarranted.  The Non-Ramos Defendants are correct the Amended Complaint does not allege they made direct contact with Ratlieff, but the Non-Ramos Defendants ignore a defendant may be liable for battery where the defendant "indirectly" causes an offensive touching.  *Rubio*, 445 F. App'x at 175.  Looking to the criminal version of battery for guidance, the Non-Ramos Defendants similarly ignore that criminal battery may be committed by "[i]ntentionally caus[ing] bodily harm to another person."  *See* Fla. Stat. § 784.03(1)(a)2.  The Non-Ramos Defendants fail to advance an argument addressing whether their actions constitute an indirect battery.  As such, the Court need not consider this issue.  *See Barmapov-Segev v. City of Miami*, No. 19-23742, 2019 WL 6170332, at *5 (S.D. Fla. Nov. 20, 2019) (refusing to dismiss a battery claim where the defendant did not touch the plaintiff because "[n]either party cite[d] a case on the issue of an indirect battery" and the court would "not serve as counsel's law clerk and make the arguments that should have been developed by each side").[8]

Ratlieff has also sufficiently pleaded the requisite intent on the part of the Non-Ramos Defendants.  MacDoughall, Greenlaw, and Dietrich "approved the deployment of tear gas and/or less-lethal munitions."  Am. Compl. ¶¶ 126–28.  And they, along with Cristafaro and Figueras,

---

[8]  The Non-Ramos Defendants cite a few cases for the proposition that one must actually touch the plaintiff to commit a battery, but none of these cases address an indirect battery under Florida law.  *See Ruizdelatorre v. City of Miami Beach*, No. 06-21183, 2008 WL 5381431, at *14–15 (S.D. Fla. Dec. 22, 2008) (battery for excessive use of force); *Sampson v. Reed*, 536 F. App'x 989, 990 (11th Cir. 2013) (Georgia battery); *Slone v. Judd*, No. 8:09–CV–1175–T–27TGW, 2010 WL 2542283, at *5 (M.D. Fla. June 23, 2010) (dismissing assault and battery claims against certain defendants who did not "enter[] the decedent's cell and use[] force on him").

then "directed the use of tear gas and KIPs" while acting "intentionally."  Am. Compl. ¶¶ 207, 209.  These allegations are far from robust, but drawing all inferences in Ratlieff's favor, the Court can infer that the Non-Ramos Defendants either deliberately intended for the tear gas and KIPs to make contact with Ratlieff—or that it was substantially certain Ratlieff would be impacted by the tear gas and KIPs given her position in the crowd.  Ratlieff has therefore, at this stage, "nudged [her] claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

Finally, the Non-Ramos Defendants move to dismiss the battery claims against them because they are entitled to statutory immunity under section 768.28(9)(a) of the Florida Statutes. But the Court finds that the allegations within the Amended Complaint demonstrate the Non-Ramos Defendants are not entitled to statutory immunity.

Section 768.28(9)(a) provides that an officer is immune from civil liability "for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function," unless she or he "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."  When an officer is entitled to statutory immunity, the plaintiff's "exclusive remedy . . . is by action against the governmental entity, or the head of such entity in her or his official capacity, or the constitutional officer of which the officer. . . is an employee."  *Id.*  Conversely, the state is immune from liability when an officer acts in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.  *Id.*

In *Peterson v. Pollack*, the Fourth District Court of Appeal defined "bad faith," "malicious purpose," and "wanton and willful disregard" as used in the statute.  290 So. 3d 102, 109–10 (Fla. 4th DCA 2020).  "Bad faith" is equivalent to "actual malice."  *Id.* at 109 (citing *Parker v. State of Fla. Bd. of Regents ex rel. Fla. State Univ.*, 724 So. 2d 163, 167 (Fla. 1st DCA 1998)).  A person acts with "malicious purpose" when the person has "ill will, hatred, spite, or an evil intent,"

alternatively phrased as "the subjective intent to do wrong." *Id.* (alteration accepted) (quoting *Eiras v. Florida*, 239 F. Supp. 3d 1331, 1343, 1345 (M.D. Fla. 2017)).  "[W]anton means with a conscious and intentional indifference to consequences and with the knowledge that damage is likely to be done to persons or property." *Id.* at 110 (internal quotation marks omitted).  And "willful" conduct is done "intentionally, knowingly and purposely." *Id.* (citation omitted).

Ratlieff alleges the Non-Ramos Defendants acted "intentionally, in bad faith, or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."  Am. Compl. ¶ 209.  As the Non-Ramos Defendants "directed the use of tear gas and KIPs" intentionally, Ratlieff has sufficiently alleged their actions were "willful."  Am. Compl. ¶¶ 207–09; *see also* FED. R. CIV. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").  Additionally, Ratlieff has alleged sufficient conduct to permit the Court to infer either actual malice (bad faith); ill will, hatred, spite, an evil intent, or a subjective intent to do wrong (malicious purpose); or a conscious and intentional indifference to consequences and with the knowledge that damage is likely to be done to persons or property (wanton behavior).  This is because Ratlieff alleges the Non-Ramos Defendants directed the use of the tear gas and KIPs against a peaceful crowd before their assembly was declared unlawful and a dispersal order was given.  Am. Compl. ¶¶ 80–86, 90, 102–04.

Ratlieff will ultimately have to substantiate the aforementioned allegations for her claim to survive the Non-Ramos Defendants' statutory immunity.  But at the pleading stage, where the Court must accept the facts alleged as true, she has sufficiently demonstrated that the Non-Ramos Defendants are not entitled to statutory immunity.  Consequently, the battery claims against the Non-Ramos Defendants do not warrant dismissal.

### iii.  The City

Finally, the City moves to dismiss the battery claim against it because the actions of Ramos

and the Non-Ramos Defendants do not constitute battery.  Non-Ramos Mot. at 13–14.  The Court has already rejected these arguments.  The City also moves to dismiss the battery claim to the extent it is based on the actions of Defendants John Doe 1, 2, and 3 because a plaintiff may not generally sue a fictitious party in federal court.  Non-Ramos Mot. at 14.  It is true that federal courts generally do not allow claims brought against fictitious parties.  *See Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010).  The City, however, does not move to dismiss the claims against the John Doe Defendants—it moves to dismiss the claim against itself.  Non-Ramos Mot. at 13–14.  But it cites no authority for the proposition that it cannot be held liable for the actions of officers that Ratlieff has yet to identify.  The Court therefore summarily rejects this argument.

### IV.  Counts VII and VIII – Negligent Use of Direct Impact Munitions

In Counts VII and VIII, Ratlieff asserts claims for "Negligent Use of Direct Impact Munitions" against the City and Ramos.  Am. Compl. ¶¶ 220–39.  The labeling of these claims notwithstanding, it is clear that Ratlieff is asserting negligence claims premised on the fact that Ramos negligently used the Direct Impact Round, thereby hitting her in the face.  Noting Florida law does not recognize a cause of action for negligent use of excessive force—because use of excessive force is an *intentional* act—Ramos and the City both argue Ratlieff's negligence claims fail.  Ramos Mot. at 11–12; Non-Ramos Mot. at 15–16.

This is a correct but irrelevant statement of the law, *see, e.g.*, *Secondo v. Campbell*, 327 F. App'x 126, 131 (11th Cir. 2009), because Counts VII and VIII make no reference to the use of excessive force.  *See generally* Am. Compl. ¶¶ 220–39.  Rather, Counts VII and VIII allege Ramos identified an individual he intended to shoot with the Direct Impact Round who "was trying to use people as shields."  Am. Compl. ¶¶ 226, 236.  And despite his vision being "obscured by tear gas," Ramos remained undeterred and took aim at this individual—at the abdomen specifically, rather than at the areas of the body recommended by the manufacturer.  *Id.*  Ramos then fired the Direct

Impact Round, missed his intended target, and hit Ratlieff in the face.  Am. Compl. ¶¶ 221, 232.

There is simply no support for the City and Ramos's argument that Ratlieff has asserted excessive

force claims in Counts VII and VIII.

Further, a plaintiff may maintain a negligence claim in conjunction with a claim for

excessive use of force if the negligence claim "pertain[s] to something other than the actual

application of force during the course of the arrest." *Sanders*, 672 So. 2d at 47–48.  In fact, "Florida

law . . . clearly recognizes a cause of action for the negligent handling of a firearm and the negligent

decision to use a firearm separate and distinct from an excessive force claim." *Lewis v. City of St.*

*Petersburg*, 260 F.3d 1260, 1263 (11th Cir. 2001).  That is exactly what Ratlieff alleges in Counts

VII and VIII: that Ramos was negligent in how he fired the Direct Impact Round.  Accordingly,

the Court must reject Ramos and the City's invitation to construe Ratlieff's claim as one for

negligent use of excessive force.

Ramos next implies he is entitled to statutory immunity as to Count VIII, arguing section

768.28(9)(a) of the Florida Statutes categorically precludes claims for negligence against officers.

After careful review of recent Florida caselaw, the Court concludes section 768.28(9)(a) does not

categorically shield officers from negligence claims.

Relying on two cases—including one unpublished decision from the Eleventh

Circuit—Ramos argues section 768.28(9)(a) provides categorical statutory immunity to officers

for claims alleging negligence.  The Eleventh Circuit has stated that "[b]y its own terms, § 768.28

protects officers from negligence-based claims." *Pena v. Marcus*, 715 F. App'x 981, 989 (11th

Cir. 2017).  As an unpublished decision, *Pena* is not binding on the Court but is nonetheless

"persuasive . . . insofar as [its] legal analysis warrants." *Bonilla v. Baker Concrete Constr., Inc.*,

487 F.3d 1340, 1345 n.7 (11th Cir. 2007).  Relying on *Pena*, one court has subsequently held that

"the plain text of the statute bars negligence claims categorically against officers." *Diaz v.*

*Miami-Dade Cnty.*, 424 F. Supp. 3d 1345, 1361 (S.D. Fla. 2019) (citing *Pena*, 715 F. App'x at 989). But recent state court decisions have rebutted this proposition.

In *Peterson*, the Fourth District Court of Appeal affirmed the denial of a motion to dismiss a negligence claim where the plaintiff asserted statutory immunity under section 768.28, holding that "a reasonable trier of fact [could] conclude that the [defendant] acted 'in bad faith,' 'with malicious purpose,' or 'in a manner exhibiting wanton and willful disregard of human rights or safety.'" 290 So. 3d at 114 (alteration accepted). Similarly, in *Medina v. Pollack*, the Fourth District explained that "[w]hile further fact development may ultimately convince a trier-of-fact that [the defendant's] actions, or lack thereof, were not wanton and willful, the allegations of the complaint are sufficient to prevent dismissal of the complaint." 300 So. 3d 173, 176–77 (Fla. 4th DCA 2020).

In light of this recent authority, the Court concludes that section 768.28(9)(a) does not categorically bar negligence claims against officers. Accordingly, Ramos's Motion must be denied as to this claim.

### V. Count IX – Negligent Training

The City argues Count IX must be dismissed because this claim is barred by sovereign immunity and insufficiently pleaded.[9] The Court disagrees.

Florida has waived sovereign immunity in instances "in which the state . . ., if a private person, would be liable to the claimant, in accordance with the general laws of this state." Fla. Stat. § 768.28(1). "[A]n employer is liable in tort for reasonably foreseeable damages resulting from the negligent training of its employees and agents." *Lewis*, 260 F.3d at 1265. Sovereign immunity still bars claims, however, based on acts that are "discretionary" as opposed to

---

[9] While Count IX is titled "Negligent Training and/or Supervision" and also references "retention" in passing, Ratlieff clarifies that this count was only meant to assert a claim for negligent training in her Response. *See* Resp. at 31. Therefore, the Court does not address negligent supervision and retention.

"operational." *Id.* at 1262 (citation omitted). This discretionary function exception "is grounded in the doctrine of separation of powers," because "it would be an improper infringement of separation of powers for the judiciary, by way of tort law, to intervene in fundamental decisionmaking of the executive and legislative branches of government, including the agencies and municipal corporations they have created." *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1118 (11th Cir. 2005) (quoting *Kaisner v. Kolb*, 543 So. 2d 732, 736–37 (Fla. 1989)).

A discretionary act is one that "involves an 'exercise of executive or legislative power such that, for the court to intervene by way of tort law would inappropriately entangle it in fundamental questions of policy and planning.'" *Lewis*, 260 F.3d at 1266 (quoting *Dep't of Health and Rehab. Servs. v. Yamuni*, 529 So. 2d 258, 260 (Fla. 1988)). It is well-settled that "[a] city's decision regarding how to train its officers and what subject matter to include in the training is clearly an exercise of governmental discretion regarding fundamental questions of policy and planning." *Id.* But this governmental immunity does not preclude a claim alleging that a municipality "was negligent in the implementation or operation of [a] training program." *See Mercado*, 407 F.3d at 1162.

At first glance, it appears Ratlieff is challenging the City's decision not to train its officers—a claim clearly subject to sovereign immunity. *See Lewis*, 260 F.3d at 1266. Indeed, the Amended Complaint alleges the City "[i]mproperly train[ed] its officers on how to use KIPs"; "fail[ed] to train FLPD on the use of KIPs in crowd control situations before authorizing their use during the George Floyd demonstrations"; and "fail[ed] to train FLPD on the use of chemical munitions in crowd control situations before authorizing their use during the George Floyd demonstrations." Am. Compl. ¶ 242. But upon closer examination, Ratlieff critically alleges these listed failures relate to *existing* policies, as the City failed "to *implement its training regimen* and

. . . *its agency review procedures*." Am. Compl. ¶ 242 (emphasis added). This purported failure to implement existing policies—an operational function—sidesteps the application of sovereign immunity to Ratlieff's negligent training claim. And the Court finds Ratlieff's allegations as to the content of these policies sufficient to identify the relevant policies at this stage.[10] Dismissal is therefore inappropriate. *See N.R. ex rel. Ragan v. Sch. Bd. of Okaloosa Cnty., Fla.*, 418 F. Supp. 3d 957, 997 (N.D. Fla. 2019) (denying motion to dismiss where the defendant failed to "adequately and appropriately train its employees in identifying, documenting, and/or reporting child abuse . . . which includes the [defendant's] alleged failure to properly implement and enforce its training" (alteration accepted) (internal quotation marks omitted)).

### VI.  Count X – Procedural Due Process

Ratlieff alleges in Count X that she was deprived of procedural due process when the demonstration was dispersed without an officer declaring it unlawful and providing her with an opportunity to comply with a dispersal order. Am. Compl. ¶¶ 245–61. She does not allege she was deprived of any hearing—only that she was entitled to an "opportunity to disperse." Am. Compl. ¶ 248. Ramos argues Ratlieff has not identified "any constitutional procedures that were not provided" and that the Due Process Clause did not entitle Ratlieff to receive "notice and an 'opportunity to disperse.'" Ramos Mot. at 13 (emphasis omitted). The Court agrees. Ratlieff has failed to state a procedural due process claim.[11]

---

[10]  Ratlieff is, however, given leave to include the information contained within her Response relating to these procedures and training regimen in any forthcoming Second Amended Complaint. *See* Resp. at 33.

[11]  Ramos also argues Ratlieff must proceed under the Fourth Amendment because she asserts an excessive force claim and he is entitled to qualified immunity because no authority shows that "an officer's use of an impact weapon, without first subjectively hearing a dispersal order (allegedly required to be given by others), violates clearly established law." Ramos Mot. at 13–14 (emphasis omitted). But Count X is not an excessive force claim, and the Amended Complaint alleges Ramos "*gave* no prior warning" before using KIPs to help disperse the crowd. Am. Compl. ¶ 249 (emphasis added). As these arguments do not accurately respond to the Amended Complaint, the Court need not address them.

The Due Process Clause of the Fourteenth Amendment provides that a state may not "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. The Fourteenth Amendment protects both "substantive" as well as "procedural" due process. *AFL-CIO*, 637 F.3d at 1185. Procedural due process entitles individuals to "notice and the opportunity to be heard incident to the deprivation of life, liberty or property at the hands of the government." *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1316 (11th Cir. 2011) (quoting *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003)). It is therefore not the act of deprivation itself that is unconstitutional—rather, "what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). To sustain a § 1983 procedural due process claim, a plaintiff must allege: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Arrington v. Helms*, 438 F.3d 1336, 1347 (11th Cir. 2006) (quoting *Grayden*, 345 F.3d at 1232).

First, it is unclear what liberty or property interest Ratlieff is relying on to support her procedural due process claim. She makes a single, passing reference to the First Amendment in one allegation that is nearly identical to an allegation in Count I, suggesting this is simply a scrivener's error. *Compare* Am. Compl. ¶ 150, *with* Am. Compl. ¶ 258. Other than this reference, Count X merely alleges Ratlieff's due process rights were violated when the officers on the scene failed to declare the assembly unlawful and allow the demonstrators to leave before the FLPD forcibly dispersed the crowd. Am. Compl. ¶¶ 246–61. But if Ratlieff was not deprived of a liberty or property interest, she has no procedural due process claim. And to the extent the Amended Complaint attempts to allege Ratlieff has a liberty or property interest in the warning procedures provided by Florida law and FLPD policy, Ratlieff has not demonstrated that these laws or policies establish an individual interest subject to deprivation. *See* Am. Compl. ¶¶ 259–60. Courts require

that a liberty or property interest be particular to an individual to implicate the Due Process Clause. *See, e.g.*, *Smith v. City of Minneapolis*, No. 21-1347, 2021 WL 6011029, at *2 (D. Minn. Dec. 20, 2021) (dismissing procedural due process claim in part because the plaintiff "provide[d] no support for her argument that" a state law "detail[ing] how a peace officer may conduct an arrest" granted her "an independent liberty interest").

Perhaps even more fatal to this claim is that the procedures Ratlieff identifies do not provide an opportunity to be heard at all—they simply require demonstrators to leave before they are dispersed or arrested. And she has not provided any support for the novel proposition that the Due Process Clause—which guarantees notice and an opportunity to be *heard*—provides her with an opportunity to disperse. Consequently, Count X warrants dismissal and the Court need not reach the parties' positions regarding a post-deprivation remedy and qualified immunity.

### VII.  Ratlieff's *Monell* Claims

The City moves to dismiss all claims against it because Ratlieff has not alleged sufficient factual matter to establish *Monell* liability under either a final policymaker or failure to train theory. The Court agrees, and while the Court has already determined Counts III, IV, and X must be dismissed on other grounds, dismissal of these counts as to the City is independently warranted for failure to sufficiently plead *Monell* liability.

Section 1983 does not operate to hold local governments liable "solely upon a respondeat superior theory." *Mandel v. Doe*, 888 F.2d 783, 791 (11th Cir. 1989). A plaintiff may maintain a § 1983 claim against a municipality "only where the municipality *itself* causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). Consequently, a municipality is only liable when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). It is only in these

circumstances that the challenged actions "are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Ratlieff advances *Monell* claims against the City by asserting the alleged constitutional violations were (1) done at the direction of final policymakers within the City; and alternatively (2) the result of the City's failure to properly train its officers.[12] The Court addresses both theories in turn.

### i. Final Policymaker Theory

Municipalities are generally only liable for a single decision made by a municipal official when the official "is the final policymaker for the municipality with respect to the subject matter in question." *Mandel*, 888 F.2d at 793. An official is the final policymaker on a given subject matter when "his decisions have legal effect without further action by the governing body" and "the governing body lacks the power to reverse the [official's] decision." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1292 (11th Cir. 2004). Courts determine whether an official is a final policymaker for the municipality by examining "the relevant positive law, including ordinances, rules and regulations" as well as "customs and practices having the force of law." *Mandel*, 888 F.2d at 793.

A lesser official's decision may subject a municipality to liability in certain circumstances—relevant here, delegation and ratification. A decision made by a municipal officer who is not a final policymaker can underlie municipal liability when the official was delegated the authority to make the decision by a final policymaker. *Id.* at 792. However, "mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate

---

[12] The parties discuss the fact Ratlieff omits specific reference to a failure to train in Count I and final policymakers in Count X. As it is clear this is an unintentional omission, the Court discusses all claims as if they set forth both theories, and Ratlieff is granted leave to amend these Counts to properly set forth both theories.

policymaking authority." *Id.* Liability only attaches under a delegation theory when "the subordinate's discretionary decisions are not constrained by official policies and are not subject to review." *Id.*

Ratification occurs when "a subordinate public official makes an unconstitutional decision" and a final policymaker "adopt[s]" the decision. *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016) (quoting *Matthews v. Columbia Cnty.*, 294 F.3d 1294, 1297 (11th Cir. 2002)). The final policymaker must "approve a subordinate's decision *and* the basis for it" before the municipality can be held liable. *Salvato v. Miley*, 790 F.3d 1286, 1296 (11th Cir. 2015) (emphasis added) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality)).

Ratlieff attempts to establish municipal liability by arguing final policymakers directed the use of tear gas and KIPs on the day of the demonstration, but her allegations are completely conclusory. *See, e.g.*, Am. Compl. ¶ 142 ("Final policymakers within the City of Fort Lauderdale authorized and directed the deployment of tear gas and KIPs . . . ."); *see also* Am. Compl. ¶¶ 157, 179, 193 (similar). It is unclear who exactly these "[f]inal policymakers" were, because in her preliminary allegations, Ratlieff only identifies Chief Maglione as "the final policymaker for policies governing policing by the FLPD." Am. Compl. ¶ 124. Because "there are . . . indicia in state law that police chiefs in Florida have final policymaking authority in their respective municipalities for law enforcement matters," the Court will assume without deciding that Maglione has final policymaking authority. *Davis v. City of Apopka*, 734 F. App'x 616, 619 (11th Cir. 2018) (quoting *Cooper v. Dillon*, 403 F.3d 1208, 1222 (11th Cir. 2005)).

Other than this allegation, however, Ratlieff only includes a single statement relating to Chief Maglione: the conclusory allegation that he "participated in the decision to use [and] approved the deployment of tear gas and/or less-lethal munitions." Am. Compl. ¶ 129. While the Court must accept Ratlieff's allegations as true, "[t]hreadbare recitals of the elements of a cause

of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  The Court must therefore disregard these conclusory allegations, which enjoy no other factual support in the Amended Complaint.  Without these allegations, Ratlieff simply has not alleged any conduct to establish that Chief Maglione or another, unidentified final policymaker directed the use of tear gas and KIPs.  Of course, Ratlieff does not necessarily need to name a specific final policymaker to survive a motion to dismiss.  *Hoefling*, 811 F.3d at 1281 (noting Rule 8(a) does not require plaintiffs to "always specifically identify the municipality's final policymaker by name").  But here, Ratlieff has failed to name any other final policymaker or include any nonconclusory factual information relating to an unidentified final policymaker's decision to disperse the demonstration.

So, the Court turns to Ratlieff's delegation theory.  Ratlieff maintains Chief Maglione delegated "the authority to disperse a demonstration as well as use tear gas and KIPs to the Incident Commander," MacDoughall.  Am. Compl. ¶¶ 125–26.  But to proceed under a delegation theory, Ratlieff must establish that MacDoughall's actions were not constrained by official policies or subject to review.  *Mandel*, 888 F.2d at 792.  The Amended Complaint contains no allegation or other factual matter indicating MacDoughall's decisions were not subject to review.  *See generally* Am. Compl.  Indeed, the allegation that Chief Maglione participated in the decision to disperse the crowd with tear gas and KIPs—though conclusory—seems to belie an argument that MacDoughall's decisions were not subject to review in some way.  Am. Compl. ¶ 129.  Therefore, the Court finds that Ratlieff has not sufficiently alleged a delegation theory.

Finally, Ratlieff's ratification allegations fail because she has not included any factual matter to support this theory.  The only relevant allegation is the conclusory statement that Chief Maglione "ratified the decisions of MacDoughall, Greenlaw, and Dietrich."  Am. Compl. ¶ 129.  Again, these types of conclusory statements must be disregarded; without more, Ratlieff's final policymaker theory has not "r[isen] . . . above the speculative level."  *Twombly*, 550 U.S. at 555.

Ultimately, Ratlieff has failed to establish that the City is liable under a final policymaker theory, and the Court need not reach the parties' additional arguments, including whether these decisions were a moving force behind any constitutional violations.  However, as amendment does not appear futile at this stage, the Court will afford Ratlieff an opportunity to amend her allegations. In doing so, the Court notes that although Ratlieff must only allege enough facts to "permit 'the reasonable inference that the City is liable for the misconduct alleged[,]'" *Hoefling*, 811 F.3d at 1281 (alteration accepted) (quoting *Iqbal*, 556 U.S. at 678), she must include more than "naked allegations" relating to the City's liability.  *See id.* (quoting *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1329–30 (11th Cir. 2015)).

### ii.  Failure to Train

In "limited circumstances" a municipality can be liable on the basis that it failed to properly train its employees.  *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (quoting *City of Canton*, 489 U.S. at 387).  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To establish liability, the municipality's failure to train "must amount to 'deliberate indifference to the rights of persons with whom the untrained employees come into contact.'"  *Id.* (alteration accepted) (quoting *City of Canton*, 489 U.S. at 388).  This is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997).  A plaintiff may demonstrate deliberate indifference "in two ways": (1) "by showing a widespread pattern of similar constitutional violations by untrained employees," or (2) "by showing that the need for training was so obvious that a municipality's failure to train its employees would result in a constitutional violation."  *Mingo v. City of Mobile, Ala.*, 592 F. App'x 793, 799–800 (11th Cir. 2014).

The "so obvious" theory of failure to train liability was first articulated in *City of Canton*, where the Supreme Court left open the possibility that a municipality could be liable in the absence of a pattern of similar constitutional violations.  In *City of Canton*, the Supreme Court hypothesized that because "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons . . . . the need to train officers in the constitutional limitations on the use of deadly force" is obvious.  *City of Canton*, 489 U.S. at 390 n.10.  The Supreme Court revisited this theory in *Connick*, explaining that "[t]here is no reason to assume that police academy applicants are familiar with the *constitutional constraints* on the use of deadly force" and that without a city providing training on the issue "there is no way for novice officers to obtain the *legal knowledge* they require."  *Connick*, 563 U.S. at 64 (emphasis added).

Here, Ratlieff does not allege the need to train the City's officers was "so obvious."  Thus, clarification is needed to the extent she intends to travel under this theory, and the Court will afford Ratlieff an opportunity to amend her complaint.  *See Weiland*, 792 F.3d at 1329 ("The complaint does not allege that the need for specialized training . . . is 'so obvious' that the failure to provide such training amounts to deliberate indifference.").  In granting leave, however, the Court emphasizes the narrowness of this theory.  *See Gold*, 151 F.3d at 1352 ("In short, to date, the Supreme Court has given only a hypothetical example of a need to train being 'so obvious' without prior constitutional violations: the use of deadly force where firearms are provided to police officers." (citing *City of Canton*, 489 U.S. at 390 n.10)).  Ratlieff must establish that the need to train officers in the use of KIPs was "obvious" enough to trigger municipal liability without any evidence of prior incidents putting the municipality on notice—a high bar under existing caselaw. *See, e.g., Brown*, 520 U.S. at 409–10 (holding isolated incident of sheriff's inadequate screening of deputy did not create such an obvious risk that it alone established the municipality's deliberate indifference to the risk that the deputy would use excessive force); *Gold*, 151 F.3d at 1352 (holding

plaintiff's "contentions that the police officers were inadequately trained and/or supervised regarding the disorderly conduct statute and the proper response to handcuff complaints fall[] far short of the kind of obvious need for training that would support a finding of deliberate indifference to constitutional rights on the part of the city" (internal quotation marks and citation omitted)); *Denham v. Corizon Health, Inc.*, 675 F. App'x 935, 942 (11th Cir. 2017) ("The Supreme Court has never determined that the need for 'more or different' training was obvious.")

### VIII. Shotgun Pleading

Finally, the Court addresses the City and the Non-Ramos Defendants' arguments that Counts I, IV, V, IX, and X are shotgun pleadings. The Court has already dismissed Counts IV and X, as well as Count I as to the City, and Ratlieff has clarified Count IX only asserts a claim for negligent training, so the Court only addresses Counts I and V.

Shotgun pleadings are condemned in the Eleventh Circuit because they are a "waste [of] scarce judicial resources." *See Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018). There are four types or categories of shotgun pleadings. *Weiland*, 792 F.3d at 1321–23. First are claims that "contain[] multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." *Id.* at 1321. Second are pleadings that are "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Id.* at 1321–22. Third are pleadings that do "not separat[e] into a different count each cause of action or claim for relief." *Id.* at 1322–23. And fourth are pleadings that "assert[] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Id.* at 1323.

The Court is unpersuaded Counts I and V are shotgun pleadings simply because they contain some collective references. Collective references are generally construed as "applying to

each defendant individually." *Sprint Sols., Inc. v. Fils-Amie*, 44 F. Supp. 3d 1224, 1227 (S.D. Fla. 2014).  A collective reference is only an issue "where it results in a complaint that fails to give each defendant notice of the claims against it." *Id.*  Counts I and V provide sufficient notice to each Defendant of the claims against them, and the Court will not dismiss these claims on this basis.[13]

**CONCLUSION**

Accordingly, for the foregoing reasons, the Motions, [ECF Nos. 50–51], are **GRANTED IN PART** and **DENIED IN PART** as follows:

1.     Counts II (Substantive Due Process), III (Fourth Amendment), IV (Fourth Amendment), and X (Procedural Due Process) are **DISMISSED WITHOUT PREJUDICE with leave to amend**.

2.     Count I (First Amendment) is **DISMISSED WITHOUT PREJUDICE with leave to amend** as to the City.

3.     Ratlieff shall file a Second Amended Complaint in compliance with this Order on or before **June 23, 2023**.

**DONE AND ORDERED** in Miami, Florida, this 1st day of June, 2023.

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**

---

[13]  In the event Ratlieff attempts to amend her *Monell* allegations, however, the Court will require her to separate her *Monell* claims from her individual § 1983 claims.  *See McDonough v. City of Homestead, Fla.*, No. 22-12637, 2023 WL 3035215, at *2 (11th Cir. Apr. 21, 2023) ("Counts I and II are 'classic' examples of shotgun pleadings.  Most obviously, each count asserts complaints against five defendants—one of whom is a city and would be subject to *Monell* liability, unlike the other § 1983 claims asserted against the four individuals.").