## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## Case No. 0:22-cv-61029-RAR

**LATOYA RATLIEFF**,

     Plaintiff,

vs.

**CITY OF FORT LAUDERDALE, FLORIDA**, a Municipal Corporation; **ELIEZER RAMOS**, individually; **PAUL CRISTAFARO**, individually; **STEVE GREENLAW**, individually; **AVERY FIGUERAS**, individually; **DOUGLAS MACDOUGHALL**, individually; **ROBERT DIETRICH**, individually; **REMY RODRIGUEZ**, individually; **RICK MAGLIONE**, individually and officially, **JOHN DOE 2**, individually; and **JOHN DOE 3**, individually,

     Defendants.

_____/

### SECOND AMENDED COMPLAINT

This federal civil rights and state law tort action arises from the Fort Lauderdale Police Department's ("FLPD") violent dispersal of peaceful demonstrators at the May 31, 2020 George Floyd demonstration. To effectuate that dispersal, FLPD deployed, without warning or a dispersal order, tear gas and kinetic impact projectiles ("KIPs"). Plaintiff Latoya Ratlieff was tear gassed and shot in the head by a KIP. Ms. Ratlieff sues the City as well as the individual FLPD officers who, acting in concert, participated in the dispersal of the demonstration, including those who deployed tear gas, deployed KIPs, and those in the chain of command who ordered the use of force or failed to stop it.

### JURISDICTION

1.    The claims asserted arise pursuant to 42 U.S.C. §§ 1983 and 1988,

the First Amendment, Fourth Amendment, and Fourteenth Amendment to the United States Constitution, and the Constitution and laws of the State of Florida. This Court has jurisdiction to hear all claims.

2.     This Court has original jurisdiction over claims brought pursuant to 42 U.S.C. § 1983 and concurrent subject matter jurisdiction over claims brought pursuant to the Constitution and laws of the State of Florida. Damages exceed $50,000.

3.     Venue is proper in Broward County, Florida because it is where the events complained of occurred, where defendant City of Fort Lauderdale is headquartered, and where the named and unidentified individual defendants work or undertook the actions that are the subject of this complaint.

4.     Plaintiff Latoya Ratlieff ("Ms. Ratlieff" or "Ratlieff" or "Latoya") performed all conditions precedent, in accordance with §768.28(6), Florida Statutes, before bringing this action. All conditions precedent have otherwise occurred, been performed, been met, been waived, would be futile, or are otherwise inapplicable.

## PARTIES

5.     Latoya Ratlieff was, at the time of the actions described in the complaint, a resident of Palm Beach County, Florida, and a citizen of the United States of America and the State of Florida.

6.     Ms. Ratlieff is the great niece of Fannie Lou Hamer, an American suffrage and women's rights activist and civil rights icon, a community organizer, and a leader of the civil rights movement in the 1960s and 1970s. From her infancy, Ms. Ratlieff was encouraged to speak out peacefully against injustice and to never be silent in the face of oppression, just as her great-aunt, Ms. Hamer, did. Through civil rights pioneer Fannie Lou Hamer, Ms. Ratlieff learned at an early age the power of organized community gatherings, peaceful in nature, designed to speak to the powerful, governmental institutions, and the favored about the need to improve society and implement social justice reforms.

7.     At all relevant times, defendant City of Fort Lauderdale ("City") is

2

and was a duly organized municipal government corporation and public entity existing under the laws of the State of Florida. At all relevant times, City was the employer of defendants Eliezer Ramos, Douglas MacDoughall, Robert Dietrich, Paul Cristafaro, Steve Greenlaw, Avery Figueras, Remy Rodriguez, and John Does 2-3. The Fort Lauderdale Police Department is a Department within the City.

8.      At all relevant times, defendant Eliezer Ramos ("Ramos") was a duly authorized employee of the City  and the FLPD. At the times relevant to the conduct described in this complaint, Ramos was a licensed police officer within the State of Florida. Ramos is a citizen of the State of Florida residing in Broward County and is over the age of 18.

9.      At all relevant times, defendant Remy Rodriguez ("Rodriguez") was a duly authorized employee of the City and the FLPD. At the times relevant to the conduct described in this complaint, Ramos was a licensed police officer within the State of Florida. Rodriguez is a citizen of the State of Florida residing in Broward County and is over the age of 18.

10.     At all relevant times, defendant Sergeant Paul Cristafaro ("Cristafaro") was a duly authorized employee of the City  and the FLPD and a licensed police officer within the State of Florida. Cristafaro is a citizen of the State of Florida and is over the age of 18. On information and belief, he resides in Broward County, Florida.

11.     At all relevant times, defendant Assistant Chief Douglas MacDoughall ("MacDoughall") was a duly authorized employee of the City  and the FLPD and a licensed police officer within the State of Florida. MacDoughall is a citizen of the State of Florida and is over the age of 18. On information and belief, he resides in Broward County, Florida.

12.     At all relevant times, defendant Captain Robert Dietrich ("Dietrich") was a duly authorized employee of the City  and the Fort Lauderdale Police Department and a licensed police officer within the State of Florida. Dietrich is a citizen of the State of Florida and is over the age of 18. On information and belief,

3

he resides in Broward County, Florida.

13.    At all relevant times, defendant Captain Steve Greenlaw ("Greenlaw") was a duly authorized employee of the City of Fort Lauderdale and the FLPD and a licensed police officer within the State of Florida. Greenlaw is a citizen of the State of Florida and is over the age of 18. On information and belief, he resides in Broward County, Florida.

14.    At all relevant times, defendant Lieutenant Avery Figueras ("Figueras") was a duly authorized employee of the City  and the FLPD and a licensed police officer within the State of Florida. On day in question, Figueras was S.W.A.T. Commander. Figueras is a citizen of the State of Florida and is over the age of 18. On information and belief, he resides in Broward County, Florida.

15.    At all relevant times, defendants John Does 2-3 were duly authorized employees of the City and the FLPD and licensed police officers within the State of Florida. John Does 2-3 are citizens of the State of Florida residing in Broward County and are over the age of 18.

16.    At all relevant times, defendant Rick Maglioni ("Maglioni") was a duly authorized employee of the City  and the FLPD. At the times relevant to the conduct described in this complaint, Maglione was a licensed police officer within the State of Florida. Maglione is a citizen of the State of Florida residing in Broward County and is over the age of 18.

### RELEVANT FACTS COMMON TO ALL COUNTS

17.    The murder of George Floyd, captured on video and seen by millions around the world, encouraged countless law-abiding citizens and residents from every corner and region of the United States (and even more worldwide) to commence peaceful public demonstrations to demand meaningful, impacting change, social justice, and a collective determination that Black lives matter. During the time of the global pandemic of COVID-19, groups of peaceful, law abiding, constitutionally enabled citizens gathered throughout the United States, including in Fort Lauderdale, Florida, to demonstrate against the brutality and systemic injustices perpetrated by law enforcement officers against Black people

4

and people of color.

18.     This action arises because of the FLPD's decision to disperse peaceful demonstrators with chemical weapons and less-than-lethal munitions without warning or lawful justification.

**I.      Weapons and Rounds Used.**

19.     Ms. Ratlieff and other peaceful demonstrators were tear gassed and shot at by FLPD officers, including the individual defendants, while the demonstrators peacefully and legally assembled and demonstrated against police brutality occurring in the United States.

**A.      Riot Control Agent.**

20.     Euphemistically labeled as "riot control agents," "tear gas" consists of chemical compounds that temporarily make people unable to function by causing substantial irritation to the eyes, mouth, throat, lungs, and skin.[1]

21.     On May 31, 2020, FLPD officers deployed riot control agents on peaceful, law-abiding demonstrators gathered in the City of Fort Lauderdale.

22.     When the City deployed these agents, it and the FLPD, including the individual defendants named in the complaint, knew or reasonably should have known the agents would temporarily incapacitate and immobilize the target of the tear gas and any person in the vicinity, whether targeted or not. The City and FLPD further knew the deployment of tear gas would restrict the free movement of gathered participants.

23.     FLPD officials knew that launching chemical munition cannisters from 40mm devices could and would injure persons when the cannisters hit a person in the head, face, or other body parts.

24.     Vendors of chemical munitions and riot control agents market them as aerosols containing ingredients formulated to provide a reliable means to

---

[1]Centers for Disease Control and Prevention, *Facts About Riot Control Agents Interim document* (Last Accessed Aug. 2, 2021), https://emergency.cdc.gov/agent/riotcontrol/factsheet.asp.

incapacitate targets and others in the vicinity.

25. An "OC chemical munition," including pepper spray, is one type of riot control agent. The active ingredient in pepper spray is oleoresin capsicum (OC), an oily resin plant extract. The spray is designed to cause a severe burning sensation in the eyes, nose, and mouth. Contact with OC particles incapacitates subjects by causing an almost immediate burning of the skin, and a burning, tearing, and swelling of the eyes. Exposure to the OC can cause severe blepharospasm (twitching or spasmodic contraction) of the eyes and even involuntary closing of the eyes.[2]

26. When an OC agent is inhaled, the respiratory tract is inflamed, resulting in a swelling of the mucous membranes lining the breathing passages, temporarily restricting breathing to short, shallow breaths.

27. The OC agent further causes a constriction of the airway. When inhaled, the inhalation causes coughing and shortness of breath. This, in turn, causes a gagging reflex and gasping for breath.

28. A "CS chemical munition" is another type of chemical munition riot control agent. Exposure to a CS chemical agent causes a burning sensation and tearing of the eyes to the extent that the subject cannot keep their eyes open, and a burning irritation of the mucous membranes of the nose, mouth, and throat, resulting in profuse coughing, nasal mucus discharge, disorientation, and breathing difficulty, partially incapacitating the subject.

29. Tear gas also causes respiratory arrest, vomiting, and allergic reactions. It can permanently damage the eyes, cause asthma symptoms, and

---

[2]David K. DuBay, Director of Research, Defense Technology Corporation of America, Casper Wyoming. Rusty E. Rush, Associate Director of Toxicology, Springborn Laboratories, Spencerville, Ohio, *Aerodynamic Particle Size Analysis Of First Defense® Pepper Spray* (2003), https://www.defense-technology.com/wp-content/uploads/2020/06/aerodynamic-particle-size-analysis-062520.pdf.

result in traumatic brain injury ("TBI").[3] It can have serious adverse effects on pregnant women and fetuses.[4]

30.     Riot control agents are banned in warfare.[5]

31.     While the effects of CS are considered temporary at low concentrations, higher concentrations have been known to cause permanent injury (primarily to the respiratory system) and death in experimental animal studies as well as anecdotal human exposures. The National Academy of Sciences does not identify a minimum safe concentration of the compound 2-chlorobenzalmalononitrile (CS, the primary component of tear gas), as even the lowest concentrations can result in "notable discomfort, irritation, or certain asymptomatic, non-sensory but transient effects".

32.     Significant psychological symptoms and long-term disability from the use of crowd control weapons have been reported in scientific literature..

33.     Members of the FLPD failed to adequately plan their deployment of tear gas on May 31, 2020. The deployment of non-lethal chemical agents from the police line, west, toward the crowd, was flawed and inadequate.

34.     A proper non-lethal chemical agent plan should include the desired

---

[3]Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/health- shots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control- agents.

[4]Chemical Irritants, Physicians for Human Rights, https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheets_Chemical_Irritants.pdf.

[5] Art. 1, § 5, Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, opened for signature Jan. 13, 1992, S. Treaty Doc. No. 103-21, 32 I.LM. 800, available at http://www.opcw.org/chemical-weapons-convention/ (last visited Jan. 28, 2022) ("Each State Party undertakes not to use riot control agents as a method of warfare."); *Gas Smells Awful: U.N. Forces, Riot-Control Agents, and the Chemical Weapons Convention*, 31 Mich. J. Int'l L. 475, 477 (2010) ("RCAs are banned chemical agents under the CWC, except when used in law-enforcement situations."); Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/health-shots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents.

direction to move the crowd, along with wind conditions and direction. Video evidence shows clouds of non-lethal chemical agents blowing away from the crowd and directly back to the line of police.

**B.    Impact Weapons Designed to Harm.**

35.    FLPD deployed kinetic impact projectiles (KIPs). KIPs have a larger surface area than other ammunition, and take unpredictable flight paths when deployed, thus reducing accuracy.[6] The unreliability of KIPs is so well understood that FLPD policy prescribes the minimal standard of accuracy for KIPs as only twelve inches.

36.    KIPs are widely known to cause contusions, abrasions, and hematomas.[7] Blunt impact from KIPs may cause internal injuries.[8]

37.    Fatalities occur when KIPs strike a person's head, neck, or precordium (the region of the chest immediately in front of the heart).[9]

38.    Reliable independent studies, well known among researchers and law enforcement agencies, have documented the likelihood of serious bodily injury and death from the use of KIPs. This is especially so when KIPs are used in crowd control situations.

39.    In *Death, injury and disability from kinetic impact projectiles in crowd control settings*, a systematic review of readily available literature uncovered that three percent of those injured by KIPs in crowd control settings died from

---

[6]Rohini Haar et al., *Death, injury and disability from kinetic impact projectiles in crowd control settings: a systematic review*, 2017 BMJ Open 2, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/pdf/bmjopen-2017-018154.pdf.; Kinetic Impact Projectiles, Physicians for Human Rights, https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheet_Kinetic_Impact_Projectiles.pdf.

[7]W. Bozeman & J. Winslow, *Medical Aspects of Less Lethal Weapons*, The Internet Journal of Rescue and Disaster Medicine, https://print.ispub.com/api/0/ispub-article/7142.

[8]*Id.*

[9]*Id.*

inflicted injuries.[10] Of those who survived KIP injuries, seventy-one percent had injuries considered severe.[11] Fifteen percent of the other survivors of KIP injuries were permanently injured.[12]

40.    Another study's findings revealed that chest and abdominal KIP impact sites are associated with increased rates of hospital admissions and serious injuries, and that head, ocular, and torso impacts sites are associated with death, significant injury, and permanent disability. Cardiac arrest and death have been described following impacts to the chest or abdomen.[13] Abdominal strikes can cause liver laceration.

41.    The U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, in a 2014 publicly released report, advised that users of impact munitions (including KIPs) must be aware that individuals struck in the chest and abdomen areas are "more susceptible to serious injury or death, especially at close ranges."[14]

42.    Among the weapons issued to and used by defendant Ramos were Defense Technology 40mm Direct Impact CS rounds. The 40mm Direct Impact munition is a high-speed projectile consisting of a plastic body and a blue crushable foam nose. The blue foam nose indicates that the round contains a CS powder payload. The CS powder contains the chemical orthochlorobenzal-

---

[10]*Id.*

[11]Rohini Haar et al., *Death, injury and disability from kinetic impact projectiles in crowd control settings: a systematic review*, 2017 BMJ Open 2, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/pdf/bmjopen-2017-018154.pdf. The study defined severe injuries as those requiring professional medical management. Severe injuries ranged from lacerations that required suturing to penetrating injuries that required surgery or intensive care unit-level care.

[12]*Id.* at 7.

[13]Jennifer A. Beatty, Jason P. Stopyra, John H. Slish, William P. Bozeman, *Injury patterns of less lethal kinetic impact projectiles used by law enforcement officers*, 69 J. Forensic Leg. Med. 4 (2020).

[14]U.S. Department of Justice Office of Justice Programs, National Institute of Justice, *Impact Munitions Use: Types, Targets, Effects* (Oct. 4, 2014), https://www.ojp.gov/pdffiles1/nij/206089.pdf.

malononitrile, the same chemical found in tear gas.

43. Upon impact, the crushable foam nose dissipates energy while simultaneously releasing the CS powder payload. The payload is ejected laterally, dispersing a two-foot diameter cloud of CS powder. The CS payload causes a burning sensation to the skin, tearing, tightness in the chest, feelings of suffocation, and possible mental disorientation.

44. The Direct Impact CS round is intended to be used as an accurate way to deliver an irritant payload in close proximity to a group of subjects. According to official product materials, due to the efficient payload dispersion pattern, multiple subjects will be affected by targeting only a few individuals with a direct impact round.

45. Consistent with the research showing the increased likelihood of serious bodily injury by targeting the abdomen and chest areas, the product specifications for the direct impact munition defendant Ramos fired expressly advised against abdominal, upper body, and head strikes. The specifications explain that the large muscle groups of the buttocks, thigh, and knees of the subject, when shot from 16 feet to 131 feet, are likely to provide sufficient pain stimulus, while greatly reducing serious or life-threatening injuries.

46. Likewise, Defense Technology's Specialty Impact Munitions Basic Instructor Certification Program advises against abdominal, upper body, and head strikes as a first resort. According to the manual, all rounds have the potential for causing serious injury and/or death. Defense Technology, accordingly, defines the "green zone" for targeting a person as the thighs, buttocks, and legs.

47. As explained by Defense Technology, the "yellow zone" includes the knees, abdomen, and arms.

48. The "red zone" includes the entire back, chest, groin area, and head. The red zone is the unauthorized target area that is to be avoided.

49. The training manual instructs that a yellow strike zone is an escalated zone only for an individual unaffected by a green zone strike.

50.    Contrary to Defense Technology training materials and product specifications, FLPD's less-than-lethal policy does not advise against targeting the lower abdomen and back.

51.    Misuse of impact weapons can result in serious and permanent bodily harm and death.[15]

52.    On May 31, 2020, City final decisionmakers directed the use of KIPs to disperse groups of peaceful demonstrators.

53.    In a statement on behalf of FLPD, approved by the Chief of Police, the City and FLPD confirmed that KIPs were fired with the intent to disperse the crowd assembled at S.E. 2nd Street and S.E. 1st Avenue.

54.    FLPD officers were directed to target anyone who picked up tear gas cannisters. FLPD officers, including defendant Ramos, did not aim for the green zone. FLPD officers, including defendant Ramos, targeted the yellow zone (i.e., the abdomen area) and red zone (i.e., the lower back, chest, groin area, and head) as a first resort. Several innocent peaceful demonstrators were hit in the red zone, including Ms. Ratlieff.

55.    FLPD's 40mm less-than-lethal training materials confirm FLPD officers were not instructed against aiming for the abdomen and lower back "no-go" zones. In training, FLPD employees were instructed to deploy rounds to the chest area if other rounds are ineffective. An FLPD captain, during the investigation into Ms. Ratlieff's shooting, confirmed that officers were "looking for. . . center mass, you know, areas" and that "hitting somebody in the chest [with a KIP] is - is just as viable."

---

[15] *See* United Nations Public Order Management, *Less Than Lethal Weapons* (UN Peacekeeping PDT Standards for Formed Police Units, 1st Edn. 2015), available at: http://repository.un.org/bitstream/handle/11176/387390/Less%20Than%20Lethal%20Weapons.pdf#page=7. KIPs include rubber bullets; rubber buckshot; soft polymer rounds; wax bullets; plastic bullets; beanbag rounds; sponge grenades; ring airfoil projectiles (both kinetic and tear gas projectiles); and rubber bullets with electroshock effect (e.g., Taser XREP rounds).

56.    The defendants knew KIPs can cause serious personal injury upon striking a person. FLPD did not train its officers on the use of KIPs in crowd control situations. Nor does the FLPD less-than-lethal munitions policy provide guidance for using KIPs during mass demonstrations. The bi-annual KIP certification course does not include or test on the use of these weapons during crowd control situations.

57.    While not identical, the impact from a Defense Technology 40mm impact munition can be described as delivering an impact similar to being hit by a fast-thrown or hit baseball. Defense Technology 40mm Impact munitions typically have a minimal safe range of five feet, and a maximum effective range of 131 feet.

**II.        Absence of a Dispersal Order.**

58.    During a demonstration, lawful protesters are often unaware of the status of their demonstration and would have no reason to leave the area unless advised by law enforcement that their protest had become an unlawful event and dispersal orders given.

59.    Deploying tear gas into a crowd and firing impact munitions prior to any announcement to the crowd that the event had become unlawful and they were being ordered to leave the area, exposes innocent persons to the effects of the tear gas and/or impact munitions.

60.    The common-sense procedural safeguards that protect lawful protestors who are peacefully assembled are half a millennia old. The earliest unlawful assembly laws, enacted during the reigns of King Edward VI (1549) and Queen Mary (1553), required notice to those assembled that their assembly was deemed unlawful by the authorities, an order to disperse, and an opportunity to disperse. William Blackstone, *Commentaries on the Laws of England, Vol. 4* *82

(1769).[16]

61.     The English Riot Act of 1715, which imposed the death penalty for failing to disperse after the assembly as declared unlawful, riotous or tumultuous, similarly required an order to disperse and one hour to comply before one could be seized, apprehended, and taken before the Justices. Martin Hinton, *And The Riot Act Was Read!*, 24 Adelaide L. R. 79, 80 (2003).[17] The Riot Act of 1715, like the Riot Act of Queen Mary, indemnified any official who killed, maimed, or hurt a person who refused to disperse when ordered to do so. *Id.* at 86.

62.     The Florida legislature in 1868 codified those same procedural safeguards. Florida statutory law contains a mandatory requirement that law enforcement notify the assembly that their assembly has become unlawful, riotous, or tumultuous.

63.     If, during the dispersal, persons who refused to leave are killed or wounded by an officer, that officer is "guiltless and fully justified in law."

64.     In contrast, if a dispersing officer is killed or wounded, the person refused to leave are be held answerable for the officer's death or injury.

65.     FLPD policies and procedures dictate the notice required by Florida law before making mass arrests for participating in an unlawful assembly. The dispersal order must inform those assembled that their assembly has been declared unlawful, to disperse, and that should they fail to disperse, they will be arrested or subjected to other police action, including less-than-lethal munitions and chemical agents.

66.     Specifically, FLPD's dispersal order Policy No. 501.10 provides:

When the Incident Commander determines that the participants are unlawfully, riotously, or tumultuously assembled in violation of F.S.

---

[16]                           (available                 at            chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://lonang.com/wp-content/download/Blackstone-CommentariesBk4.pdf).

[17]                           (available                                          at http://classic.austlii.edu.au/au/journals/AdelLawRw/2003/6.pdf).

870.04, the following proclamation must be issued before an arrest for unlawful assembly is made: DISPERSAL ORDER I am (rank and name), of the Fort Lauderdale Police Department. I hereby declare this to be an unlawful assembly and, in the name of the State of Florida, command all persons so assembled at (specific address of location) to immediately and peacefully disperse, which means to separate and leave the area. If you do not do so, you will be arrested or subjected to other police action. Other police action may include the use of less-lethal munitions, or chemical agents. Chapter 870.04 of the Florida State Statutes prohibits remaining present at an unlawful assembly. If you remain in the area, which was just described, regardless of your purpose for remaining, you will be in violation of Section 870.04. The following routes of dispersal are available: (give directions for evacuation routes). **You have (X number of minutes) to leave** in a peaceful, orderly manner, or face arrest or other police action.

67.    The policy further provides that the warnings will be made from stationary vantage points that are observable by the crowd, or to a large number of participants. Additional warnings, according to the policy, must be announced via public address systems in police vehicles. The warning must be given at an amplitude to be heard by the entire assemblage.

68.    In preparation for the Fort Lauderdale demonstrations in solidarity with worldwide opposition to the unprovoked police murder of the unarmed and not resisting George Floyd, FLPD prepared a pre-recorded dispersal order to be played from a Long-Range Acoustic Device (LRAD).

69.    LRAD "can project messages up to 600 meters away, produce a maximum continuous output of 136 dB at one meter away, and has the capacity to overcome 88 dBs of background noise at 250 meters."

70.    FLPD Detective Burdick assisted in the preparation of the dispersal announcement. The LRAD was placed on top of FLPD Lt. Jenkins' marked FLPD Suburban vehicle.

71.    Lt. Jenkins, with the LRAD and pre-recorded dispersal order, was present at the parking garage during the incident giving rise to this complaint.

72.    Lt. Jenkins did not personally deploy chemical munitions or fire less-than- lethal weapons. He was aware of other FLPD officers doing so but did nothing to stop them.

73. Lt. Jenkins remained ready and able to play the pre-recorded dispersal message through the LRAD.

74. During the time leading to the tear gassing and shooting of gathered participants, including Ms. Ratlieff, at no point was their assembly declared unlawful. Nor was any dispersal order given.

75. No advance warning or announcement was made before FLPD deployed chemical and less-than-lethal munitions.

76. In contrast, police in the area received ample warning of the FLPD's decision and intent to deploy chemical munitions via their closed-access police communications channel.

77. Contrary to the clear requirements of Florida law, FLPD trained its officers that no dispersal orders was necessary where there was violence, including rocks and/or bottles were being thrown.

78. By policy, custom, and practice, FLPD does not give the dispersal orders required by law. This custom eliminates the dispersal order requirements of Florida law altogether, as it is difficult to imagine a **nonviolent** riotous, tumultuous, or unlawful assembly that could be subject to dispersal by tear gas and KIPs.

79. Thus, although FLPD had the means of providing a dispersal order, FLPD chose not to issue a dispersal order.

**III.    Timeline of Law Enforcement Response to Fort Lauderdale George Floyd Demonstration.**

80. On Sunday, May 31, 2020, Black Lives Matter Alliance of Broward County organized a peaceful community gathering against police brutality in the wake of the murder of George Floyd by Minneapolis, Minnesota police on May 25, 2020.

81. In preparation for the event, the BLM Alliance trained 80 volunteers

in de-escalation techniques.[18]

82.    The Fort Lauderdale peaceful gathering involved thousands of socially conscious citizens from every walk of life and every recognizable demographic group. Some participants were born in the United States. Others were immigrants to this country. Men, women, and children gathered in solidarity. Black, white, people of color, Latinos, Asians, Caucasians, and many other ethnicities and cultures were represented in Fort Lauderdale that day. They all joined in a visible demonstration to propel meaningful change in police behavior against the citizens and people of the United States, the State of Florida, and Broward County.

83.    The gathering was peaceful and without incident. None of the participants were accused of looting, burning, rioting, or otherwise inciting violence.

84.    Yet, despite the peaceful gathering and the organizers' announcements that the lawful display would be peaceful, FLPD readied its officers and employees for violence, and presented themselves as ready to unleash violence against the peaceful congregants.

85.    As the gathering, including speeches and displays, wound down and the peaceful demonstrators returned to their cars, some passers-by observed uniformed FLPD police officers situated at a public parking garage at S.E. 2nd Street and S.E. 1st Avenue. They began a peaceful chant and display of their signs around 6:45 p.m.

86.    One of the FLPD officers (Hayes) requested the arrival of more police units and officers, claiming she was completely surrounded.

87.    Photojournalists and others present in the area, as well video footage of that time period, confirm that the police officers were never attacked and were never in danger of being attacked. Those persons walking from the organized

---

[18]Miami Herald, *Protest live updates: Ft. Lauderdale issues 9 pm curfew after clashes with 'agitators,'* https://www.miamiherald.com/site-services/profiles/article243135896.html (last accessed October 21, 2022).

demonstration were peaceful and kept a sufficient distance from the police vehicle. They were engaged in the peaceful exercise of their First Amendment rights.[19]



88.     Nonetheless, several FLPD units responded in emergency mode with the intent to disperse the crowd at the intersection. The responding units did not encounter any unlawful conduct from the peaceful demonstrators. Still, force was used against peaceful demonstrators.

89.     Specifically, video footage shows a responding member of the FLPD (Stephen Pohorence) physically attacking a peaceful demonstrator while attempting to disperse peaceful demonstrators from the intersection. The officer, with a known history of using excessive force against citizens, attacked a woman kneeling with her hands in the air while offering no violence to anyone at or around 6:52 p.m. Pohorence pushed the demonstrator who was on her knees.

90.     The City does not claim there were any acts of violence toward law

---

[19] Miami Herald, *How a peaceful march turned ugly: Cops say protesters attacked.        Photos        tell        another        story,* https://www.miamiherald.com/news/local/community/broward/article24367 1132.html#storylink=cpy (last accessed October 21, 2022).

enforcement stationed at the corner of Southeast 2nd Street and Southeast 1st Avenue before Pohorence used force against a kneeling demonstrator.

91.    A SWAT Quick Reaction Force also responded. That team included Detective James, and Defendants Ramos, Burdick, and Cristafaro.

92.    A few individuals in the crowd defended the unarmed woman by responding to this unprovoked use of force—done at a rally decrying those very police practices—in throwing the water bottles in their hands at Pohorence.

93.    The majority of those gathered, however, remained peaceful. The majority peaceful congregants continued demonstrating and lawfully exercising their First Amendment rights by taking to their knees, displaying signs, chanting, and policing the small minority of agitators.

94.    Notwithstanding, at or around 6:52:52 p.m., in broad daylight, FLPD decided to disperse the crowd in front of the garage by means of tear gas and kinetic impact projectiles (KIPs). Body camera footage shows an officer requesting the key to get tear gas from the police vehicles.

95.    FLPD gave no announcement to those gathered of its intention to use these means of force, despite having the opportunity to do so.

96.    The decision to use tear gas and KIPs was not a split-second decision. Nor was the implementation of the decision to disperse the crowd using tear gas and KIPs.

97.    At or around 6:53:09 p.m., the FLPD officers were first advised of the anticipated tear gas. FLPD made no effort to similarly inform the gathered demonstrators.

98.    However, when FLPD made the decision to deploy tear gas, the assembly had not been declared unlawful. Nor was there a curfew violation.

99.    FLPD ignored Florida law's dispersal order requirements, even though FLPD had ready access to a pre-recorded dispersal order and other speakers for broadcasting to the persons gathered in the vicinity.

100.   The group near the parking garage included peaceful demonstrators, media observers, and other persons who were simply trying to

18

drive out of the parking garage.

101.   At around 6:54 p.m., FLPD officers were advised a second time to clear the area because of the anticipated tear gas.

102.   The announcement made exclusively to the FLPD officers via the confidential police radios but not broadcast to those gathered citizens gave law enforcement officers without tear gas masks the opportunity to move to a safe distance, and to further encourage those officers equipped with gas masks sufficient time to put their gas masks on. Because of the announcement, officers without gas masks were able to retreat to a safe distance.

103.   The public, media, and peaceful demonstrators received no such warning that tear gas was about to be deployed.

104.   After officers without gas masks were allowed to go to places of safety and those with masks were given the opportunity to put on gas masks, FLPD began indiscriminately directing tear gas against peaceful demonstrators minutes later.

105.   Defendant Cristafaro deployed the first round of tear gas.

106.   The police use of the tear gas was done by firing metal cannisters capable of inflicting serious bodily injury directly into the community of gathered citizens. Throwable munitions were also deployed.

107.   SWAT operators indiscriminately deployed tear gas, throwing the cannisters into the demonstrators intending to disrupt the protest.

108.   At 6:56 p.m., SWAT member Steve Smith requested Field Force team.

109.   By this point, the FLPD officer who had initially requested police reinforcements and the officer who provoked the crowd by attacking a demonstrator (Pohorence) had already left the scene.

110.   FLPD completely blocked egress and ingress from the public parking garage and prohibited the free movement of the gathered community members. The FLPD presence and concerted actions in attacking the peaceful demonstrators agitated those present in the area. No legitimate law enforcement

19

interest existed to cause the police line to be initiated or maintained.

111.   Among the demonstrators struck by the deployment of tear gas were those who had parked in the public parking garage and were merely trying to leave the day's peaceful event. They were trapped in the garage and assaulted by the FLPD unannounced deployment of tear gas. As recorded by body camera footage, many of these unarmed, law-abiding, and peaceful participants begged and pleaded to be allowed to leave, even as they were tear gassed.

112.   As these peaceful demonstrators were gassed, one demonstrator who was finally allowed to leave by the FLPD requested that internal affairs be called to the scene immediately. An FLPD bicycle officer, who had been given enough time to move to a safe location by the pre-gas warnings, casually replied, almost gleefully, that not only was internal affairs present at the scene, but internal affairs had ordered the use of tear gas.

113.   Body camera footage shows tear gas filling the garage even as peaceful demonstrators were trapped by FLPD officers at around 6:56 p.m. The police made no provision for peaceful participants to exit the garage in their cars until around 6:56:45 p.m., after being assaulted by the tear gas.

114.   Also counted among demonstrators subjected to tear gas was a group of peaceful demonstrators standing in front of the FLPD, but sufficiently far away to not be within reach.

115.   The City agrees there is no video footage supporting any contention by any of its officers that rocks, bottles, bricks or fireworks or other explosives were thrown at law enforcement staged at the corner of Southeast 2nd Street and Southeast 1st Avenue on May 31, 2020, between 7:00 p.m. and 7:07:30 p.m.

116.   The City does not contend that rocks, bottles, bricks or fireworks or other explosives were thrown at law enforcement staged at the corner of Southeast 2nd Street and Southeast 1st Avenue on May 31, 2020, between the time periods of 7:00 p.m. Eastern Time and 7:07:30 p.m. Eastern Time.

117.   The body worn camera footage and video footage from spectators confirm no rocks, bottles, or bricks were thrown at law enforcement from 7:00

20

p.m. to the time Ratlieff was shot at around 7:07:30 pm.

118.   Law enforcement at the corner of S.E. 2nd Street and S.E. 1st Avenue, Fort Lauderdale were not confronted with burning buildings, burning cars, and looting like other police departments throughout the nation.

119.   At 7:01 p.m., FLPD Bravo Field Force and Field Force Commander Captain Robert Dietrich arrived at S.E. 2nd Street and S.E. 1st Avenue. Field Force arrived with the intent to disperse the demonstration. Attached to the field force was a four-man SWAT team that included Defendant Ramos. Bravo Field Force was a block and a half away.

120.   There were approximately 50 officers at the corner, who were later joined by more officers and the Broward Sheriff's Office.

121.   Ramos assisted the field force team's protection contingent.

122.   FLPD Bravo Field Force did not arrive to rocks, bottles, explosives, or fireworks being thrown at them. Rather, on the ground were rocks, bottles, and canisters: "You could tell that a clash had happened between our police officers and some of the violent crowd that was at that intersection.".

123.   Plaintiff Ratlieff, while passing the parking garage at approximately 7:01:29 p.m., joined with peaceful participants who were taking a knee and peacefully exercising their First Amendment rights in the presence of the FLPD officers. Plaintiff held a sign proclaiming "Stop Killing Us."

124.   Ms. Ratlieff and those gathered with her were a sufficient distance away from the FLPD to not interfere with or disrupt any law enforcement activities.

125.   But FLPD continued to deploy tear gas without provocation and without warning. Again, the City concedes that rocks and bottles were no longer being thrown at FLPD after 7:00 p.m.

126.   When the peaceful demonstrators verbally complained of the indiscriminate and assaultive FLPD police conduct, FLPD continued to deploy tear gas without legal justification. Participants, hands raised in the air, chanted the now-common mantra: "Hands up, don't shoot."

127.   Plaintiff Ratlieff and the peaceful participants gathered with her were intentionally tear gassed by FLPD to stop their demonstration. They received no advance warning before being tear gassed, and no warning was made during the FLPD tear gas deployment. Their assembly was not declared unlawful. No order to disperse issued. At all times, Ms. Ratlieff and other peaceful demonstrators were lawfully assembled in a place they were allowed to be.

128.   FLPD located at SE 2nd Street and SE 1st Avenue provided regular updates of their progress in dispersing the crowd. By 7:04 p.m., on-scene officers reported that only twenty (20) to thirty (30) participants remained in front of the FLPD officers. Notwithstanding, FLPD officers continued to deploy tear gas and fire kinetic impact weapons without warning or legal justification for the sole purpose of stopping the demonstrators from assembling.

129.   According to Field Force Commander Captain Dietrich, the SWAT team would deploy a gas canister that would cause the crowd to "kind of disperse." It would be quiet for a minute or two and then the crowd would come right back into the intersection on top of the Field Force Team. According to Captain Dietrich, the following picture describes the group of people "on top" of the field force team that they sought to disperse:

22



130.   At 7:05 p.m., Chief Maglione requested the multiagency field force.

131.   Some demonstrators responded to the unlawful deployment of tear gas by picking it up in an effort to thwart law enforcement's efforts to effectuate the dispersal. Some covered it with cones, threw it to the side, or back at the field force line. The throwing back of tear gas cannisters thwarted FLPD's efforts to disperse the crowd.

132.   By the time Ms. Ratlieff was shot, FLPD knew the deployment of tear gas would trigger some to throw it back.

133.   At or around 7:06:06 p.m., the FLPD officers in the vicinity of Ms. Ratlieff reported that there were only ten (10) demonstrators in front of them and that most had dispersed after being attacked by the deployment of tear gas and KIPs. Notwithstanding, the FLPD SWAT team continued using chemical munitions directed at the participants, fully aware that the tear gas and KIPs were intended to and likely to cause serious personal harm and injury. Ms. Ratlieff was among the ten (10) remaining peaceful participants targeted by the FLPD. She struggled to flee from the armed police presence at approximately 7:07:01 p.m.

23

134. Ms. Ratlieff walked to a safe space near journalists and observers, even as she choked on and tried to recuperate from the tear gas. For no lawful reason, defendant FLPD officer Defendant Remy Rodriguez deployed yet another round of chemical munitions directly at and in the vicinity of Ms. Ratlieff and the group, incapacitating Ms. Ratlieff to the point she could not move or function.

135. As another peaceful demonstrator was helping her to safety, Ms. Ratlieff was shot in the face by defendant Ramos.



136. Ramos gave no warning before deploying the direct impact round. FLPD Policy No. 113, Section H.4.b. requires the deploying officer give a warning before deploying a KIP.

137. When he shot Ms. Ratlieff, Ramos was not defending life or property. He did not fire in response to any reasonable fear of imminent bodily harm to himself or others.

138. Ms. Ratlieff was struck in the face by Ramos' direct impact round, causing her severe, painful, and permanent physical and emotional injuries:



139.  The shooting of Ms. Ratlieff did not stop the FLPD's dispersal or deployment of tear gas and KIPs without warning. FLPD continued to disperse the crowd and were joined by BSO field force team that also assisted in clearing out the crowd.

140.  At 7:57 pm, FLPD issued a dispersal order at the intersection. Everyone complied and left the intersection.

141.  The After Action Report records no violence, looting, or burning in that area after issuance of a dispersal order.

**IV.      The Aftermath.**

142.  Ms. Ratlieff was targeted by the City, FLPD, and the individual defendants and treated as an aggressor solely for her exercise of her protected

First Amendment rights.

143.   City and FLPD officials mocked Ms. Ratlieff in public.

144.   Several officers who claimed to witness the shooting falsely told Internal Affairs that Ms. Ratlieff was injured by a thrown rock, not a less lethal projectile. The Director of Internal Affairs responded that there would be discussions on how to proceed.

145.   FLPD claims it investigated the officer who shot Ms. Ratlieff, but the "investigation" was mere window dressing designed to provide public cover for the illegal, unconstitutional, and unconscionable shooting.

146.   When Ms. Ratlieff appeared for her interview with FLPD internal affairs officers, she was informed by the FLPD official specifically selected and assigned to conduct the investigation that defendant Ramos was a "good guy" who "did not intend" to strike her.

147.   Given the clear bias on the part of the investigating internal affairs officer, the FLPD, and the City, Ms. Ratlieff objected and terminated the interview.

148.   When Ms. Ratlieff appeared for a second interview, she was again victimized by the City, the FLPD, and its authorized agents. The substitute investigator, specifically tasked by the City and FLPD to conduct the interview after Ms. Ratlieff's recognized complaint about the biased first interview, asked her in an accusatory manner if she threw projectiles at law enforcement, despite no evidence supporting the accusation and abundant contemporaneous video and personal observations that she did nothing of the sort.

149.   The City and FLPD had no factual basis for asking any such question or making the objectively false inquisition, knowing full well from both police body camera footage and cell phone video that Ms. Ratlieff was a peaceful participant. The offending comment was made solely for the purpose of intimidating Ms. Ratlieff for participating in an internal affairs investigation of the City's officers.

150.   During the internal affairs interview, the FLPD interviewer

26

demanded to know how Ms. Ratlieff knew and was associated with individuals accused of throwing back the unlawfully deployed chemical munitions to law enforcement. Again, the City and FLPD had no factual basis for this line of questioning and knew from the police body camera and cell phone footage that Ms. Ratlieff had no such associations.

151.   The City did not investigate the initial decision to use tear gas and KIPs against demonstrators without warning. Nor was Defendant Rodriguez's deployment of tear gas formally investigated.

152.   IA made no effort to identify, much less formally investigate the officer who deployed tear gas just before Ms. Ratlieff was shot.

**V.      After Action Report confirms lack of training.**

153.   FLPD assigned Major Dana Swisher the task of drafting an After Action Report. To do so, he reviewed over 8,000 minutes of body-worn camera footage, all related police reports, documented evidence, dispatch recordings, aerial footage, and social media postings and videos from attendees (After Action Report at 3).

154.   The After-Action Report concedes the last department-wide field force training was in 2017. The report notes that the "gap" contributed to some of the issues they experienced. As FLPD explained, when individuals are under stress they revert to their training; many did not have training to revert to as a reference point for their actions.

155.   The After Action Report acknowledged that FLPD in prior demonstrations, including the FTAA protests in Miami, utilized smaller projectiles that have lesser potential for creating injury. Those tools, which would provide sufficient, less lethal capabilities while minimizing the risk of serious injury to others, were not available on May 31, 2020.

156.   As a direct and proximate result of the defendants' individual and collective unlawful conduct, Ms. Ratlieff suffered severe and lasting physical injury, mental and emotional distress, and humiliation, some of which is permanent, and is entitled to monetary damages for each of said losses and

damages.

157.   As a further direct and proximate result of the individual and collective acts and conduct of the defendants, and each of them, as alleged in the complaint, Ms. Ratlieff incurred and will incur for an indefinite time in the future, medical, hospital, and related expenses, all in an amount presently unascertained, but according to proof at the time of trial.

158.   As a further direct and proximate result of the individual and collective acts and conduct of defendants, and each of them, as alleged in the complaint, Ms. Ratlieff has suffered loss of income and loss of earning capacity, all in an amount presently unascertained, but according to proof at the time of trial.

VI.     **Municipal Liability Allegations.**

A.     **Final Policymaker Theory**

159.   The FLPD Chief of Police is the final policymaker for policies governing policing by the FLPD. The Chief of Police reviews and approves FLPD policies before their implementation and dissemination.

160.   There is no FLPD formal written policy governing the circumstances under which a crowd may be dispersed by tear gas and KIPs.

161.   Police Chief issued a directive that field force could not be mobilized without an order from him or one of the three Assistant Chiefs. Dietrich received a call to mobilize and so responded.

162.   FLPD did not create an Incident Operation Action Plan for the demonstration. There was one for a smaller protest.

163.   FLPD planned for a demonstration on May 31, 2020, but learned a much larger demonstration would take place near downtown Fort Lauderdale on May 31, 2020.

164.   City officials monitored the police response from the Real-Time Crime Center (RTCC).

165.   The group included the City Manager, all three Assistant Chiefs of

28

Police, which included Incident Commander Assistant Chief Douglas MacDougall, several Majors, and SWAT Commander Captain Steven Greenlaw, among many others. The Chief of Police was available by phone and participated in major decisions via telephone.

166.   Incident Command heard the radio request for assistance for an officer who claimed she was surrounded and needed help. Incident command sent an extraction team.

167.   Cristafaro requested from Incident Command permission to deploy less-lethal munitions. SWAT Commander Greenlaw communicated the request to the leadership present at Incident Command. The Chief of Police attended by phone. While some in Incident Command opposed and advised against the deployment of less-lethal munitions against the crowd, the Chief of Police authorized the deployment of tear gas and KIPs. The Chief has agreed that the intent of the deployment of KIPs was to disperse the crowd at SE 2nd Street and SE 1st Ave.

168.   Incident Command knew the crowd was being dispersed with tear gas and KIPs without a dispersal order.

169.   Assistant Chief Douglas MacDoughall claims he disapproved the deployment of tear gas and less-lethal munitions on May 31, 2020, near the corner of SE 2nd Street and SE 1st Ave, from 6:30pm to 7:30pm. The City has claimed in its interrogatories, however, that the Assistant Chief approved the deployment of tear gas and less lethal munitions. The Assistant Chief did not stop the deployment.

170.   Captain Steven Greenlaw, Operations Bureau - Special Events & Emergency Management S.W.A.T. Commander, approved the deployment of tear gas and less-lethal munitions on May 31, 2020, near the corner of SE 2nd Street and SE 1st Ave, from 6:30 p.m. to 7:30 p.m.

171.   Captain Robert Dietrich, Field Force Commander approved the deployment of tear gas and less-lethal munitions on May 31, 2020, near the corner of SE 2nd Street and SE 1st Ave, from 6:30 p.m. to 7:30 p.m.

172.   Police Chief Rick Maglione authorized the deployment of tear gas and less-lethal munitions on May 31, 2020, near the corner of SE 2nd Street and SE 1st Ave, from 6:30 p.m. to 7:30 p.m. He also initiated the deployment of a multi-agency field force.

173.   The decisions of the Police Chief, Assistant Chief MacDoughall, Captains Greenlaw and Dietrich were not subject to review.

174.   FLPD officers who deployed chemical munitions, the FLPD officers assigned to deploy less-than-lethal munitions, and FLPD command staff worked collectively toward a unified goal of dispersing the assembly that included Ms. Ratlieff.

175.   Final policymakers within the City authorized and directed the deployment of tear gas and KIPs at demonstrators at SE Second Street and SE First Avenue.

176.   Chief Maglione authorized the deployment of KIPs and tear gas.

177.   Captain Dietrich, the Field Force Commander, took FLPD Bravo Field Force Team to SE 2nd Street & SE 1st Ave with the intent to disperse the crowd.

178.   The Field Force donned gas masks and brought ballistic shields, batons, tear gas, and KIPs.

179.   Each officer present at FLPD played a different role, but worked toward a unified goal of clearing out SE 2nd Street & SE 1st Ave.

180.   Officers on the Field Force front line used their ballistic shields to protect and conceal FLPD officers behind the line who deployed KIPs and tear gas.

181.   Defendant Rodriguez and John Does 2-3 stood behind the protection of the Field Force line, where they deployed the tear gas that dispersed peaceful demonstrators. FLPD officers subjectively knew tear gas deploys indiscriminately and that demonstrators lawfully present and engaged in First Amendment activities would be forced to inhale tear gas.

182.   Defendant Ramos protected the field force line with less-lethal cover.

He also deployed several rounds of KIPs at anyone who attempted to thwart the dispersal by removing the tear gas cannisters his team members deployed.

183. Defendant Lieutenant Figueras, the most senior SWAT officer on scene, explained that less lethal munitions deployed by Ramos and others was used to help FLPD disperse the crowd.

184. Defendant Ramos deployed several rounds of KIPs to ensure that crowds of peaceful demonstrators could no longer peacefully practice their First Amendment-protected rights. Ramos fired direct impact munitions in aid of dispersing the crowd of demonstrators.

185. Shortly before or after Ratlieff's shooting, one officer with KIPs approached another officer who had also fired KIPs. The first officer asked if the second officer's video was on. The second officer mistakenly said it was on standby. Their conversation was recorded. The first officer asked, "Did you see me f**k up those motherf****rs? The second officer responded "Yeah, "I got the one f***er," and the two began laughing.

### B. Failure to Train

186. The City and FLPD's failure to properly train its employees on the proper use of KIPs in crowd control situations, including the type of KIPs that should be used as well as where and when to aim KIPs, was a moving force behind the constitutional law violations alleged in this lawsuit.

187. Conspicuously absent is a policy for the FLPD that would provide guidance to department members when to make announcements of unlawful assemblies and dispersal orders absent the intent to make mass arrests as outlined in policy 501.10. FLPD could and should have made continual announcements and dispersal orders prior to Ms. Ratlieff being shot in the face with an impact munition.

188. The department-wide Field Force trained officers how to put on gas masks when deploying tear gas. The course does not address how to deploy tear gas or kinetic impact projectiles during a crowd control situation. This is not a training objective of the course.

189.   FLPD provides SWAT and field training officers a course on 40 mm Multi Launcher Operator. The course does not address the use of tear gas and less lethal munitions specifically in crowd control situations. Nor does the annual qualification test on the officer's ability to accurately use a 40mm with a gas mask on, much less with a gas mask on while gas is being deployed

190.   Defendant Ramos did not recall and his training file does not record him receiving training on using less lethal in the context of crowd control or demonstrations, firing a less-lethal munitions with a gas masks, or warning suspects before deploying a KIPs.

191.   Ramos' lack of training in firing the 40mm launcher while wearing a helmet and gas mask increased the likelihood of hitting an unintended person. While Detective Ramos estimated the distance from his position in the line of police officers to the unknown male at 30 to 50 feet, a Google Map view indicates the distance may have been to be up to 60 feet. Regardless, Detective Ramos had not been trained to fire 40mm impact munitions at distances over 45 feet. (KH at 19).

## CAUSES OF ACTIONS

### COUNT I: Federal Civil Rights Violations – Unlawful First Amendment Restriction on Speech.

(All Defendants, but the City)

192.   Plaintiff realleges paragraphs 1 through 191.

193.   On May 31, 2020, all Defendants  stopped peaceful demonstrators from exercising their First Amendment rights. Plaintiff was among the peaceful demonstrators.

194.   Plaintiff and other demonstrators were in a public forum, set aside by FLPD for demonstrators to assemble and exercise their First Amendment rights.

195.   Defendants violated plaintiff's rights of freedom of speech and assembly under the First Amendment to the United States Constitution by

disrupting her lawful First Amendment activities, including her peaceful demonstration against excessive force by law enforcement.

196.   Defendants violated Plaintiff's First Amendment rights when they stopped the assembly of peaceful congregants gathered in a public forum.

197.   Defendants violated Plaintiff's First Amendment rights by deploying tear gas and KIPs at crowds containing peaceful demonstrators without warning.

198.   The deployment of tear gas and KIPs forced peaceful demonstrators like Ms. Ratlieff to discontinue exercising their First Amendment rights.

199.   The restrictions on speech imposed by FLPD were not narrowly tailored to achieve a compelling governmental interest using the least restrictive means available.

200.   The Defendants, individually and in concert with one another, deployed tear gas and KIPs that stopped peaceful demonstrations.

201.   Ms. Ratlieff was in a place she had a right to be. Curfew had not yet begun. FLPD had not issued a dispersal order, much less declared the assembly unlawful.

202.   Defendants' actions violated plaintiff's clearly established rights to freedom of expression and assembly under the First Amendment to the United States Constitution by prohibiting plaintiff from and making her discontinue exercising her constitutional rights to free speech and expression in a public forum.

203.   The restrictions were not reasonable time, place and manner restrictions.

204.   Final policymakers within the City authorized and directed the deployment of tear gas and KIPs at demonstrators at SE Second Street and SE First Avenue.

205.   Chief Maglione authorized the deployment of KIPs and tear gas and initiated the deployment of a multi-agency field force.

206.   Captain Dietrich, the Field Force Commander, took FLPD Bravo Field Force Team to SE 2nd Street & SE 1st Ave with the intent to disperse the

crowd.

207. The Field Force donned gas masks and brought ballistic shields, batons, tear gas, and KIPs.

208. Each officer present at FLPD played a different role, but worked toward a unified goal of clearing out SE 2nd Street & SE 1st Ave.

209. Officers on the Field Force front line used their ballistic shields to protect and conceal FLPD officers behind the line who deployed KIPs and tear gas.

210. Defendant Rodriguez and John Does 2-3 stood behind the protection of the Field Force line, where they deployed the tear gas that dispersed peaceful demonstrators. FLPD officers subjectively knew tear gas deploys indiscriminately and that demonstrators lawfully present and engaged in First Amendment activities would be forced to inhale tear gas.

211. Defendant Ramos protected the field force line with less-lethal cover. He also deployed several rounds of KIPs at anyone who attempted to thwart the dispersal by removing the tear gas cannisters his team members deployed.

212. Defendant Lieutenant Figueras, the most senior SWAT officer on scene, explained that less lethal munitions deployed by Ramos and others was used to help FLPD disperse the crowd.

213. Defendant Ramos deployed several rounds of KIPs to ensure that crowds of peaceful demonstrators could no longer peacefully practice their First Amendment-protected rights. Ramos fired direct impact munitions in aid of dispersing the crowd of demonstrators.

214. Sergeant Cristafaro, Assistant Chief MacDougall, and Captain Dietrich violated plaintiff's First Amendment rights because their commands caused the subordinate police officers to disperse  peaceful demonstrators, including plaintiff, who were exercising their freedom of expression protected by the First Amendment.

215. Sergeant Cristafaro, Assistant Chief MacDougall, and Captain Dietrich violated plaintiff's First Amendment rights by failing to stop the use of

tear gas and KIPs against peaceful demonstrators who he knew or should have known were exercising their First Amendment rights. Their failure to stop their subordinate officers from acting unlawfully caused the First Amendment violations.

216.   Captain Greenlaw and Lieutenant Figueras violated plaintiff's First Amendment rights because their commands caused the subordinate police officers to disperse peaceful demonstrators, including plaintiff, who were exercising their freedom of expression protected by the First Amendment. Defendants inhibited and chilled plaintiff's First Amendment activity by incapacitating and injuring her with tear gas and KIPs when plaintiff was engaged in a peaceful demonstration at a public forum, speaking out against police violence and the continued law enforcement oppression of communities of color in the United States. Plaintiff's protected First Amendment activity was a substantial or motivating factor in defendants' use of force intended to chill plaintiff's speech.

217.   FLPD and its employees were not enforcing a lawful dispersal order. The participants' assembly had not been declared unlawful. Nor was there a lawful order to disperse. At all times, plaintiff was in a place she was allowed to be. Yet, FLPD indiscriminately deployed chemical agents at the peaceful gathering and directed the use of KIPs to effectuate and support the deployment of chemical agents.

218.   The defendants knew or should have known that dispersing peaceful demonstrators, directing subordinates to dispersing   peaceful demonstrators, and failing to stop subordinates from dispersing peaceful demonstrators, thereby preventing plaintiff from exercising her constitutional rights to free speech and expression in a public forum, were clearly established violations of the First Amendment at the time of the incident. *Keating v. City of Miami*, 598 F.3d 753, 766 (11th Cir. 2010).

219.   As a direct and proximate result of defendants' unlawful conduct, plaintiff was tear gassed, shot by a KIP, and suffered severe and permanent

physical injury, emotional distress, and humiliation, and is entitled to monetary damages.

For these reasons, Ms. Ratlieff demands judgment against all defendants (but the City) for damages, punitive damages, prejudgment interest on liquidated damages as allowed by law, costs of this action, reasonable attorney's fees, injunctive relief, and any other relief this Court deems just and proper.

## COUNT II: Federal Civil Rights Violations – Unlawful First Amendment Restriction on Speech.

(The City)

220.   Plaintiff realleges paragraphs 1 through 191.

221.   On May 31, 2020, all Defendants  stopped peaceful demonstrators from exercising their First Amendment rights. Plaintiff was among the peaceful demonstrators.

222.   Plaintiff and other demonstrators were in a public forum, set aside by FLPD for demonstrators to assemble and exercise their First Amendment rights.

223.   Defendants violated plaintiff's rights of freedom of speech and assembly under the First Amendment to the United States Constitution by disrupting her lawful First Amendment activities, including her peaceful demonstration against excessive force by law enforcement.

224.   Defendants violated Plaintiff's First Amendment rights when they stopped the assembly of peaceful congregants gathered in a public forum.

225.   Defendants violated Plaintiff's First Amendment rights by deploying tear gas and KIPs at crowds containing peaceful demonstrators without warning.

226.   The deployment of tear gas and KIPs forced peaceful demonstrators like Ms. Ratlieff to discontinue exercising their First Amendment rights.

227.   The restrictions on speech imposed by FLPD were not narrowly tailored to achieve a compelling governmental interest using the least restrictive means available.

228.   The Defendants, individually and in concert with one another,

36

deployed tear gas and KIPs that stopped peaceful demonstrations.

229.   Ms. Ratlieff was in a place she had a right to be. Curfew had not yet begun. FLPD had not issued a dispersal order, much less declared the assembly unlawful.

230.   Defendants' actions violated plaintiff's clearly established rights to freedom of expression and assembly under the First Amendment to the United States Constitution by prohibiting plaintiff from and making her discontinue exercising her constitutional rights to free speech and expression in a public forum.

231.   The restrictions were not reasonable time, place and manner restrictions.

232.   Final policymakers within the City authorized and directed the deployment of tear gas and KIPs at demonstrators at SE Second Street and SE First Avenue.

233.   Chief Maglione authorized the deployment of KIPs and tear gas and initiated the deployment of a multi-agency field force.

234.   Captain Dietrich, the Field Force Commander, took FLPD Bravo Field Force Team to SE 2nd Street & SE 1st Ave with the intent to disperse the crowd.

235.   The Field Force donned gas masks and brought ballistic shields, batons, tear gas, and KIPs.

236.   Each officer present at FLPD played a different role, but worked toward a unified goal of clearing out SE 2nd Street & SE 1st Ave.

237.   Officers on the Field Force front line used their ballistic shields to protect and conceal FLPD officers behind the line who deployed KIPs and tear gas.

238.   Defendant Rodriguez and John Does 2-3 stood behind the protection of the Field Force line, where they deployed the tear gas that dispersed peaceful demonstrators. FLPD officers subjectively knew tear gas deploys indiscriminately and that demonstrators lawfully present and engaged in First Amendment

activities would be forced to inhale tear gas.

239.   Defendant Ramos protected the field force line with less-lethal cover. He also deployed several rounds of KIPs at anyone who attempted to thwart the dispersal by removing the tear gas cannisters his team members deployed.

240.   Defendant Lieutenant Figueras, the most senior SWAT officer on scene, explained that less lethal munitions deployed by Ramos and others was used to help FLPD disperse the crowd.

241.   Defendant Ramos deployed several rounds of KIPs to ensure that crowds of peaceful demonstrators could no longer peacefully practice their First Amendment-protected rights. Ramos fired direct impact munitions in aid of dispersing the crowd of demonstrators.

242.   Sergeant Cristafaro, Assistant Chief MacDougall, and Captain Dietrich violated plaintiff's First Amendment rights because their commands caused the subordinate police officers to disperse  peaceful demonstrators, including plaintiff, who were exercising their freedom of expression protected by the First Amendment.

243.   Sergeant Cristafaro, Assistant Chief MacDougall, and Captain Dietrich violated plaintiff's First Amendment rights by failing to stop the use of tear gas and KIPs against peaceful demonstrators who he knew or should have known were exercising their First Amendment rights. Their failure to stop their subordinate officers from acting unlawfully caused the First Amendment violations.

244.   Captain Greenlaw and Lieutenant Figueras violated plaintiff's First Amendment rights because their commands caused the subordinate police officers to disperse peaceful demonstrators, including plaintiff, who were exercising their freedom of expression protected by the First Amendment. Defendants inhibited and chilled plaintiff's First Amendment activity by incapacitating and injuring her with tear gas and KIPs when plaintiff was engaged in a peaceful demonstration at a public forum, speaking out against police violence and the continued law enforcement oppression of communities of

color in the United States. Plaintiff's protected First Amendment activity was a substantial or motivating factor in defendants' use of force intended to chill plaintiff's speech.

245.   FLPD and its employees were not enforcing a lawful dispersal order. The participants' assembly had not been declared unlawful. Nor was there a lawful order to disperse. At all times, plaintiff was in a place she was allowed to be. Yet, FLPD indiscriminately deployed chemical agents at the peaceful gathering and directed the use of KIPs to effectuate and support the deployment of chemical agents.

246.   The defendants knew or should have known that dispersing peaceful demonstrators, directing subordinates to dispersing   peaceful demonstrators, and failing to stop subordinates from dispersing peaceful demonstrators, thereby preventing plaintiff from exercising her constitutional rights to free speech and expression in a public forum, were clearly established violations of the First Amendment at the time of the incident. *Keating v. City of Miami*, 598 F.3d 753, 766 (11th Cir. 2010).

247.   As a direct and proximate result of the City's unlawful conduct, plaintiff was tear gassed, shot by a KIP, and suffered severe and permanent physical injury, emotional distress, and humiliation, and is entitled to monetary damages.

For these reasons, Ms. Ratlieff demands judgment against the City for damages, punitive damages, prejudgment interest on liquidated damages as allowed by law, costs of this action, reasonable attorney's fees, injunctive relief, and any other relief this Court deems just and proper.

### COUNT III: Federal Civil Rights Violations - First Amendment Retaliation.

(All Defendants, but the City)

248.   Plaintiff realleges paragraphs 1 through 191.

249.   On May 31, 2020, all Defendants named in this lawsuit stopped

peaceful demonstrators from exercising their First Amendment rights. Plaintiff was among the peaceful demonstrators.

250. Defendants violated plaintiff's rights of freedom of speech and assembly under the First Amendment to the United States Constitution by disrupting her lawful First Amendment activities, including her peaceful demonstration of excessive force by law enforcement.

251. Defendants violated Plaintiff's First Amendment rights by deploying tear gas and KIPs at crowds containing peaceful demonstrators without warning.

252. The FLPD forced peaceful demonstrators, including Ms. Ratlieff, to discontinue exercising their First Amendment rights.

253. FLPD deployed KIPs and tear gas with the intent to disperse the assembled demonstrators.

254. FLPD knew not all demonstrators present were engaged in acts of violence. FLPD further knew they would be affected by the use of force to disperse the crowd.

255. Plaintiff was one of those peacefully demonstrating when she was tear gassed and forced to discontinue her peaceful assembly and demonstration.

256. While trying to recover from tear gas and then escape the tear gas, she was struck with a KIP, and forced to discontinue her peaceful assembly and demonstration.

257. The Defendants, individually and in concert with one another, deployed tear gas and KIPs that stopped peaceful demonstrators. They did so without any warning, forcing demonstrators to discontinue their peaceful assembly.

258. Defendants' actions violated plaintiff's clearly established rights to freedom of expression and assembly under the First Amendment to the United States Constitution by prohibiting plaintiff from and making her discontinue exercising her constitutional rights to free speech and expression in a public forum.

259. Final policymakers within the City of Fort Lauderdale authorized

40

and directed the deployment of tear gas and KIPs at demonstrators at SE Second Street and SE First Avenue.

260.   Final policymakers within the City authorized and directed the deployment of tear gas and KIPs at demonstrators at SE Second Street and SE First Avenue.

261.   Chief Maglione authorized the deployment of KIPs and tear gas and initiated the deployment of a multi-agency field force.

262.   Captain Dietrich, the Field Force Commander, took FLPD Bravo Field Force Team to SE 2nd Street & SE 1st Ave with the intent to disperse the crowd (RD 87:3-8).

263.   The Field Force donned gas masks and brought ballistic shields, batons, tear gas, and KIPs.

264.   Each officer present at FLPD played a different role, but worked toward a unified goal of clearing out SE 2nd Street & SE 1st Ave.

265.   Officers on the Field Force front line used their ballistic shields to protect and conceal FLPD officers behind the line who deployed KIPs and tear gas.

266.   Defendant Rodriguez and John Does 2-3 stood behind the protection of the Field Force line, where they deployed the tear gas that dispersed peaceful demonstrators. FLPD officers subjectively knew tear gas deploys indiscriminately and that demonstrators lawfully present and engaged in First Amendment activities would be forced to inhale tear gas.

267.   Defendant Ramos protected the field force line with less-lethal cover. He also deployed several rounds of KIPs at anyone who attempted to thwart the dispersal by removing the tear gas cannisters his team members deployed .

268.   Defendant Lieutenant Figueras, the most senior SWAT officer on scene, explained that less lethal munitions deployed by Ramos and others were used to help FLPD disperse the crowd.

269.   Sergeant Cristafaro, Assistant Chief MacDougall, and Captain Dietrich violated plaintiff's First Amendment rights because their commands

41

caused the subordinate police officers to disperse peaceful demonstrators, including plaintiff, who were exercising their freedom of expression protected by the First Amendment.

270.   Sergeant Cristafaro, Assistant Chief MacDougall, and Captain Dietrich violated plaintiff's First Amendment rights by failing to stop the use of tear gas and KIPs against peaceful demonstrators who he knew or should have known were exercising their First Amendment rights. Their failure to stop their subordinate officers from acting unlawfully caused the First Amendment violations.

271.   Captain Greenlaw and Lieutenant Figueras violated plaintiff's First Amendment rights because their commands caused the subordinate police officers to disperse peaceful demonstrators, including plaintiff, who were exercising their freedom of expression protected by the First Amendment. Defendants inhibited and chilled plaintiff's First Amendment activity by incapacitating and injuring her with tear gas and KIPs when plaintiff was engaged in a peaceful demonstration at a public forum, speaking out against police violence and the continued law enforcement oppression of communities of color in the United States. Plaintiff's protected First Amendment activity was a substantial or motivating factor in defendants' use of force intended to chill plaintiff's speech.

272.   FLPD and its employees were not enforcing a lawful dispersal order. The participants' assembly had not been declared unlawful. Nor was there a lawful order to disperse. At all times, plaintiff was in a place she was allowed to be. Yet, FLPD indiscriminately deployed chemical agents at the peaceful gathering and directed the use of KIPs to effectuate and support the deployment of chemical agents.

273.   As a direct and proximate result of defendants' unlawful conduct, plaintiff was tear gassed, shot by a KIP, and suffered severe and permanent physical injury, emotional distress, and humiliation, and is entitled to monetary damages.

42

For these reasons, Ms. Ratlieff demands judgment against all defendants (but the City) for damages, punitive damages, prejudgment interest on liquidated damages as allowed by law, costs of this action, reasonable attorney's fees, injunctive relief, and any other relief this Court deems just and proper.

## COUNT IV: Federal Civil Rights Violations - First Amendment Retaliation.

(The City)

274.   Plaintiff realleges paragraphs 1 through 191.

275.   On May 31, 2020, all Defendants named in this lawsuit stopped peaceful demonstrators from exercising their First Amendment rights. Plaintiff was among the peaceful demonstrators.

276.   Defendants violated plaintiff's rights of freedom of speech and assembly under the First Amendment to the United States Constitution by disrupting her lawful First Amendment activities, including her peaceful demonstration of excessive force by law enforcement.

277.   Defendants violated Plaintiff's First Amendment rights by deploying tear gas and KIPs at crowds containing peaceful demonstrators without warning.

278.   The FLPD forced peaceful demonstrators, including Ms. Ratlieff, to discontinue exercising their First Amendment rights.

279.   FLPD deployed KIPs and tear gas with the intent to disperse the assembled demonstrators.

280.   FLPD knew not all demonstrators present were engaged in acts of violence. FLPD further knew they would be affected by the use of force to disperse the crowd.

281.   Plaintiff was one of those peacefully demonstrating when she was tear gassed and forced to discontinue her peaceful assembly and demonstration.

282.   While trying to recover from tear gas and then escape the tear gas, she was struck with a KIP, and forced to discontinue her peaceful assembly and demonstration.

283.  The Defendants, individually and in concert with one another, deployed tear gas and KIPs that stopped peaceful demonstrators. They did so without any warning, forcing demonstrators to discontinue their peaceful assembly.

284.  Defendants' actions violated plaintiff's clearly established rights to freedom of expression and assembly under the First Amendment to the United States Constitution by prohibiting plaintiff from and making her discontinue exercising her constitutional rights to free speech and expression in a public forum.

285.  Final policymakers within the City of Fort Lauderdale authorized and directed the deployment of tear gas and KIPs at demonstrators at SE Second Street and SE First Avenue.

286.  Final policymakers within the City authorized and directed the deployment of tear gas and KIPs at demonstrators at SE Second Street and SE First Avenue.

287.  Chief Maglione authorized the deployment of KIPs and tear gas and initiated the deployment of a multi-agency field force.

288.  Captain Dietrich, the Field Force Commander, took FLPD Bravo Field Force Team to SE 2nd Street & SE 1st Ave with the intent to disperse the crowd (RD 87:3-8).

289.  The Field Force donned gas masks and brought ballistic shields, batons, tear gas, and KIPs.

290.  Each officer present at FLPD played a different role, but worked toward a unified goal of clearing out SE 2nd Street & SE 1st Ave.

291.  Officers on the Field Force front line used their ballistic shields to protect and conceal FLPD officers behind the line who deployed KIPs and tear gas.

292.  Defendant Rodriguez and John Does 2-3 stood behind the protection of the Field Force line, where they deployed the tear gas that dispersed peaceful demonstrators. FLPD officers subjectively knew tear gas deploys indiscriminately

44

and that demonstrators lawfully present and engaged in First Amendment activities would be forced to inhale tear gas.

293. Defendant Ramos protected the field force line with less-lethal cover. He also deployed several rounds of KIPs at anyone who attempted to thwart the dispersal by removing the tear gas cannisters his team members deployed .

294. Defendant Lieutenant Figueras, the most senior SWAT officer on scene, explained that less lethal munitions deployed by Ramos and others were used to help FLPD disperse the crowd.

295. Sergeant Cristafaro, Assistant Chief MacDougall, and Captain Dietrich violated plaintiff's First Amendment rights because their commands caused the subordinate police officers to disperse peaceful demonstrators, including plaintiff, who were exercising their freedom of expression protected by the First Amendment.

296. Sergeant Cristafaro, Assistant Chief MacDougall, and Captain Dietrich violated plaintiff's First Amendment rights by failing to stop the use of tear gas and KIPs against peaceful demonstrators who he knew or should have known were exercising their First Amendment rights. Their failure to stop their subordinate officers from acting unlawfully caused the First Amendment violations.

297. Captain Greenlaw and Lieutenant Figueras violated plaintiff's First Amendment rights because their commands caused the subordinate police officers to disperse peaceful demonstrators, including plaintiff, who were exercising their freedom of expression protected by the First Amendment. Defendants inhibited and chilled plaintiff's First Amendment activity by incapacitating and injuring her with tear gas and KIPs when plaintiff was engaged in a peaceful demonstration at a public forum, speaking out against police violence and the continued law enforcement oppression of communities of color in the United States. Plaintiff's protected First Amendment activity was a substantial or motivating factor in defendants' use of force intended to chill plaintiff's speech.

298.   FLPD and its employees were not enforcing a lawful dispersal order. The participants' assembly had not been declared unlawful. Nor was there a lawful order to disperse. At all times, plaintiff was in a place she was allowed to be. Yet, FLPD indiscriminately deployed chemical agents at the peaceful gathering and directed the use of KIPs to effectuate and support the deployment of chemical agents.

299.   As a direct and proximate result of defendants' unlawful conduct, plaintiff was tear gassed, shot by a KIP, and suffered severe and permanent physical injury, emotional distress, and humiliation, and is entitled to monetary damages.

For these reasons, Ms. Ratlieff demands judgment against all defendants for damages, punitive damages, prejudgment interest on liquidated damages as allowed by law, costs of this action, reasonable attorney's fees, injunctive relief, and any other relief this Court deems just and proper.

## COUNT V: Federal Civil Rights Violations – Fourteenth Amendment.

### (All Defendants, but the City)

300.   Plaintiff realleges paragraphs 1 through 191.

301.   Defendants committed acts that violated plaintiff's right to substantive due process of law in violation of the Fourteenth Amendment to the United States Constitution.

302.   Freedom of speech and the right to peacefully assemble in a public forum are fundamental components of the liberty safeguarded by the Due Process Clause to the U.S. Constitution.

303.   The City, FLPD, and the individual defendants provoked a peaceful gathering by using unwarranted and unlawful violence against a peaceful demonstrator kneeling and chanting.

304.   The City, FLPD, and the individual defendants did not deescalate. Instead, final policymakers within the City authorized and directed the

46

deployment of tear gas and KIPs to disperse the peaceful gathering. The demonstration was never declared unlawful, as provided by Florida law and FLPD policies. No dispersal order issued. Nor were those gathered warned before the police deployment of force.

305.   The decision by the City, FLPD, and the individual defendants to deploy tear gas and KIPs to disperse peaceful demonstrators was not a split-second decision.

306.   The City, FLPD, and the individual defendants had sufficient time to allow those peacefully assembled to leave. The City, FLPD, and the individual defendants had sufficient time to declare (if the facts warranted) an unlawful assembly, to issue a lawful dispersal order, or alternatively, to warn peaceful demonstrators of the police intent to deploy force.

307.   FLPD warned law enforcement officers present in the same area of its intended deployment of tear gas, giving only the police sufficient time to get to safety. The City, FLPD, and the individual defendants refused and failed to give the peaceful gathering the same warning, despite having the opportunity to do so. The City, FLPD, and the individual defendants failed and refused to broadcast the readily available prerecorded message on the LRAD device.

308.   After the initial use of tear gas and KIPs, City final policymakers had sufficient time to consider the continued use of tear gas and KIPs.

309.   The City, FLPD, and the individual defendants knew or reasonably should have known the demonstrators were mostly peaceful demonstrators and members of the media. The City, FLPD, and the individual defendants were deliberately indifferent to the substantial likelihood of injury to peaceful demonstrators and media observers lawfully present who were neither warned nor lawfully dispersed.

310.   Defendant Ramos deployed munitions in a manner that created a substantial risk of causing death or serious bodily harm. Ramos intentionally fired direct impact rounds into  peaceful demonstrators knowing they had been tear gassed and were frantically trying to escape the cloud of tear gas.

311.   In addition, Ramos did not aim for the thighs, buttocks, and legs, the recommended target areas. He aimed for the abdomen. By firing, as a first resort, at areas other than those recommended by the product specifications, Ramos increased the substantial risk of death or serious bodily injury naturally associated with the use of KIPs in crowd control situations, and knew or reasonably should have known of the increased risk.

312.   Ramos did not deploy direct impact rounds to protect himself or others from death or serious bodily harm, much less to prevent *imminent* death or serious bodily harm. Ramos did not deploy direct impact rounds to protect property or life. Nor did Ramos deploy direct impact rounds for a lawful purpose. Ramos was not responding to a clear and present danger.

313.   Defendant Ramos deployed direct impact rounds to effectuate the indiscriminate dispersal of those persons gathered in the area. Their presence was lawful, and their assembly was never declared unlawful. There was no dispersal order. There was no curfew violation. Those who gathered and assembled, including the media observers, were lawfully gathered in a place they had a right to be.

314.   Ramos' statement that he was targeting a man walking away after throwing back a chemical munition launched at the peaceful demonstrators was not true. Notwithstanding, the claim did not justify his use of force against Ms. Ratlieff or any other person.

315.   As Ramos admitted under oath, he knew at the time he fired the round that the intended target "was trying to use people as shields." Ramos accordingly knew or should have known there was a substantial likelihood that plaintiff (whom Ramos claims the intended target was hiding behind) would either be struck by the direct impact round itself or the CS powder payload ejected upon impact as well as the substantial likelihood of death or serious bodily injury.

316.   Furthermore, the people comprising the group into which FLPD fired indiscriminately were engaged in no unlawful conduct when Defendant

Rodriguez and John Does 2-3 fired chemical munitions to disperse the lawful assembly. There was no lawful ground or legitimate government interest served by using tear gas to disperse the lawfully assembled group without a warning or lawful dispersal order. There was no lawful ground or legitimate government interest served by using KIPs to effectuate or support the unlawful dispersal by tear gas. Their unlawful conduct caused LaToya Ratlieff to move and ultimately be shot while escaping the tear gas.

317.   The Defendants knew the gas might be moved.

318.   By their conduct, the defendants individually and collectively were deliberately indifferent to the substantial risk of harm their conduct could cause. Their conduct was so egregious that it shocks the conscience.

319.   Defendants' conduct was not objectively reasonable.

320.   Defendants' conduct and manner in which they deployed chemical munitions and KIPs without warning or dispersal order violated Ms. Ratlieff's due process rights.

321.   Defendants' conduct in unjustifiably using chemical munitions and KIPs to unlawfully disperse peaceful demonstrators and in striking plaintiff in the head, causing severe physical injury, while plaintiff and other peaceful demonstrators were engaged in protected First Amendment activity was shocking to the conscience, beyond the bounds of acts tolerable in a civilized society, and so egregious and outrageous that it may fairly be said to shock the contemporary conscience.

322.   Alternatively, defendants' individual and collective conduct in using chemical munitions and KIPs to unlawfully disperse a peaceful assembly engaged in protected First Amendment activity was maliciously and sadistically done to harm and injure those gathered, including the plaintiff.

323.   Alternatively, defendants' individual and collective conduct in using chemical munitions and KIPs to unlawfully disperse a peaceful assembly engaged in protected First Amendment activity was objectively unreasonable.

324.   The City and FLPD's failure to properly train its employees,

including Defendant Ramos and John Does 2-3, on the proper use of KIPs in crowd control situations, including the type of KIPs that should be used as well as where and when to aim KIPs, was a moving force behind the constitutional law violations alleged.

325.  As a direct and proximate result of defendants' unlawful conduct, plaintiff was tear gassed, shot by a KIP, and suffered severe and permanent physical injury, emotional distress, and humiliation, and is entitled to monetary damages.

For these reasons, Ms. Ratlieff demands judgment against All Defendants (But the City) for damages, punitive damages, prejudgment interest on liquidated damages as allowed by law, costs of this action, reasonable attorney's fees, injunctive relief, and any other relief this Court deems just and proper.

### COUNT VI: Federal Civil Rights Violations – Fourteenth Amendment.

(The City)

326.  Plaintiff realleges paragraphs 1 through 191.

327. Defendants committed acts that violated plaintiff's right to substantive due process of law in violation of the Fourteenth Amendment to the United States Constitution.

328.  Freedom of speech and the right to peacefully assemble in a public forum are fundamental components of the liberty safeguarded by the Due Process Clause to the U.S. Constitution.

329.  The City, FLPD, and the individual defendants provoked a peaceful gathering by using unwarranted and unlawful violence against a peaceful demonstrator kneeling and chanting.

330.  The City, FLPD, and the individual defendants did not deescalate. Instead, final policymakers within the City authorized and directed the deployment of tear gas and KIPs to disperse the peaceful gathering. The demonstration was never declared unlawful, as provided by Florida law and

FLPD policies. No dispersal order issued. Nor were those gathered warned before the police deployment of force.

331.   The decision by the City, FLPD, and the individual defendants to deploy tear gas and KIPs to disperse peaceful demonstrators was not a split-second decision.

332.   The City, FLPD, and the individual defendants had sufficient time to allow those peacefully assembled to leave. The City, FLPD, and the individual defendants had sufficient time to declare (if the facts warranted) an unlawful assembly, to issue a lawful dispersal order, or alternatively, to warn peaceful demonstrators of the police intent to deploy force.

333.   FLPD warned law enforcement officers present in the same area of its intended deployment of tear gas, giving only the police sufficient time to get to safety. The City, FLPD, and the individual defendants refused and failed to give the peaceful gathering the same warning, despite having the opportunity to do so. The City, FLPD, and the individual defendants failed and refused to broadcast the readily available prerecorded message on the LRAD device.

334.   After the initial use of tear gas and KIPs, City final policymakers had sufficient time to consider the continued use of tear gas and KIPs.

335.   The City, FLPD, and the individual defendants knew or reasonably should have known the demonstrators were mostly peaceful demonstrators and members of the media. The City, FLPD, and the individual defendants were deliberately indifferent to the substantial likelihood of injury to peaceful demonstrators and media observers lawfully present who were neither warned nor lawfully dispersed.

336.   Defendant Ramos deployed munitions in a manner that created a substantial risk of causing death or serious bodily harm. Ramos intentionally fired direct impact rounds into  peaceful demonstrators knowing they had been tear gassed and were frantically trying to escape the cloud of tear gas.

337.   In addition, Ramos did not aim for the thighs, buttocks, and legs, the recommended target areas. He aimed for the abdomen. By firing, as a first

resort, at areas other than those recommended by the product specifications, Ramos increased the substantial risk of death or serious bodily injury naturally associated with the use of KIPs in crowd control situations, and knew or reasonably should have known of the increased risk.

338.  Ramos did not deploy direct impact rounds to protect himself or others from death or serious bodily harm, much less to prevent imminent death or serious bodily harm. Ramos did not deploy direct impact rounds to protect property or life. Nor did Ramos deploy direct impact rounds for a lawful purpose. Ramos was not responding to a clear and present danger.

339.  Defendant Ramos deployed direct impact rounds to effectuate the indiscriminate dispersal of those persons gathered in the area. Their presence was lawful, and their assembly was never declared unlawful. There was no dispersal order. There was no curfew violation. Those who gathered and assembled, including the media observers, were lawfully gathered in a place they had a right to be.

340.  Ramos' statement that he was targeting a man walking away after throwing back a chemical munition launched at the peaceful demonstrators was not true. Notwithstanding, the claim did not justify his use of force against Ms. Ratlieff or any other person.

341.  As Ramos admitted under oath, he knew at the time he fired the round that the intended target "was trying to use people as shields." Ramos accordingly knew or should have known there was a substantial likelihood that plaintiff (whom Ramos claims the intended target was hiding behind) would either be struck by the direct impact round itself or the CS powder payload ejected upon impact as well as the substantial likelihood of death or serious bodily injury.

342.  Furthermore, the people comprising the group into which FLPD fired indiscriminately were engaged in no unlawful conduct when Defendant Rodriguez and John Does 2-3 fired chemical munitions to disperse the lawful assembly. There was no lawful ground or legitimate government interest served

by using tear gas to disperse the lawfully assembled group without a warning or lawful dispersal order. There was no lawful ground or legitimate government interest served by using KIPs to effectuate or support the unlawful dispersal by tear gas. Their unlawful conduct caused LaToya Ratlieff to move and ultimately be shot while escaping the tear gas.

343. The Defendants knew the gas might be moved.

344. By their conduct, the defendants individually and collectively were deliberately indifferent to the substantial risk of harm their conduct could cause. Their conduct was so egregious that it shocks the conscience.

345. Defendants' conduct was not objectively reasonable.

346. Defendants' conduct and manner in which they deployed chemical munitions and KIPs without warning or dispersal order violated Ms. Ratlieff's due process rights.

347. Defendants' conduct in unjustifiably using chemical munitions and KIPs to unlawfully disperse peaceful demonstrators and in striking plaintiff in the head, causing severe physical injury, while plaintiff and other peaceful demonstrators were engaged in protected First Amendment activity was shocking to the conscience, beyond the bounds of acts tolerable in a civilized society, and so egregious and outrageous that it may fairly be said to shock the contemporary conscience.

348. Alternatively, defendants' individual and collective conduct in using chemical munitions and KIPs to unlawfully disperse a peaceful assembly engaged in protected First Amendment activity was maliciously and sadistically done to harm and injure those gathered, including the plaintiff.

349. Alternatively, defendants' individual and collective conduct in using chemical munitions and KIPs to unlawfully disperse a peaceful assembly engaged in protected First Amendment activity was objectively unreasonable.

350. The City and FLPD's failure to properly train its employees, including Defendant Ramos and John Does 2-3, on the proper use of KIPs in crowd control situations, including the type of KIPs that should be used as well

as where and when to aim KIPs, was a moving force behind the constitutional law violations alleged.

351. As a direct and proximate result of defendants' unlawful conduct, plaintiff was tear gassed, shot by a KIP, and suffered severe and permanent physical injury, emotional distress, and humiliation, and is entitled to monetary damages.

For these reasons, Ms. Ratlieff demands judgment against the City for damages, punitive damages, prejudgment interest on liquidated damages as allowed by law, costs of this action, reasonable attorney's fees, injunctive relief, and any other relief this Court deems just and proper.

## COUNT VII: Federal Civil Rights Violations – Fourth Amendment.

(Remy Rodriguez and John Does 2-3)

352. Plaintiff realleges paragraphs 1 through 191.

353. The conduct of Rodriguez and John Does 2-3 violated plaintiff's rights to be free from unreasonable seizures and excessive force in violation of the Fourth Amendment to the United States Constitution.

354. Final policymakers within the City of Fort Lauderdale authorized and directed the use of tear gas and less lethal munitions against peaceful demonstrators without warning and without first issuing a lawful dispersal order.

355. The tear gas restrained her freedom of movement. Ms. Ratlieff and other peaceful demonstrators were seized.

356. Ms. Ratlieff was seized when FLPD, by means of extreme force (persistent tear gas), restrained her freedom of movement through means intentionally applied. FLPD and its officers excessively tear gassed the demonstrators.

357. The subjective intent of FLPD in deploying force is immaterial, because the appropriate inquiry is whether the challenged conduct objectively

manifested an intent to restrain freedom movement. *Torres v. Madrid*, 141 S. Ct. 989, 998 (2021).

358.   The officers, including Rodriguez, John Does 2-3, and Ramos, objectively restrained the plaintiff's and others' freedom of movement by deploying tear gas and blocking their freedom of movement.

359.   Ms. Ratlieff, who was trying to demonstrate and exercise her First Amendment rights in a place she was allowed to be, was not free to disregard FLPD's show of authority and go about her business of demonstrating in front of the Field Force team assembled at the parking garage.

360.   Ratlieff and other peaceful demonstrators complied with the show of force that limited their freedom of movement by no longer showing her sign and demonstrating in the area in front of the FLPD Field Force team.

361.   Notwithstanding, Officer Rodriguez deployed more force in the form of tear gas that further restrained Ms. Ratlieff's freedom of movement. Video footage show Ms. Ratlieff incapacitated as she choked on tear gas.

362.   As a result of Defendant Rodriguez's conduct, Ms. Ratlieff complied with the unlawful order and submitted to the unlawful show of authority that restricted her freedom of movement and while doing so was shot in the face by Defendant Ramos with a direct impact round.

363.   The seizure was unreasonable. Ms. Ratlieff was in a place she had a right to be. Curfew had not yet begun. FLPD had not issued a dispersal order, much less declared the assembly unlawful. FLPD did not have probable cause or reasonable suspicion to seize Ms. Ratlieff.

364.   Defendants City, Rodriguez, John Does 2-3, and Ramos could not have reasonably believed plaintiff had committed or was about to commit any crime or public offense, particularly since plaintiff was unarmed, non-violent, compliant, and engaged in lawful First Amendment activity when seized by police. She was not unlawfully assembled.

365.   With no lawful basis, reasonable suspicion, probable cause, or warrant, defendants used excessive force on plaintiff by unjustifiably deploying

tear gas and KIPs at the area in which plaintiff was situated as well as by striking plaintiff in the head with a direct impact weapon not marketed for targeting a single individual in a peaceful assembly, causing severe physical injury when there was no reason to so restrain a peaceful participant such as plaintiff. Given the absence of a lawful basis to seize plaintiff, all force used was unreasonable.

366.   Defendant Ramos fired KIPs to effectuate the seizure of the peaceful assembly. After tear gas was deployed, Ramos fired KIPs in support of that seizure, firing indiscriminately at anyone who attempted to prevent the attempted seizure by picking up the chemical munitions and moving the munitions from the location.

367.   FLPD officers who deployed chemical munitions worked collectively with the FLPD officers assigned to deploy less-than-lethal munitions to restrain the freedom of movement of those present, including plaintiff.

368.   The City and FLPD's failure to properly train its employees, including Ramos and John Does 2-3, on the proper use of KIPs in crowd control situations, including the type of KIPs that should be used as well as where and when to aim KIPs, was a moving force behind the constitutional law violations alleged.

369.   Final policymakers within the City authorized and directed the deployment of tear gas and KIPs at demonstrators at SE Second Street and SE First Avenue. Chief Maglione authorized the deployment of KIPs and tear gas and initiated the deployment of a multi-agency field force.

370.   Under *California v. Hodari D.*, 499 U.S. 621, 625 (1991), the law was clearly established that a seizure occurs when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen. The law was likewise clearly established that a show of authority which restrains a person's freedom of movement is a seizure where a reasonable person under the circumstances would believe that he or she should comply. *Popple v. State*, 626 So. 2d 185, 188 (Fla. 1993).

371.   As a direct and proximate result of defendants' unlawful conduct,

plaintiff was tear gassed, shot by a KIP, and suffered severe physical injury, emotional distress, humiliation, and is entitled to monetary damages.

For these reasons, Ms. Ratlieff demands judgment against the Defendants (minus the City) for damages, punitive damages, prejudgment interest on liquidated damages as allowed by law, costs of this action, reasonable attorney's fees, injunctive relief, and any other relief this Court deems just and proper.

## COUNT VIII: Federal Civil Rights Violations – Fourth Amendment.

(The City)

372.  Plaintiff realleges paragraphs 1 through 191.

373.  The conduct of Rodriguez and John Does 2-3 violated plaintiff's rights to be free from unreasonable seizures and excessive force in violation of the Fourth Amendment to the United States Constitution.

374.  Final policymakers within the City of Fort Lauderdale authorized and directed the use of tear gas and less lethal munitions against peaceful demonstrators without warning and without first issuing a lawful dispersal order.

375.  The tear gas restrained her freedom of movement. Ms. Ratlieff and other peaceful demonstrators were seized.

376.  Ms. Ratlieff was seized when FLPD, by means of extreme force (persistent tear gas), restrained her freedom of movement through means intentionally applied. FLPD and its officers excessively tear gassed the demonstrators.

377.  The subjective intent of FLPD in deploying force is immaterial, because the appropriate inquiry is whether the challenged conduct objectively manifested an intent to restrain freedom movement. Torres v. Madrid, 141 S. Ct. 989, 998 (2021).

378.  The officers, including Rodriguez, John Does 2-3, and Ramos, objectively restrained the plaintiff's and others' freedom of movement by

deploying tear gas and blocking their freedom of movement.

379.   Ms. Ratlieff, who was trying to demonstrate and exercise her First Amendment rights in a place she was allowed to be, was not free to disregard FLPD's show of authority and go about her business of demonstrating in front of the Field Force team assembled at the parking garage.

380.   Ratlieff and other peaceful demonstrators complied with the show of force that limited their freedom of movement by no longer showing her sign and demonstrating in the area in front of the FLPD Field Force team.

381.   Notwithstanding, Officer Rodriguez deployed more force in the form of tear gas that further restrained Ms. Ratlieff's freedom of movement. Video footage show Ms. Ratlieff incapacitated as she choked on tear gas.

382.   As a result of Defendant Rodriguez's conduct, Ms. Ratlieff complied with the unlawful order and submitted to the unlawful show of authority that restricted her freedom of movement and while doing so was shot in the face by Defendant Ramos with a direct impact round.

383.   The seizure was unreasonable. Ms. Ratlieff was in a place she had a right to be. Curfew had not yet begun. FLPD had not issued a dispersal order, much less declared the assembly unlawful. FLPD did not have probable cause or reasonable suspicion to seize Ms. Ratlieff.

384.   Defendants City, Rodriguez, John Does 2-3, and Ramos could not have reasonably believed plaintiff had committed or was about to commit any crime or public offense, particularly since plaintiff was unarmed, non-violent, compliant, and engaged in lawful First Amendment activity when seized by police. She was not unlawfully assembled.

385.   With no lawful basis, reasonable suspicion, probable cause, or warrant, defendants used excessive force on plaintiff by unjustifiably deploying tear gas and KIPs at the area in which plaintiff was situated as well as by striking plaintiff in the head with a direct impact weapon not marketed for targeting a single individual in a peaceful assembly, causing severe physical injury when there was no reason to so restrain a peaceful participant such as plaintiff. Given

the absence of a lawful basis to seize plaintiff, all force used was unreasonable.

386.   Defendant Ramos fired KIPs to effectuate the seizure of the peaceful assembly. After tear gas was deployed, Ramos fired KIPs in support of that seizure, firing indiscriminately at anyone who attempted to prevent the attempted seizure by picking up the chemical munitions and moving the munitions from the location.

387.   FLPD officers who deployed chemical munitions worked collectively with the FLPD officers assigned to deploy less-than-lethal munitions to restrain the freedom of movement of those present, including plaintiff.

388. The City and FLPD's failure to properly train its employees, including Ramos and John Does 2-3, on the proper use of KIPs in crowd control situations, including the type of KIPs that should be used as well as where and when to aim KIPs, was a moving force behind the constitutional law violations alleged.

389.   Final policymakers within the City authorized and directed the deployment of tear gas and KIPs at demonstrators at SE Second Street and SE First Avenue. Chief Maglione authorized the deployment of KIPs and tear gas and initiated the deployment of a multi-agency field force.

390.   Under California v. Hodari D., 499 U.S. 621, 625 (1991), the law was clearly established that a seizure occurs when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen. The law was likewise clearly established that a show of authority which restrains a person's freedom of movement is a seizure where a reasonable person under the circumstances would believe that he or she should comply. Popple v. State, 626 So. 2d 185, 188 (Fla. 1993).

391.   As a direct and proximate result of defendants' unlawful conduct, plaintiff was tear gassed, shot by a KIP, and suffered severe physical injury, emotional distress, humiliation, and is entitled to monetary damages.

For these reasons, Ms. Ratlieff demands judgment against the City for damages, punitive damages, prejudgment interest on liquidated damages as

allowed by law, costs of this action, reasonable attorney's fees, injunctive relief, and any other relief this Court deems just and proper.

## COUNT IX: Battery.

(Ramos, Eugene, Cristafaro, Greenlaw, Figueras, Dietrich, MacDoughall, Rodriguez, and John Does 2-3)

392.   Plaintiff realleges paragraphs 1 through 181.

393.   Ratlieff suffered a harmful and offensive contact when she was shot by Ramos.

394.   Ratlieff did not consent to the Defendants' contact.

395.   Ratlieff suffered a harmful and offensive contact when she was tear gassed by Rodriguez and John Does 2-3.

396.   Eugene, Cristafaro, Greenlaw, and Figueras, Dietrich, MacDoughall directed the use of tear gas and KIPs.

397.   Ramos, Eugene, Cristafaro, Greenlaw, Figueras, Dietrich, MacDoughall, Rodriguez, and John Does 2-3 were acting in the scope and furtherance of their employment.

398.   Ramos, Eugene, Cristafaro, Greenlaw, Figueras, Dietrich, MacDoughall, Rodriguez, and John Does 2-3 acted intentionally, in bad faith, or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

399.   As a direct and proximate result of Ramos, Rodriguez, and John Does 2-3's conduct, plaintiff was tear gassed, shot by a KIP, and suffered damages, including mental anguish, bodily injury, pain and suffering, disability, disfigurement, emotional distress, humiliation, embarrassment, loss of capacity of the enjoyment of life, expense of hospitalization, medical treatment. The losses are permanent and/or continuing and plaintiff will continue to suffer losses in the future.

For these reasons, Ms. Ratlieff demands judgment against Ramos,

Rodriguez, and John Does 2-3 for compensatory damages, costs, injunctive relief, and such other and further relief as the Court deems appropriate.

## COUNT X: Battery.

(City of Fort Lauderdale)

400.   Plaintiff realleges paragraphs 1 through 191.

401.   Ratlieff suffered a harmful and offensive contact when she was shot by Ramos.

402.   Ratlieff did not consent to the Defendant's contact.

403.   Ratlieff suffered a harmful and offensive contact when she was tear gassed by Rodriguez, John Does 2-3 and other FLPD employees.

404.   Final decisionmakers within the City directed and authorized the use of chemical and less-than-lethal munitions against the assembly. Ms. Ratlieff was a participant in the assembly.

405.   Eugene, Cristafaro, Greenlaw, Dietrich, MacDoughall, and Figueras directed the use of tear gas and KIPs.

406. Ramos, Eugene, Cristafaro, Greenlaw, Figueras, Dietrich, MacDoughall, Rodriguez, and John Does 2-3 were acting in the scope of their employment.

407. Ramos, Eugene, Cristafaro, Greenlaw, Figueras, Dietrich, MacDoughall, Rodriguez, and John Does 2-3 acted intentionally but not in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

408.   Pursuant to Florida Statute §768.28(9), the City of Fort Lauderdale is liable.

409.   As a direct and proximate result of Ramos, Rodriguez, and John Does 2-3's conduct, plaintiff was tear gassed, shot by a KIP, and suffered damages, including mental anguish, bodily injury, pain and suffering, disability, disfigurement, emotional distress, humiliation, embarrassment, loss of capacity of the enjoyment of life, expense of hospitalization, medical treatment. The losses

are permanent and/or continuing and Ratlieff will continue to suffer losses in the future.

For these reasons, Ms. Ratlieff demands judgment against the City for compensatory damages, costs, injunctive relief, and such other and further relief as the Court deems appropriate.

## COUNT XI: Negligent Use of Direct Impact Munitions and Chemical Munitions.

### (City of Fort Lauderdale)

410. Plaintiff realleges paragraphs 1 through 191.

411. This common law cause of action arises from Ramos negligently shooting plaintiff with a direct impact weapon in the face.

412. Ratlieff did not consent to the Defendant's actions.

413. Final decisionmakers within the City directed and authorized the use of chemical and less-than-lethal munitions against the assembly. Ms. Ratlieff was a participant in the assembly.

414. The City, Rodriguez, and Ramos created a foreseeable zone of risk by deploying tear gas without warning or dispersal order and then deploying impact rounds into peaceful demonstrators who had been tear gassed and were frantically moving around trying to escape the cloud of tear gas.

415. The City, Rodriguez, and Ramos owed a duty to all within the zone, including Ratlieff, to act with reasonable care to lessen the risk or see that sufficient precautions were taken to protect others from the harm that the risk imposed.

416. Ramos breached his duty of care owed by negligently handling his 40mm launcher, negligently firing a direct impact round that hit plaintiff, and/or firing a KIP into a crowd without giving a warning.

417. Ramos negligently deployed a direct impact at a demonstrator. Ramos knew his intended target "was trying to use people as shields." Notwithstanding, Ramos attempted to strike this demonstrator with a less-than-lethal round, while firing into a known group of people peacefully assembled.

62

Ramos used the wrong less-than-lethal round and fired even though his view was obscured by tear gas and the bystanders behind whom the intended target was hiding. Even worse, Ramos aimed for the abdomen, a body part different from that recommended by the direct impact product specifications (i.e., the thighs, buttocks, and legs), that substantially increased the risk of serious death or bodily harm. There was no immediate need for Ramos to fire a less-than-lethal round.

418. Defendant Ramos's negligent operation of his KIP directly and proximately caused Ratlieff's wrongful injury and resultant damages.

419. Ramos' actions occurred within the scope and course of his employment with the City.

420. Rodriguez breached his duty of care owed by negligently throwing chemical munitions into a crowd containing peaceful demonstrators without giving a warning.

421. Rodriguez's negligent operation of chemical agents directly and proximately caused Ratlieff's wrongful injury and resultant damages.

422. Pursuant to Florida Statute §768.28(9), the City of Fort Lauderdale is liable.

423. As a direct and proximate result of Ramos's conduct, Ratlieff was tear gassed, shot by a KIP, and suffered damages, including mental anguish, bodily injury, pain and suffering, disability, disfigurement, emotional distress, humiliation, embarrassment, loss of capacity of the enjoyment of life, expense of hospitalization, medical treatment. The losses are permanent and/or continuing and Ratlieff will continue to suffer losses in the future.

For these reasons, Ms. Ratlieff demands judgment against the City for compensatory damages, costs, injunctive relief, and such other and further relief as the Court deems appropriate.

### COUNT XII: Negligent Use of Direct Impact Munitions.

(Ramos)

63

424.   Plaintiff realleges paragraphs 1 through 191.

425.   This common law cause of action arises from Ramos negligently shooting plaintiff with a direct impact weapon in the face.

426.   Ramos created a foreseeable zone of risk by deploying impact rounds into persons peacefully assembled who had been tear gassed and were trying to escape the cloud of tear gas.

427.   Ratlieff did not consent to the Defendant's actions.

428.   Ramos owed a duty to all within the zone, including Ratlieff, to act with reasonable care to lessen the risk or see that sufficient precautions were taken to protect others from the harm that the risk imposed.

429.   Ramos breached his duty of care owed by negligently handling his 40mm launcher, negligently firing a direct impact round that hit plaintiff, and/or firing the KIP without providing a warning.

430.   Ramos negligently deployed a direct impact at a person in the assembly. Ramos knew his intended target "was trying to use people as shields." Notwithstanding, Ramos attempted to strike this person with a less-than-lethal round, while clearly in a group of people peacefully assembled. Ramos used a less-lethal round not intended to target a single person in a group and fired even though his view was clearly obscured by tear gas and the bystanders behind whom the target was hiding. Even worse, Ramos aimed for the abdomen, a body part different from that recommended by the direct impact product specifications (i.e., the thighs, buttocks, and legs), that substantially increased the risk of serious death or bodily harm. And there was no immediate need for Ramos to fire a less-than-lethal round.

431.   Ramos's negligent operation of his KIP directly and proximately caused Ms. Ratlieff's wrongful injury and resultant damages.

432.   Ramos acted in bad faith, or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

433.   As a direct and proximate result of Ramos's conduct, Ms. Ratlieff was tear gassed, shot by a KIP, and suffered damages, including mental anguish,

bodily injury, pain and suffering, disability, disfigurement, emotional distress, humiliation, embarrassment, loss of capacity of the enjoyment of life, expense of hospitalization, medical treatment. The losses are permanent and/or continuing and Ratlieff will continue to suffer losses in the future.

For these reasons, Ms. Ratlieff demands judgment against the City of Fort Lauderdale for compensatory damages, costs, injunctive relief, and such other and further relief as the Court deems appropriate.

### COUNT XIII: Negligent Use of Chemical Munitions.

(Rodriguez)

434.  Plaintiff realleges paragraphs 1 through 191.

435.  This common law cause of action arises from Rodriguez's negligently use of chemical munitions.

436.  Rodriguez created a foreseeable zone of risk by deploying chemical munitions into crowds of persons peacefully assembled without warning or dispersal order.

437.  Ratlieff did not consent to the Defendant's actions.

438.  Rodriguez owed a duty to all within the zone, including Ratlieff, to act with reasonable care to lessen the risk or see that sufficient precautions were taken to protect others from the harm that the risk imposed.

439.  Rodriguez breached his duty of care owed by negligently handling chemical munitions, negligently deploying the round in Ms. Ratliff's vicinity while she was already choking on gas, and/or deploying the chemical munition without providing a warning.

440.  Rodriguez's negligent operation of chemical rounds directly and proximately caused Ms. Ratlieff's wrongful injury and resultant damages.

441.  Rodriguez knew or should have known the round would be picked up and that a KIP would in turn be fired.

442.  Rodriguez acted in bad faith, or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or

property.

443.   As a direct and proximate result of Ramos's conduct, Ms. Ratlieff was tear gassed, shot by a KIP, and suffered damages, including mental anguish, bodily injury, pain and suffering, disability, disfigurement, emotional distress, humiliation, embarrassment, loss of capacity of the enjoyment of life, expense of hospitalization, medical treatment. The losses are permanent and/or continuing and Ratlieff will continue to suffer losses in the future.

For these reasons, Ms. Ratlieff demands judgment against the City of Fort Lauderdale for compensatory damages, costs, injunctive relief, and such other and further relief as the Court deems appropriate.

### Count XIV: Federal Civil Rights Violations – Fourteenth Amendment Procedural Due Process
(All Defendants but the City)

444.   Plaintiff realleges paragraphs 1 through 191.

445.   The due process clause provides that no state shall deprive any person of life, liberty, or property, without due process of law.

446.   Freedom of speech and the right to peacefully assemble in a public forum are fundamental components of the liberty safeguarded by the Due Process Clause to the U.S. Constitution.

447.   Before FLPD could deprive peaceful demonstrators like Ms. Ratlieff of their First Amendment rights, they were entitled to notice, an opportunity to be heard, and other procedural safeguards.

448.   The common sense procedural safeguards that protect persons peacefully assembling are half a millennia old. The earliest unlawful assembly laws, enacted during the reigns of King Edward VI (1549) and Queen Mary (1553), required notice to those assembled that their assembly was deemed unlawful by the authorities, an order to disperse, and an opportunity to disperse.

William Blackstone, *Commentaries on the Laws of England, Vol. 4* *82 (1769).[20]

449.   The English Riot Act of 1715, which imposed the death penalty for failing to disperse after the assembly as declared unlawful, riotous or tumultuous, similarly required an order to disperse and one hour to comply before one could be seized, apprehended, and taken before the Justices. Martin Hinton, *And The Riot Act Was Read!*, 24 Adelaide L. R. 79, 80 (2003).[21] The Riot Act of 1715, like the Riot Act of Queen Mary, indemnified any official who killed, maimed, or hurt a person who refused to disperse when ordered to do so. *Id.* at 86.

450.   The Florida legislature in 1868 codified those same procedural safeguards. Florida statutory law contains a mandatory requirement that law enforcement notify the assembly that their assembly has become unlawful, riotous, or tumultuous.

451.   If, during the dispersal, persons who refused to leave are killed or wounded by an officer, that officer is "guiltless and fully justified in law."

452.   In contrast, if a dispersing officer is killed or wounded, the person refused to leave are be held answerable for the officer's death or injury.

453.   Applied here, regardless of whether FLPD could lawfully disperse the crowd, before dispersing a peaceful demonstrators, and using force to effectuate that dispersal, 152 years of Florida law and 471 years of English law established the common sense procedural safeguards. That is, law enforcement was required to provide notice that the assembly was unlawful, issue an order to disperse, and give demonstrators an opportunity to comply.

454.   FLPD's policy requires dispersal orders before making mass arrests, but FLPD has no policy governing the dispersal of an assembly determined to be

---

[20]                              (available                        at                  chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://lonang.com/wp-content/download/Blackstone-CommentariesBk4.pdf).

[21]                                   (available                               at http://classic.austlii.edu.au/au/journals/AdelLawRw/2003/6.pdf).

unlawful, riotous, or tumultuous.

455.   Contrary to the clear requirements of Florida law, FLPD trained its officers that no dispersal orders was necessary where there was violence, including rocks and/or bottles were being thrown.

456.   By policy, custom, and practice, FLPD does not give the dispersal orders required by law. This custom eliminates the dispersal order requirements of Florida law altogether, as it is difficult to imagine a ***nonviolent*** riotous, tumultuous, or unlawful assembly that could be subject to dispersal by tear gas and KIPs.

457.   Thus, although FLPD had the means of providing a dispersal order, FLPD chose not to issue a dispersal order.

458.   Ratlieff's Due Process rights were violated when the defendants, individually and in concert with each other, dispersed a demonstration using chemical agents and kinetic impact projectiles without providing notice, an opportunity to be heard, and opportunity to disperse in a way that a person of ordinary intelligence could understand and comply with.

459.   The Defendants, individually and in concert with one another, deployed tear gas and KIPs that stopped peaceful demonstrations without giving a warning.  Ramos gave no prior warning. Nor did he rely on warnings given by someone else. No one warned the demonstrators of the use of force.

460.   Remy Rodriguez and John Does 2-3 dispersed a crowd of demonstrators with tear gas. They gave no prior warning before dispersing demonstrators with tear gas. Nor were they relying on warnings given by someone else. No one warned the demonstrators of the use of force.

461.   Ratlieff did not consent to the Defendants' actions.

462.   It was the City's policy, as well as its failure to train and supervise its officers on the requirement of Florida law, and issue corrective instructions after violations were brought to light, that caused the due process violations.

463.   Plaintiff's Fourteenth Amendment rights were violated when she was shot with a kinetic impact projectile by Defendant Ramos and John Does 2-3

without prior warning or prior dispersal order.

464. Plaintiff's Fourteenth Amendment rights were violated when she was tear-gassed by Remy Rodriguez without prior warning or prior dispersal order.

465. The Chief of Police authorized the deployment of tear gas and KIPs.

466. Cristafaro ordered the use of KIPs and tear gas, after requesting permission from SWAT command.

467. Sergeant Cristafaro, Assistant Chief MacDougall, and Captain Dietrich violated plaintiff's rights because their commands caused the subordinate police officers to disperse peaceful demonstrators, including plaintiff, who were lawfully assembled.

468. Sergeant Cristafaro, Assistant Chief MacDougall, and Captain Dietrich violated plaintiff's rights by failing to stop the use of tear gas and KIPs against peaceful demonstrators. Their failure to stop their subordinate officers from acting unlawfully caused the Fourteenth Amendment violations.

469. SWAT command consisted of defendants Captain Steve Greenlaw and Lieutenant Avery Figueras.

470. Captain Greenlaw and Lieutenant Figueras violated plaintiff's rights because their commands caused the subordinate police officers to disperse peaceful demonstrators, including plaintiff, who were exercising their freedom of expression.

471. There is no remedy at state law for the defendants' violation of Florida's unlawful assembly statutory procedure. Chapter 870 contains nor does Florida common law authorize a cause of action under Florida law for ignoring the requirements of notice and opportunity to disperse before the deployment of force.

472. There is no adequate remedy at state law for challenging the defendants' dispersal of demonstrators, using force, without declaring their assembly unlawful and providing an opportunity to leave.

473. There is no adequate remedy at state law for vindicating the denial of Ms. Ratlieff's right to assemble without due process.

69

474.   FLPD did not give Ms. Ratlieff and other demonstrators a hearing before or after depriving them of their First Amendment rights to assemble in a public forum.

475.   As a direct and proximate result of the City's conduct, Ratlieff was tear gassed, shot by a KIP, and suffered damages, including mental anguish, bodily injury, pain and suffering, disability, disfigurement, emotional distress, humiliation, embarrassment, loss of capacity of the enjoyment of life, expense of hospitalization, medical treatment. The losses are permanent and/or continuing and Ratlieff will continue to suffer losses in the future.

For these reasons, Ms. Ratlieff demands judgment against the City for compensatory damages, costs, injunctive relief, attorney's fees, and such other and further relief as the Court deems appropriate.

## Count XV: Federal Civil Rights Violations – Fourteenth Amendment Procedural Due Process
### (The City)

476.   Plaintiff realleges paragraphs 1 through 191.

477.   The due process clause provides that no state shall deprive any person of life, liberty, or property, without due process of law.

478.   Freedom of speech and the right to peacefully assemble in a public forum are fundamental components of the liberty safeguarded by the Due Process Clause to the U.S. Constitution.

479.   Before FLPD could deprive peaceful demonstrators like Ms. Ratlieff of their First Amendment rights, they were entitled to notice, an opportunity to be heard, and other procedural safeguards.

480.   The common sense procedural safeguards that protect persons peacefully assembling are half a millennia old. The earliest unlawful assembly laws, enacted during the reigns of King Edward VI (1549) and Queen Mary (1553), required notice to those assembled that their assembly was deemed unlawful by the authorities, an order to disperse, and an opportunity to disperse.

William Blackstone, Commentaries on the Laws of England, Vol. 4 *82 (1769).22

481.   The English Riot Act of 1715, which imposed the death penalty for failing to disperse after the assembly as declared unlawful, riotous or tumultuous, similarly required an order to disperse and one hour to comply before one could be seized, apprehended, and taken before the Justices. Martin Hinton, And The Riot Act Was Read!, 24 Adelaide L. R. 79, 80 (2003).23 The Riot Act of 1715, like the Riot Act of Queen Mary, indemnified any official who killed, maimed, or hurt a person who refused to disperse when ordered to do so. Id. at 86.

482.   The Florida legislature in 1868 codified those same procedural safeguards. Florida statutory law contains a mandatory requirement that law enforcement notify the assembly that their assembly has become unlawful, riotous, or tumultuous.

483.   If, during the dispersal, persons who refused to leave are killed or wounded by an officer, that officer is "guiltless and fully justified in law."

484.   In contrast, if a dispersing officer is killed or wounded, the person refused to leave are be held answerable for the officer's death or injury.

485.   Applied here, regardless of whether FLPD could lawfully disperse the crowd, before dispersing a peaceful demonstrators, and using force to effectuate that dispersal, 152 years of Florida law and 471 years of English law established the common sense procedural safeguards. That is, law enforcement was required to provide notice that the assembly was unlawful, issue an order to disperse, and give demonstrators an opportunity to comply.

486.   FLPD's policy requires dispersal orders before making mass arrests, but FLPD has no policy governing the dispersal of an assembly determined to be

---

22              (available                 at              chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://lonang.com/wp-content/download/Blackstone-CommentariesBk4.pdf).

23              (available                 at http://classic.austlii.edu.au/au/journals/AdelLawRw/2003/6.pdf).

unlawful, riotous, or tumultuous.

487.   Contrary to the clear requirements of Florida law, FLPD trained its officers that no dispersal orders was necessary where there was violence, including rocks and/or bottles were being thrown.

488.   By policy, custom, and practice, FLPD does not give the dispersal orders required by law. This custom eliminates the dispersal order requirements of Florida law altogether, as it is difficult to imagine a nonviolent riotous, tumultuous, or unlawful assembly that could be subject to dispersal by tear gas and KIPs.

489.   Thus, although FLPD had the means of providing a dispersal order, FLPD chose not to issue a dispersal order.

490.   Ratlieff's Due Process rights were violated when the defendants, individually and in concert with each other, dispersed a demonstration using chemical agents and kinetic impact projectiles without providing notice, an opportunity to be heard, and opportunity to disperse in a way that a person of ordinary intelligence could understand and comply with.

491.   The Defendants, individually and in concert with one another, deployed tear gas and KIPs that stopped peaceful demonstrations without giving a warning.  Ramos gave no prior warning. Nor did he rely on warnings given by someone else. No one warned the demonstrators of the use of force.

492.   Remy Rodriguez and John Does 2-3 dispersed a crowd of demonstrators with tear gas. They gave no prior warning before dispersing demonstrators with tear gas. Nor were they relying on warnings given by someone else. No one warned the demonstrators of the use of force.

493.   Ratlieff did not consent to the Defendants' actions.

494.   It was the City's policy, as well as its failure to train and supervise its officers on the requirement of Florida law, and issue corrective instructions after violations were brought to light, that caused the due process violations.

495.   Plaintiff's Fourteenth Amendment rights were violated when she was shot with a kinetic impact projectile by Defendant Ramos and John Does 2-3

without prior warning or prior dispersal order.

496.   Plaintiff's Fourteenth Amendment rights were violated when she was tear-gassed by Remy Rodriguez without prior warning or prior dispersal order.

497.   The Chief of Police authorized the deployment of tear gas and KIPs.

498.   Cristafaro ordered the use of KIPs and tear gas, after requesting permission from SWAT command.

499.   Sergeant Cristafaro, Assistant Chief MacDougall, and Captain Dietrich violated plaintiff's rights because their commands caused the subordinate police officers to disperse peaceful demonstrators, including plaintiff, who were lawfully assembled.

500.   Sergeant Cristafaro, Assistant Chief MacDougall, and Captain Dietrich violated plaintiff's rights by failing to stop the use of tear gas and KIPs against peaceful demonstrators. Their failure to stop their subordinate officers from acting unlawfully caused the Fourteenth Amendment violations.

501.   SWAT command consisted of defendants Captain Steve Greenlaw and Lieutenant Avery Figueras.

502.   Captain Greenlaw and Lieutenant Figueras violated plaintiff's First Amendment rights because their commands caused the subordinate police officers to disperse peaceful demonstrators, including plaintiff, who were exercising their freedom of expression.

503.   There is no remedy at state law for the defendants' violation of Florida's unlawful assembly statutory procedure. Chapter 870 contains nor does Florida common law authorize a cause of action under Florida law for ignoring the requirements of notice and opportunity to disperse before the deployment of force.

504.   There is no adequate remedy at state law for challenging the defendants' dispersal of demonstrators, using force, without declaring their assembly unlawful and providing an opportunity to leave.

505.   There is no adequate remedy at state law for vindicating the denial of Ms. Ratlieff's right to assemble without due process.

73

506.   FLPD did not give Ms. Ratlieff and other demonstrators a hearing before or after depriving them of their First Amendment rights to assemble in a public forum.

507.   As a direct and proximate result of the City's conduct, Ratlieff was tear gassed, shot by a KIP, and suffered damages, including mental anguish, bodily injury, pain and suffering, disability, disfigurement, emotional distress, humiliation, embarrassment, loss of capacity of the enjoyment of life, expense of hospitalization, medical treatment. The losses are permanent and/or continuing and Ratlieff will continue to suffer losses in the future.

For these reasons, Ms. Ratlieff demands judgment against the City for compensatory damages, costs, injunctive relief, attorney's fees, and such other and further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial as to all counts so authorized.

**RATZAN WEISSMAN & BOLDT**
2850 Tigertail Avenue, Suite 400
Coconut Grove, FL  33133
Tele: 305.374.6366
Fax: 305.374.6755
Stuart@rwblawyers.com
StuartW@rwblawyers.com
Kimberly@rwblawyers.com

**KUEHNE DAVIS LAW, P.A.**
100 SE 2 Street, Suite 3105
Miami, FL 33131
Tel: 305.789.5989
Fax: 305.789.5987
ben.kuehne@kuehnelaw.com
mdavis@kuehnelaw.com
johand@kuehnelaw.com
efiling@kuehnelaw.com

By:    *s/Stuart N. Ratzan*
**STUART N. RATZAN**
Florida Bar No. 911445
**STUART J. WEISSMAN**
Florida Bar No. 57909
**KIMBERLY L. BOLDT**
Florida Bar No. 957399

By:    *S/ Michael T. Davis*
**BENEDICT P. KUEHNE**
Florida Bar No. 233293
**MICHAEL T. DAVIS**
Florida Bar No. 63374
**JOHAN D. DOS SANTOS**
Florida Bar No. 1025373

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify on July 6, 2023, I electronically filed this document with the Clerk using CM/ECF, and certify this document is served on all counsel via transmission of Notices of Electronic Filing generated by CM/ECF.

By:   *S/ Michael T. Davis*
**MICHAEL T. DAVIS**