**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-CV-61029-RAR**

**LATOYA RATLIEFF**,

     Plaintiff,

v.

**CITY OF FORT LAUDERDALE**, *et al.*,

     Defendants.

_____/

**<u>ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT</u>**

Few areas are fraught with more constitutional peril than interactions between protestors exercising their First Amendment rights and law enforcement personnel attempting to ensure officer safety. In the wake of George Floyd's death, protests roiled the United States and repeatedly tested this delicate balance. One such episode transpired on May 31, 2020, when violence erupted between demonstrators and the Fort Lauderdale police. Plaintiff Latoya Ratlieff suffered injuries as a result of this clash and brought suit against the City of Fort Lauderdale ("City") and several Fort Lauderdale Police Department ("FLPD") officers, alleging violations of her federal constitutional rights and several torts under Florida law.

Discovery is now closed, and the parties have each filed motions for summary judgment: Ratlieff's Partial Motion for Summary Judgment ("Ratlieff PMSJ"), [ECF No. 159]; Defendant Officer Eliezer Ramos's Motion for Summary Judgment ("Ramos MSJ"), [ECF No. 146]; and the remaining Non-Ramos Defendants'[1] Consolidated Motion for Summary Judgment ("Non-Ramos

---

[1] The Court adopts the parties' nomenclature and refers to the individual named Defendants other than Ramos as the "Non-Ramos Defendants."

MSJ"), [ECF No. 160] (collectively. "Motions").[2]  Having carefully considered the parties'

Motions, the record, and being otherwise fully advised, it is hereby

**ORDERED AND ADJUDGED** that the Ratlieff PMSJ is **DENIED**; the Ramos MSJ is

**GRANTED IN PART**; and the Non-Ramos MSJ is **GRANTED IN PART** as set forth herein.

## BACKGROUND

On May 31, 2020, demonstrations protesting police brutality in the wake of George Floyd's

death occurred in various locations in and around downtown Fort Lauderdale, Florida.  All parties

agree that Ratlieff attended these demonstrations peacefully and did not herself engage in any acts

of violence. *See generally* PSMF; NRSMF; RSMF.  All parties also agree that Ratlieff was injured

when a foam baton deployed from a so-called "less-lethal" weapon shot by FLPD Officer and

Special Weapons and Tactics ("SWAT") Team Member Eliezer Ramos ("Ramos") struck her in

the face. *See generally* PSMF; NRSMF; RSMF.

But the parties disagree as to the details.  Ratlieff contends that Defendants—the City,

FLPD Chief Rick Maglione ("Maglione"), FLPD Assistant Chief of Police Douglas MacDoughall

("MacDoughall"), Field Force Commander Captain Robert Dietrich ("Dietrich"), SWAT

---

[2]  The Motions are fully briefed and ripe for adjudication.  *See* Non-Ramos Defs'. Resp. in Opp'n to Pl.'s Mot. for Partial Summ. J. ("Non-Ramos Resp."), [ECF No. 169]; Pl.'s Reply as to Non-Ramos Defs. in Supp. of Partial Summ. J. ("Ratlieff Non-Ramos Reply"), [ECF No. 176]; Ramos's Resp. to Pl.'s Mot. for Partial Summ. J. ("Ramos Resp."), [ECF No. 164]; Pl's Reply as to Ramos in Supp. of Partial Summ. J. ("Ratlieff Ramos Reply"), [ECF No. 175]; Pl.'s Combined Resp. in Opp'n to Defs.' Mots. for Summ. J. ("Ratlieff Combined Resp."), [ECF No. 170]; Non-Ramos Defs.' Reply in Supp. of Summ. J ("Non-Ramos Reply"), [ECF No. 177]; Ramos's Reply in Supp. of Summ. J. ("Ramos Reply"), [ECF No. 172].  The Court has also reviewed Pl.'s Statement of Undisputed Facts ("PSMF"), [ECF No. 158]; Non-Ramos Defs.' Statement of Material Facts ("NRSMF"), [ECF No. 157]; Ramos's Statement of Material Facts ("RSMF"), [ECF No. 147]; Pl.'s Resp. in Opp'n to Non-Ramos Defs.' Statement of Material Facts ("Ratlieff Resp. to NRSMF"), [ECF No. 171]; Pl.'s Resp. in Opp'n to Ramos's Statement of Undisputed Facts ("Ratlieff Resp. to RSMF"), [ECF No. 168]; Non-Ramos Defs.' Resp. in Opp'n to Pl.'s Statement of Undisputed Facts ("Non-Ramos Resp. to PSMF"), [ECF No. 167]; Ramos's Resp. to Pl.'s Statement of Undisputed Facts ("Ramos Resp. to PSMF"), [ECF No. 165]; Ratlieff's Reply to Non-Ramos Defs.' Resp. in Opp'n to Pl's Statement of Undisputed Facts ("Ratlieff Reply in Supp. of PSMF"), [ECF No. 173]; Non-Ramos Reply to Pl.'s Resp. in Opp'n to NRSMF ("Non-Ramos Reply in Supp. of NRSMF"), [ECF No. 174]; and all the associated exhibits, including the parties' conventionally filed USB drives, *see* [ECF Nos. 145, 161].

Command Captain Steve Greenlaw ("Greenlaw"), SWAT Executive Officer Avery Figueras ("Figueras"), SWAT Team Leader Sergeant Paul Cristafaro ("Cristafaro"), SWAT Team Member Ramos, and John Does 1–3 ("John Does")[3]—violated her rights under the U.S. Constitution and committed multiple federal constitutional and state law torts against her in the process.  *See generally* Ratlieff Mot.  Defendants contend that Ratlieff's injuries were the accidental, regrettable consequence of FLPD's effort to quell unlawful violence directed at FLPD after the day's earlier, lawful demonstrations had concluded.  *See generally* Non-Ramos MSJ; Ramos MSJ.

The parties offer voluminous conventionally and electronically filed submissions in support of their respective factual claims and cross motions for summary judgment.  This includes extensive video evidence captured via police Body Worn Camera ("BWC"), local news coverage posted online, and bystander recordings.  Further, the parties advance complex, fact-intensive arguments concerning specific officers' states of mind; changing threat levels over time; the reasonableness of different officers' responses under the circumstances; the content of relevant FLPD policies and training; and the roles, responsibilities, and locations of various Defendants during the period leading up to Ratlieff's injuries.

The factual record is addressed as follows.  First, the Court discusses FLPD's less-lethal weapons inventory on May 31, 2020, focusing specifically on the munitions that injured Ratlieff.  Next, the Court reconstructs the timeline of events on May 31, 2020 relevant to Ratlieff's claims.  This also requires the Court to examine the key events preceding Ratlieff's injuries that triggered initial violence between police and the crowd.  Third, the Court discusses the governing FLPD

---

[3] Plaintiff's Second Amended Complaint ("SAC") also named FLPD Officer Remy Rodriguez as a Defendant.  *See* [ECF No. 102] at 1.  Plaintiff's Third Amended Complaint ("TAC"), however, appears to drop Defendant Rodriguez.  *See* [ECF No. 126].  Further, neither the PSMF nor Plaintiff's Motion includes factual claims or argument indicating an intention to maintain suit against Defendant Rodriguez.  Accordingly, any claims against Defendant Rodriguez are hereby **DISMISSED**.

policy and training procedures in place on May 31, 2020.  Fourth, the Court explains the roles, responsibilities, and locations of various FLPD individual Defendants on May 31, 2020.  Finally, the Court briefly summarizes this case's procedural history and the current structure of Ratlieff's claims.  The relevant facts recounted below are undisputed unless otherwise noted.

### A.  FLPD's May 31, 2020 "Less-Lethal" Weapons Inventory[4]

On May 31, 2020, FLPD officers were armed with a variety of so-called "less-lethal" weapons and munitions.  *See* PMSF ¶ 1.  Specifically, FLPD deployed fifty-five cans of throwable CS chemical munitions, ten throwable OC chemical munitions, ten cans of OC/CS clearout, 100 Kinetic Impact Projectiles, and eight noise flash diversionary devices.  PMSF ¶ 1.  Two specific forms of less-lethal munitions are relevant to Ratlieff's claims here: CS chemical munitions ("CS") and Kinetic Impact Projectiles ("KIPs").  *See* PMSF ¶ 1.[5]

CS munitions deploy a type of gas colloquially known as "tear gas."  *See* PMSF ¶ 2. Human exposure to CS agents temporarily causes a burning sensation and tearing of the eyes and makes it difficult for the subject to keep his or her eyes open; causes a burning irritation of the mucous membranes of the nose, mouth, and throat; and induces profuse coughing, nasal mucus discharge, disorientation, and breathing difficulty.   *See* PMSF ¶ 2.   These effects partially incapacitate the subject.  PMSF ¶ 2.

KIPs, on the other hand, function by transferring kinetic energy from a less-lethal munition, such as a rubber or foam projectile, into the body of the subject.  *See* PMSF ¶ 4.  Though considered less-lethal weapons, KIPs can nonetheless cause contusions, abrasions, and hematomas.  *See*

---

[4]  The Court adopts FLPD's nomenclature for these weapons as defined in FLPD Policy 113: Authorized Less-Lethal Weapons, [ECF No. 155-14].

[5]  The Court's June 1, 2023 Order Granting in Part Defendants' Motions to Dismiss ("Order"), [ECF No. 93], explained the nuances of these devices in specific detail.  The Court's analysis is incorporated herein by reference.  *See* Order at 3–5.

PMSF ¶ 6.  When KIPs strike a person's head, neck, or the region of the chest immediately in front of the heart, blunt impact from the projectile may also cause internal injuries.  PMSF ¶ 6.  Officer Ramos was armed with a 40mm KIP launcher on May 31, 2020.  *See* Non-Ramos Resp. to PSMF ¶ 180.  FLPD Policy 113, titled "Authorized Less-Lethal Weapons," describes the 40mm KIP launcher as firing "[f]lexible 40mm Foam/Sponge Impact Rounds[.]" *See* [ECF No. 155-14] at 12.

### B.  Timeline

Following George Floyd's death on May 25, 2020 through May 31, 2020, FLPD's command staff was actively preparing for possible protests and demonstrations in Fort Lauderdale. NRSMF ¶ 1.  On May 28, 2020, FLPD Chief Maglione sent an email to FLPD sergeants, lieutenants, captains, majors, and assistant chiefs, which included directives to minimize police presence and intervention during protests; stated that any type of field force would be deployed only if gatherings became violent and only after receiving approval from the Chief or assistant chief; and further stated his expectation that a police manager would be on scene to make such assessments.  NRSMF ¶ 3; *see also* [ECF 155-16].  Prior to May 31, 2020, FLPD Lieutenant Jeffrey Jenkins ("Jenkins"), at the direction of Defendant Dietrich,[6] pre-recorded a dispersal order on a device known as a Long-Range Acoustic Device ("LRAD").  PMSF ¶ 113.  FLPD SWAT Executive Officer Avery Figueres testified that he was aware the LRAD could project as far as eight blocks away.  PSMF ¶ 115; Non-Ramos Resp. to PSMF ¶ 115.  The LRAD was placed on top of Dietrich's FLPD Suburban.  PSMF ¶ 117.

On the morning of Sunday, May 31, 2020, FLPD planned to provide security and traffic control for a small George Floyd protest at Broomfield Grocery at 751 NW 22nd Road in Fort Lauderdale.  NRSMF ¶ 5. The event was scheduled to begin at 2:00 p.m. and include a peaceful

---

[6]  Capt. Dietrich was the FLPD Field Force Commander on May 31, 2020.  PSMF ¶ 44.

march to the Broward Sheriff's Office at 2701 West Broward Boulevard. *Id.* Sometime in the early afternoon, a larger protest originally planned for Lauderhill was moved to Huizenga Park from 3:00–6:00 p.m. in downtown Fort Lauderdale. NRSMF ¶ 8. At 2:00 p.m., the Broomfield Grocery demonstration kicked off its march to the Broward Sheriff's Office headquarters. NRSMF ¶ 13. As the Broomfield Grocery march proceeded, FLPD began to set up command, staffing, security, and traffic control for the Huizenga Park demonstration. NRSMF ¶ 14. At 3:00 p.m., the Huizenga protest began with approximately 500 protestors in the park. NRSMF ¶ 16. By 4:30 p.m., the crowd had swelled to over 2,000 attendees. NRSMF ¶ 19. Ratlieff attended a speech at Huizenga Park during this period. PSMF ¶ 13. A little after 4:30 p.m., protestors exited Huizenga Park and marched to various locations throughout downtown Fort Lauderdale. *See* NRSMF ¶¶ 20, 27, 28; PSMF ¶ 14.

To ensure safe passage for the protestors, FLPD shut down Broward Boulevard and diverted traffic in both directions from SE 3rd Ave. to NW 18th Ave. NRSMF ¶ 21. At 6:48 p.m., an officer advised over dispatch that a crowd of over 100 protestors was heading northbound on SE 1st Ave. from East Las Olas Boulevard. NRSMF ¶ 30. In keeping with FLPD's operational plan, very few officers were present in the immediate park area and the nearby FAU parking garage ("Parking Garage") on the east side of the intersection at SE 2nd St. and SE 1st Ave. ("Intersection"). *See* NRSMF ¶ 31. FLPD Officer Stylianee Hayes was posted near that Intersection blocking traffic from entering the crowd of pedestrian-demonstrators. *See* NRSMF ¶ 32. The parties essentially agree on the above recounted facts up until this point in the day.

But the sequence of events at the Intersection starting at around 6:50 p.m. is critically and materially in dispute. In particular, the parties dispute when exactly the crowd turned violent and why. The parties agree that at 6:50 p.m., Officer Hayes was inside her unmarked Toyota Camry

with the emergency lights activated as she sat facing westbound at the Intersection.  NRSMF ¶ 32.

The parties further agree that right around 6:50 p.m., Officer Hayes placed a series of distress calls

indicating she was in danger and requesting officer assistance.  *See* NRSMF ¶ 32; Ratlieff Resp.

to NRSMF ¶ 32; Synchronized Pohorence Push Video ("Push Video"), [ECF No. 156-49] at 0:00–

1:00; [ECF No. 156-6] at 63:12–65:8.  But the parties dispute the content of Officer Hayes's

distress calls and the extent to which the crowd near her car was violent.  *Compare* NRSMF ¶¶

32–34; [ECF No. 156-6] at 63:12–65:8 *with* Ratlieff Resp. to NRSMF ¶ 32–34.

 As to this factual issue, Plaintiff has submitted video evidence that does not appear to depict

any protestors jumping on Officer Hayes's car at any point.  *See* Push Video at 0:00–1:00.  And

no Defendant has submitted any video evidence to counter Plaintiff's video evidence on this point.

Moreover, in Officer Hayes's May 30, 2023 deposition, [ECF No. 156-6], she further confirmed

that at no point did she actually witness anyone jumping on her car—though she did claim to feel

the car moving as though people were jumping on it and further stated she saw footprints on the

car after things had calmed down.  *See* [ECF No. 156-6] at 65:25–66:8, 83:16–84:5.

 Relying upon Officer Hayes's earlier deposition taken during a criminal battery case

against FLPD Officer Steven Pohorence, [ECF No. 148-8] at 6:16–9:2, the Non-Ramos

Defendants dispute Ratlieff's characterization, claiming instead that "Officer Hayes encountered

hostile agitators that surrounded her vehicle leaving her trapped with nowhere to go.  Individuals

were pounding on her windows, rocking her vehicle, and jumping on the trunk of her car."

NRSMF ¶ 33.  In further support of the Non-Ramos Defendants' claim that the crowd was already

violent around the time of Officer Hayes's distress calls, the Non-Ramos Defendants also point to

a separate incident of alleged violence against FLPD Officer Nicole Graves ("Graves").  Citing

both the FLPD After Action Report on the May 31, 2020 events ("AAR"), [ECF No. 148-1], and

a Case Supplemental Report filled out on June 12, 2020 ("Case Supplement"), [ECF No. 155-17], the Non-Ramos Defendants claim that at 6:51:46 p.m., Graves was responding to Hayes's distress call when protestors surrounded and blocked her marked police vehicle and then began throwing objects at it, one of which shattered her rear passenger side window.  NRSMF ¶ 36 (citing AAR at 8, 24; Case Supp. at CFL-007226).  Neither Officer Hayes's nor Officer Graves's BWC was activated during either of these events.  *See* [ECF No. 148-8] at 7:20–21; Case Supp. at CFL-007226 ("My BWC was not activated during this incident.").

In any event, the parties agree that at approximately 6:52 p.m., Officer Pohorence and other officers stepped in front of Officer Hayes's vehicle to move the crowd away from the immediate area.  NRSMF ¶ 38; *see* Push Video at 0:00–1:00.  Officer Hayes then stepped out of her vehicle without injury.  *See* NRSMF ¶ 38; Push Video at 0:00–1:00.  Again, up until this point, none of the record video evidence depicts any violence towards any FLPD personnel.[7]  Then, at around 6:52:07 p.m., Officer Pohorence walked directly into the crowd, paused for a few moments while gesturing aggressively, turned around, and walked back towards Officer Hayes's vehicle.  *See* YouTube_Video_of_5.31.2020 ("YouTube Video"), [ECF No. 161]; Push Video at 0:00–1:00.  While walking back east towards Hayes's vehicle, Pohorence can be seen pushing a woman— kneeling with both of her hands in the air—out of his way.  PSMF ¶ 23.  The parties have submitted clear video evidence depicting this event from multiple vantage points.  *See generally* YouTube Video; Push Video at 0:00–1:00.  And just after Pohorence pushes the kneeling woman, video

---

[7]  Maj. Swisher, the author of the City's AAR and a Rule 30(b)(6) designated corporate representative for the City, stated in his deposition that there were no acts of violence towards FLPD officers present at the SE 2nd St. and SW 1st Ave. Intersection until Officer Pohorence pushed a kneeling demonstrator.  PSMF ¶22 (citing [ECF No. 156-8] at 88:11-17).  The non-Ramos Defendants attempt to dispute the City's concession by pointing to the Officer Hayes and Officer Graves incidents discussed above, along with an incident that occurred at 6:53 p.m., after Pohorence's push.  *See* Non-Ramos Resp. to PSMF ¶ 22.

evidence then depicts the crowd immediately throwing objects at police.  *See* YouTube Video, [ECF No. 161].[8]  At 6:52:30 p.m., instructions were given over the radio to back away from the crowd.  PSMF ¶ 27.  At 6:52:49 p.m., radio dispatched: "We got some rocks being thrown."  PSMF ¶ 29.

Shortly thereafter, FLPD began deploying tear gas.  And once again, the precise timing and purpose of FLPD's tear-gas deployment is materially in dispute.  The Non-Ramos Defendants maintain that SWAT, led by Defendant Sgt. Paul Cristafaro, arrived on scene responding to Officer Hayes's distress calls, and at 6:54 p.m., Sgt. Cristafaro himself made the decision to deploy tear gas in response to rocks, bottles, and explosive devices being thrown at officers.  NRSMF ¶ 43–47 (citing, *e.g.*, [ECF No. 155-8][9] at 23:14–24; 30:5–20, 43:18–45:5, 44:1–24; [ECF No. 155-5] at 62:1 to 63:19).  Specifically, the Non-Ramos Defendants maintain that Cristafaro deployed tear gas to protect officers against violence: "Sgt. Cristafaro deployed a canister of tear gas at a protestor who attempted to ignite a possible explosive behind a line of protestors" and "was the first to deploy tear gas – a throwable CS canister – west of 1st Avenue.  He deployed it underhand to an open space in an attempt to stop that attack amongst other attacks occurring against them."  NRSMF ¶ 47 (citing [ECF No. 155-8] at 30:5–20, 43:18–45:5).  Plaintiff disputes this account and claims instead that FLPD Officers both decided to deploy tear gas and did deploy it prior to

---

[8]  The parties offer different characterizations of the protestors' reaction to the push.  Plaintiff claims, "[a] few people responded spontaneously by throwing the water bottles in their hands at Pohorence" and that "[t]his collective response lasted a mere few seconds."  PSMF ¶24 (citing Push Video at 0:49–0:57).  The Non-Ramos Defendants maintain the crowd began throwing water bottles, rocks, and striking police vehicles with their fists and other objects, NRSMF ¶¶ 39–41, and further characterize the reaction as "an eruption of violence that lasted for several minutes and never actually stopped."   Non-Ramos Resp. to PSMF ¶ 24.  Ramos characterizes the reaction as "more than a 'few people' [] engaged in acts of violence towards the police at this juncture."  Ramos Resp. to PSMF ¶ 24.

[9]  Plaintiff relies upon the same deposition but numbers it Exhibit 12, [ECF No. 156-12].  The Court cites to Defendant's filed version as the first-filed exhibit.

Cristafaro's arrival.  Ratlieff Resp. to NRSMF at ¶¶ 43–47.  Plaintiff further maintains that FLPD deployed tear gas to disperse the crowd rather than as a protective response to violence against officers.  *See* PSMF ¶ 36.  The parties also agree that Ramos also deployed gas, apparently explaining that he did so in order "to disperse the crowd."  PSMF ¶ 40 (citing [ECF No. 156-15] at 14:272-83; 18:359-61; 36:731-32).  While Ramos does not dispute that he deployed gas, he claims he did not deploy any that affected Ratlieff.  Ramos Resp. to PSMF ¶ 40 (citing [ECF No. 148-5] at ¶ 26).  The timing and purpose of FLPD's tear gas deployment is thus disputed.

Relatedly, the parties also offer conflicting factual characterizations of the crowd remaining at the Intersection around this time.  Plaintiff characterizes the crowd as including a "few agitators who threw objects," PSMF ¶ 105, emphasizes "the people walking around, speaking with one another, chanting and kneeling," PSMF ¶ 17, and further points to "the peaceful who were taking a knee and exercising First Amendment rights."  PSMF ¶ 52.  In contrast, Ramos and the Non-Ramos Defendants characterize the crowd as "violent," the situation as "chaos," and describe officers as "under attack."  *See, e.g.*, NRSMF ¶¶ 57, 65, 67; RSMF ¶¶ 17–22.  As to why FLPD did not arrest any violent individuals at the scene, the parties appear to agree that there were not enough officers to manage the crowd and detain subjects at the same time.  *See* PSMF ¶¶ 105– 106; Non-Ramos Resp. to PSMF ¶¶ 105–106; Ramos Resp. to PSMF ¶¶ 105–106.

The parties also offer conflicting accounts as to the nature of the objects thrown at police from the moment Officer Pohorence pushed the kneeling woman around 6:52 p.m. until Ratlieff was struck at around 7:07 p.m.  All appear to agree that FLPD officers were intentionally shooting KIPs only at individuals throwing objects at police.  *See* PSMF ¶ 68.  But the agreement ends there.  Ratlieff's factual position on this point is not entirely clear.  She appears to maintain that from 6:52 p.m. to 6:59 p.m., no demonstrators were throwing fireworks, explosives, or smoke bombs,

and that any explosive sounds or smoke visible on the video footage during this period was deployed by FLPD.  Ratlieff Resp. to NRSMF ¶ 83.  Plaintiff further appears to claim that between 7:01 p.m. and 7:07 p.m. demonstrators had also stopped throwing rocks, bricks, or bottles at police too, citing the City's Rule 30(b)(6) deposition for the proposition that the City "does not contend in this litigation that rocks, bottles, bricks or fireworks or other explosives were thrown at law enforcement staged at the Parking Garage from 7:00 p.m. through 7:07:30 p.m., the time when Ms. Ratlieff was shot."  PSMF ¶ 48 (citing [ECF No. 156-8][10] at 63:10-22, 64:4-9); *see also* Ratlieff Resp. to NRSMF ¶ 83 ("No rocks, bottles, bricks or fireworks or other explosives were thrown at law enforcement staged at the Parking Garage from 7:01 p.m. through 7:07:30 p.m., the time when Ms. Ratlieff was shot.").  Instead, Ratlieff appears to claim that between 7:01 p.m. and 7:07 p.m. when she was shot, demonstrators were solely throwing back whatever tear gas canisters FLPD had continued to deploy.  *See* PSMF ¶¶ 62, 68.

The Non-Ramos Defendants dispute these contentions.  *See* Non-Ramos Resp. to PSMF ¶ 48.  They claim instead that the crowd was still actively throwing both gas canisters and other objects—such as rocks, explosives, and fireworks—at FLPD personnel from 7:01 p.m. to 7:07 p.m., relying primarily on Ramos's conventionally filed video evidence as proof of this claim.  *Id.* (citing Knapp BWC, [ECF No. 145] at 23:07:05–23:07:10; Fort Lauderdale Rose Shortened ("Rose BWC"), [ECF No. 145] at 23:07:06; Twitter_Video_Screen_Grab_ (Nick_Nehamas)).

The Court's review of the parties' video submissions—considered alongside Plaintiff's apparent agreement that FLPD officers were intentionally discharging KIPs at individuals throwing objects at police from 7:01 p.m. to 7:07 p.m.—confirms that certain individuals in the

---

[10]  Plaintiff incorrectly cites to [ECF No. 156-20] for this proposition—Part II of Major Swisher's Deposition, which occurred on June 9, 2023.  However, the relevant statements Plaintiff proffers are contained in Part I of Major Swisher's deposition, [ECF No. 156-8], which occurred on May 31, 2023.

vicinity were throwing objects at police during this period; that FLPD officers were continuing to deploy tear gas canisters into the crowd during this period; and that FLPD officers were, at a minimum, discharging KIPs at those individuals who threw objects at the FLPD police line. *See generally* Knapp BWC; Rose BWC; PSMF ¶ 68.  The parties thus agree that *some* demonstrators were throwing objects at police from 7:01 p.m. to 7:07 p.m.  But they dispute the nature of the objects being thrown at police during this time frame, as well as the relative risk these objects posed to officers.

As to the timing of FLPD's dispersal order, the parties essentially agree to the following material facts.  FLPD did not issue a dispersal order prior to FLPD's deployment of tear gas or KIPs. *See* PSMF ¶ 43; Non-Ramos Resp. to PSMF ¶ 43.  Indeed, no dispersal order was issued until 7:57 p.m., nearly an hour after Ratlieff was struck. *See* PSMF ¶ 43; Non-Ramos Resp. to PSMF ¶ 43.  All agree that FLPD Bravo Field Force and Field Force Commander Defendant Dietrich arrived in the vicinity of the Intersection at 7:01 p.m. *See* PSMF ¶ 44.  And Jenkins rode with Dietrich to the FAU Parking Garage next to the Intersection, where they parked the LRAD-equipped Suburban on the east side of the garage, 100 yards or so from the garage itself. *See* PSMF ¶ 118.  Upon arriving near the Intersection and exiting the LRAD-equipped Suburban, Jenkins did not turn on the LRAD's pre-recorded dispersal order because he believed if FLPD officers were responding to violence against them, he did not need to turn it on. *See* PSMF ¶ 123; Non-Ramos Resp. to PMSF ¶ 123.  The parties further agree that the LRAD remained nearby and was available for deployment up until FLPD issued a dispersal order at 7:57 p.m.[11] *See* PSMF ¶ 119. Finally, the Court notes that Dietrich further stated that while he was heading to the

---

[11]  The Non-Ramos Defendants partially dispute this statement, maintaining that "Jenkins stated they did not need to use the LRAD but it was available when it was safe and they were able to get it."  Non-Ramos Resp. to PMSF ¶ 119.

Intersection (1) he was riding in the lead vehicle with the LRAD; (2) he knew his intention upon arriving was to disperse the crowd; (3) he had access to the LRAD to play the dispersal order; and (4) FLPD officers could go back to the Suburban to retrieve the LRAD if necessary. *See* [ECF No. 155-4] at 86:17–87:8. The parties thus dispute whether an earlier dispersal order—either prior to officers' deployment of tear gas or prior to their deployment of KIPs—was required under the circumstances. *See, e.g.*, PSMF ¶ 43; Non-Ramos Resp. to PSMF ¶ 43.

The Court next turns to the sequence of events leading up to Ratlieff's injuries. In doing so, the Court relies primarily upon the parties' conventionally filed video evidence depicting the scene. From 7:01 p.m. to 7:06 p.m., Capt. Dietrich was in command of a field force team of at least 30 FLPD officers forming a skirmish line. NRSMF ¶ 58. At around 7:06:06 p.m., FLPD BWC depicts Ratlieff holding a sign that says "Stop Killing Us Black Lives Matter" while peacefully walking towards the police line in the middle of the Intersection before eventually stopping and then kneeling. *See* Knapp BWC at 5:26–6:01. Starting around 6:06:37 p.m., Ratlieff gets back on her feet and can be seen standing among several other nonviolent demonstrators, all of whom are assembled immediately in front of the FLPD police line, waving their arms asking police why they are "shooting," *i.e.*, why they are deploying less-lethal munitions at the crowd. *See id.* at 5:48–6:04. At 7:06:58 p.m., smoke drifts from south to north across the area where Ratlieff had been standing shortly before. *Id.* at 6:10–6:20. By the time Ratlieff is visible on the BWC again around 7:07 p.m., she can be seen walking towards the northwest corner of the Intersection. *Id.* at 6:19–6:22; *see also* Rose BWC, [ECF No. 145] at 6:23.

Ratlieff is then seen hunched over at the waist several feet from the stop sign at the northwest corner of the Intersection. Knapp BWC at 6:22–6:32; Rose BWC at 6:23–6:33. Ratlieff maintains that she was choking on gas as she walked to the Intersection's northwest corner and

was hunched over because she was coughing from it.  *See* PSMF ¶ 72.[12]  For the next few seconds, Ratlieff remains bent over at the northwest corner of the Intersection, still among a group of apparently nonviolent individuals.  Knapp BWC at 6:22–6:32; Rose BWC at 6:23–6:33. At 7:07:21 p.m., the Knapp BWC depicts a CS gas canister deploy midair, apparently thrown by an unseen individual[13] from the area behind FLPD's police line to an area immediately behind where Ratlieff appears bent over with her sign.  Knapp BWC at 6:33–6:34.  Smoke drifts from the area behind Ratlieff to the vicinity where she is standing.  *Id.*  Ratlieff still appears bent over as the newly deployed smoke surrounds her.  *Id.* at 6:34–6:36; Rose BWC at 6:33–6:39.   An unidentified individual then walks over to Ratlieff, appears to grab her hand, and then appears to attempt to pull her away from the smoke.  *See* Knapp BWC at 6:36–6:38; Rose BWC at 6:39–6:41.

As Ratlieff is being led away, a smoking object then appears to be hurdled back towards the police line from the obscured, partially covered area at the base of the building located at the northwest corner of the Intersection.  *See* Knapp BWC at 6:38–6:40.  Just as the smoking object lands in the area directly in front of the police line, a loud crack can be heard, followed immediately by Ratlieff dropping to the ground.  *Id.* at 6:40–6:44; *see also* Rose BWC at 6:41–6:44.  Moments after Ratlieff drops to the ground, what sounds like a woman's voice can be heard audibly screaming: "Ah! Don't shoot! Don't shoot!"  *Id.* at 6:40–6:44; *see also* Rose BWC at 6:41–6:44.

---

[12]  Ramos does not dispute this statement of fact.  Ramos Resp. to PSMF ¶ 72.  The Non-Ramos Defendants do, however, stating: "Disputed.  Undisputed that this was a portion of Ms. Ratlieff's Statement."  *See* Non-Ramos Resp. to PSMF ¶ 72.

[13]  Plaintiff's counsel designates the unknown individual who threw this canister as Defendant John Doe 1. John Doe 1's identity has yet to be identified by any party, and none of the Defendants claim to know why this canister was thrown and by whom.  *See* PSMF ¶¶ 148–149; Non-Ramos Resp. to PSMF ¶¶ 148–149; Ramos Resp. to PSMF ¶¶ 148–149.  Given that BWC depicts the canister flying from the area off screen but immediately behind the skirmish line and out into the crowd, there is, at a minimum, circumstantial evidence that this individual was an FLPD Officer—and a reasonable jury could impute liability to the City for this act.

Ratlieff then remains on the ground next to the same individual who was leading her away and is now crouching next to her, as several more people walk over to where she had collapsed.  Knapp BWC at 6:44–6:55; Rose BWC at 6:44–6:54.  After about ten seconds, the group of people surrounding Ratlieff appear to get her on her feet and slowly escort her Northbound on SE 1st Avenue away from the Intersection.  Knapp BWC at 6:55–7:04; Rose BWC at 6:55–7:05.  The parties agree that during the moments recounted above, Ratlieff was struck in the face by a KIP that Officer Ramos discharged.   *See* PMSF ¶ 91; Non-Ramos Resp. to PSMF ¶ 91; Ramos Resp. to PSMF ¶ 91.

The parties agree that Ramos did not intentionally shoot Ratlieff and was instead aiming for the individual who had just thrown a tear gas canister towards the FLPD line.  *See* PSMF ¶¶ 81–91; NRSMF ¶¶ 75, 78; RSMF ¶ 21.  However, the parties dispute whether the KIP shot can be characterized as "accidental" and was therefore justified under the circumstances.  Ramos and the Non-Ramos Defendants describe the shooting as accidental and state that Ramos was aiming for an "Unknown Felon" who had just committed a forcible felony threatening officer safety.  *See* NRSMF ¶¶ 75, 78; RSMF ¶¶ 21–24.  They further claim Ramos was targeting the unknown man for purposes of "pain compliance and deterrence."  *See* RMSF ¶¶ 32–36; NRSMF ¶¶ 76–78.  Ratlieff disputes Defendants' characterization of an accidental shooting, claiming instead that Ramos unlawfully and improperly targeted an unidentified individual, who was using peaceful protestors—including Ratlieff—as human shields; that he unsafely engaged this unidentified individual from a distance at which he was untrained; and that Ratlieff's injuries were the foreseeable result of an intentional act which "by definition is not an 'accident' or 'accidental.'" Ratlieff Resp. to NRSMF ¶ 80; Ratlieff Resp. to RMSF ¶¶ 22–24, 34–36; *see also* PSMF ¶ 84–91.  The parties accordingly agree that Ramos was not aiming for Ratlieff.  Their dispute on this factual

issue takes the following form: If Ramos's action was justified under the circumstances as Defendants claim, Ratlieff's shooting is fairly characterized as an accident.  If it was not justified under the circumstances as Ratlieff claims, it is not fairly characterized as an accident.

Finally, the Court finds it appropriate to emphasize several record facts indicating a disturbing lack of professionalism among FLPD officers on May 31, 2020.  First, and most egregiously, there is Officer Pohorence's push of a kneeling woman without provocation, discussed at length above.  The Court adds only that a nearby FLPD officer reprimands Pohorence immediately afterwards for "agitating" the crowd.  PSMF ¶ 26; *see generally* Push Video.  Second, several officers whose testimony is central to FLPD's version of these events inexplicably failed to turn on their BWCs during key moments underlying their accounts.  Specifically, Officer Hayes, Officer Graves, and Officer Ramos all apparently had their BWCs turned off during the key events described above.  *See* [ECF No. 148-8] at 7:20-21; Case Supp. at CFL-007226; Ramos BWC, [ECF No. 166-11].  And notably, three minutes *after* Ratlieff was shot, Ramos turned on his BWC.  Ratlieff Resp. to NRSMF ¶ 160; *see* Ramos BWC.  After turning on his BWC, Ramos is seen pacing behind the police line, when at a certain point, an unseen bystander nearby can be heard saying "Say cheese, f*****," after which Ramos requests permission to throw a gas canister at the crowd.  Ramos BWC at 0:01–0:27.  He is told no.  Ramos BWC at 0:26–0:28.  And during the course of their tear gas and KIP deployment, FLPD officers can be heard stating things like "Eat it mother******"; "If he picks up a can, I'll pop his a**"; and "Throw it back b****."  *See generally* Shooting Video.  In another moment, at 7:07:20 p.m., just before Ratlieff was struck, two officers are laughing and joking about striking individuals with less-lethals.  *Id.* at 2:30–2:40.  One officer asks whether the other's BWC is on, to which the other officer mistakenly replies "yeah it's on standby."  *See* Shooting Video at 2:32–2:38.  The first officer then says, "Did you

see me f\*\*k up those motherf\*\*\*\*ers?"  *See id*.  The second officer responds, "Yeah, I got the one f\*\*\*\*er," and the two begin laughing.  *See id*.

### C.  FLPD Policies, SWAT Standard Operating Procedure, and Training Guide

Factual claims concerning FLPD policies and training are central to each party's respective summary-judgment arguments.  The Court accordingly describes the undisputed content of the relevant policies.  The parties' Motions and Statements of Fact repeatedly reference three main categories of policy: (1) FLPD-wide policy ("FLPD Policy"); (2) FLPD SWAT's Standard Operating Procedures ("SWAT SOP"), and (3) FLPD's police officer training program ("FLPD Training").  *See*, *e.g.*, NRSMF ¶¶ 101–105.  The Court addresses each in turn.

#### 1.  FLPD Policies

As to FLPD Policy, three specific policies submitted as record evidence are especially relevant: (1) FLPD Policy 113, Authorized Less-Lethal Weapons, [ECF No. 155-14]; (2) FLPD Policy 119.1, Response to Resistance, [ECF No. 155-15]; and (3) FLPD Policy 501.10, Mass Arrests, [ECF No. 155-13].

First, FLPD Policy 113, titled "Authorized Less-Lethal Weapons" ("Policy 113"), governs FLPD personnel's deployment of less-lethal weapons.  *See generally* [ECF No. 155-14].  It specifically states "[o]nly those less-lethal weapons specifically listed in this policy may be carried by any member of [FLPD]."  *See id.* at 2.  Policy 113 defines less-lethal weapons as "subject control chemical defense sprays, all chemical munitions, batons, sting bags [sic], Pepperball guns, and [Conducted Electrical Weapons]."  *Id.*  Policy 113 further defines less-lethal weapons as those "that, when deployed, are not likely to cause death or great bodily harm, but have the potential to do so in certain circumstances."  *Id.*

As previously noted, Officer Ramos was armed with a 40mm KIP launcher on May 31, 2020.  *See* Non-Ramos Resp. to PSMF ¶ 180.  Policy 113.H.2.b. defines a "Kinetic Energy Impact

Projectile" as "[f]lexible or non-flexible projectiles, which are intended to incapacitate a subject with minimal potential for causing death or serious physical injury, when compared to conventional projectiles." *Id.* at 12. Policy 113.H.3.a further states that the FLPD utilizes "[l]ess-lethal extended range kinetic energy impact devices" and that the FLPD uses three primary types of extended-range KIP: "(1) Non-flexible 37mm; (2) Safariland 40MM eXact Impact Sponge Round; (3) CTS 40MM Foam Baton Round." *Id.* And with respect to the 40mm KIP launcher rounds noted above, Policy 113.H.3.b.(2) further describes these specific rounds as follows: "a) Flexible 40MM Foam/Sponge Impact Rounds, either authorized Safariland or CTS less lethal rounds; b) Foam/Sponge Impact Rounds; c) Must be deployed by a rifled barrel 40mm weapon specially designed for this projectile, namely the 'CTS 40MM Multi-Launcher or Def Tech 40MM Single Launcher.'" *Id*.

Apart from describing the type of weapon that struck Ratlieff, Policy 113 also contains the following relevant provisions:

> 113.F.1.a: The use of chemical agents by SWAT personnel will be under the direction of the SWAT Supervisor.

> 113.F.3.a: SWAT personnel will train within their unit under the direction of the SWAT Commander or his/her designee.

> 113.H.4.b: The deploying officer should give verbal direction that the less-lethal weapon is about to be deployed.

> 113.H.4.d.(4): Deployment areas – "Point of aim, Point of impact" . . . each situation will dictate which criteria to be used. (a) Only if deadly force becomes necessary will any round be fired at the head and neck area of the subject; (b) Waist down, with the exception of groin, back and front; (c) Chest/nipple line to waist, back and front; (d) Extremities are not recommended due to potential for movement.

> 113.H.5.b(3)–(5) (Deployment Techniques – 37 mm / 40 mm): Officers shall consider (a). The level of force being confronted; (b). The use of [FLPD] issued rangefinder or measuring devices to assist

in determining the proximity/range of violators, when practical to do so; and (c). [FLPD] safety priorities . . . At all times the intended use of less-lethal will be communicated to the other officers present, prior to deployment, to negate any perception of gunfire . . . ."

[ECF No. 155-14] at 10–15.

FLPD Policy 119.1, titled "Response to Resistance" ("Policy 119"), is the second relevant FLPD Policy. Policy 119.1 establishes and maintains guidelines for FLPD officers responding to subject resistance. *See* [ECF No. 155-15] at 1. Policy 119(B)(1) states that FLPD members "shall only respond to the level of resistance with a level of response necessary to effect lawful objectives. The response used by a member of [FLPD] must be objectively reasonable to meet the level of resistance[.]" *Id.* Policy 119 further outlines the following three factors for officers to rely upon in determining whether a contemplated resistance-response level is objectively reasonable:

    a.  How serious is the suspected offense?

    b.  Is there a physical threat to the officer or anyone else?

    c.  Is the subject actively resisting or attempting to evade arrest by flight?

*Id.*

The third relevant FLPD Policy—FLPD Policy 501.10, "Mass Arrests" ("Policy 501.10")— provides "guidelines and [] outline[s] procedures and processing for the arrest and processing of a large number of persons." *See* [ECF No. 155-13] at 1. Policy 501.10 further states that "Mass arrests will be accomplished according to law and this order." *Id.* And Policy 501.10(C)(2), titled "When mass arrests anticipated," includes the following sub-provision stating FLPD's established procedure for issuing dispersal orders:

    f. Warnings: When the Incident Commander determines that the participants are unlawfully, riotously, or tumultuously assembled in violation of F.S. 870.04, the following proclamation must be issued before an arrest for unlawful assembly is made:

DISPERSAL ORDER

I am (rank and name), a police officer for the Fort Lauderdale Police Department. I hereby declare this to be an unlawful assembly and, in the name of the State of Florida, command all persons so assembled at (specific location) to immediately and peacefully disperse, which means break up and leave this assembly. If you do not do so, you will be arrested or subject to other police action. Other police action may include the use of less-lethal munitions, which could cause significant risk of serious injury to those who remain. Chapter 870.04 of the Florida State Statutes prohibits remaining present at an unlawful assembly. If you remain in the area, which was just described, regardless of your purpose in remaining, you will be in violation of Section 870.04.[14] The following routes of dispersal are available: (give most expeditious routes of dispersal). You have (a reasonable amount of time - minutes) to disperse.

(1). Warnings will be made from stationary vantage points that are observable by the crowd, or to a large number of participants. Additional warnings will be given via public address systems in police vehicles. The warning will be given at an amplitude to be heard by the entire assemblage.

*See* [ECF No. 155-13] at 3.

## 2. FLPD SWAT SOP

The parties' Motions also reference FLPD's SWAT SOP, [ECF No. 166-5].[15] The SWAT SOP states that its purpose is "to provide guidelines for the management and operation of the [FLPD SWAT Team]." *Id.* at 2. The SWAT SOP further states "[t]he goals of the [FLPD SWAT] Team are: [(1.)] The protection and safety of innocent civilians and control of police personnel to

---

[14]  Fla. Stat. § 870.04 (2019) provides, in pertinent part: "If any number of persons . . . are unlawfully, riotously, or tumultuously assembled in any county, city, or municipality, . . . any . . . police officer of the city or municipality . . . shall go among the persons so assembled, or as near to them as may be done with safety, and shall in the name of the state command all the persons so assembled immediately and peaceably to disperse[.]"

[15]  In their Statement of Facts, the Non-Ramos Defendants direct the Court's attention to this SOP.  NRSMF ¶ 48.  Puzzlingly, as Ratlieff points out, the Non-Ramos Defendants do not include this policy as a summary judgment exhibit.  *See* Ratlieff Resp. to NRSMF 48.  Ratlieff, however, has included it in her submissions. *See* [ECF No. 166-5].

reduce or eliminate injuries and death. [(2.)] The neutralization and apprehension of the suspect(s) through negotiation and/or tactical assault." *Id.* As to less-lethal weapons and munitions, Section Q. of the SWAT SOP is titled "LESS LETHAL WEAPONS: APPLICATIONS AND USE FOR SWAT" and contains two relevant subsections. First is Subsection Q.1.b., titled Chemical Agent Usage, which states the following:

> Chemical agent and its delivery systems will only be used by trained SWAT team members. Improper use of chemical agent projectiles or thrown devices can lead to fire, injury and possibly death. Although there have been very few documented incidents of death attributed solely to the use of OC/CS, those most seriously affected have been the very young and the very old. These factors, if possible, should be taken into consideration before deployment. The decision to use chemical agent *other than for crowd control purposes* will be left to the on-scene SWAT Commander.

*Id.* at 18 (emphasis added). Second is Section Q.3.a.(1)–(2), titled "Stingbags: Purpose/Usage/Effect," which states the following:

> (1). A stingbag is a small-enclosed package of either powdered metal or small pellets which has been loaded into a cartridge for the purposes of being fired from a 40-MM launcher. Stingbags are a low velocity projectile designed to incapacitate a subject without causing serious harm. If used properly by trained personnel, it will ordinarily knock the subject down or knock the wind out of them. Stingbags may be deployed with or without CS tear gas.
>
> (2). Stingbags were not intended for use in deadly force situations and were not designed for this purpose. However, improper use of these projectiles can cause serious injury or death. They will be used only by trained SWAT members on SWAT incidents, and if possible, at the direction of a Team Leader.

*Id.* at 20–21. Given the definitional parity between stingbag as used in the SWAT SOP and the 40MM KIP launcher referenced in Policy 113 above, the Court understands "Stingbag" as referenced in the SWAT SOP to be an alternative name for KIP.

### 3. FLPD Training Policy

Finally, the parties also draw the Court's attention to the relevant FLPD Training Policy. Plaintiff claims that there is no FLPD formal written policy governing the circumstances under which FLPD officers are permitted to disperse a crowd with tear gas and KIPs.  PSMF ¶ 109.  The Non-Ramos Defendants dispute this claim, countering that "[t]raining is policy and vice versa. Under the circumstances here, the officers were not using chemical munitions and KIPs to disperse an unlawful assembly or curfew where a dispersal order would be required, instead they were directing munitions at persons actively committing crimes.  It is clear from training documents provided that both 'Arriving under violent circumstances' and 'Lawful order to disperse' are part of FLPD's lesson plan."  Non-Ramos Resp. to PSMF ¶ 109.

The Non-Ramos Defendants point to and include as an exhibit the FLPD Field Force Operations Course Training Guide ("Training Guide"), [ECF 155-19].  The Training Guide includes a three-column chart listing what appears to be the training module in the far-left column, discussion items in the center column, and additional module notes in the far-right column.  *See generally id*.  Notably, on page 3 of the Training Guide,[16] Module X is titled "Arriving under violent circumstances."  In the center column, Module X lists the following: *A. Rocks and/or bottles being thrown*; B. Cars being torched; C. Shots being fired; D. Looting or *vandalism*."  *Id.* (emphasis added).  In the far-right column, the following text appears: "**Classroom----NO DISPERSAL ORDER NECESSARY.**"  *Id.*

The subsequent Module, Module XI, is titled "Lawful order to disperse."  *Id.*  In the center column, Module XI is partially redacted, but the visible items read as follows: "A. Position for a public address [redacted] . . . D. Allow reasonable time for the crowd to disperse in a peaceful

---

[16] CFL-005334.

manner; E. Give consideration to which languages to use when giving the dispersal order." *Id.* The far-right column states only "Classroom----See copy of dispersal order in PowerPoint." *Id.* Accordingly, the Non-Ramos Defendants maintain—and Plaintiff does not dispute—that "[t]he City's field force training provides that a dispersal order is not required when there is violence against police officers. Training is governed by policy. Under FLPD's field force operations training course, a dispersal order was not required when police arrive under violent circumstances such as rocks and/or bottles being thrown, cars being torched, shots being fired, looting or vandalism." NRSMF ¶ 82 (citations omitted).

However, as discussed at length above, the parties do dispute whether FLPD policy required a dispersal order under these specific factual circumstances. The Non-Ramos Defendants maintain the dispersal order requirement applies only to an officer's decision to disperse assemblies that have been deemed unlawful—and is not required when there is ongoing violence against police officers taking action to protect themselves, which pursuant to FLPD Training Policy, would include situations involving vandalism and thrown objects such as gas canisters, bottles, and rocks. *See* NRSMF ¶¶ 81–83; Non-Ramos Resp. to PSMF ¶ 121 (citing [ECF No.156-40] at 18:17–25). Plaintiff responds that no rocks, bottles, bricks, fireworks, or other explosives were thrown at law enforcement staged at the Parking Garage from 7:01 p.m. through 7:07:30 p.m. when Ratlieff was shot; the only objects being thrown at police during this time frame were gas canisters that FLPD had unlawfully deployed. Ratlieff Resp. to NRSMF ¶ 83. Ratlieff further maintains that Fla. Stat. § 870.04, *supra.* n.14, requires officers to issue a dispersal order "when confronted by a tumultuous, riotous, or unlawful assembly," *id.* ¶ 81, and that FLPD's failure to do so until 7:57 p.m. was unlawful. The parties accordingly dispute whether officers were intending to disperse "a tumultuous, riotous, or unlawful assembly" at the Intersection from 7:01

p.m. to 7:07 p.m.—or intending only to protect themselves against violence.  Relatedly, there is a factual dispute as to whether the situation was sufficiently violent towards officers that FLPD's failure to issue a dispersal order before deploying less-lethal munitions was justified under the circumstances.

Lastly, the Court addresses FLPD officers' experience managing crowds with less-lethals. The parties agree that prior to May 31, 2020, the City was not aware of a prior incident where tear gas was deployed at a group or crowd by the FLPD.  NRSMF ¶ 86.  The parties also agree that prior to the COVID-19 pandemic, field force training was scheduled for the 2020 annual block training, but as of March 2020, all training blocks were postponed due to COVID-19 exposure concerns.  NRSMF ¶ 87.  All apparently further agree that the last FLPD department-wide field force training occurred in 2017.  Non-Ramos Resp. to PSMF ¶ 181 (citing [ECF No. 148-1] at 21). The parties also agree that to become a member of SWAT, Ramos received additional training consisting of eighty hours at SWAT School in 2016, which included training on less-lethal weapons, including the 40mm used during the incident.  RSMF ¶ 8.  But in his April 10, 2023 deposition, Ramos stated that he had not trained on firing a 40mm impact projectile while wearing a gas mask since attending SWAT school in 2016 and did not recall having any training on the use of less-lethal munitions in the context of crowd control situations. [ECF No. 156-11] at 73:02–74:22.  The parties further agree that all FLPD SWAT members train monthly on various weapons systems (and sometimes two to three times per month) depending on the requirements of the FLPD, but this apparently does not include training with gas masks.  *See* RSMF ¶ 8.[17]

As to the adequacy of FLPD's training of its officers in the use of less-lethal weapons in crowd control situations, Plaintiff submits expert reports from police tactics and training experts

---

[17]  The factual record does not indicate what exactly this "training" entails.

Ken Hubbs and Greg Meyer and further proffers the expert report of Criminology and Criminal Justice Professor Edward Maguire of Arizona State University. Mr. Hubbs opines that FLPD failed to adequately train its officers to perform tasks that are "keenly obvious during incidents of civil unrest," including:

- When and how to announce an unlawful assembly and dispersal orders,

- Using force only when reasonably necessary, and only directed at specific individuals, not indiscriminate force that will likely harm innocent persons known to be in the area,

- Competent deployment of impact weapons such as the 40mm impact munitions while wearing required safety equipment commonly worn during incidents of civil unrest, i.e. helmets and gas masks,

- Moving targets,

- Understanding decreased accuracy at extended ranges,

- Authorized targeting areas consistent with policy and training,

- Shoot–no–shoot situations to avoid hitting innocent bystanders.

*See* [ECF No. 156-4] at 43. Mr. Meyer, addressing the failure to train Ramos in deploying KIPs while wearing a gas mask, similarly opines: "The need for such training should be obvious because officers being deployed to handle crowd control situations that might feature the use of teargas is predictable." [ECF No. 127-5] at 20. Finally, Professor Maguire described FLPD's training program on crowd management as "clearly and obviously deficient." [ECF No. 156-44] at 21–20. Defendants have not directed the Court to any countervailing opinions or reports indicating that FLPD's training program in these core crowd control competencies was adequate.

### D. Roles, Responsibilities, and Locations of FLPD Officer-Defendants

Next, the Court describes the material activities, roles, and responsibilities of the various

key decisionmakers and individual Defendants on May 31, 2020.  As a threshold matter, it is undisputed that Defendant Maglione, the FLPD Police Chief on May 31, 2020, was the final policymaker for FLPD's policing policies on that day.  PSMF ¶ 107; *see* NRSMF ¶ 95.  The Police Chief reviews and approves FLPD policies before implementation and dissemination.  *Id.*  The Police Chief is also responsible for policy related to the tactics and techniques FLPD uses during law enforcement operations.  *See id.*

As for FLPD's command and control structure on May 31, 2020, once the Broomfield Grocery demonstration kicked off at 2:00 p.m., FLPD began to set up command, staffing, security, and traffic control for the Huizenga Park demonstration planned for 3:00 p.m.  NRSMF ¶¶ 13–14. Between 2:00 p.m. and 3:00 p.m., Assistant Police Chief MacDougall was designated Incident Commander, Major Swisher the Operations Chief,[18] and Captain Dietrich the Field Force Commander.  NRSMF ¶ 15.  Various city officials monitored the police response from the Real-Time Crime Center ("RTCC") on May 31, 2020.  *Id.*  The RTCC Command Group ("Command Group") included the City Manager, all three Assistant Chiefs of Police, several Majors, and SWAT Commander Captain Steven Greenlaw, among others.  PSMF ¶ 111. Defendant MacDoughall claims the Command Group could not actually see the Intersection from the RTCC. Non-Ramos Resp. to PSMF ¶¶ 111–112 (citing [ECF No. 156-38][19] at 56:1).  As explained in more detail below, Chief Maglione, Asst. Chief MacDoughall, and Capt. Greenlaw were not physically located at the Intersection during the events giving rise to Ratlieff's claims.

---

[18]  On May 31, 2020, Maj. Dana Swisher was a major of the patrol division assigned to the incident command at the station until he responded to the scene between 7:00 p.m. and 8:00 p.m.  NRSMF ¶ 2.  Maj. Swisher drafted the AAR in the three to four weeks following the incident on May 31, 2020, except for the addition of a few photos and some grammatical changes.  *Id.*  He was also the City's Rule 30(b)(6) corporate representative on the topic of the AAR.  *Id.*

[19]  The Non-Ramos Defendants incorrectly cite to [ECF No. 156-36], but this appears to be another scrivener's error.

Chief Maglione was at the Broomfield Grocery protest close to the FLPD jurisdictional border because he had contact with the organizer.  NRSMF ¶ 95.  He remained in constant communication with Assistant Police Chief Luis Alvarez ("Alvarez"), who was keeping him apprised of what was going on in the City.  *See* NRSMF ¶ 95; PSMF ¶ 111.  Chief Maglione, while on the phone with Alvarez, was advised of an initial request to deploy tear gas.  NRSMF ¶¶ 94–95; Ratlieff Resp. to NRSMF ¶¶ 94–95.  Chief Maglione approved the request after less-lethal deployment.  *See* NRSMF ¶¶ 94–95; Ratlieff Resp. to NRSMF ¶¶ 94–95.  Maglione had the authority to stop the use of tear gas and KIPs if they were being unlawfully deployed.  PSMF ¶ 130.  Maglione also had the means to contact officers at the Parking Garage and Intersection during the period when tear gas and KIPs were being deployed.  *See* PSMF ¶ 131.  Maglione did not issue an order to stop the officers' deployment of KIPs and tear gas, because he did not believe such instructions were required given the situation.   *See* PSMF ¶ 132; Non-Ramos Resp. to PSMF ¶ 132.

Asst. Police Chief MacDoughall was located at the RTCC throughout the day.  NRSMF ¶ 6.  MacDoughall also had the authority to stop the deployment of tear gas and less-lethal weapons if he felt they were being deployed unconstitutionally and/or unlawfully.  PSMF ¶ 135; Non-Ramos Resp. to PSMF ¶ 135.  MacDougall also had the authority to direct Capt. Dietrich to issue a dispersal order.  PSMF ¶ 136.

SWAT Command Captain Steven Greenlaw was also at the RTCC.  NRSMF ¶ 6.  Greenlaw also participated in the request made by on-scene SWAT team leaders over the SWAT channel to utilize less-lethal resources by relaying radio transmissions to officials in incident command.  PSMF ¶ 138; Non-Ramos Resp. to PSMF ¶ 138 (citing [ECF No. 155-20] at 4).  Greenlaw knew

of his authority to halt further use of tear gas and KIPs if they were being deployed unconstitutionally and/or unlawfully.  *See* PSMF ¶ 139.

The parties do not dispute that both Chief Maglione and the RTCC Command Group, which included Defendants MacDoughall and Greenlaw, each approved the deployment of tear gas after it had already been deployed.  *See* NRSMF ¶¶ 94–95; Plaintiff's Resp. to NRSMF ¶ 95. The Non-Ramos Defendants maintain that "[e]ven though gas was deployed before the Chief or his designee gave authorization, an authorization was not applicable in that situation because officers do not have to get specific authorization to defend themselves."  NRSMF ¶ 96.  Ratlieff, in contrast, maintains the purpose of the tear gas was to disperse the crowd and thus pre-approval was required before deploying it.  Ratlieff Resp. to NRSMF ¶¶ 94–95.

As to the FLPD Officer-Defendants on scene, it is undisputed that Figueras, Cristafaro, and Dietrich were each located at the Intersection during the events giving rise to Ratlieff's claims. *See* PSMF ¶¶ 44, 140, 146.  Defendant Lieutenant Avery Figueras, as the SWAT Executive Officer attached to Bravo Field Force, authorized the deployment of tear gas and/or less-lethal munitions in the vicinity of the Intersection and Parking Garage.  PSMF ¶ 140.  Figueras had the authority and ability to stop the use of tear gas and KIPs if they were being deployed unlawfully and/or unconstitutionally.  PSMF ¶ 145.

Defendant Sergeant Paul Cristafaro, the SWAT Team Leader/Supervisor, also authorized the deployment of tear gas and KIPs in the vicinity of the Intersection and Parking Garage.  PSMF ¶ 146.  The Non-Ramos Defendants maintain that Cristafaro directed officers to deploy chemical munitions and/or less-lethal weapons as a protective measure to subdue only those in the crowd who were throwing chemical munitions, rocks, bottles, or explosives at police.   *See* NRSMF ¶¶ 51–52.  Ratlieff, in contrast, maintains that the purpose of Cristafaro's approval of tear gas/less-

lethal deployment was to disperse the crowd.  *See* Ratlieff Resp. to NRSMF ¶ 51.  The parties thus dispute the purpose of Cristafaro's approval of tear gas and/or less-lethal munition deployment.

As to Defendant Dietrich, the parties dispute whether he was even involved in the decision to approve the deployment of tear gas and/or less-lethal weapons.  *Compare* NRSMF ¶ 61 *with* Ratlieff Resp. to NRSMF ¶ 61.  The Non-Ramos Defendants maintain that Capt. Dietrich "never gave any kind of approval for deployment of tear gas or less lethal munitions." NRSMF ¶ 61.  The Non-Ramos Defendants further maintain that Dietrich "was in the approval process but that was not his responsibility or role." *Id.*  According to Capt. Dietrich, by the time his team arrived, less-lethal munitions had already been delivered.  *See* NRSMF ¶ 61 (citing [ECF No. 155-4] at 54:02–0:3).  Ratlieff, on the other hand, maintains that Dietrich approved the deployment of tear gas and/or less-lethal munitions at the Parking Garage.  Ratlieff Resp. to NRSMF ¶ 61 (citing [ECF No. 156-36] at 3).[20]  There is accordingly a dispute of material fact as to whether Defendant Dietrich was involved in the decision to approve less-lethal deployment.

Finally, it is undisputed that Defendants John Does 1 through 3 remain unidentified after discovery in this matter concluded.  *See* PSMF ¶ 148.

In sum, the parties dispute (1) when exactly the first gas deployment occurred; (2) whether the initial request for approval was tied to officer rescue or to crowd dispersal; (3) whether pre-approval was required before deployment given the circumstances; (4) whether continued deployment was tied to officer safety or crowd dispersal; and (5) whether Defendant Dietrich was involved in the decision to deploy less-lethal weapons at all.  *Compare* NRSMF ¶¶ 94–95 *with* Ratlieff Resp. to NRSMF ¶¶ 94–95.

---

[20]  In their initial response to Plaintiff's Interrogatories, the Non-Ramos Defendants included Capt. Dietrich as one of the individuals who approved tear gas and/or less-lethal munition deployment on May 31, 2020. In their Supplemental Answer, however, the Non-Ramos Defendants removed Capt. Dietrich and replaced him with Lt. Figueras.  *See* [ECF No. 156-36] at 3.

### E. Ratlieff's Claims

The Court now turns to the procedural history of this matter before describing Ratlieff's extant claims. Ratlieff filed her initial Complaint on May 31, 2022. *See* [ECF No. 1]. On October 27, 2022, Ratlieff subsequently filed a ten-count First Amended Complaint ("FAC") bringing an amalgamation of state-law-tort and 42 U.S.C. § 1983 claims and naming as Defendants the City, Cristafaro, Figueras, Greenlaw, Ramos, Dietrich, and MacDoughall, as well as three unidentified individuals designated as John Does 1–3. *See* [ECF No. 49]. Shortly thereafter, the Non-Ramos Defendants and Officer Ramos—represented by separate counsel—each moved to dismiss the FAC ("MTDs"), [ECF Nos. 50–51].

On June 1, 2023, the Court entered an Order granting in part Defendants' MTDs ("Order"), [ECF No. 93]. The Order dismissed with leave to amend Count I (§ 1983–First Amendment) as to the City only;[21] Count II (§ 1983–Fourteenth Amendment Substantive Due Process) as to the City; Count III (§ 1983–Fourth Amendment) as to the City; Count IV (§ 1983–Fourth Amendment) as to Ramos and the City; and Count X (§ 1983–Fourteenth Amendment Procedural Due Process) as to all Defendants. Order at 34.

On July 6, 2023, Ratlieff filed a Second Amended Complaint ("SAC"), [ECF No. 102], in which she now identified FLPD Officer Remy Rodriguez as John Doe 1. After serving and deposing Officer Rodriguez however, the parties determined that Officer Rodriguez was not in fact John Doe 1. *See* [ECF No. 124] at 2. On September 13, 2024, Plaintiff accordingly requested leave to file a Third Amended Complaint ("TAC") to re-substitute John Doe 1 in place of Officer Rodriguez over objection by Defendants, who sought to have John Does 1–3 excluded altogether from the contemplated TAC. *See id.* at 2. The Court granted Plaintiff's request to file a TAC via

---

[21] Count I's First Amendment claim as to all other named Defendants survived dismissal. *See* Order at 7–12.

Paperless Order that same day. *See* [ECF No. 125]. In that Order, the Court observed "[t]o the extent that Defendants continue to oppose the inclusion of John Does as Defendants in the [TAC], the Court finds that Plaintiff is correct that the inclusion of John Does as Defendants remains permissible at this stage of the litigation." *Id.* (citing *Dean v. Barber*, 951 F.2d 1210, 1215–16 (11th Cir. 1992)). Plaintiff accordingly filed the TAC on September 13, 2023. *See* [ECF No. 126].

The TAC—the operative complaint—names as Defendants (1) the City of Fort Lauderdale; (2) Eliezer Ramos; (3) Paul Cristafaro; (4) Steve Greenlaw; (5) Avery Figueras; (6) Douglas MacDoughall; (7) Robert Dietrich; (8) Rick Maglione; and (9) John Does 1–3. *See generally* TAC.[22] And against these Defendants, the TAC advances 15 separate counts: **(1)** a § 1983 claim against all Defendants except the City for "Unlawful First Amendment Restriction on Speech" (Count I); **(2)** a § 1983 claim against the City for "Unlawful First Amendment Restriction on Speech" (Count II); **(3)** a § 1983 claim against all Defendants except the City for First Amendment Retaliation (Count III); **(4)** a § 1983 claim against the City for First Amendment Retaliation (Count IV); **(5)** a § 1983 claim against all Defendants except the City for violating Ratlieff's substantive due process rights under the Fourteenth Amendment (Count V); **(6)** a § 1983 claim against the City for violating Ratlieff's substantive due process rights under the Fourteenth Amendment (Count VI); **(7)** a § 1983 claim against John Does 1–3 for excessive force under the Fourth Amendment (Count VII); **(8)** a § 1983 claim against the City for excessive force under the Fourth Amendment (Count VIII); **(9)** a state-law battery claim against Ramos, Cristafaro, Greenlaw, Figueras, Dietrich, MacDoughall, and John Does 1–3 (Count IX);[23] **(10)** a state-law battery claim

---

[22] The TAC drops Remy Rodriguez altogether, adds Rick Maglione as a Defendant, and readds John Doe 1 as a Defendant. *See generally*, TAC.

[23] Count IX also includes a reference to "Eugene." *See* TAC at 60. As the Court already noted in its June 1, 2023 Order at 5 n.3, Plaintiff appears to have again included the same scrivener's error, since Ratlieff abandoned her claims against Herns Eugene in the FAC, and he is also not listed in the case caption as a

against the City (Count X); **(11)** a state-law claim for Negligent Use of Direct Impact Munitions and Chemical Munitions against the City (Count XI); **(12)** a state-law claim for Negligent Use of Direct Impact Munitions against Ramos (Count XII); **(13)** a state-law claim for Negligent Use of Chemical Munitions against John Doe 1 (Count XIII); **(14)** a § 1983 claim against all Defendants except the City for violating Ratlieff's procedural due process rights under the Fourteenth Amendment (Count XIV); and **(15)** a § 1983 claim against the City for violating Ratlieff's procedural due process rights under the Fourteenth Amendment (Count XV). *See generally* TAC. Notably, the TAC proceeds against the Officer-Defendants in an individual capacity.

With the exception of John Does 1–3, who have yet to be identified, each remaining served Defendant filed an Answer and Affirmative Defenses between September 19, 2023 and September 29, 2023. *See* [ECF Nos. 129, 133–139]. And as noted above, the parties have each filed cross motions for summary judgment along with extensive exhibits in support of their respective motions.[24] Plaintiff, for her part, seeks partial summary judgment in her favor on Counts III, IV, X, XIV, and XV. PMSJ at 30. Plaintiff further requests a "[m]atter of law finding that Ms. Ratlieff's injuries were a foreseeable consequence of dispersing a crowd containing peaceful demonstrators with tear gas and KIPs without a dispersal order[]"; "a jury trial on damages for Counts III, IV, X, XIV, and XV[]"; and "a status conference for a determination of the necessity of a trial on Ms. Ratlieff's remaining civil rights claims alleged in Counts I–II and V–VIII, in light of [her requested] partial summary judgment on Counts III, IV, X, XIV, and XV." *Id.* Ramos

---

Defendant. *See* TAC at 1. Because Eugene was terminated from this lawsuit on October 27, 2022, the Court no longer considers him an active Defendant in this lawsuit.

[24] The Court also notes that, in addition to their electronically filed exhibits, the parties requested—and the Court granted leave—to conventionally file the extensive video evidence depicting the events of May 31, 2020. *See* [ECF Nos. 144, 154]. Accordingly, the Court has carefully reviewed each of the parties' electronically filed and conventionally filed submissions in considering the instant Motions.

separately moves for summary judgment in his favor as to all counts brought against him.  Ramos MSJ at 1–2.  The Non-Ramos Defendants similarly move for summary judgment in their favor as to Counts I–IV, VIII–X, XIV, and XV.  Non-Ramos MSJ at 35.

## LEGAL STANDARD

Summary judgment shall be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no *genuine* issue as to any *material* fact, and the movant is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(a), (c) (emphasis added).  In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997), and "must resolve all reasonable doubts about the facts in favor of the non-movant," *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of America*, 894 F.2d 1555, 1558 (11th Cir. 1990).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56(c)).

"By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  An issue of fact is "material" if it might affect the outcome of the case under governing law.  *See id.* at 248.  "[T]he substantive law will identify which facts are material . . . Factual disputes that are irrelevant or unnecessary will not be counted."

*Id.* A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). And when the parties "agree on the basic facts, but disagree about the inferences that should be drawn from these facts[,]" summary judgment may be inappropriate. *Whelan v. Royal Caribbean Cruises Ltd.*, No. 12-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citing *Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969)).

"The standard for cross-motions for summary judgment is not different from the standard applied when only one party moves for summary judgment." *Boatwright v. Aetna Life Ins. Co.*, 599 F. Supp. 3d 1218, 1222 (M.D. Fla. 2022) (citing *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005), *abrogated on other grounds by Pulsifer v. United States*, 601 U.S. 124 (2024)); *see also Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1233–34 (11th Cir. 2001). "The Court must consider each motion separately, resolving all reasonable inferences against the party whose motion is under consideration." *Id.* (citing *Am. Bankers Ins. Grp*, 408 F.3d at 1331).

Finally, the Court should not credit any version of events that contradicts unrebutted evidence captured on video. *See Scott v. Harris,* 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). And when the record video evidence so utterly discredits a party's account that no reasonable jury could believe that party, courts must disregard that portion of the nonmoving party's version of events at the summary judgment stage. *See Brooks v. Miller*, 78 F.4th 1267, 1278 (11th Cir. 2023). But if the "recording renders a party's

story merely unlikely yet does not necessarily contradict it, the default rule kicks in: [courts] must accept the party's version for purposes of considering the motion for summary judgment." *Id.*; *see also Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2015) (noting that video footage in case was "often not obviously contradictory" to the plaintiff's account and crediting plaintiff's version "where no obviously contradictory video evidence [was] available").

## <u>ANALYSIS</u>

Ratlieff's 15-count TAC advances 10 constitutional tort claims under 42 U.S.C. § 1983 (Counts I–VIII, XIV–XV) and five state-law claims under Florida common law (Counts IX–XIII). The analysis proceeds in three parts:  First, the Court addresses the status of the claims against the John Doe Defendants.  Second, the Court addresses the parties' respective arguments for summary judgment as to Ratlieff's constitutional claims.  And third, the Court concludes by addressing the parties' arguments as to Ratlieff's state-law claims.

### I.   THE JOHN DOE DEFENDANTS (JOHN DOES 1–3)

As noted above, the TAC asserts several counts against the John Doe Defendants. Specifically, the TAC brings Counts I, III ,V, IX, and XIV against John Does 1–3 alongside other Defendants; brings Count VII for excessive force under § 1983 against John Does 1–3 only; and brings Count XIII for Negligent Use of Chemical Munitions against John Doe 1 only.  *See generally* TAC.  Because discovery is now closed and these Defendants remain unidentified, the Court finds that dismissal of the John Doe Defendants from this lawsuit is appropriate.

"[S]ummary judgment should not be granted until the party opposing the motion has had an adequate opportunity for discovery."  *Dean v. Barber*, 951 F.2d 1210, 1213 (11th Cir. 1992) (citing *Snook v. Trust Co. of Ga.,* 859 F.2d 865, 870 (11th Cir. 1988)).  And "[a]s a general matter, fictitious-party pleading is not permitted in federal court."  *Richardson v. Johnson*, 598 F.3d 734,

738 (11th Cir. 2010) (citing *New v. Sports & Recreation, Inc.,* 114 F.3d 1092, 1094 n.1 (11th Cir. 1997)).  The Eleventh Circuit "has created a limited exception to this rule when the plaintiff's description of the defendant is so specific as to be 'at the very worst, surplusage.'"  *Id.* (quoting *Dean*, 951 F.2d at 1215 n.6).  But "[i]t is important to distinguish suing fictitious parties from real parties sued under a fictitious name.  There may be times when, for one reason or another, the plaintiff is unwilling or unable to use a party's real name." *Dean*, 951 F.2d at 1215–16 (footnote omitted).  Indeed, "one may be able to describe an individual (*e.g.*, the driver of an automobile) without stating his name precisely or correctly."  *Id.* (citing *Bryant v. Ford Motor Co.*, 832 F.2d 1080, 1096 n.19 (9th Cir. 1987) (Kozinski, J., dissenting)).  Nonetheless, if a fictitiously named party remains unidentified at the close of discovery despite the parties' diligent efforts to identify them, dismissal of the fictitiously named party is appropriate at summary judgment.  *See Owaki v. City of Miami*, 491 F. Supp. 2d 1140, 1155 (S.D. Fla. 2007); *Smith v. Augusta-Richmond Cnty., Georgia*, No. CV 122-149, 2024 WL 1257494, at *2 n.4 (S.D. Ga. Mar. 25, 2024).

Here, notwithstanding the Eleventh Circuit's prohibition on fictitious-party practice, *see Richardson*, 598 F.3d at 738, the Court has afforded Ratlieff significant leeway to identify John Doe Defendants until now.  Specifically, the Court declined to dismiss the John Doe Defendants on fictitious-party grounds at the dismissal stage.  Order at 20–21.  The Court also subsequently allowed Ratlieff to re-substitute John Doe 1 for Remy Rodriguez as a Defendant in the TAC over Defendants' objection.  *See* [ECF Nos. 124–125].  However, now that discovery is over, and the John Doe Defendants remain unidentified, the Court is compelled to conclude that the John Doe Defendants qualify as impermissible fictitious parties prohibited in federal court.  *See Owaki*, 491 F. Supp. 2d at 1155 ("However, John Doe No. 1 has never been identified in the three and a half years since the incident occurred.  Although there is no factual dispute on whether the unidentified

Police officer used excessive force in violation of the constitution, fictitious party practice is not allowed in Federal Courts . . . The unserved fictional defendant John Doe No. 1 must be dismissed." (cleaned up)); *Smith*, 2024 WL 1257494, at *2 n.4 (dismissing John Doe defendants who remained unidentified at close of discovery and granting summary judgment in defendants' favor as to claims naming them).

Accordingly, summary judgment is granted in favor of the Non-Ramos Defendants as to all remaining claims against John Does 1–3—specifically, as John Does 1–3 are the only Defendants under Count VII and John Doe 1 is the only Defendant under Count XIII, summary judgment is granted as to both Counts VII and XIII.

## II.  FEDERAL CONSTITUTIONAL CLAIMS UNDER § 1983

Section 1983 provides a private right of action against "[e]very person who," acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]"  42 U.S.C. § 1983.  Thus, to state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).  And under *Monell v. Department of Soc. Servs.* and its progeny, the Supreme Court has repeatedly confirmed that a municipality or other local government entity may be held liable under § 1983 if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivations.  436 U.S. 658, 692 (1978).

Counts I–VIII and XIV–XV of the TAC each assert constitutional tort claims against the individual Defendants and the City pursuant to § 1983.  Counts I–IV assert claims under the First

Amendment; Counts V, VI, XIV, and XV assert claims under the Fourteenth Amendment; and Counts VII and VIII assert claims under the Fourth Amendment. As discussed below, the Court determines that summary judgment in Defendants' favor is warranted as to each of Ratlieff's Fourth and Fourteenth Amendment Claims because she has failed to demonstrate a genuine dispute of material fact as to the necessary constitutional violation underpinning these § 1983 claims. And the Court finds summary judgment as to Ratlieff's First Amendment claims unwarranted. The Court discusses each § 1983 claim in turn.

### A. Ratlieff's Alleged Fourth Amendment Violations

In Counts VII and VIII, Ratlieff claims that on May 31, 2020, John Does 1–3 and the City unlawfully relied upon excessive force by discharging tear gas and KIPs in the area where Ratlieff was situated and thus unreasonably seized her within the ambit of the Fourth Amendment. *See* TAC ¶¶ 352–391. The Court has already granted summary judgment in favor of Defendants as to Count VII above. Thus, the Court need only address Count VIII. The Non-Ramos Defendants argue that Ratlieff fails to establish a genuine dispute of material fact as to whether a seizure occurred. Non-Ramos MSJ at 26–29. The Court agrees.

The Fourth Amendment provides that the government shall not violate "[t]he right of the people to be secure . . . against unreasonable searches and seizures." U.S. CONST. amend. IV; *see also Torres v. Madrid*, 592 U.S. 306, 314 (2021) ("[T]he Fourteenth Amendment . . . incorporated the protections of the Fourth Amendment against the States."). This includes the right to be free from the use of excessive force during an "arrest, investigatory stop, or other 'seizure[.]'" *Corbitt v. Vickers*, 929 F.3d 1304, 1313 (11th Cir. 2019) (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)). Thus, a Fourth Amendment excessive-force claim under § 1983 requires "(1) that a

seizure occurred and (2) that the force used to effect the seizure was unreasonable." *Troupe v. Sarasota Cnty., Fla.*, 419 F.3d 1160, 1166 (11th Cir. 2005).

"A seizure occurs whenever the police 'restrain the freedom of a person to walk away.'" *AFL-CIO v. City of Miami, FL*, 637 F.3d 1178, 1191 (11th Cir. 2011) (alteration accepted) (quoting *Brower v. Cnty. of Inyo*, 489 U.S. 593, 595 (1989)). To determine if a seizure has occurred, a court must evaluate whether "'a reasonable person would have believed that he was not free to leave.'" *See Knight ex rel. Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 822 (11th Cir. 2017) (quoting *U.S. v. Mendenhall*, 446 U.S. 544, 553–54 (1980)). "A seizure requires the use of force *with intent to restrain*. Accidental force will not qualify." *Torres*, 592 U.S. at 317 (emphasis added) (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998)). "Nor will force intentionally applied for some other purpose satisfy this rule." *Id.* Courts must remain cognizant that not "every physical contact between a government employee and a member of the public" is a seizure. *See id.* at 317. Thus, "the appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain[.]" *Id.* (emphasis added).

In opposition to summary judgment, Ratlieff dedicates little more than a page to defending her claim that there remains a genuine dispute of material fact as to whether she was unreasonably seized. *See* Ratlieff Combined Resp. 27–28. In doing so, she largely rehashes the same argument this Court already rejected at the dismissal stage. *Compare* [ECF No. 65] at 15–17 *with* Ratlieff Combined Resp. 27–28. Essentially, Ratlieff claims that, because the undisputed facts confirm she was tear gassed repeatedly and ultimately struck with an FLPD-deployed KIP that incapacitated her, her freedom of movement was therefore restricted by means intentionally applied and she was thus unreasonably seized within the ambit of the Fourth Amendment. *See id.*

Ratlieff's reprised argument is equally unavailing.  At the outset, the Court notes that Ratlieff has identified no new evidence during discovery that otherwise alters her original Fourth Amendment seizure theory, which the Court has already rejected.  Order at 15–17.  She has once again failed to demonstrate how FLPD's deployment of tear gas and KIPs "objectively manifest[ed]" an intent to restraint her—as opposed to being accidental or intentional force applied for some other purpose.  *Torres*, 592 U.S. at 317.

Ratlieff's § 1983 theory maintains that FLPD officers deployed tear gas and KIPs against peaceful demonstrators without a dispersal order and with the specific intention to unlawfully disperse them for voicing anti-police-brutality views.  *See, e.g.,* TAC ¶ 18 ("This action arises because of the FLPD's decision to disperse peaceful demonstrators with chemical weapons and less-than-lethal munitions without warning or lawful justification."); TAC ¶ 89 ("Specifically, video footage shows a responding member of the FLPD . . . physically attacking a peaceful demonstrator while attempting to disperse peaceful demonstrators from the intersection."); TAC ¶ 96 ("The decision to use tear gas and KIPs was not a split-second decision.  Nor was the implementation of the decision to disperse the crowd using tear gas and KIPs.").  But under Ratlieff's unlawful-dispersal theory, FLPD's deployment of tear gas and KIPs amount to intentional force applied *for some other purpose*.  *See Torres*, 592 U.S. at 317 (emphasis added).

Ratlieff's Fourth Amendment claims thus fail the objective-intent-to-restrain test under *Torres*—a conclusion similarly reached by other courts.  *See AFL-CIO*, 637 F.3d at 1191 (holding plaintiff suffered no Fourth Amendment injury where her "freedom of movement was certainly restrained" but she nonetheless "had the ability to, and indeed did, walk away" despite the fact she was also "expos[ed] to pepper fumes"); *Dundon v. Kirchmeier*, 577 F. Supp. 3d 1007, 1040 (D.N.D. 2021) (holding there was no Fourth Amendment seizure where officers did not use less-

than-lethal force "to herd Plaintiffs into a certain location" or "encircle them without a way out" and the protestors could "leave and disengage law enforcement contact"); *see also Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 49 (D.D.C. 2021) (holding defendants were entitled to qualified immunity because it was not clearly established that "the use of tear gas to move members of a crowd can constitute a seizure").

Thus, after considering the parties' arguments and the undisputed facts, including the parties' video evidence, the Court concludes that Ratlieff has failed to create a genuine dispute of material fact as to whether she was unreasonably seized. *Rauen v. City of Miami*, 613 F. Supp. 2d 1324, 1333–34 (S.D. Fla. 2007). Accordingly, Ratlieff's Fourth Amendment claims fail as a matter of law. Defendants are entitled to summary judgment on Count VIII.[25]

### B. Ratlieff's Alleged Fourteenth Amendment Violations

Ratlieff brings several § 1983 claims pursuant to the Fourteenth Amendment premised upon both procedural due process and substantive due process theories. The Due Process Clause of the Fourteenth Amendment provides that a state may not "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. The Fourteenth Amendment protects both "substantive" as well as "procedural" due process. *AFL-CIO*, 637 F.3d at 1185. "A violation of either of these kinds of protection may form the basis for a suit under section 1983." *McKinney v. Pate*, 20 F.3d 1550, 1555 (11th Cir. 1994) (citing *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)).

Relevant here, one sense in which substantive due process rights differ from their procedural counterpart concerns "the manner in which a violation of the right occurs." *Id.* at 1556.

---

[25] The Court acknowledges it has already granted summary judgment in Defendants' favor as to Count VII because of the parties' failure to identify John Does 1–3. But Ratlieff's failure to create a genuine dispute of material fact as to any violation of her Fourth Amendment rights also provides a separate, independent ground for granting summary judgment in Defendants' favor as to Count VII.

"A violation of a substantive due process right, for instance, is complete when it occurs; hence, the availability *vel non* of an adequate post-deprivation state remedy is irrelevant." *Id.* at 1556–57. "Because the right is 'fundamental,' no amount of process can justify its infringement." *Id.* at 1557 (footnote omitted). "By contrast, a procedural due process violation is not complete 'unless and until the State fails to provide due process.'" *Id.* (quoting *Zinermon,* 494 U.S. at 123). "In other words, the state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise." *Id.*

   Here, Ratlieff has failed to demonstrate a genuine dispute of material fact that her procedural or substantive due process rights were violated on May 31, 2020.  Summary judgment is therefore appropriate in Defendants' favor as to each of Ratlieff's Fourteenth Amendment claims.  The Court discusses each theory in turn.

### 1. Ratlieff's Procedural Due Process Claims

   In Counts XIV and XV respectively, Ratlieff advances § 1983 claims against all individual Defendants and the City for violations of her procedural due process rights.  Ratlieff argues that her interest in peacefully protesting on matters of public concern is a protected liberty interest that FLPD personnel violated when they deployed less-lethal weapons against peaceful protestors, including herself, without a dispersal order.  PMSJ at 16–20.

   Procedural due process entitles individuals to "notice and the opportunity to be heard incident to the deprivation of life, liberty or property at the hands of the government." *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1316 (11th Cir. 2011) (quoting *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003)).  It is therefore not the act of deprivation itself that is unconstitutional—rather, "what is unconstitutional is the deprivation

of such an interest *without due process of law*." *Zinermon*, 494 U.S. at 125 (emphasis added). Alternatively stated, "[p]rocedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus,* 435 U.S. 247, 259 (1978). "In this circuit, a § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Arrington v. Helms*, 438 F.3d 1336, 1347–48 (11th Cir. 2006) (quoting *Grayden*, 345 F.3d at 1232).

Ratlieff's procedural due process theory fails for three reasons. First, as to the liberty-or-property-interest requirement of a procedural due process claim under § 1983, the Court remains skeptical as to whether Ratlieff has established such an interest here. As the Court previously explained in its June 1, 2023 Order, Ratlieff has yet to provide any authority for the novel proposition that the Fourteenth Amendment's Due Process Clause entitles her to notice and an opportunity *to disperse* in the context of a clash between protestors and police. Order at 25. Further, Ratlieff's ability to maintain an actionable procedural-due-process claim under § 1983 is questionable given that she has simultaneously advanced a § 1983 claim under the First Amendment based upon the same factual predicate. *See Cotriss v. City of Roswell*, No. 16-4589, 2018 WL 11350388, at *3 (N.D. Ga. Mar. 9, 2018) (noting plaintiff "has provided no case law to support her contention that a deprivation of First Amendment rights can also support a due process claim, whether procedural or substantive" and accordingly denying leave to file an amended complaint seeking to bring both a First Amendment free speech claim and Fourteenth Amendment due process claim under § 1983).

Second, to the extent Ratlieff seeks to argue that Florida law and FLPD Policy related to dispersal orders establish an independent liberty interest sufficient to ground a cognizable procedural-due-process claim under § 1983, this argument fails. Specfically, Ratlieff has failed to provide specific legal argument explaining why such laws or policies establish an independent liberty interest protected by the Due Process Clause. *See, e.g.*, *Smith v. City of Minneapolis*, No. 21-1347, 2021 WL 6011029, at *2 (D. Minn. Dec. 20, 2021) (dismissing procedural due process claim in part because plaintiff "provide[d] no support for her argument that" a state law "detail[ing] how a peace officer may conduct an arrest" granted her "an independent liberty interest").

Third, and most fatally, Ratlieff has failed to establish the third requirement of a § 1983 procedural-due-process claim: Constitutionally inadequate process. As the Court noted above, "a procedural due process violation is not complete 'unless and until the State fails to provide due process.'" *McKinney*, 20 F.3d at 1557 (quoting *Zinermon*, 494 U.S. at 123). Here, Ratlieff chose to pursue her claims in federal court rather than pursue remedies provided by the Florida courts and/or other Florida administrative processes. And because Ratlieff has failed to provide any evidence regarding the inadequacy of Florida process to remedy any conceivable deprivation of her liberty, she has failed to establish a genuine dispute of material fact as to the third element of a § 1983 procedural-due-process claim. *See Young v. Akal*, 985 F. Supp. 2d 785, 804 (W.D. La. 2013) ("[I]t is clear a claim of deprivation of procedural due process cannot proceed, because the plaintiffs have adequate post-deprivation state tort remedies to pursue a recovery for their alleged injuries, that is, plaintiffs may bring state tort actions against the deputies in question to attempt to recover for the injuries they allege."); *Ellsworth v. City of Lansing*, 34 F. Supp. 2d 571, 579–80 (W.D. Mich. 1998) (finding demonstrators' procedural due process claim based on their alleged entitlement to some form of notice or process prior to the release of tear gas "barred" because they

failed to prove the inadequacy of state post-deprivation remedies); *McKinney*, 20 F.3d at 1563 (holding that, in the context of a property deprivation, a plaintiff has not suffered a violation of his or her procedural due process rights unless and until the State of Florida refuses to make available a sufficient means to remedy the deprivation).

In sum, Ratlieff has failed to establish a genuine dispute of material fact that she suffered a violation of an independent, constitutionally protected liberty interest as required to maintain a procedural due process claim under § 1983. And even if she could demonstrate such an interest, she has failed to identify a genuine issue of fact as to the constitutional inadequacy of Florida's process for remedying such a deprivation. Accordingly, Ratlieff's Fourteenth Amendment procedural due process claims under Counts XIV and XV fail as a matter of law and all Defendants are thus entitled to summary judgment on these claims.

### 2. Ratlieff's Substantive Due Process Claims

In Counts V and VI, Ratlieff advances a § 1983 claim against all individual Defendants and the City, respectively, for violations of her substantive due process rights under a non-custodial excessive force theory. *See* Ratlieff Combined Resp. at 19–20. All Defendants move for summary judgment on these claims, arguing that Ratlieff has failed to demonstrate a genuine dispute of material fact that Defendants' conduct rose to the level of conscience shocking. Ramos MSJ at 7; Non-Ramos MSJ at 20– 24. In opposition to Defendants' argument for summary judgment, Ratlieff presents little to no analysis, *see* Ratlieff PMSJ at 20, and fails to establish a genuine dispute of material fact that Defendants' conduct was sufficiently arbitrary or conscience shocking as required to sustain a substantive due process claim in this context. Summary judgment in favor of all Defendants on these claims is therefore appropriate.

"The Due Process Clause was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression." *Davis v. Carter*, 555 F.3d 979, 981 (11th Cir. 2009) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). "The substantive component of the Due Process Clause 'protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them.'" *Id.* (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)). "Officials acting under the color of state law violate the substantive component of the Due Process Clause only when their conduct 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Peterson v. Baker*, 504 F.3d 1331, 1336 (11th Cir. 2007) (cleaned up) (quoting *Lewis*, 523 U.S. at 847). "The Supreme Court has made clear 'that the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm.'" *Id.* (quoting *Lewis*, 523 U.S. at 848). The Eleventh Circuit has accordingly stressed that § 1983 must not be used "as a 'font of tort law' to convert state tort claims into federal causes of action." *Id.* (quoting *Waddell v. Hendry Cnty. Sheriff's Off.*, 329 F.3d 1300, 1305 (11th Cir. 2003)). And the Eleventh Circuit has also noted that "even intentional wrongs seldom violate the Due Process Clause." *Waddell*, 329 F.3d at 1305.

Neither the Supreme Court nor the Eleventh Circuit has defined what conduct "shocks the conscience in every circumstance." *Smith v. Wayne Cnty.*, No. 2:23-CV-27, 2024 WL 1936277, at *9 (S.D. Ga. May 2, 2024) (citing *Sanders v. Boutwell*, 426 F. Supp. 3d 1235, 1242 (M.D. Ala. 2019)). But the Supreme Court has instructed that "our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Carr v. Tatangelo*, 338 F.3d 1259, 1271 (11th Cir. 2003) (citing *Lewis*, 523 U.S. at 850). Thus, conduct "is to be tested by an appraisal of

the totality of facts in a given case." *Lewis*, 523 U.S. at 850; *see also Waldron v. Spicher*, 954 F.3d 1297, 1307 (11th Cir. 2020) ("[T]he context in which the officer's action occurs is important in determining the level of culpability required for a plaintiff to state a viable substantive due process violation."). And "'conduct *intended to injure in some way unjustifiable by any government interest* is the sort of official action most likely to rise to the conscience-shocking level.'" *Peterson*, 504 F.3d 1331, 1336 (11th Cir. 2007) (emphasis added) (quoting *Lewis,* 523 U.S. at 849); *see also Davis v. Carter*, 555 F.3d 979, 982 (11th Cir. 2009) ("To rise to the conscience-shocking level, conduct most likely must be 'intended to injure in some way unjustifiable by any government interest [.]'"). "'Only the most egregious official conduct' will be the sort of 'abusive executive action' that can be sufficiently arbitrary for constitutional recognition as a potentially viable substantive due process claim." *Carr*, 338 F.3d at 1271 (quoting *Lewis*, 523 U.S. at 846).

Finally, the Eleventh Circuit has recognized "that under some circumstances, an individual not actually seized by an officer may have a Fourteenth Amendment substantive due process right to be free from excessive force used on them by the officer." *Jones v. City of Dothan*, 121 F.3d 1456, 1461 (11th Cir. 1997) (citing *Wilson v. Northcutt,* 987 F.2d 719, 722 (11th Cir. 1993). To establish a substantive due process violation based on excessive force in a non-custodial setting such as this, the standard is the same: "[a] [p]laintiff must allege facts showing the [defendant's] conduct was 'arbitrary or conscience-shocking.'" *See Smith*, 2024 WL 1936277, at *9 (citing *Davis*, 555 F.3d at 982). "Similar to the standard used to evaluate Fourth Amendment excessive force claims, the standard used to evaluate substantive due process excessive force claims [in a non-custodial setting] looks to a number of factors, including 'the need for force and the amount of force used, the extent of injury inflicted, and whether force was applied in a good faith effort to

maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Jones*, 121 F.3d at 1461 (quoting *Wilson,* 987 F.2d at 722); *see also Kingsley v. Hendrickson*, 576 U.S. 389, 402 (2015) (clarifying that, in the context of a pretrial detainee's excessive force claim under the Fourteenth Amendment, "these four factors provide examples of some considerations, among others, that might help show that the use of force was excessive" but none is necessary).

As noted above, there is no genuine dispute of material fact that Ratlieff was not subjected to a seizure within the meaning of the Fourth Amendment on May 31, 2020.   Accordingly, in order for her substantive due process claims based upon excessive force to survive summary judgment, Ratlieff must identify a genuine dispute of material fact that Defendants' conduct was "arbitrary or conscience-shocking, in a constitutional sense." *Davis*, 555 F.3d at 982 (citing *Lewis,* 523 U.S. at 847).  She has not done so.

At the outset, the Court notes that there is a factual dispute as to whether FLPD's deployment of tear gas and KIPs from 7:01 p.m. to 7:07 p.m. without a dispersal order was justifiably intended to protect officer safety—or unjustifiably intended to disperse demonstrators exercising their First Amendment rights.  But all agree that the identity and motivations of the individual who threw the CS canister near Ratlieff just before she was struck remain unknown. *See* PSMF ¶¶ 148–149; Non-Ramos Resp. to PSMF ¶¶ 148–149; Ramos Resp. to PSMF ¶¶ 148–149.  And all further agree that Ramos did not *intentionally* shoot Ratlieff but was instead aiming for the unknown individual who had just thrown a tear gas canister back towards the FLPD line. *See* PSMF ¶¶ 81–91; NRSMF ¶¶ 75, 78; RSMF ¶ 21.  The parties' factual dispute thus centers around whether Ramos's shooting was or was not "accidental."  According to Ratlieff's proffered interpretation of the factual record, the unknown individual who threw the canister was unarmed,

retreating, and using Ratlieff as a human shield when Ramos's shot struck her; thus, her injuries were "the foreseeable results of an intentional [unlawful] act by Mr. Ramos, which by definition is not an 'accident' or 'accidental.'" *See* Ratlieff Resp. to NRSMF ¶¶ 78–80; Ratlieff Resp. to RMSF ¶¶ 23–24.  But Ratlieff also concedes multiple times throughout her Partial MSJ—with record cites included—that Defendants "were not acting in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property" on May 31, 2020.  *See* Ratlieff PMSJ at 3, 29.

After reviewing the record evidence, drawing all factual inferences in the light most favorable to Ratlieff as the nonmoving party, and considering Ratlieff's factual account in light of the factors articulated in *Jones*, the Court cannot conclude that any one Defendants' conduct rises to the level of "arbitrary, or conscience shocking, in a constitutional sense." *Peterson*, 504 F.3d 1336.  To be sure, under the record interpretation most favorable to Ratlieff, Defendants impermissibly deployed less-lethal weapons without a dispersal order in a manner that violated Ratlieff's First Amendment rights, and Ramos's KIP-shot at the unknown individual who threw the CS canister back at police was an unjustified use of less-lethal force that resulted in foreseeable injuries to Ratlieff.  But given Ratlieff's concession that Defendants "were not acting in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property[,]" PMSJ at 29, Ratlieff has, at best, asserted a claim for state-law battery against the City.[26]  But § 1983 must not be used "as a 'font of tort law' to convert state tort claims into federal causes of action."  *See Peterson*, 504 F.3d at 1336.

Finally, at least one other court in this district has explicitly rejected the notion that officers' use of less-lethal weapons to control a protest could rise to the level of conscience shocking

---

[26]  Ratlieff's state-law battery claims are fully addressed in Part III, *infra*.

sufficient to sustain a § 1983 substantive due process claim.  *AFL-CIO v. City of Miami*, No. 07-22966, 2008 WL 11333331, at *6 (S.D. Fla. Sept. 4, 2008) (concluding that police officers' use of less-lethal weapons, denial of plaintiffs' access to their property, and detention of plaintiffs and other protestors at gunpoint in the context of attempting to control a protest march "cannot be said to shock the Court's conscience" and, thus, "do not meet the standard for a Fourteenth Amendment substantive due process violation"); *see also Redd v. City of Evansville, Ind.*, No. 3:12-cv-00070-RLY-WGH, 2014 WL 2439701, at *7–8 (S.D. Ind. May 30, 2014) (finding plaintiff's excessive force claim based on allegations regarding officer's negligent use of pepper spray to disperse crowd "insufficient to give rise to a substantive due process claim").  And after carefully reviewing the record in the light most favorable to Ratlieff, the Court similarly finds that she has failed to demonstrate a genuine dispute of material fact as to whether Defendants violated her substantive due process rights.  Accordingly, Counts V and VI fail as a matter of law, and all Defendants are entitled to summary as to these claims.

### C.  Ratlieff's Alleged § 1983 First Amendment Claims (Counts I–IV)

In Counts I through IV of the TAC, Ratlieff brings § 1983 claims pursuant to the First Amendment premised upon both speech-restriction and speech-retaliation theories. Counts I and II proceed upon the theory that the individual Defendants and the City unlawfully restricted Ratlieff's speech. Counts III and IV proceed upon the theory that the individual Defendants and the City retaliated against Ratlieff for exercising her First Amendment rights.  Counts I and III also contain supervisory theories of liability against the individual Non-Ramos Defendants.  TAC ¶¶ 205–216; 261–271.

The Free Speech Clause of the First Amendment prohibits States from abridging freedom of speech.  U.S. CONST. amend. I; *see also Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct.

1921, 1928 (2019) ("[T]he Fourteenth Amendment makes the First Amendment's Free Speech Clause applicable against the States."). It is well-established that peaceful protest is an expressive activity that constitutes protected "speech" under the First Amendment. *See U.S. v. Grace*, 461 U.S. 171, 176 (1983). The Free Speech Clause not only guarantees the right to free speech, "but also the right to be free from retaliation by a public official for the exercise of that right." *Echols v. Lawton*, 913 F.3d 1313, 1320 (11th Cir. 2019) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000)). "Determining whether police are authorized to curtail speech is a balancing act." *Rauen*, 613 F. Supp. 2d at 1331. In general, "to state a claim under § 1983," a plaintiff must allege (1) the violation of a right secured by the Constitution and laws of the United States, and (2) that the alleged violation "was committed by a person acting under the color of state law." *West*, 487 U.S. at 48.

Ratlieff moves for summary judgment only as to Counts III and IV, arguing there is no genuine dispute of material fact as to any element of her First Amendment Retaliation claims. Ratlieff PMSJ at 4–16. Defendants, in contrast, move for summary judgment as to each of Counts I–IV. In support of their respective motions for summary judgment on Counts I and III, Defendants argue Ratlieff (1) has not established there is a genuine dispute of material fact that any First Amendment violation occurred; (2) and that even if she had, qualified immunity would shield them from liability. *See generally* Non-Ramos MSJ; Ramos MSJ. The Non-Ramos Defendants further argue Ratlieff has not demonstrated a genuine dispute of material fact regarding supervisory liability under § 1983 for the individual Officer-Defendants other than Ramos, who is not a supervisor. Non-Ramos MSJ at 12–15. Finally, as to Counts II and IV, the Non-Ramos Defendants argue Ratlieff has insufficently established the requisite elements to hold the City liable under *Monell*. Non-Ramos MSJ at 15–20.

After reviewing the factual record and considering the parties' arguments, the Court concludes there remain genuine disputes of material fact as to whether Ratlieff's First Amendment rights were violated under both (1) her restriction theory and (2) her retaliation theory.  The Court further concludes that (3) Ratlieff has demonstrated a genuine dispute of material fact as to her supervisory liability theory concerning the individual Non-Ramos Defendants who were at the scene only; (4) qualified immunity shields the remaining individual Defendants from liability on Ratlieff's First Amendment § 1983 claims; and (5) Ratlieff has demonstrated a genuine issue of material fact as to her so-obvious-failure-to-train *Monell* theory of liability.  The Court discusses each of the foregoing conclusions in turn.

### 1.  Ratlieff's § 1983 First Amendment Restriction Claims (Counts I–II)

Ratlieff has demonstrated a genuine dispute of material fact as to her First Amendment speech-restriction claims.  Counts I and II advance claims styled "Unlawful Restriction on Speech."  TAC at ¶¶ 192–247.  Notably, as to these Counts, Ratlieff does not point to any law, regulation, or ordinance that she contends runs afoul of the First Amendment.  Instead, she claims that Defendants' *actions* on May 31, 2020 effectuated an unlawful restriction on her First Amendment speech and assembly rights.  *See id.*  In particular, Ratlieff points to FLPD's decision to employ gas and KIPs without a dispersal order, claiming she was occupying a traditional public forum where she and other individuals—though admittedly not all of them—were engaged in peaceful speech and protest.[27]

As noted above, all Defendants move for summary judgment on Counts I and II.  In support of summary judgment on these Counts, the Non-Ramos Defendants maintain the lawful portion of

---

[27]  This of course distinguishes Ratlieff's claim from the usual First Amendment speech-restriction claim, where a party challenges the constitutionality of a government law or regulation for impermissibly curtailing speech or assembly in some way.  But as explained herein, this distinction does not doom Ratlieff's speech-restriction theory *per se.*

the demonstration had concluded at 6:40 p.m., twenty-one minutes before FLPD began deploying less-lethal munitions at "violent agitators" and thirty minutes before Ratlieff was struck by the KIP.  Non-Ramos MSJ at 5.  In effect, Defendants appear to question whether Ratlieff was even engaged in protected speech activity at the time she was gassed and struck. The Non-Ramos Defendants further maintain that officers deployed tear gas and KIPs to protect officer safety rather than to disperse peaceful protestors and that Ratlieff was unintentionally caught in the crossfire because she chose to remain in a dangerous area.  *See id.*  Ramos similarly maintains that he was only targeting—as a protective and deterrence measure—those individuals engaged in committing forcible felonies that threatened officer safety, and because he did not intend to strike Ratlieff, he could not have violated her First Amendment rights.  *See* Ramos MSJ at 3–4.

Importantly, neither Plaintiff nor Defendants have correctly addressed Counts I and II in their respective briefings.  Ratlieff's position muddles the applicable law by indiscriminately intermixing conflicting legal standards with sparse and inapposite analysis.[28]  And Ramos provides argument only as to Ratlieff's First Amendment retaliation claim and fails to address Ratlieff's speech-restriction claim against him.  *See* Ramos MSJ at 4–6.  Further, the Non-Ramos Defendants do not help clarify this confusion; they appear to argue that *only* prior restrictions on speech are

---

[28]   For example, Ratlieff cites *Henderson v. McMurray*, 987 F.3d 997, 1002 (11th Cir. 2021) for the proposition that "[f]or a public forum like a sidewalk, a city may regulate the time, place, and manner of speech 'so long as the restrictions [1] are justified without reference to the content of the regulated speech, . . . [2] are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information." Ratlieff Combined Resp. at 3–4 (cleaned up). Several lines later, however, Ratlieff goes on to state: "The police actions were not narrowly tailored to achieve a compelling governmental interest using the least restrictive means available (DE126, ¶ 199)." *Id.* In the first instance she appears to correctly cite the requisite intermediate scrutiny courts must apply when evaluating content-neutral, "time, place, and manner restrictions" in traditional public fora. In her analysis, however, Ratlieff then applies strict scrutiny.  *See* Ratlieff Combined Resp. at 4.  In any event, if FLPD's restrictions on Ratlieff's speech fail intermediate scrutiny, then the restrictions necessarily fail strict scrutiny.  The Court thus construes Ratlieff's Combined Response as arguing that she was located in a traditional public forum and subjected to content-neutral time place and manner restrictions, which she maintains were unreasonable under the circumstances.

actionable as § 1983 First Amendment claims, *see* Non-Ramos MSJ at 4–5, a puzzling contention that caselaw within this circuit appears to directly contradict. *See, e.g.*, *Toole v. City of Atlanta*, 798 F. App'x 381 (11th Cir. 2019); *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170 (11th Cir. 2009); *see also Saltz v. City of Frederick*, 538 F. Supp. 3d 510 (D. Md. 2021). Given these briefing deficiencies, the Court must fill the significant legal and analytical gaps. After applying the law to the record evidence viewed in the light most favorable to Ratlieff as the nonmoving party, the Court finds that a genuine dispute of material fact remains as to whether FLPD unlawfully curtailed Ratlieff's First Amendment speech-and-assembly rights under her speech-restriction theory.

"[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) (citing *Adderley v. Fla.*, 385 U.S. 39, 47–48 (1966)). For example, "[t]he government may restrict private speech on public property—though its latitude for doing so depends on the kind of 'forum' it's regulating." *McDonald v. City of Pompano Beach,* 556 F. Supp. 3d 1334, 1351 (S.D. Fla. 2021). And "the degree of scrutiny [courts] place on a government's restraint of speech is largely governed by the kind of forum the government is attempting to regulate." *Bloedorn v. Grube*, 631 F.3d 1218, 1230 (11th Cir. 2011). "Accordingly, the 'critical first step' in [the Court's] First Amendment analysis is to 'discern the nature of the forum at issue.'" *McDonald*, 556 F. Supp. 3d at 1351 (quoting *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1236 (11th Cir. 2019)). "Broadly speaking, the Supreme Court has recognized four categories of government fora: the traditional public forum, the designated public forum, the limited public forum, and the nonpublic forum." *Id.* (citing *Keister v. Bell*, 879 F.3d 1282, 1288 (11th Cir. 2018)).

The *first* category of government property, the "traditional public forum," encompasses areas that have "traditionally been available for public expression," *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992), and have as "a principal purpose . . . the free exchange of ideas," *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 800 (1985). "The quintessential examples of traditional public fora are streets, sidewalks, and parks, because those settings 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *McDonald*, 556 F. Supp. 3d at 1351 (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)).  There is no genuine dispute of material fact that at the time Ratlieff was gassed and shot with a KIP, she was occupying a traditional public forum.

But even in a traditional public forum, both the Supreme Court and the Eleventh Circuit have made clear that "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Battle*, 559 F.3d at 1182 (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989)); *see also Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) ("In a traditional public forum—parks, streets, sidewalks, and the like—the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited.").

As to the degree of government regulation satisfying the "narrowly tailored" requirement in this context, the Supreme Court has further clarified that "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate,

content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so." *Ward*, 491 U.S. at 798 (footnote omitted). "Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Id.* at 799 (quoting *U.S. v. Albertini,* 472 U.S. 675, 689 (1985)). The Supreme Court has further cautioned that "this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* at 799–800 (footnote omitted) (citing *Frisby v. Schultz,* 487 U.S. 474, 485 (1988)). But "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 800. With that said, both the Supreme Court and the Eleventh Circuit have nonetheless recognized that police may properly limit the exercise of free speech where necessary for the safety and protection of protestors and the community. *Battle,* 559 F.3d at 1183–84 (citing *Cantwell v. Connecticut,* 310 U.S. 296, 304 (1940) ("Conduct remains subject to regulation for the protection of society.")).

Finally, as a general matter, individuals have a constitutional right to engage in peaceful protest on public land, which includes public land like the Intersection where Ratlieff was situated. *Id.* at 1182 (11th Cir. 2009) (citing *Frisby*, 487 U.S. at 484 (1988) ("In . . . quintessential public fora, the government may not prohibit all communicative activity."); *Shuttlesworth v. City of Birmingham, Ala.,* 394 U.S. 147, 162 (1969) (Harlan, J., concurring) (noting that the right to assemble peaceably to voice political protest is a basic right)). "Governments may not prevent

protests, punish the exercise of the right to protest peacefully by arresting the demonstrators, nor unduly burden the right[.]" *Id.* (citing *Edwards v. S.C.,* 372 U.S. 229, 235 (1963); *Cox v. State of La.,* 379 U.S. 536, 545 (1965); *Bourgeois v. Peters,* 387 F.3d 1303, 1324–25 (11th Cir. 2004)).

In light of the above principles, the Court understands Counts I and II to collectively advance the theory that Ratlieff was occupying a traditional public forum exercising her First Amendment rights to speech and assembly when FLPD deployed tear gas and KIPs without a dispersal order, and that by doing so, FLPD unlawfully curtailed her protected speech-and-assembly rights. *See generally* TAC ¶¶ 192–247.  Ratlieff thus argues that FLPD did not impose reasonable time, place, and manner restrictions narrowly tailored to effectuate a substantial government interest and/or that FLPD did not adequately leave open ample alternative channels of communication. *See id.*

Here, there is no dispute that Defendants were acting under color of state law, so the Court can proceed directly to the question of whether Ratlieff has sufficiently demonstrated an unlawful restriction of her speech to survive summary judgment.  After carefully considering the video evidence and factual record, the Court finds that genuine issues of material fact persist as to whether FLPD's actions were reasonable, narrowly tailored restrictions on speech and assembly under the circumstances.  Specifically, Ratlieff has provided more than a scintilla of evidence supporting her position that FLPD intended to disperse the entire crowd at the Intersection, including peaceful protestors—and that FLPD's decision to do so *without* a dispersal order was not a reasonable time-place-and-manner restriction because it was not *narrowly tailored* to effectuate a substantial government interest.

To be clear, it cannot be denied that FLPD's proffered justification for deploying tear gas and KIPs without a dispersal order—officer safety—amounts to a substantial government interest.

But the issue here is not whether the government's proffered interest is constitutionally adequate. Instead, it is whether, given the situation on the ground, FLPD's restrictions "burden[d] substantially more speech than [] necessary to further the government's legitimate interests," since "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799–800.

As to whether Ratlieff was engaged in protected speech and assembly from 7:01 p.m. to 7:07 p.m., the Court has no trouble concluding that, based upon clear video evidence, there is no genuine dispute of material fact that she was.  BWC clearly shows Ratlieff conspicuously positioned in the middle of the Intersection on a closed street holding a sign standing among several other peaceful protestors and committing no violent acts.  Further, all parties agree that prior to 7:57 p.m., FLPD did not verbally inform *anyone* at the Intersection—including the so-called "violent agitators" whom FLPD claims were the sole targets of officers' less-lethal weapon deployment—that they were unlawfully assembled or otherwise impermissibly occupying the Intersection.

This failure is significant given that at least 30 officers formed the FLPD skirmish line, and that clear, unrebutted video evidence confirms that at least one of them was fully capable of issuing a verbal dispersal order during these moments if so directed.  This would be true even if the Court were to credit the Non-Ramos Defendants' assertion that it was still too dangerous from 7:01 p.m. to 7:07 p.m. to access the LRAD-equipped Suburban's pre-recorded means of doing so.  Indeed, FLPD's ultimate decision to issue a dispersal order informing everyone at the Intersection that they were no longer authorized to be there is itself circumstantial evidence that FLPD implicitly acknowledged peaceful individuals' speech-and-assembly activities leading up to 7:57 p.m.

But while the Court can conclude that Ratlieff was engaged in protected speech and assembly from 7:01 p.m. to 7:07 p.m., several factual issues remain concerning other aspects of her speech-restriction theory under Counts I and II.  Specifically, factual issues remain as to whether officer safety was legitimately at risk from 7:01 p.m. to 7:07 p.m.—and even if it was, whether the officers' intention in deploying both KIPs *and* tear gas was to protect themselves or to disperse the crowd.  Additionally, issues of fact persist as to whether FLPD's failure to issue a dispersal order during this time frame was reasonable under the circumstances.

Consequently, it is genuinely and materially in dispute whether, between 7:01 p.m. and 7:07 p.m., Defendants' continued deployment of tear gas and KIPs without a dispersal order constituted a reasonable, narrowly tailored time-place-and-manner restriction on speech.   And "'[t]his highly disputed factual record' is 'exactly the sort of factual, credibility-sensitive task best left to the jury.'"  *See Toole*, 798 F. App'x at 386 (quoting *Skop v. City of Atlanta*, 485 F.3d 1130, 1141 (11th Cir. 2007)) (finding summary judgment in defendant-officer's favor inappropriate as to plaintiff's First Amendment § 1983 claims where several fundamental factual questions necessary to resolve those claims remained materially and genuinely disputed); *Rauen*, 613 F. Supp. 2d at 1331–33 (finding genuine dispute of material fact as to whether riot conditions existed, thus declining to grant Defendant City of Miami and police supervisors summary judgment as to whether plaintiffs' First Amendment rights were violated).

The Court thus declines to grant summary judgment in Defendants' favor on Counts I and II based upon the argument that no actionable unlawful restriction of speech occurred.

### 2.  Ratlieff's § 1983 First Amendment Retaliation Claims (Counts III–IV)

Ratlieff has also demonstrated a genuine dispute of material fact as to her First Amendment speech-retaliation claims. In Counts III and IV, Ratlieff maintains that Defendants unlawfully

retaliated against her for exercising her First Amendment speech-and-assembly rights.  *See* TAC ¶¶ 248–299.  Ratlieff posits that given the subject matter of the demonstration—opposition to police brutality—FLPD was confronted with speech it did not like and thus sought to retaliate against individuals peacefully expressing said speech.  Ratlieff PMSJ at 4.  She further argues that FLPD unilaterally triggered violence when one of its officers pushed a kneeling woman without provocation, and in response to the very violence FLPD itself triggered, FLPD supervisors failed to require a dispersal order before deploying less-lethal weapons against a mostly peaceful assembly contrary to both Florida law and the First Amendment.  Ratlieff PMSJ at 4–16.

The Non-Ramos Defendants separately argue in favor of summary judgment, arguing that even if Ratlieff could establish the first two elements of her retaliation claims, she has not proffered sufficient evidence for a reasonable jury to find in her favor as to the third element—namely, that there is a causal connection between any adverse action by FLPD and Ratlieff's speech.  Non-Ramos MSJ at 5–7.  The Non-Ramos Defendants further argue that the evidence establishes FLPD deployed KIPs and tear gas only against violent agitators who were throwing objects at police and that neither Ramos nor the Non-Ramos Defendants were aware of Plaintiff's specific presence, much less her protesting.  *See id.* at 7.  The Non-Ramos Defendants therefore maintain there can be no retaliation against conduct of which they were unaware.  *See id.*

Ramos separately moves for summary judgment in his favor, arguing that Ratlieff has not demonstrated a genuine issue of material fact as to either the second or third elements of her retaliation claims.  As to the second element, Ramos claims that he was attempting to discharge a KIP at a violent forcible felon, and because all parties agree he was not intentionally aiming at Ratlieff, she cannot establish that a person of ordinary firmness would be deterred from engaging in such speech.  *See* Ramos MSJ at 5.  And as to the third element, Ramos adopts the same

argument as the Non-Ramos Defendants—that Ratlieff cannot demonstrate a causal connection because Ramos was unaware of her presence until she was struck. Ramos MSJ at 5 (citing *Kidd v. Mando American Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013); *Willis v. Publix Super Markets, Inc.*, 619 F. App'x 960, 962 (11th Cir. 2015); *Jackson v. Board of Comm'rs of Housing Authority of Prichard*, No. 17-0149-WS-M, 2018 WL 3715730, at *9 (S.D. Ala. Aug. 2, 2018)).

First Amendment retaliation "is a well-established basis for section 1983 liability." *O'Boyle v. Sweetapple*, 187 F. Supp. 3d 1365, 1370 (S.D. Fla. 2016). "To establish a First Amendment retaliation claim, a plaintiff must show that (1) her speech was constitutionally protected; (2) she suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech; and (3) there was a causal relationship between the adverse conduct and the protected speech. *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011) (citing *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005)). "In order to establish a causal connection, the plaintiff must show that the defendant was subjectively motivated to take the adverse action because of the protected speech." *Id.* (citing *Smith v. Mosley,* 532 F.3d 1270, 1278 (11th Cir. 2008)).

"However, once the plaintiff shows that her protected conduct was a motivating factor, the burden shifts to the defendant to show that [plaintiff] would have taken the same action in the absence of the protected conduct, in which case the defendant cannot be held liable." *Id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)). This so-called "same-decision" defense is a recognized affirmative defense to retaliation claims. *See Warren v. DeSantis*, No. 23-10459, 2024 WL 105340, at *9 (11th Cir. Jan. 10, 2024) (citing *Mt. Healthy*, 429 U.S. at 287). The same-decision affirmative defense is a "but for" test by which defendants must demonstrate "by a preponderance of the evidence that [they] would have made the same . . .

decision, even had the plaintiff never engaged in the protected conduct." *See Rodriguez v. City of Doral*, 863 F.3d 1343, 1350 (11th Cir. 2017); *Pulliam v. Tallapoosa Cnty. Jail*, 185 F.3d 1182, 1184 (11th Cir. 1999) (describing *Mt. Healthy*'s "same decision" defense as an affirmative defense); *Bryson v. Waycross*, 888 F.2d 1562, 1566 (11th Cir. 1989) (describing the *Mt. Healthy* affirmative defense as a "but for" test, for which the defendant bears the burden of proof).

Here, after reviewing the record evidence, especially the video evidence, the Court finds that genuine disputes of material fact remain as to the second and third elements of Ratlieff's retaliation claims.

As to the first element, the Court has already explained that there is no genuine dispute of material fact that Ratlieff was engaged in protected speech activity from 7:01 p.m. to 7:07 p.m. when she was gassed and struck. That conclusion is equally applicable in the retaliation context. Relatedly, the Court finds as absurd Defendants' collective suggestion that each Defendant was unaware Ratlieff was engaged in protected speech activity during this period. To the contrary, the clear video evidence all parties have submitted shows Ratlieff standing directly in front of the police skirmish line holding a sign—openly and conspicuously—among several other peaceful individuals moments before she is gassed and shot. *See Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

But the second and third elements of Ratlieff's retaliation counts remain genuinely and materially in dispute. Each party's argument for summary judgment on these claims presupposes their respective version of the facts concerning the relative threat level facing officers on the ground—as well as the motivation underlying officers' continued deployment of less-lethal

weapons at the Intersection from 7:01 p.m. to 7:07 p.m.   And the factual record presents conflicting interpretations as to these key issues. *See Rauen*, 613 F. Supp. 2d at 1331–33 (finding genuine disputes of material fact regarding whether, at the time plaintiffs were prevented from demonstrating, police were dealing with riot conditions that justified their dispersal of the crowd with less-lethal weapons).[29]

Defendants' argument in favor of summary judgment as to Ratlieff's retaliation claims is problematic on multiple levels.  To put it bluntly, the Court is skeptical of each Defendant's attempt to characterize their deployment of both KIPs and tear gas as directed *solely* against "violent agitators" rather than peaceful protestors.  As discussed in more detail below, by distinguishing between the violent agitators present at the Intersection and everyone else, Defendants implicitly concede that there were peaceful individuals assembled at the Intersection.  This concession undermines Defendants' claims that they were "unaware" Ratlieff was present and peacefully protesting at the Intersection when she was gassed and struck.  Moreover, with respect to tear gas specifically, Defendants fail to appreciate and explain exactly how tear gas canisters—a less-lethal, area-impact weapon designed primarily for crowd control—are even feasibly deployable in a targeted manner against *certain* individuals within a crowd but not others.

Notwithstanding these infirmities, a reasonable jury could nonetheless find that the officers' motivation to deploy tear gas was legitimate and reasonable self-protection under the circumstances.  If a jury drew this conclusion, then Ratlieff's retaliation claim would necessarily fail.  But a jury could also conclude that FLPD's deployment of less-lethals to disperse the crowd

---

[29] Ratlieff also argues that Defendants have not proffered sufficient evidence to satisfy the requirements of their same-decision affirmative defense—namely, that Defendants would have deployed gas and KIPs under the circumstances even if Ratlieff were not engaged in protected speech-and-assembly activity. *See* Ratlieff PMSJ at 12–16.  But because there are genuine disputes of material fact as to the second and third elements of Ratlieff's retaliation claims, the jury will determine the sufficiency of Defendants' same-decision affirmative defense.

and to suppress speech without a dispersal order was not reasonable under the circumstances. Thus, whether FLPD retaliated against Ratlieff is quintessentially a question for the jury. In sum, given that it remains genuinely and materially disputed whether Ratlieff was unlawfully gassed in retaliation for the exercise of her First Amendment rights, summary judgment on Counts III and IV in favor of Defendants is unwarranted.

### 3. Supervisory Liability Under § 1983

The Non-Ramos Defendants separately argue that summary judgment is warranted because Ratlieff has failed to establish that Defendants Maglione, MacDoughall, Greenlaw, Dietrich, Cristafaro, and Figueras can be held liable under a theory of § 1983 supervisory liability. Non-Ramos MSJ at 12–15. "It is well established that § 1983 claims may not be brought against supervisory officials on the basis of vicarious liability or respondeat superior." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (citing *Belcher v. City of Foley,* 30 F.3d 1390, 1396 (11th Cir. 1994); *Hardin v. Hayes,* 957 F.2d 845, 849 (11th Cir. 1992)). "However, supervisors are liable under § 1983 'either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation.'" *Id.* (citing *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003)).

"A causal connection can be established by, *inter alia*, 'facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.'" *Id.* (citing *Gonzalez*, 325 F.3d at 1235). The "standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." *Gonzalez*, 325 F.3d at 1234 (cleaned up). A failure-to-stop claim under a supervisory liability theory "requires that the supervisor (1) have the ability to

prevent or discontinue a known constitutional violation by exercising his or her authority over the subordinate who commits the constitutional violation, and (2) subsequently fails to exercise that authority to stop it." *Keating*, 598 F.3d at 765. "Supervisors are entitled to qualified immunity, however, unless 'a reasonable person in the supervisor's position would have known that his conduct infringed the constitutional rights of the plaintiff[.]'" *Rauen*, 613 F. Supp. 2d at 1338 (quoting *McKinney v. DeKalb Cnty.,* 997 F.2d 1440, 1443 (11th Cir. 1993)).

Here, it is undisputed that Maglione, MacDoughall, and Greenlaw were not located at the Intersection when the alleged First Amendment violations occurred but that Dietrich, Cristafaro, and Figueras were. The Court accordingly addresses the two groups' supervisory liability separately. And upon doing so, the Court concludes that summary judgment on Counts I and III in favor of Defendants Maglione, MacDoughall, and Greenlaw is warranted because Ratlieff has failed to establish a genuine dispute of material fact concerning the requisite elements of § 1983 supervisory liability as to them.

### a. *Maglione, MacDoughall, & Greenlaw*

The parties do not dispute that Maglione, MacDoughall and Greenlaw ("Off-Site Defendants") were not physically present at the Intersection when the alleged violations of Ratlieff's First Amendment rights occurred. They further agree Maglione was present at the Broomfield Grocery demonstration and in constant contact with Assistant Chief Alvarez, who was keeping him apprised of events at the Intersection and to whom Chief Maglione communicated his retroactive approval of less-lethal deployment—after Alvarez informed him that such means were required and had already been deployed. And they also agree that both MacDoughall and Greenlaw were located off-site with the Command Group at the RTCC when the alleged First Amendment violations occurred.

Because it is undisputed that the Off-Site Defendants were not physically located at the scene; did not personally participate in the alleged violations; did not direct subordinates to deploy tear gas or KIPs; and do not appear to have had any reason to know their subordinates were acting unlawfully,  the Court concludes that Ratlieff has not established the requisite "causal connection between actions of the supervising official and the alleged constitutional violation." *See Keating*, 598 F.3d at 762.  Accordingly, the Off-Site Defendants cannot be held liable for alleged violations of Ratlieff's First Amendment rights under a § 1983 supervisory theory of liability as a matter of law.

In opposition to this conclusion, Plaintiff cites *Williams v. Santana*, 340 F. App'x 614, 618 (11th Cir. 2009) and *Poor & Minority Just. Ass'n v. Chief Judge*, No. 8:19-CV-2889-T-02TGW, 2020 WL 5513342, at *2 (M.D. Fla. Sept. 14, 2020), for the proposition that the Off-Site Defendants can be held liable under § 1983 here.  *See* Ratlieff Combined Resp. at 13; Ratlieff Non-Ramos Reply at 4.  But *Williams* and *Poor* are both inapposite.

*Williams* involved a defendant police director's appeal of the district court's denial of his motion to dismiss based on qualified immunity.  *See generally id.*  At issue was whether an inmate plaintiff had adequately stated a claim for supervisory liability under § 1983 given that plaintiff failed to allege the defendant police director personally participated in excessive force against him. *Id.* at 617–18.  The *Williams* court concluded that the § 1983 supervisory claim against the absent police director could proceed—but emphasized that plaintiff had also pleaded the officer who committed the alleged constitutional violation had received numerous previous reports of egregiously inappropriate excessive force without cause, and the director was accordingly "on notice of misconduct that was sufficiently 'obvious, flagrant, rampant and of continued duration' to require him to act." *Id.* at 618 (quoting *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990)).

The situation here is markedly different.  Ratlieff has not pointed to any prior reports implicating any of the individual Defendants such that notice could be imputed to the Off-Site Defendants that their subordinates were likely to commit First Amendment violations.

*Poor* is similarly unavailing.  Ratlieff cites *Poor* for the proposition that "Supervisory liability allows for a defendant to be held liable even if he or she is not present at the scene of the deprivation if . . . the 'facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so.'"  Ratlieff Non-Ramos Reply at 4 (quoting *Poor*, 2020 WL 5513342, at *2).  But contrary to Ratlieff's position, the court in *Poor* determined that a sheriff could *not* be held liable on a supervisory theory because plaintiffs had failed to allege that he was present when violations of plaintiffs' constitutional rights occurred, noting the absence of allegations that the sheriff directed his deputies, in a supervisory capacity, to violate plaintiffs' rights.  *Poor*, 2020 WL 5513342, at *3.

Similarly, the facts here do not provide any indication that the Off-Site Defendants directed subordinates to act unlawfully or knew their subordinates would do so and failed to stop them.  For one, the Off-Site Defendants approved less-lethals *after* they had already been deployed.  *See* NRSMF ¶¶ 94–95; Plaintiff's Resp. to NRSMF ¶¶ 94–95.  For another, there is no record evidence indicating the Off-Site Defendants specifically approved or directed that less-lethals be deployed without a dispersal order, nor were they aware the situation at the Intersection required one under the circumstances.  And Ratlieff offers no evidence to rebut the Non-Ramos Defendants' claim that the Off-Site Defendants were not at the scene and were making decisions based upon the information their subordinates relayed to them.  In sum, Ratlieff fails to offer any evidence indicating the Off-Site Defendants directed their subordinates to act unlawfully or that they knew

their subordinates were acting unlawfully.  Ratlieff has thus failed to demonstrate any genuine dispute of material fact supporting the inference that the Off-Site Defendants "directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so." *See Poor*, 2020 WL 5513342, at *2.

Accordingly, Defendants Maglione, MacDoughall, and Greenlaw are entitled to summary judgment in their favor as to Counts I and III.

### b.  Dietrich, Cirstafaro, Figueras

In contrast to the Off-Site Defendants, all agree that Dietrich, Cristafaro, and Figueras ("On-Site Defendants") were at the Intersection between 7:01 p.m. and 7:07 p.m when Ratlieff was gassed and struck.  As it is undisputed that the On-Site Defendants were present at the Intersection and each had the authority to order and/or put a stop to Ratlieff's alleged First Amendment violations, Dietrich, Cristafaro, and Figueras's supervisory liability is again contingent upon whether the situation on the ground at the Intersection between 7:01 p.m and 7:07 p.m. justified the skirmish line's continued deployment of less-lethals without a dispersal order.

Under Ratlieff's version of the facts, which a reasonable jury could accept or reject, she has demonstrated "facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Keating*, 598 F.3d at 762 (internal quotation marks omitted) (citing *Gonzalez*, 325 F.3d at 1235).  Accordingly, Ratlieff has demonstrated a genuine dispute of material fact as to the On-Site Defendants' supervisory liability, and summary judgment in their favor upon this basis is premature.  But the On-Site Defendants, along with Ramos, all maintain that qualified immunity nonetheless shields them from liability.  The Court now turns to these arguments.

### 4. **Qualified Immunity**

As explained above, Ratlieff has demonstrated a genuine issue of material fact as to whether her First Amendment rights were violated under her speech-restriction and retaliation theories. But the remaining individual § 1983 Defendants— Dietrich, Figeuras, Cirstafaro, and Ramos—invoke qualified immunity defenses as well.

"Qualified immunity shields government employees from suit in their individual capacities for discretionary actions they perform [in carrying out] their duties." *Brooks v. Miller*, 78 F.4th 1267, 1279 (11th Cir. 2023). "The thought behind the doctrine is the 'balancing of two important public interests: the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Id.* (cleaned up) (quoting *Davis v. Waller*, 44 F.4th 1305, 1312 (11th Cir. 2022)). "Under the balance that qualified immunity strikes, 'all but the plainly incompetent or those who knowingly violate the law' enjoy its protection.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"To determine whether qualified immunity applies, [courts] engage in a burden-shifting analysis." *Id.* at 1280. The first step requires a defendant to show that he was acting within the scope of his discretionary authority when committing the challenged act. *Id.* (citing *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). "Once the defendant does that, the burden shifts to the plaintiff, who must show that qualified immunity is not appropriate." *Id.* To show that qualified immunity is not appropriate, "the plaintiff must establish two things: (1) the defendant violated a constitutional right, and (2) that constitutional right was 'clearly established' at the time of the defendant's actions." *Id.* (citing *Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022)). The Supreme Court has cautioned that "[a]lthough 'this Court's caselaw does not require a case directly

on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.'"  *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly,* 580 U.S. 73, 79 (2017)).  In other words, "[t]he clearly established right must be defined with specificity."  *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019).   And the Supreme Court has further cautioned that "[a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'"  *Kisela*, 584 U.S. at 105 (citing *Plumhoff v. Rickard,* 572 U.S. 765, 778–779 (2014)).

Within the Eleventh Circuit  "[a] plaintiff can show that a violation is 'clearly established' in any of three ways: (1) by relying on a 'materially similar decision of the Supreme Court, of this Court, or of the supreme court of the state in which the case arose;' (2) by invoking 'a broader, clearly established principle that controls the novel facts[] of the case;' or (3) [by showing] that the officer's acts 'so obviously violate the Constitution that prior case law is unnecessary.'" *Brooks*, 78 F.4th at 1280 (cleaned up) (quoting *Powell*, 25 F.4th at 920).  "If a plaintiff proceeds under the first or second method, [plaintiff] must point to a court decision."  *Id.* (citing *Powell*, 25 F.4th at 920).  And "[t]he second and third methods require 'obvious clarity.'"  *Id.* (quoting *Powell*, 25 F.4th at 920).  "That is, the principle must be so apparent that, even without a case with similar facts to light the way, any competent officer would know that his conduct crossed the line." *Id* (citing *Powell*, 25 F.4th at 920).

"In sum, the 'clearly established' part of the qualified-immunity inquiry asks whether the law when the officer engaged in the challenged conduct gave him fair warning that his conduct was unlawful." *Brooks*, 78 F.4th at 1280 (quoting *Powell*, 25 F.4th at 921).  "To answer this question, [courts] look to law as decided by the Supreme Court, the Eleventh Circuit, or the

Supreme Court of Florida." *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012) (alteration accepted) (citing *Barnes v. Zaccari*, 669 F.3d 1295, 1307 (11th Cir. 2012)). The facts of existing caselaw do not need to be identical to the plaintiff's case, "but the unlawfulness of the conduct must be apparent from pre-existing law." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011).

Finally, "Courts have discretion to decide the order in which to engage these two [qualified immunity] prongs." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (alteration added) (citing *Pearson v. Callahan,* 555 U.S. 223, 236, 129 (2009)). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* (citing *Brosseau v. Haugen,* 543 U.S. 194, 195 n.2 (2004) (per curiam)). Thus, the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." *Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013) (quoting *McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009)).

The parties do not dispute that all remaining individual Defendants were acting within the scope of their discretionary authority during the events giving rise to Ratlieff's claims. *See Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 ("To receive qualified immunity, the officer must first show that he acted within his discretionary authority." (citation omitted)). Accordingly, the burden falls upon Ratlieff to establish that each remaining Defendant "(1) [] violated a constitutional right, and (2) that constitutional right was clearly established at the time of the defendant's actions.'" *Brooks*, 78 F.4th at 1280 (citing *Powell*, 25 F.4th at 920); *Crocker v. Beatty*, 995 F.3d 1232, 1239–40 (11th Cir. 2021). Here, this means Ratlieff must establish, based upon the record evidence viewed in the light most favorable to her, that each specific Defendant engaged in the First Amendment violations underlying Counts I and III, and must further demonstrate that

her First Amendment rights in this context were clearly established.  The Court first addresses the On-Site Defendants' qualified-immunity arguments before addressing Ramos's qualified-immunity argument.

### a. Dietrich, Cristafaro, Figueras

The Court's analysis above confirms that, after viewing the facts in the light most favorable to Ratlieff, the On-Site Defendants "directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so," *Keating*, 598 F.3d at 762, as required to ground a § 1983 supervisory-liability claim.  But "[s]upervisors are [nonetheless] entitled to qualified immunity [] unless 'a reasonable person in the supervisor's position would have known that his conduct infringed the constitutional rights of the plaintiff[.]'" *Rauen*, 613 F. Supp. 2d at 1338 (quoting *McKinney,* 997 F.2d at 1443.)  And "[c]ourts have discretion to decide the order in which to engage [qualified immunity's] two prongs." *Tolan*, 572 U.S. at 656 (alterations added) (citing *Pearson,* 555 U.S. at 236); *Brooks*, 78 F.4th at 1280 ("[S]ince a plaintiff must show both prongs to overcome qualified immunity, if the prong the court considers first is not satisfied, the court need not consider the other prong because the officer is entitled to qualified immunity, regardless.").

The Court thus proceeds directly to the question of whether Ratlieff has identified a clearly established law that "gave [the On-Site Defendants] fair warning that [their] conduct was unlawful." *Brooks*, 78 F.4th at 1280 (quoting *Powell*, 25 F.4th at 921).  And once again, it is Ratlieff who bears the burden of establishing that the constitutional right at issue was clearly established. *See id*.  Thus, to defeat the On-Site Defendants' qualified immunity defense, Ratlieff must show that under her verison of the facts, the On-Site Defendants' conduct violated her clearly established First Amendment rights. *See id.*

Here, the Court concludes Ratlieff has failed to make this showing. Specifically, she has adduced no cases clearly establishing that the remaining On-Site Defendants violated her First Amendment rights on May 31, 2020. Ratlieff points only to *Keating* and a series of Eleventh Circuit First Amendment cases involving a variety of tangentially related speech restriction-and-retaliation contexts. *See* Ratlieff Combined Resp. at 12 (citing *Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1130 (11th Cir. 2021); *Bennett v. Hendrix*, 423 F.3d 1247, 1255–56 (11th Cir. 2005); *Toole*, 798 F. App'x at 388; *Duncan v. City of Sandy Springs*, No. 20-13867, 2023 WL 3862579, at *1 (11th Cir. June 7, 2023)). But as the Supreme Court has made clear, "[t]he clearly established right must be defined with specificity." *City of Escondido*, 586 U.S. at 42; *see also Kisela*, 584 U.S. at 105 ("An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." (cleaned up)); *Crocker*, 995 F.3d at 1240 ("[T]he Supreme Court has warned us not to 'define clearly established law at a high level of generality.'") (quoting *Plumhoff*, 572 U.S. at 779).

Other than *Keating*, Ratlieff has directed the Court to no other case directly involving First Amendment issues and the police's use of force against a crowd. The Court accordingly construes Ratlieff's argument against qualified immunity as invoking "'a broader, clearly established principle [that] control[s] the novel facts' of the case[.]'" *Brooks*, 78 F.4th at 1280. In other words, Ratlieff argues that *Keating*'s " broader, clearly established principle should control the novel facts in this situation." *See Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005); *see also Crocker*, 995 F.3d at 1240 (explaining that "when a plaintiff relies on a 'general rule[ ]' to show that the law is clearly established, it must 'appl[y] with *obvious clarity* to the circumstances.'" (quoting *Long v. Slaton*, 508 F.3d 576, 584 (11th Cir. 2007))).

In making this argument, Ratlieff dedicates just one page of her response to arguing that the law at the time she was injured clearly established her First Amendment rights in this context. *See* Ratlieff Combined Resp. at 13.   And as to *Keating*'s applicability to the Non-Ramos Defendants, Ratlieff states only the following: "The non-Ramos defendants finally seek to distinguish *Keating* . . . on grounds that their subordinate police officers were not deploying less-than-lethal munitions to disperse peaceful demonstrators but were responding to violent acts by agitators committing felonies.  However, as previously discussed, this is a disputed fact."  Ratlieff Combined Resp. at 13 (citations omitted).  Ratlieff then spends the rest of her argument explaining why the cases cited by the Non-Ramos Defendants are inapplicable here.  *See* Ratlieff Combined Resp. at 12–16.  But it is Ratlieff who bears the burden to demonstrate, viewing the facts in the light most favorable to her, that the On-Site Defendants violated her First Amendment rights and that these rights were clearly established at the time of the violation.  *See Brooks*, 78 F.4th at 1280. And Ratlieff devotes little analysis to explaining exactly how *Keating* demonstrates that her First Amendment rights were clearly established in this context.

The Court's own review of *Keating* and the factual record here confirms that it does not suffice to invoke a broader clearly established principle that should control the novel facts of this case.  For one, *Keating*—decided at the dismissal stage where the district court was required to assume the truth of all well-pleaded allegations—concerned the beating and deployment of projectiles and tear gas at purely peaceful demonstrators.  *Keating*, 598 F.3d at 757–65.  Critically, there were no allegations that some protestors were commiting acts of violence against the police. *See id.*

Thus, the question in *Keating* was whether police supervisors who ordered subordinates to beat and deploy less-lethals against *purely peaceful* demonstrators could be held liable for violating

plaintiff's First Amendment rights under a § 1983 supervisory liability theory.  *See id*.  And particularly relevant to Ratlieff's argument here, after concluding the plaintiff in *Keating* had adequately alleged that supervisors violated his First Amendment rights, the Eleventh Circuit then addressed whether the supervisors' qualified immunity defense nonetheless shielded them from liability based upon a lack of clearly established law.  *See id.* at 765–768.  Based upon the *facts as they were alleged in the amended complaint*, the Eleventh Circuit determined the supervisors' conduct violated clearly established law, concluding:

> [The supervisors], in directing their subordinates to use less-than-lethal weapons to disperse a crowd of peaceful demonstrators, were aware that their orders to their subordinate officers would violate the Protesters' First Amendment rights. Additionally, [the Supervisors] were aware that their failure to stop the use of less-than-lethal weapons to disperse a crowd of peaceful demonstrators would violate the Protesters' First Amendment rights.

*Id.* at 767.  Thus, in *Keating*, the Eleventh Circuit rested its determination that the supervisors had violated plaintiff's clearly established First Amendment rights upon the *alleged* facts that the crowd of demonstrators was *wholly peaceful*.

Here, in contrast, there is no dispute that when Ratlieff was at the Intersection from 7:01 p.m. to 7:07 p.m., the crowd was comprised of both peaceful <u>and non-peaceful</u> individuals.  Of course, as the Court has noted repeatedly throughout its analysis, the degree of violence officers faced is genuinely and materially disputed.  And both parties have submitted evidence supporting each of their respective factual accounts.  But Ratlieff has conceded— and the video evidence is clear—that at least some individuals were throwing objects at officers from 7:01 p.m. to 7:07 p.m. And the Court's own review of the video evidence confirms that the situation was at best chaotic and threatening—even if Defendants' characterization of the threat level may be overstated.

Accordingly, viewing the factual record in the light most favorable to Ratlieff, the situation here is fundamentally different from that in *Keating*.

Faced with these key factual differences, the Court cannot conclude that *Keating*, standing alone, would have adequately put the On-Site Defendants on notice of the governing principle Ratlieff seeks to establish—namely, that police supervisors violate a person's First Amendment rights when they order or fail to stop their subordinates from deploying tear gas and KIPs into a crowd where some individuals in that crowd are throwing objects directly at police. And because *Keating* does not clearly state *this* broader principle, Ratlieff must identify some other precedent from the Supreme Court, the Eleventh Circuit, or the Florida Supreme Court standing for an analogous proposition. *See Loftus*, 690 F.3d at 1204. She has not done so.

Finally, the Court acknowledges that in its June 12, 2023 Order granting in part Defendants' Motions to Dismiss, the Court found *Keating* controlling at the dismissal stage, and accordingly declined to dismiss the individual Defendants based upon qualified immunity grounds. Order at 7–12. But as the Court also observed in its Order, "subsequent discovery might call [the FAC's] version of events into question[.]" *Id.* And discovery has done just that. Thus, after considering the facts and holding of *Keating* alongside the factual record here, the Court cannot conclude that *Keating* clearly establishes that the On-Site Defendants violated Ratlieff's First Amendment rights such that "the law when the [On-Site Defendants] engaged in the challenged conduct gave [them] fair warning that [their] conduct was unlawful." *Brooks*, 78 F.4th at 1280 (quoting *Powell*, 25 F.4th at 921). Accordingly, Ratlieff has failed to overcome Dietrich, Cristafaro, and Figueras's qualified immunity defense at summary judgment. They are each entitled to qualified immunity, and summary judgment is thus granted in their favor as to Counts I and III.

### b. *Ramos*

The analysis above applies with even greater force to Ramos. In detemining whether Ramos—a line officer rather than a supervisor— is entitled to qualified immunity, the Court must similarly ask whether Ramos (1) violated Ratlieff's First Amendment rights (2) under clearly established law. And again, "[c]ourts have discretion to decide the order in which to engage these two prongs." *Tolan*, 572 U.S. at 656 (citing *Pearson,* 555 U.S. at 236); *Brooks*, 78 F.4th at 1280. The Court again proceeds directly to determining whether Ratlieff has identified a clearly established law that "gave him fair warning that his conduct was unlawful." *Brooks*, 78 F.4th at 1280 (quoting *Powell*, 25 F.4th at 921). And once again, it is Ratlieff who bears the burden of establishing that the constitutional right at issue was clearly established. *See id.* Thus, to defeat Ramos's qualified immunity defense, Ratlieff must show that under her verison of the facts, Ramos's conduct violated her clearly established First Amendment rights. *See id.*

Here, after considering the evidence in the light most favorable to Ratlieff, the Court again concludes that she has not identified clearly established law sufficient to overcome Ramos's qualified immunity defense. In her argument as to Ramos, Ratlieff identifies the same cases already discussed above. *See* Ratlieff Combined Resp. at 13–16.[30] But she devotes scant analysis

---

[30] Both Ratlieff and Ramos argue extensively over the persuasive weight the Court should attribute to *Epps v. City & Cnty. of Denver*, 588 F. Supp. 3d 1164 (D. Colo. 2022). In *Epps*, Denver police officers deployed less-lethal munitions at a crowd comprised of both violent and nonviolent protestors. *See Epps*, 588 F. Supp. 3d at 1177–78. According to plaintiff's account, one officer deployed pepperballs at her while she was filming the protests and committing no acts of violence, which she captured via cellphone video. *See id.* Separately, according to plaintiff, a second officer allegedly shot pepperballs at a protestor who had just thrown an object at the police. *Epps*, 588 F. Supp. 3d at 1178. The second officer's shot missed and hit plaintiff, who was still not engaged in any violence and was by that time standing 10 to 15 feet behind the person who had thrown the object. *Id.* at 1178. Relying on Tenth Circuit precedent, the court concluded that plaintiff had created a genuine dispute of material fact as to whether the first officer had violated her clearly established First Amendment rights. *Id.* at 1177–78. But as to the second officer, the court concluded: "The [Tenth Circuit] cases cited above establish that pepperballs are inappropriate against non-threatening individuals. I do not find them applicable here where an individual threw objects at the police. And plaintiffs have provided no authority clearly establishing that it violates the constitution for an officer to fail to give warning to those standing behind an aggressive individual before firing at that individual, or

to explaining why *Keating*—a supervisory liability case—suffices to put Ramos—a line FLPD SWAT officer—on notice that his conduct violated Ratlieff's First Amendment rights.  In any event, the Court again understands Ratlieff as proceeding under the second method for demonstrating clearly established law, namely, that *Keating*'s "broader, clearly established principle should control the novel facts in this situation."  *See Mercado*, 407 F.3d at 1159.

*Keating* does not set forth a broader, clearly established principle that "gave [Ramos] fair warning that [his] conduct was unlawful" under these circumstances.  *See Brooks*, 78 F.4th at 1280 (quoting *Powell*, 25 F.4th at 921).  In addition to the Court's foregoing analysis, which is also applicable here, the following Ramos-specific considerations militate in favor of this conclusion.  *First*, there is no dispute that Ramos was not a supervisor but instead a line police officer following supervisors' directives to target anyone throwing tear gas canisters at police with KIPs.  And although there are undoubtedly situations where a supervisor's order would obviously violate the Constitution under clearly established law such that a subordinate following that order would not be entitled to qualified immunity, given the factual ambiguity in the record and conflicting video evidence, the Court cannot conclude that this is one of those situations. The Court accordingly

---

that an officer violates the constitutional rights of those standing behind a threatening individual by aiming too high and being a poor shot."  *Id.* at 1178.  The court accordingly determined that the second officer was entitled to qualified immunity, but the first officer was not.  *Id.* at 1177–78.

The Court finds *Epps* persuasive insofar as it involves similar facts and provides helpful analysis concerning qualified immunity principles.  With that said, both Ratlieff and Ramos each overemphasize *Epps*'s relevance to Ramos's qualified immunity defense.  Ramos overemphasizes its relevance because the court relied entirely upon Tenth Circuit precedent in concluding that the second officer did not violate clearly established law.  Ramos MSJ at 16–19. Tenth Circuit precedent is irrelevant to the Court's determination as to whether Ramos violated clearly established law in the Eleventh Circuit.  Ratlieff similarly dedicates most of her argument to explaining why *Epps* is distinguishable rather than explaining why *Keating* or some other in-circuit authority clearly establishes the principle Ratlieff claims Ramos violated.  *See* Ratlieff Combined Resp. at 14–15.  But Ratlieff bears the burden of identifying binding caselaw from the Supreme Court, the Eleventh Circuit, or the Florida Supreme Court standing for the broader principle she claims was clearly established on May 31, 2020.  *See Loftus*, 690 F.3d at 1204.  Thus, distinguishing a Tenth Circuit case does nothing to advance her argument on this point.

agrees with Ramos's argument that, "no clearly established law would have alerted Ramos that following a directive to target those that pick up gas canisters was constitutionally infirm," Ramos MSJ at 20, simply because the targeted individuals were comingled with lawful protestors.

*Second*, and even more importantly, *Keating* involved allegations that officers had directed subordinates to beat, gas, and shoot KIPs at purely peaceful demonstrators to disperse them. Here, considering the video evidence and adopting the most charitable interpretation of the factual record in Ratlieff's favor, it is undisputed that there were individuals in the crowd throwing objects at police from 7:01 p.m. to 7:07 p.m. And it is also undisputed that Ramos did not *intentionally* shoot Ratlieff but was instead aiming for the individual who had just thrown a tear gas canister back towards the FLPD skirmish line. *See* Ratlieff Resp. to NRSMF ¶¶ 78, 80; Ratlieff Resp. to RMSF ¶¶ 23–24. Ratlieff has not identified precedent from the Supreme Court, the Eleventh Circuit, or the Florida Supreme Court standing for the broader principle that a police officer following an order to deploy KIPs at individuals throwing objects at police violates a plaintiff's constitutional rights when that officer shoots—recklessly or otherwise—a less-lethal weapon at someone who has just thrown something at police but instead misses and unintentionally strikes a bystander. And the Court has not identified any sufficiently similar precedent standing for this proposition.

In sum, viewing the evidence in the light most favorable to Ratlieff, she has failed to meet her burden of demonstrating that Ramos's actions, pursuant to his supervisors' orders, violated her clearly established First Amendment rights.[31] Accordingly, Ramos is entitled to qualified immunity, and summary judgment is thus granted in his favor on Counts I and III.

---

[31] To be clear, the above analysis applies only to Ramos's KIP shot, which all agree struck Ratlieff's face. As to tear gas, Ratlieff has not adduced evidence that Ramos deployed tear gas in her vicinity. Indeed, the Court's review of the record confirms that, as to Ramos specifically, Ratlieff has only presented evidence that Ramos deployed tear gas at the Intersection and that his stated rationale for doing so was "to disperse the crowd." *See* PMSF 40 (citing [ECF No. 156-15] at 14:272-83; 18:359-61, 36:731-32). But Ratlieff is the plaintiff here, not the crowd. And Ramos clarified that although he deployed "pepper spray" at the

### 5. *Monell* Liability

The Court now turns to Ratlieff's *Monell* claims in Counts II and IV, by which she seeks to hold the City liable for violations of her First Amendment rights under § 1983.[32]

"The Supreme Court has placed strict limitations on municipal liability under § 1983." *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003).  Section 1983 does not operate to hold local governments liable "solely upon a respondeat superior theory." *Mandel v. Doe*, 888 F.2d 783, 791 (11th Cir. 1989).  Instead, a plaintiff may maintain a § 1983 claim against a municipality "only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  Consequently, a municipality is only liable when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694; *Grech*, 335 F.3d at 1329 ("Indeed, a county is liable only when the county's 'official policy' causes a constitutional violation.").  "[R]ecovery from a municipality is limited to acts that are, properly speaking, acts of the municipality—that is, acts which the municipality has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).  Thus, a plaintiff must "identify a municipal policy or custom that caused [the] injury." *Grech*, 335 F.3d at 1329

---

Intersection (which the Court understands to mean tear gas), he did not deploy it in Ratlieff's vicinity. Ramos Resp. to PSMF ¶ 50 (citing Ramos's Sworn Affidavit, [ECF No. 148-5] at ¶ 26).  Accordingly, even viewing the facts in the light most favorable to Ratlieff, she has identified no evidence upon which a reasonable jury could conclude that Ramos himself deployed tear gas in her vicinity in violation of her First Amendment rights.  Ratlieff has also failed to direct the Court to any case establishing the broader principle that a police officer who deploys tear gas into a crowd of partly violent and partly peaceful individuals violates the peaceful individuals' First Amendment rights.

[32]  The TAC advances five *Monell* claims in total (Counts II, IV, VI, VIII, and XV).  Given the Court has already concluded that Ratlieff cannot demonstrate a genuine dispute of material fact as to the alleged constitutional violations underlying Counts VI, VIII, and XV, *Monell* liability is resolved in the City's favor as to these counts.

(cleaned up) (quoting *Gold v. City of Miami,* 151 F.3d 1346, 1350 (11th Cir. 1998)); *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 403 (1997) (citing *Monell,* 436 U.S. at 694).

A plaintiff "has two methods by which to establish a county's policy: identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." *Grech*, 335 F.3d at 1329 (citing *Monell,* 436 U.S. at 690–91; *Brown v. Neumann*, 188 F.3d 1289, 1290 (11th Cir. 1999)). But "[b]ecause a county rarely will have an officially-adopted policy of permitting a particular constitutional violation, most plaintiff[s] . . . must show that the county has a custom or practice of permitting it and that the county's custom or practice is 'the moving force behind the constitutional violation.'" *Grech*, 335 F.3d at 1330 (citing *City of Canton,* 489 U.S. at 389).

Before turning to the merits of Ratlieff's specific *Monell* theories, the Court addresses two preliminary matters. First, it is undisputed that Defendant Maglione, the FLPD Chief of Police on May 31, 2020, was the final policymaker for FLPD's policing policies on that day. PSMF ¶ 107; *see* NRSMF ¶ 95. Second, the Court notes that Ratlieff moves for summary judgment as to Count IV, not Count II. But because there is a genuine dispute of material fact as to whether *any* Defendants violated Ratlieff's First Amendment rights, summary judgment in her favor is premature. In the § 1983 context, a plaintiff must first establish there is no genuine dispute of material fact as to the underlying constitutional violation before a court can grant summary judgment in plaintiff's favor as to *Monell* liability. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). But the reverse does not hold here: The Non-Ramos Defendants are entitled to summary judgment on *Monell* liability if Ratlieff is unable to demonstrate a genuine dispute of material fact as to one or more of the elements underlying her *Monell* claims.

With the above principles in mind, the Court now turns to address whether Ratlieff has demonstrated a genuine dispute of material fact as to the City's *Monell* liability on Counts II and IV.  The Court discerns two discrete *Monell* theories from Ratlieff's pleadings: (a) a ratification theory[33] and (b) a "so obvious" failure-to-train theory.[34]  After considering the record and the parties' arguments, the Court finds that Ratlieff has demonstrated a genuine dispute of material fact as to her "so obvious" failure-to-train theory, but not as to her ratification theory.  The Court addresses each theory below.

### a. Ratification

Ratlieff has failed to demonstrate a genuine dispute of material fact that the City's final policymakers ratified her alleged First Amendment violations.  As an alternative means of demonstrating a "custom or policy" for purposes of establishing *Monell* liability, "under certain

---

[33]  Ratlieff also initially suggested she intended to maintain her delegation theory at summary judgment.  *See* Ratlieff PMSJ at 22–23.  However, Ratlieff's subsequently filed response concedes she has abandoned this theory.  Ratlieff Combined Resp. at 17 ("[T]he Second Amended Complaint abandoned the delegation theory. Since the Police Chief gave the authorization himself, there was no delegation.").  Accordingly, the Court need only address Ratlieff's ratification theory.

[34]  Within the section of Ratlieff's motion claiming she is entitled to summary judgment on *Monell* liability as to the City, Ratlieff PMSJ at 21–23, she appears to maintain that FLPD failed to issue a dispersal order pursuant to a City policy in violation of Fla. Stat. § 870.04.  *See* Ratlieff PMSJ at 23.  As a threshold matter, there is a factual dispute as to whether the officers' less-lethal deployment violated Florida law.  But even if Ratlieff could demonstrate a violation of Florida law, *Monell* and its progeny concern whether a municipality can be held liable for violations of federal constitutional or federal statutory rights under § 1983.  And while *Monell* clearly permits a § 1983 plaintiff to travel under an official-policy theory, *see, e.g.*, *Grech*, 335 F.3d at 1329, § 1983 does not countenance *Monell* liability predicated upon a plaintiff's claim that an official policy caused a violation of *state* law.  *See* 42 U.S.C. § 1983; *West*, 487 U.S. at 48 ("To state a claim under § 1983, a plaintiff must allege the violation of a *right secured by the Constitution and laws of the United States*, and must show that the alleged deprivation was committed by a person acting under the color of state law." (emphasis added)).  Since neither the TAC nor Ratlieff's PMSJ advances any claim that an FLPD official policy or unofficial custom caused the violation of her *First Amendment rights*, the Court need not address whether Ratlieff has satisfied the elements necessary to sustain this species of *Monell* liability.  Thus, even if the Court views the factual record in the light most favorable to Ratlieff and concludes that FLPD violated Florida law by failing to issue a dispersal order, this would still be insufficient for Ratlieff to travel under a *Monell* official-policy theory of liability.  *See Grech*, 335 F.3d at 1329 ("Indeed, a [municipality] is liable only when the county's 'official policy' causes a *constitutional* violation." (emphasis added)).

circumstances, municipal liability may be imposed for a single decision by a municipal policymaker." *See Mandel*, 888 F.2d at 791–92 (citing *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 834 (1985) (Brennan, J., concurring in part and concurring in the judgment)); *Pembaur*, 475 U.S. at 480.  Two such "single-decision" theories arise when there has been either the delegation of final policymaking authority from one official to another or the ratification of a subordinate's actions by a final policymaker.  *See Mandel*, 888 F.2d at 791 (citing *Tuttle,* 471 U.S. at 834).[35]

"[A] municipality can be held liable 'on the basis of ratification when a subordinate public official makes an unconstitutional decision and [the] decision is then adopted by someone who does have final policymaking authority.'"  *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016) (citing *Matthews v. Columbia Cnty.,* 294 F.3d 1294, 1297 (11th Cir. 2002)).  Under a ratification theory predicated upon a single incident, as here, a plaintiff "must demonstrate that local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis before a court can hold the government liable on a ratification theory."  *Salvato v. Miley*, 790 F.3d 1286, 1296 (11th Cir. 2015) (citing *Thomas ex rel. Thomas v. Roberts,* 261 F.3d 1160, 1174 n.12 (11th Cir. 2001), *cert. granted, judgment vacated sub nom. Thomas v. Roberts,* 536 U.S. 953 (2002), *opinion reinstated,* 323 F.3d 950 (11th Cir. 2003)).  "Only when 'the authorized policymakers approve a subordinate's decision and the basis for it' have they 'ratified' that 'decision.'"  *Id.* at 1296 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality)).  "[I]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."  *Id.* at 1295 (quoting *Praprotnik*, 485 U.S. at 127) (finding plaintiff had

---

[35]  As noted above, Ratlieff initially advanced both a ratification and a delegation theory but has since abandoned the delegation theory.  Ratlieff Combined Resp. at 17 ("[T]he Second Amended Complaint abandoned the delegation theory. Since the Police Chief gave the authorization himself, there was no delegation.").

insufficently established ratification where plaintiff had not shown the sheriff reviewed or approved the decision and the basis for it before it became final).

As already noted, all agree that Defendant Maglione was an official FLPD policymaker on May 31, 2020.  Accordingly, for Ratlieff's ratification theory to survive summary judgment, she must show that, after viewing the record in the light most favorable to her, Maglione approved the subordinate(s) decision(s) that led to Ratlieff's alleged First Amendment violations, as well as the basis for the decision(s).  *See id.*

Ratlieff has failed to create a genuine dispute of material fact as to her ratification theory for two reasons.  First, the Court's review of the factual record confirms that Maglione was informed of the decision to deploy less-lethals at around 6:54 p.m.—after they had already been deployed—and further, that his decision was based on the representation that less-lethals were needed to support officer rescue.  *See* NRSMF ¶¶ 94–95; Plaintiff's Resp. to NRSMF ¶¶ 94–95. While Ratlieff maintains the officer rescue was a pretextual reason for FLPD's deployment of less-lethals, she has adduced no evidence to contest this justification as relayed to Chief Maglione to secure his approval *after* less-lethal deployment had already occurred.  NRSMF ¶ 95; Ratlieff Resp. to NRSMF ¶ 95.  And because all agree that Maglione was not present at the Intersection at any point from the time less-lethals were first deployed until the time Ratlieff was gassed and struck, there is no way he could ratify this decision based upon any basis other than what his subordinates relayed to him.  If subordinates intentionally lie or unintentionally mischaracterize the situation on the ground to gain final policymaker approval for an unconstitutional action, a final policymaker cannot be said to have actually ratified the violation for purposes of establishing *Monell* liability.

Second, Ratlieff has not presented any evidence that Chief Maglione continued approving the deployment of less-lethals from 7:01 p.m. to 7:07 p.m., a period during which all agree that Officer Hayes was no longer in need of rescue. And since this is also the period during which all agree Ratlieff's alleged First Amendment violations occurred, she has failed to demonstrate a genuine dispute of material fact that Maglione ratified the specific subordinate actions that led to her claimed First Amendment violations. *See Johnson v. City of San Jose*, No. 21-CV-01849-BLF, 2023 WL 7513670, at *15–16 (N.D. Cal. Nov. 11, 2023) (granting summary judgment on ratification theory where plaintiff did not point to evidence "that could create a material dispute of fact as to whether Chief Garcia or another official with final policy-making authority was aware that Officer Adgar had fired a 40mm PIW that hit Mr. Johnson and made a 'conscious, affirmative choice' to ratify the conduct."). Accordingly, summary judgment is warranted in the City's favor as to Ratlieff's ratification theory.

### b. *"So Obvious" Failure to Train*

Unlike her ratification theory, Ratlieff has demonstrated a genuine issue of material fact as to her "so obvious" failure-to-train theory under *Monell*. "A municipality can also be held liable under § 1983 when its employees cause a constitutional injury as a result of the municipality's policy- or custom-based failure to adequately train or supervise its employees." *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. City of Miami*, 637 F.3d 1178, 1188 (11th Cir. 2011) (citing *Gold*, 151 F.3d at 1350). But "[s]ince a municipality rarely will have an express written or oral policy of inadequately training or supervising its employees, the Supreme Court has further explained that a plaintiff may prove a city policy by showing" that a municipality's "'inadequacy of police training . . . amounts to deliberate indifference to the rights of persons with whom the police come into contact[.]'" *Gold*, 151 F.3d at 1350 (quoting *City of Canton*, 489 U.S. at 388–

89).  Alternatively stated, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *Am. Fed'n of Lab.*, 637 F.3d at 1188 (cleaned up) (quoting *City of Canton*, 489 U.S. at 388).  Thus, a plaintiff can hold a municipality liable under this theory "where the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights."  *Gold*, 151 F.3d at 1350 (citing *City of Canton*, 489 U.S. at 389–91; *Bryan Cnty.*, 520 U.S. at 407–08; *Kerr v. City of West Palm Beach,* 875 F.2d 1546, 1555 (11th Cir. 1989)).

To prevail on her "so obvious" failure-to-train theory, Ratlieff needs to establish that (i) her First Amendment rights were violated; (ii) FLPD had a policy of failing to train officers in crowd control techniques with less-lethal weapons constituting deliberate indifference to First Amendment rights; and (iii) FLPD's failure-to-train policy caused the violation of Ratlieff's First Amendment rights.  *See Gold*, 151 F.3d at 1350; *Favors v. City of Atlanta*, 849 F. App'x 813, 817–22 (11th Cir. 2021).

### i.  *Violation of First Amendment Rights*

As explained above, there is a genuine dispute of material fact as to whether FLPD violated Ratlieff's First Amendment rights.  The Court accordingly proceeds directly to consider whether FLPD's purported failure to train in this context constituted a policy or custom of deliberate indifference.

### ii.  *"So Obvious" Deliberate Indifference*

Ratlieff has demonstrated a genuine dispute of material fact as to whether FLPD had a policy of failing to train officers in crowd control techniques with less-lethal weapons constituting

deliberate indifference to First Amendment rights.  To establish a municipality's "deliberate indifference," a plaintiff must both (1) put forward some evidence that the municipality was aware of the need to train or supervise its employees in a particular area and (2) establish the municipality "made a deliberate choice" not to train its employees in that area.  *See Am. Fed'n of Lab.*, 637 F.3d at 1188–89; *Gold*, 151 F.3d at 1350–51 (collecting cases) ("To establish a 'deliberate or conscious choice' or such 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action.").

As to the notice requirement, "[e]stablishing notice of a need to train or supervise is difficult."  *Id.* at 1189.  "A plaintiff may demonstrate notice by showing a 'widespread pattern of prior abuse' or even a single earlier constitutional violation."  *Id.* (quoting *Gold*, 151 F.3d at 1351).  "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train."  *Connick v. Thompson*, 563 U.S. 51, 62 (2011).  But both the Supreme Court and the Eleventh Circuit have also acknowledged that, in some cases, a need to train municipal employees may be "so obvious" that the municipality could still face *Monell* liability even without a pattern of prior constitutional violations.  *See Gold*, 151 F.3d at 1351–52 (citing *City of Canton*, 489 U.S. at 390; *Bryan Cnty.,* 520 U.S. at 409; *Am. Fed'n of Lab.*, 637 F.3d at 1189); *Weiland v. Palm Beach Cnty.*, 792 F.3d 1313, 1329 (11th Cir. 2015) (noting "that evidence of previous incidents is not required to establish city policy if the need to train and supervise in a particular area is "so obvious" that liability attaches for a single incident." (citation omitted)).

In *Bryan Cnty.*, the Supreme Court elaborated upon this "so obvious" failure-to-train basis for *Monell* liability as follows:

> [I]n a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable.

520 U.S. at 409–10; *see also J.K.J. v. Polk County*, 960 F.3d 367, 380 (7th Cir. 2020) (explaining the Supreme Court "reinforced . . . [this] doorway to *Monell* liability . . . in *Bryan County,* [and] confirmed . . . the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability . . . [and] 'in a narrow range of circumstances,' deliberate indifference could be found when the violation of rights is a 'highly predictable consequence' of a failure to provide officers what they need to confront 'recurring situations.'" (quoting *Bryan Cnty.*, 520 U.S. at 409)).

Several years earlier in *City of Canton*, the Supreme Court offered the following hypothetical example of the kind of training deficiency that could rise to this level:

> For example, city policymakers know . . . that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

489 U.S. at 390 n.10 (citations omitted).  And "more recently, in *Connick*, the Court renewed its prior observations that *City of Canton* 'sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could

be liable under § 1983 without proof of a pre-existing pattern of violations.'"  *J.K.J.*, 960 F.3d at 380 (quoting *Connick*, 563 U.S. at 64); *see also Vielma v. Gruler*, 808 F. App'x 872, 882 (11th Cir. 2020) (explaining that the Supreme Court in *Connick* "reasserted the possibility that 'single-incident' liability could attach to a municipality 'in a narrow range of circumstances' where there was an 'obvious need for specific legal training,' regardless of the absence of prior similar incidents." (quoting *Connick*, 563 U.S. at 63–64)).

Given that FLPD is a relatively large police department located in a major metropolitan area, crowd control with less-lethal weapons presents precisely the kind of highly predictable scenario likely to reoccur in which "officer[s] lacking specific tools to handle that situation will violate citizens' rights" such that a jury would be justified in "finding that policymakers' decision not to train the officer[s] reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right." *Bryan Cnty.*, 520 U.S. at 409.  Here, policymakers for a city of nearly 200,000 people have armed their police with military-grade less-lethal weapons with the high likelihood that they will be regularly required to manage crowds—including individuals exercising their constitutionally protected speech and assembly rights.

The Non-Ramos Defendants argue that the record evidence is insufficient to establish that the need to train officers in the above-mentioned skills was "so obvious" that municipal liability should attach without any evidence of prior incidents.  *See* Non-Ramos MSJ at 20.  In support of this argument, the Non-Ramos Defendants cite *Johnson*, 2023 WL 7513670, at *15.  Apart from its sparse analysis regarding the specific question of when a need for training is "so obvious" that failure to do so constitutes deliberate indifference, *Johnson* is also distinguishable for two additional reasons.

First, in *Johnson*, officers had been trained to use less-lethals and plaintiff appeared to complain only about the fact that officers were not specifically trained to use less-lethals to handle large crowds. *See id.* at *1–2. Here, on the other hand, Ratlieff complains of FLPD's failure to train officers deploying less-lethals *in handling large crowds while also wearing gas masks*, a key distinction given that Ratlieff's most serious injuries resulted from Ramos's missed shot while wearing a gas mask—a task which all agree Ramos had not performed since SWAT school in 2016 and that FLPD had not trained him to perform at any time. Second, the defendant-officers in *Johnson* adduced a series of detailed facts concerning their training requirements and the relevant department policies governing crowd control with less-lethals. *See id.* In this case, however, FLPD's own policies governing crowd control and dispersal orders—which officers claimed to rely upon to justify the conduct leading up to Ratlieff's injuries—contain serious ambiguities and potential constitutional infirmities that did not appear to be present in *Johnson*. Thus, *Johnson* is inapposite.

FLPD's own policies, coupled with record evidence of their failure to adequately train officers deploying less-lethals, also distinguishes this case from those in which the Eleventh Circuit has affirmed the entry of summary judgment pursuant to a "so obvious" failure-to-train theory under *Monell*. In *Lewis v. City of W. Palm Beach*, 561 F.3d 1288 (11th Cir. 2009), the Eleventh Circuit addressed whether a city was liable for its alleged failure to train officers in the use of hobbles, or four-point restraints. There, the Court concluded that "the application of a hobble does not rise to the level of obviousness reserved for a 'narrow range of circumstances [where] a violation of federal rights may be a highly predictable consequence' of a failure to provide adequate training." *Id.* at 1293 (quoting *Bryan Cnty.*, 520 U.S. at 409). But in reaching this conclusion, the Court in *Lewis* noted that the record contained evidence "showing that [the

city] actually *did provide adequate training* on the use of the four-point restraint." *Id.* (emphasis added) (explaining that where a city has a training program, "the focus must be on the adequacy of the training program in relation to the tasks the officers must perform, and not merely on the training deficiencies for a particular officer."). Similarly, in *Mingo v. City of Mobile*, 592 F. App'x 793 (11th Cir. 2014), the Eleventh Circuit concluded the record "containe[d] evidence that the City . . . provid[ed] its officers with constitutionally adequate training in the use of the four-point restraint and the treatment of the mentally ill." *Id.* at 804.

Here, the record is rife with issues of fact concerning whether FLPD provided adequate training similar to that afforded by the cities in *Lewis* and *Mingo*. Further, the use of less-lethals in crowd-control scenarios—while certainly not as "extreme" as the example of firearms in *City of Canton*—does possess "the same potential flagrant risk of constitutional violations" and failure to provide adequate training in this regard is thus a "glaring omission" in FLPD's training regimen. *See Lewis*, 561 F.3d at 1293. Given this "high probability for constitutional violations in the manner intended by the 'so obvious' notice," FLPD has opened the door to municipal liability. *See id.* The instant record supports notice to the City based upon a theory of single-incident liability as "the risk of constitutional violation is so obvious or foreseeable that it amounts to deliberate indifference for the [C]ity to fail to prepare officers for it." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 287 (6th Cir. 2020) (citing *Connick*, 563 U.S. at 63); *see also Valdez v. MacDonald*, 66 F.4th 796, 815–16 (10th Cir. 2023) (noting single-incident failure-to-train municipal liability under *City of Canton* where "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.") (quoting *Bryan Cnty.*, 520 U.S. at 409)).

To be sure, "[n]otice alone is insufficient to establish deliberate indifference." *Yancey v. Tillman*, 696 F. Supp. 3d 1310, 1327–28 (N.D. Ga. 2023). To satisfy the deliberate-indifference prong, Ratlieff must present facts indicating the City made a "deliberate choice not to train its employees." *Id.* (citing *Gold*, 151 F.3d at 1350); *Am. Fed'n of Lab.*, 637 F.3d at 1189; *Favors*, 849 F. App'x at 818 ("[O]ur next task is to determine whether the municipality made a deliberate choice not to take any action despite that notice."). Here, as to the "deliberate-choice" requirement, Ratlieff has also established a genuine issue of material fact. Specifically, the Court's review of the record indicates serious deficiencies in FLPD's training program with respect to officers' use of less-lethal weapons in real world scenarios.

Particularly relevant are the record discrepancies concerning where on the subject's body FLPD trained its officers to aim KIPs, *see* Ratlieff Resp. to NRSMF at ¶¶ 128–129; Non-Ramos Reply in Supp. of NRSMF ¶¶ 128–129, along with the agreed-upon fact that Ramos had not received training on handling crowds armed with a 40mm KIP launcher while wearing a gas mask *at all* since attending SWAT school in 2016. This latter concession is particularly problematic given that the Non-Ramos Defendants have also stated that FLPD requires SWAT members "to train monthly" and sometimes up to 2 to 3 times per month. These omissions from the SWAT training program thus appear to qualify as precisely the kind of policymakers' "deliberate choice" that a plaintiff must show in this context. Given that FLPD is ostensibly requiring SWAT to train frequently in other skillsets, FLPD appears to have necessarily made the decision *not* to train SWAT members on how to handle crowds using less-lethals.

FLPD also proffers sparse historical evidence of department-wide training on the use of less-lethals in crowd control situations. For example, the Non-Ramos Defendants cite to their own AAR on the May 31, 2020 demonstrations for the proposition that FLPD "field force training was

scheduled for the 2020 annual block training . . . [but] all training blocks were postponed due to COVID-19 exposure concerns."  NRSMF ¶ 87 (citing AAR, [ECF No. 148-1] at 21).  Prior to that, the parties agree the last department-wide field force training occurred in 2017.  Non-Ramos Resp. to PSMF ¶ 181 (citing [ECF No. 148-1] at 21).  However, the Non-Ramos Defendants have provided no detail as to what exactly this "field force training" entailed, nor have they advanced any other evidence of department-wide training in crowd control techniques with less-lethal weapons.  Finally, as outlined at length in the background section above, the conspicuous lack of professionalism among FLPD officers deploying less-lethals on May 31, 2020—captured both on BWC and bystander video—provides additional evidence of FLPD officers' inadequate training to handle crowds with such weapons.

In opposition to Ratlieff's claim that FLPD made a deliberate choice not to train officers to handle crowd control with less-lethal munitions, the Non-Ramos Defendants point to the 80 hours of training that Ramos received at SWAT school, as well as FLPD's monthly SWAT training requirements.  "But the Eleventh Circuit has cautioned district courts against reliance on the number of training hours an officer received overall when analyzing whether a municipality's actions were deliberate."  *Yancey*, 696 F. Supp. 3d at 1328 (citing *Favors*, 849 F. App'x at 819). And given that FLPD, as a subdivision of the City, admittedly did not train Ramos to handle crowds using less-lethals, the 80 hours of training he received at SWAT school and his monthly SWAT training in other skillsets appears to hurt FLPD's argument on this point more than help it. Thus, Ramos's "testimony raises questions about the adequacy of the city's training." *Favors*, 849 F. App'x at 818–19 (noting police officer's testimony on his lack of training "raises questions about the adequacy of the City's training.").

### iii. Causation

Finally, Ratlieff has demonstrated a genuine dispute of material fact concerning whether FLPD's failure-to-train policy caused violations of Ratlieff's First Amendment rights.  "The causation prong asks whether the injury would have been avoided 'had the employee been trained under a program that was not deficient in the identified respect.'"  *Favors*, 849 F. App'x at 821 (quoting *Canton*, 489 U.S. at 391).  "In a failure-to-train case, 'the identified deficiency in a city's training program must be closely related to the ultimate injury.'"  *Id.* (quoting *Canton*, 489 U.S. at 391) (explaining the role of the factfinder in determining the element of causation)).  The Eleventh Circuit has further "held that a single constitutional violation may establish municipal liability when there is 'sufficient independent proof that the moving force of the violation was a municipal policy or custom.'"  *Id.* (citing *Vineyard v. County of Murray*, 990 F.2d 1207, 1212 (11th Cir. 1993) (per curiam) (affirming judgment against county for failure to train in light of expert opinion that municipality's efforts to address excessive force incidents—separate from whatever policies it had on the books—were inadequate)).  And in *City of Canton*, the Supreme Court described the causation prong as follows:

> Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect? Predicting how a hypothetically well-trained officer would have acted under the circumstances may not be an easy task for the factfinder, particularly since matters of judgment may be involved, and since officers who are well trained are not free from error and perhaps might react very much like the untrained officer in similar circumstances. But judge and jury, doing their respective jobs, will be adequate to the task.

489 U.S. at 391.  Thus, it appears the Supreme Court anticipated that causation ordinarily cannot be determined at summary judgment.  *See Yancey*, 696 F. Supp. 3d at 1331 (citing *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 29 (1st Cir. 2005) (recognizing causation as a jury

question)). Finally, "[a] high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." *Bryan Cnty.*, 520 U.S. at 409–10.

Here, viewing the facts in the light most favorable to Ratlieff, the Court concludes that she has presented more than enough evidence to support the inference that FLPD's training deficiencies caused her alleged First Amendment violations. Apart from the record evidence of training deficiencies and the predictability of this situation recurring—which can itself support an inference of causation, *see id.*—Ratlieff has also offered three expert reports supporting her claim that FLPD did not adequately train its officers in crowd management with less-lethal weapons and that these failures caused her alleged First Amendment violations. *See* [ECF No. 127-5]; [ECF No. 156-4]; [ECF No. 156-44]. And the Eleventh Circuit has "indicate[d] that this kind of expert testimony can create a genuine dispute of material fact." *Favors*, 849 F. App'x at 821 (citing *Vineyard*, 990 F.2d at 1209–13 (affirming jury's verdict against municipality after plaintiff's expert testified at trial that county's lack of adequate training and supervision allowed abuses like the one plaintiff suffered to occur and that plaintiff's expert opinion provided an adequate basis for the jury to find causation)). Accordingly, after "[d]rawing reasonable inferences in [Ratlieff's] favor," the Court finds that she has "set forth specific facts showing that there is a genuine issue for trial" regarding causation. *See Anderson*, 477 U.S. at 248.

In sum, based upon the foregoing analysis regarding each of Ratlieff's theories of *Monell* liability, summary judgment is warranted in the City's favor as to Ratlieff's ratification theory—but not as to her "so obvious" failure-to-train theory. The Court is acutely aware that liability under such a theory remains rare. The risk of the constitutional violation must be foreseeable in such a way that it amounts to deliberate indifference when the municipality fails to prepare their

officers for it.  *See Connick*, 563 U.S. at 63.   But viewing the facts in the light most favorable to the non-movant, the Court finds that deliberate indifference and causation present factual questions that should be decided by a jury.

### III.  STATE LAW TORT CLAIMS

The Court now turns to address Ratlieff's five state-law claims.  Count IX brings a state-law battery claim against Ramos, Cristafaro, Greenlaw, Figueras, Dietrich, MacDoughall, and John Does 1–3; Count X brings a state-law battery claim against the City; Count XI brings a state-law claim for Negligent Use of Direct Impact Munitions and Chemical Munitions against the City; Count XII brings a state-law claim for Negligent Use of Direct Impact Munitions against Ramos; and Count XIII brings a state-law claim for Negligent Use of Chemical Munitions against John Doe 1.  The Court first addresses the overarching sovereign and statutory immunity principles governing state-law claims brought against municipalities and police officers before turning to address the parties' summary judgment arguments.  And after applying the law to the undisputed facts, the Court concludes that each individual Defendant is entitled to summary judgment on Ratleiff's state-law battery-and-negligence claims, but issues of fact persist that preclude summary judgment as to Ratlieff's negligence-and-battery claims against the City.

### A.  Florida's Sovereign-and-Statutory Immunity Scheme

"Florida municipalities and municipal agencies enjoy sovereign immunity." *Fluid Dynamics Holdings, LLC v. City of Jacksonville*, 752 F. App'x 924, 925 (11th Cir. 2018) (citing *Cauley v. City of Jacksonville*, 403 So. 2d 379, 384 (Fla. 1981)); *Jetton v. Jacksonville Electric Authority*, 399 So. 2d 396, 398 (Fla. 1st DCA 1981)).  "In Florida, sovereign immunity is the rule, rather than the exception." *Strong v. City of Naples*, No. 2:22-CV-318-KCD, 2022 WL 14029702, at *1 (M.D. Fla. Oct. 24, 2022) (quoting *Pan-Am Tobacco Corp. v. Dep't of Corr.*, 471 So. 2d 4,

5 (Fla. 1984)).  However, "[t]he Florida legislature has waived sovereign immunity from tort suits to the extent set out in Fla. Stat. § 768.28."  *Id.*  "This waiver extends to any state 'agencies or subdivisions,' defined to include counties and municipalities[.]" *Id.* (citing § 768.28(1), (2)). Relevant here, § 768.28(9)(a) provides:

> The exclusive remedy for injury or damage suffered as a result of an act, event, or omission of an officer, employee, or agent of the state or any of its subdivisions or constitutional officers is by action against the governmental entity, or the head of such entity in her or his official capacity, or the constitutional officer of which the officer, employee, or agent is an employee, unless such act or omission was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. The state or its subdivisions are not liable in tort for the acts or omissions of an officer, employee, or agent committed while acting outside the course and scope of her or his employment or committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

Fla. Stat. § 768.28(9)(a) (2024) (emphasis added).

Thus, the general rule under § 768.28 is that Florida and its subdivisions, which includes municipalities like the City of Fort Lauderdale, may be held liable for the acts of their employees, unless "such [an] act or omission was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." *See Moore v. Miami-Dade Cnty.*, 502 F. Supp. 2d 1224, 1235 (S.D. Fla. 2007) (quoting Fla. Stat. § 768.28(9)(a)); s*ee also McGhee v. Volusia County,* 679 So. 2d 729, 733 (Fla. 1996).  And critically, "Florida courts have explicitly held that section 768.28 does not immunize a governmental entity from liability for the intentional torts of its employees committed in the course and scope of their employment where the act or conduct does not involve bad faith or malicious purpose, nor was [] committed in a manner exhibiting a wanton and willful disregard of human rights, safety, or property." *Bickel v. City of Coral Springs*, No. 17-60606, 2017 WL 2439078, at *5 (S.D. Fla. June

6, 2017) (cleaned up) (quoting *Jones v. City of Orlando*, No. 6:11-cv-1681-Orl-19KRS, 2012 WL 12904725, at *9 (M.D. Fla. Nov. 16, 2012)); *see also Richardson v. City of Pompano Beach*, 511 So. 2d 1121, 1122 (Fla. 4th DCA 1987).

Sovereign immunity—which shields the State of Florida and its subdivisions from liability unless otherwise waived—can be distinguished from so-called "statutory immunity," which similarly shields Florida's officers, employees, and agents from liability unless otherwise waived, as enumerated in the same statute, Fla. Stat. § 768.28.  *See Eiras v. Fla.*, 239 F. Supp. 3d 1331, 1343 (M.D. Fla. 2017) (referring to this type of immunity as "statutory immunity"); *Brown v. McKinnon*, 964 So. 2d 173, 175 (Fla. 3d DCA 2007) (same).  Relevant here, § 768.28(9)(a) also provides:

> An officer, employee, or agent of the state or of any of its subdivisions may not be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

Fla. Stat. § 768.28(9)(a).  Alternatively stated, statutory immunity "may be pierced only if state [or municipal] agents either act outside the scope of their employment, or act 'in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.'"  *Eiras*, 239 F. Supp. 3d at 1343 (citing Fla. Stat. § 768.28(9)(a)).

Viewing these provisions as an interconnected whole, § 768.28(9)(a) thus "creates a bifurcated tort liability scheme for public entities and their employees.  Suits may proceed against an employee only if he (i) acted outside the course and scope of his employment, or (ii) committed a tort 'in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.'"  *Strong*, 2022 WL 14029702, at *2 (quoting *Cauley*, 403

So. 2d at 384).  "In all other circumstances, the case must proceed against the public agency where the employee works."  *Id.* (citing *Ullman v. Fla. Dep't of Corr.*, No. 5:17-CV-66-OC-30PRL, 2017 WL 2103392, at *2 (M.D. Fla. May 15, 2017)).  "The effect of § 768.28(9)(a) is two mutually exclusive outcomes: 'In any given situation either the agency is liable under Florida law, or the employee, but not both.'"  *Id.* (alterations accepted) (quoting *McGhee*, 679 So. 2d at 733).  State officers, employees, or agents are entitled to statutory immunity when acting within the scope of their employment and without bad faith, malice, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.  *See id.* (citing *Ullman*, 2017 WL 2103392, at *2). Conversely, the state entity is entitled to sovereign immunity where the employee acts outside the scope of employment or when he or she acts with bad faith, malice, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.  *Id.* (citing *Ullman*, 2017 WL 2103392, at *2).  Finally, "sovereign immunity can be decided as a matter of law when the facts compel that outcome."  *Id.* (citing *Terry v. Rodriguez*, No. 09-23726, 2010 WL 2342382, at *2 (S.D. Fla. June 7, 2010)).

### B.  State-Law Claims Against Individual Officers (Counts IX, XII, XIII)

Each individual Defendant is entitled to summary judgment in his favor as to Ratlieff's state-law claims.  As noted above, "an officer . . . of the state or of any of its subdivisions may not be held personally liable in tort  . . . for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, *unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.*"  Fla. Stat. § 768.28(9)(a) (emphasis added). And relatedly, Fla. Stat. § 776.06(2), titled "Deadly force by a law enforcement or correctional officer," provides:

(a) The term 'deadly force' does not include the discharge of a firearm by a law enforcement officer or correctional officer during and within the scope of his or her official duties which is loaded with a less-lethal munition. As used in this subsection, the term "less-lethal munition" means a projectile that is designed to stun, temporarily incapacitate, or cause temporary discomfort to a person without penetrating the person's body.

(b) *A law enforcement officer or a correctional officer is not liable in any civil or criminal action arising out of the use of any less-lethal munition in good faith during and within the scope of his or her official duties.*

Fla. Stat. § 776.06(2) (emphasis added).

The parties agree that the individual officers were acting within the scope of their employment. Accordingly, the Court proceeds directly to the question of whether any officer "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property" as required to pierce an officer's statutory immunity. *See* Fla. Stat. § 768.28(9)(a).

Here, the individual Defendants, all of whom are FLPD police officers,[36] are immune from civil liability under both § 768.28(9)(a) and § 776.06(2). This is so because Ratlieff concedes no individual Defendant acted in a manner that would pierce their statutory immunity. Specifically, Ratlieff explicitly states that no individual Defendant acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. *See* Ratlieff PMSJ at 3 ("There are no disputed issues of fact that the individual defendants committed a battery and were acting within the scope of their employment and without bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety,

---

[36] All individual Defendants thus qualify as "officers of the State or its subdivisions" pursuant to § 768.28(9)(a).

or property."); Ratlieff PMSJ at 29 (citing PSMF ¶¶ 84–85, 121–22, 128–47) ("There are no disputed issues of material fact that the defendants were acting inside the scope of their employment and were not acting in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." (record citations omitted)). Accordingly, the state-law claims against the individual Defendants cannot proceed. Summary judgment is therefore warranted in favor of Ramos, Cristafaro, Greenlaw, Figueras, Dietrich, MacDoughall as to Count IX and to Ramos as to Count XII.[37]

### C.  State-Law Claims Against City (Counts X–XI)

As already explained above, Ratlieff concedes the individual Defendants were not acting maliciously or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.  Therefore, her exclusive remedy is to proceed against the City itself.  *See* Fla. Stat. § 768.28(9)(a).  But a city can only act through its officers, employees, and agents.  Thus, the FLPD officers' conduct remains relevant to determining whether there is a genuine issue of material fact as to Ratlieff's state-law claims against the City.

#### 1.  Negligence Claim Against City (Count XI)

Neither Ratlieff nor the Non-Ramos Defendants move for summary judgment as to the negligence claim against the City.  This claim must therefore be submitted to the jury for resolution.  The Court accordingly proceeds to the battery claim against the City.

#### 2.  Battery Claim Against City (Count X)

There is a genuine dispute of material fact as to whether the City is liable for civil battery against Ratlieff.  As noted above, "Florida courts have explicitly held that section 768.28 does not immunize 'a governmental entity from liability for the intentional torts of its employees committed

---

[37]  This again constitutes separate grounds for summary judgment in favor of John Does 1–3 as to Count IX and in favor of John Doe 1 as to Count XIII.

in the course and scope of their employment where the act or conduct does not involve bad faith

or malicious purpose, nor was [] committed in a manner exhibiting a wanton and willful disregard

of human rights, safety, or property.'"  *Bickel*, 2017 WL 2439078, at *5 (cleaned up) (quoting

*Jones*, 2012 WL 12904725, at *9).

There are two elements to battery under Florida law: (1) "intent to cause a harmful or

offensive contact" and (2) "a resulting 'offensive contact with the person of [another].'"  *Baxter v.

Roberts*, 54 F.4th 1241, 1272 (11th Cir. 2022) (cleaned up) (quoting *City of Miami v. Sanders*, 672

So. 2d 46, 47 (Fla. 3d DCA 1996)).  As to the first element, "[t]o establish the required intent to

commit battery, the plaintiff must show that defendant exhibit[ed] a deliberate intent to injure or

engage[d] in conduct . . . substantially certain to result in injury."  *Rubio v. Lopez*, 445 F. App'x

170, 175 (11th Cir. 2011) (citing *D'Amario v. Ford Motor Co.,* 806 So. 2d 424, 438 (Fla. 2001)).

And in Florida "[t]here is no difference between the tort of battery and the crime of battery."

*Swindell v. Hunter*, No. 3:15-cv-1532-J-25JBT, 2019 WL 1297207, at *4 (M.D. Fla. Mar. 21,

2019) (quoting *Mason v. Fla. Sheriffs*' *Self-Insurance Fund*, 699 So. 2d 268, 270 n.1 (Fla. 5th

DCA 1997)).  Accordingly, courts evaluating civil battery claims may look to the criminal

analogue for guidance.  *See id.*  And under Florida criminal law, a person commits battery when

he or she "[a]ctually and intentionally touches or strikes another person against the will of the

other" or "[i]ntentionally causes bodily harm to another person."  Fla. Stat. § 784.03(1)(a).

Finally, "[t]he doctrine of transferred intent transfers the defendant's intent as to the

intended victim to the unintended victim."  *S.G. v. State*, 29 So. 3d 383, 385 (Fla. 5th DCA 2010)

(citing *Mordica v. State,* 618 So. 2d 301, 304 (Fla. 1st DCA 1993)).  This doctrine "has

traditionally been applied in homicide cases as a means of holding a defendant criminally

responsible for premeditation or intent to commit murder that results in the death of another

person." *Sagner v. State*, 791 So. 2d 1156, 1157–58 (Fla. 4th DCA 2001) (collecting cases). "As the Florida Supreme Court observed in *Provenzano*, '[t]he usual case involving the doctrine of transferred intent is when a defendant aims and shoots at A intending to kill him but instead misses and kills B.'" *Id.* (citing *Provenzano v. State*, 497 So. 2d 1177, 1180 (Fla. 1986)). But Florida courts "have also applied the doctrine of transferred intent in aggravated battery prosecutions when a blow intended for one victim struck another." *Id.* at 1158 (collecting cases).

The key legal question here is whether the doctrine of transferred intent can be applied in the civil battery context. The Court has identified no Florida civil case extending the doctrine of transferred intent in this way. *See* 1 Florida Torts § 20.03 (2024). But at least one Florida District Court of Appeal has explicitly suggested that transferred intent is applicable in the civil battery context, and such an application does not appear incompatible with Florida law. *See, e.g.*, *City of Winter Haven v. Allen*, 541 So. 2d 128, 137–38 (Fla. 2d DCA 1989) ("Finally, Prosser tells us that in order to subject a defendant to liability for a battery, the act of the defendant must cause and be *intended to cause an unpermitted contact* . . . Thus, if Clouse's action was justifiable, the original intent here was not wrongful, no intentional tort was committed and there would be no wrongful intent to be transferred.").

Looking beyond Florida, the transferred intent doctrine has been regularly applied in civil assault and battery cases in other jurisdictions. *See generally* 8 American Law of Torts § 26:6 (2024); *see also Rodriguez v. City of Fresno*, 819 F. Supp. 2d 937, 953 (E.D. Cal. 2011); *Baska v. Scherzer*, 156 P.3d 617, 622–24 (Kan. 2007); *Keel v. Hainline*, 331 P.2d 397, 399 (Okla. 1958). And in *Rodriguez*, a federal court applied this doctrine specifically in the context of a civil battery claim brought against a police officer who intended to shoot a suspect but accidentally shot a

bystander instead.  *See* 819 F. Supp. 2d at 953.  In declining to grant summary judgment in the defendant-officer's favor, the *Rodriguez* court reasoned:

> Under the doctrine of transferred intent, the viability of a claim of battery by a bystander against a police officer turns on the reasonability of the application of force by the police officer against the intended suspect . . . [I]n the presence of conflicting evidence, the court cannot find that Chavez's decision to employ deadly force against Hernandez was reasonable as a matter of law. *Although the court can find no evidence that affirmatively indicates Chavez targeted Plaintiff in order to shoot Hernandez, the court may not find for Defendants on Plaintiff's battery claim because the court cannot rule out the possibility that a jury could find that Chavez unreasonably used lethal force against Hernandez.* Summary judgment as to Plaintiff's claim for battery is therefore not warranted.

*Id.* (emphasis added) (citations omitted).  The Court agrees with the reasoning in *Rodriguez*.  And given that in Florida, "[t]here is no difference between the tort of battery and the crime of battery," *Swindell*, 2019 WL 1297207, at *4, the Court concludes that Florida law permits the application of transferred intent to the civil battery context.[38]

Considering the above principles, neither Ratlieff nor the City is entitled to summary judgment as to Count X.  Specifically, significant material and genuine issues of fact remain as to whether FLPD officers—as officers of the City and acting on the City's behalf—intentionally and unreasonably deployed less-lethal munitions given the circumstances.

---

[38] It bears acknowledging that unlike *Rodriguez*, which involved deadly force, this case involves an alleged battery effectuated by less-lethal force. And under Fla. Stat. § 776.06(b), "[a] law enforcement officer or a correctional officer is not liable in any civil or criminal action arising out of the use of any less-lethal munition in good faith during and within the scope of his or her official duties." Accordingly, under Florida law, a police officer acting in good faith during and within the scope of his or her official duties who deploys less-lethal force and accidentally misses cannot be held liable for civil battery under a transferred intent theory. But this provision is essentially a restatement—in the context of less-lethal munitions—of the broader statutory immunity principle codified at § 768.28(9)(a), since an officer acting within the scope of his or her employment in good faith cannot be held personally liable in tort regardless. But since Count X is not brought against the individual Officer-Defendants, § 776.06(b) does not alter the Court's conclusion as to the applicability of the transferred intent doctrine to Ratlieff's battery claim against the City.

With regards to the tear gas deployment, Ratlieff has demonstrated a genuine dispute of material fact as to whether *any* FLPD officers, not just the individual named Defendants, intentionally and unreasonably targeted her with tear gas in a manner unjustified by the circumstances.  There is strong—albeit circumstantial—record and video evidence that FLPD officers, both identified and unidentified,[39] did exactly that.  And as to Ratlieff's argument in favor of summary judgment, the City has also demonstrated a genuine dispute of material fact viewing the record in the light most favorable to the City.  For example, a reasonable jury could also find that officers' deployment of tear gas from 7:01 p.m. to 7:07 p.m, when Ratlieff was at the Intersection, was neither intentionally directed at Ratlieff nor unreasonable under the circumstances.

The same is true with respect to Ramos's KIP shot.  Specifically, there remains a genuine dispute of material fact as to whether Ramos's decision to fire a KIP shot at the individual who had just thrown a tear gas canister was justified under the circumstances. For example, a reasonable jury might find—given BWC confirms the tear gas canister fell several feet in front of the skirmish line and officers were carrying shields and wearing both body armor and gas masks—that the canister posed no actual threat to officers.  A reasonable jury might thus conclude that Ramos had no justification under the circumstances for intentionally shooting a KIP at the unknown individual who had thrown the canister.  In that case, transferred intent would function to make the City liable to Ratlieff based upon an unjustified, intentional KIP shot, even though the shot was aimed at someone else.  *See Rodriguez*, 819 F. Supp. 2d at 953.

But a reasonable jury might also determine that Ratlieff was in a conspicuously dangerous place where certain individuals among the crowd were committing ongoing acts of violence

---

[39] *E.g.*, John Does 1–3.

against police.  Consequently, the jury might find that police were responding reasonably with tear gas to defend themselves and deploying KIPs to deter additional acts of violence.  And given this danger, a reasonable jury might accordingly conclude that Ramos's shot was a justified act of officer protection and deterrence.  The record thus presents a quintessential fact question as to whether Ramos's KIP shot at the unknown individual was reasonable under the circumstances.  If it was, then transferred intent is entirely inapplicable.  If it was not, then the doctrine of transferred intent permits Ratlieff to hold the City liable for civil battery.  *See id.*

In sum, a reasonable jury may or may not find that the City, via FLPD's KIP and tear gas deployment from 7:01 p.m. to 7:07 p.m., committed a civil battery against Ratlieff.  The factual record in the light most favorable to the non-movant supports either interpretation and must be left to the province of the jury.  Accordingly, summary judgment as to Count X is unwarranted in favor of either Ratlieff or the City.

## **CONCLUSION**

There is no question that on May 31, 2020, the clash between police and protestors implicated Latoya Ratlieff's First Amendment rights.  But as explained herein, qualified and statutory immunity extinguish liability as to all officers.  However, a jury will determine whether the City of Fort Lauderdale is liable for Ratlieff's injuries through its policies, procedures, and officers' conduct.  For the foregoing reasons, [ECF No. 159] is **DENIED** and [ECF Nos. 146, 160] are **GRANTED IN PART** and **DENIED IN PART** as follows:

1. Summary Judgment is **GRANTED** in favor of all individual Defendants as to Count I (First Amendment Restriction) and Count III (First Amendment Retaliation).

2. Summary Judgment is **DENIED** as to Count II (First Amendment Restriction) and Count IV (First Amendment Retaliation) against the City of Fort Lauderdale under Ratlieff's failure-to-train *Monell* theory only.  Summary Judgment is **GRANTED** as to Ratlieff's ratification theory on both Counts.

3. Summary Judgment is **GRANTED** in favor of **all** Defendants as to Counts V–VI, (Fourteenth Amendment Substantive Due Process); Counts VII–VIII (Fourth Amendment Excessive Force); and Counts XIV–XV (Fourteenth Amendment Procedural Due Process).

4. Summary Judgment is **GRANTED** in favor of Ramos, Cristafaro, Greenlaw, Figueras, Dietrich, MacDoughall, and John Does 1–3 as to Count IX (state-law Battery); in favor of Ramos as to Count XII (state-law Negligence); and in favor of John Doe 1 as to Count XIII (state-law Negligence).

5. Summary Judgment is **DENIED** as to Count X (state-law Battery) against the City of Fort Lauderdale.

6. Pursuant to Federal Rule of Civil Procedure 58, Final Judgment for the individual Defendants will be entered by separate order.

**DONE AND ORDERED** in Miami, Florida, this 4th day of September, 2024.

 

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**